Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

CASA NIDO PARTNERSHIP, a      )
California Partnership,        )
                              )
          Plaintiff,          )
                              )
  VS.                         )      **NO. C 20-07923 EMC**
                              )
CATHERINE O'HANKS, et al.,    )
                              )
          Defendants.         )
_____)

San Francisco, California
Thursday, January 20, 2022

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)

For Plaintiff:
                    GREENFIRE LAW, P.C.
                    2001 Addison Street - Suite 300
                    Berkeley, California  94704
                BY: **JESSICA A. TAYLOR, ATTORNEY AT LAW**

                    WATER and POWER LAW GROUP, P.C.
                    2140 Shattuck Avenue - Suite 801
                    Berkeley, California  94704
                BY: **PAUL S. KIBEL, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**<u>APPEARANCES:</u>**   **(cont'd, via videoconference)**

For Defendant Sentry Insurance Company:

                SELMAN BREITMAN LLP
                33 New Montgomery - Sixth Floor
                San Francisco, California  94105
        **BY:  SAM LIPSITZ, ATTORNEY AT LAW**

For Defendant Catherine O'Hanks:

                KELLER and HECKMAN LLP
                Three Embarcadero Center - Suite 1420
                San Francisco, California  94111
        **BY:  ROHIT A. SABNIS, ATTORNEY AT LAW**

                BASSI, EDLIN, HUIE and BLUM
                500 Washington Street - Suite 700
                San Francisco, California  94111
        **BY:  CHRISTOPHER J. DOW, ATTORNEY AT LAW**

1   **Thursday - January 20, 2022**                        **3:42 p.m.**

2                        **P R O C E E D I N G S**

3                            **---oOo---**

4        **THE CLERK:**  The Court is now calling the Casa Nido

5   Partnership versus Kwon, et al. case number 20-7923.

6        Counsel, please state your appearance for the record

7   beginning with Plaintiff.

8                    (Pause in the proceedings.)

9        **THE COURT:**  You are muted, Mr. Kibel.

10       **MR. KIBEL:**  My apologies.  Good afternoon, Your Honor,

11   Paul Kibel, co-counsel for the Plaintiff Casa Nido Partnership.

12   I'm here with my co-counsel Jessica Taylor.

13       **THE COURT:**  Thank you, Mr. Kibel and Ms. Taylor.

14       **MR. SABNIS:**  Good afternoon, Your Honor, Rohit Sabnis

15   for Defendant Catherine O'Hanks along with my co-counsel

16   Christopher Dow.  And I will be arguing on the motion to

17   dismiss.

18       **THE COURT:**  Thank you, Mr. Sabnis and Mr. Dow.

19       **MR. LIPSITZ:**  Good afternoon, Your Honor, this is Sam

20   Lipsitz on behalf of Defendant Sentry Insurance Company.

21       **THE COURT:**  Thank you, Mr. Lipsitz.

22       **MR. JACOBUS:**  Good afternoon, Your Honor, Alan Jacobus

23   on behalf of Defendant Ms. Garibotti.

24       **THE COURT:**  Thank you, Mr. Jacobs.

25       So to cut to the chase here, the DCE, Dry Cleaner

1    Endorsement, covers pollution liability and sets the occurrence

2    as when the injury or property damage first manifests itself.

3         And so, this is not one of those things where we just have

4    to construe occurrence in a general vacuum with no further

5    definition of the policy.

6         It seems like the critical question is what does

7    manifestation mean here.

8         And *Montrose* says that manifestation of damages is that

9    point in time when appreciable damage occurs and is or should

10   be known to the insured such that a reasonable insured would be

11   aware that his notification duty has been triggered EPA.

12        So that seems to me that is a reasonable person standard.

13   It is an objective standard.  It is one of discovery or should

14   have discovered, not necessarily when it occurred and not

15   necessarily confined to when it was actually discovered but

16   when it should have been discovered.

17        And that's a matter that seems to me could be a question

18   of fact.  And so, my initial take is that that's the applicable

19   standard.  There seems to be a question of fact here.

20        And, therefore, it's hard to resolve a question of fact on

21   a motion to dismiss.

22        So that's my simplified conclusion, but I will -- I will

23   let the parties comment on that.

24             **MR. KIBEL:**  Your Honor, this is Paul Kibel for the

25   Plaintiff Casa Nido.

1          I would simply like to highlight a couple principles of

2     California insurance law at the outset.  I think they are

3     highly relevant to resolving it; but, you know, the first is

4     that the relationship between insurance companies and insureds

5     is recognized in California as a fiduciary relationship.

6          It's not a standard contract with heightened duties of

7     transparency and fair dealing.

8          The second principle, as I believe you are aware, all

9     ambiguities in the insurance contracts are to be construed in

10    favor of the insured and what their understanding was.

11         But third, and I think of practical importance, is when

12    you look at Civil Code Section 1649, the ambiguity -- whether

13    or not there is an ambiguity is to be resolved at the time the

14    contract -- the insurance contract was entered into.

15         And in their briefing Sentry Insurance has focused on the

16    *Montrose* case.  We fundamentally disagree with their

17    interpretation of the *Montrose* case.  The *Montrose* case was

18    decided six to eight years after they entered into the policy.

19         So whatever clarification was provided, even though we

20    disagree with their take in *Montrose*, the question is back in

21    1987 to 1989 whether there was an ambiguity.

22         And I will simply highlight that the term "manifest" was

23    not defined at all in that policy.

24         So, pointing to a decision six to eight years later to

25    clarify does not seem consistent with 1649 of the Civil Code,

1    which focuses on at the time of the making of the contract.

2        And if you do look at that policy, the term "manifest" was

3    used in reference to the definition of occurrence.

4        And the definition of "occurrence" in the policy is

5    whether there was a discharge or release of pollutants, not

6    appreciable damage.

7        Two other quick points -- and I will try to be brief,

8    Your Honor -- these are just important distinctions in

9    California insurance law.

10       The first is this difference between occurrence based

11   coverage and claim based coverage.

12       Occurrence based coverage simply requires that the

13   occurrence occurred during the policy period.  It doesn't

14   matter when -- whether a claim is filed afterwards; whereas, a

15   claims based policy requires not only an occurrence but also

16   requires that the claim be filed during the period.

17       Occurrence based policies are broader and cost more.

18   Claims based policies are narrower and cost less.

19       It seems very clear from the language of the Sentry

20   policy, it's an occurrence based policy focused on the

21   discharge or release.

22       And we paid our clients, as well as Catherine O'Hanks,

23   paid a premium for occurrence based coverage.

24       The argument that is being advanced here is essentially to

25   use *Montrose*, decided six to eight years later, to refashion an

1  occurrence based policy as a claims based policy that they

2  needed to make a claim.

3       **THE COURT:**  Well, yeah, I don't take issue with your

4  characterization that this is occurrence based.  I don't think

5  we have to say that *Montrose* makes this a -- converts this to a

6  pure claims based because it says -- you know, you can file a

7  claim much later than when you should have known.  That's why

8  the "should have known" is kind of an important factor.

9       So it is a bit of misnomer.  But DCE says:  For purposes

10  of pollution liability occurrence is a date -- so it is clearly

11  about occurrence -- is a date upon which bodily injury or

12  property damage first manifests itself.

13       So, the manifestation does appear in the context of, you

14  know, defining what an occurrence is.

15       So it seems to me your better argument is that, Well, that

16  is ambiguous enough to say, well, first manifest could mean

17  just whenever the injury and the leakage happened, not just

18  when it should have been discovered.

19       **MR. KIBEL:**  I agree with you.

20       And I think the ambiguity is partially that the definition

21  of occurrence also refers to -- in the policy itself refers to

22  the release and discharge of pollutants as the occurrence.

23       So you have sort of complex, confusing, unclear

24  definitions of occurrence.

25       But, Your Honor, just for one moment I wanted to offer a

slight modification of what we believe the *Montrose* case said.

In discussing that manifestation theory, the *Montrose* case was discussing that in the context of first-party coverage, coverage by an insured made directly to the carrier for injuries suffered by the insured.

In *Montrose* the Court then went on to discuss whether the manifestation theory was appropriate for third-party claims.

And it forcefully and explicitly held no.  It held that the manifestation theory should not be used in the context of third-party claims.

And I think there is a clear reason for this in that when an insured is facing a third-party claim, as my clients, Casa Nido, did by the claim by Catherine O'Hanks, they need to legally defend against that third-party claim in a way that you don't with a first-party claim.

So it goes to the insurance carrier's legal obligation to defend, not just indemnify.

So, what we would like to clarify is that I don't believe *Montrose* stands for an embrace of the manifestation theory in the third-party claim context.

I think, in fact, when you read that case carefully, they explain that to embrace that theory in the third-party context would, in fact, on a functional level cause an occurrence based policy to be transformed into a claims based policy.  And they, therefore, rejected it.

1       So I think on that basis alone, just following *Montrose*,

2   *Montrose* has specifically looked at the manifestation theory in

3   third-party claim context and has rejected it.

4       And so I think to the extent *Montrose* is relevant, that

5   holding should be determinative.

6       And to the extent that they want to now -- that Sentry

7   Insurance is suggesting that that interpretation that they have

8   suggested should be used to clarify what the understanding was

9   in 1987 and 1989, I don't think that's allowed under Section

10  1649 of the Civil Code.

11      Because it is the understanding of the parties at the time

12  they entered into the contract, not six or eight years later.

13      **THE COURT:**  And, I guess, part of your argument would

14  be with respect to the distinction between third party and

15  first party is that, what do you do with the third-party

16  coverage if there is no -- nothing to defend; there is no suit?

17      I mean, is that part of the argument that they -- even if

18  you should have known of a problem, there was no -- no action

19  to defend because nobody has been sued yet?

20      **MR. KIBEL:**  I think that's correct; you don't know.

21  But also, I guess that in terms of dealing with third-party

22  claims, the *Montrose* court specifically rejected this

23  manifestation theory in favor of what it called the continuous

24  trigger theory, which was that so long as the discharge of the

25  pollutants or the release began during the policy period, the

 1   fact that it continued later or that the full extent of that

 2   injury wasn't known until later shouldn't be a basis for

 3   denying coverage in the third-party claim context.

 4       And I think it is noteworthy that Sentry Insurance

 5   completely ignored the distinction between first-party and

 6   third-party coverage in its analysis of *Montrose*, which we feel

 7   relates to our bad faith claim that the failure to really focus

 8   on that actually amounted to a misrepresentation of what

 9   *Montrose* held.

10       **THE COURT:**  What about the word "manifestation,"

11   though; does that change things?

12       **MR. KIBEL:**  It is a fair question.

13       And I would say no.  I would say no, because the

14   manifestation holding in *Montrose* related to first-party

15   coverage.

16       And this is not a first-party coverage case.  This is a

17   third-party coverage case.  And *Montrose* specifically rejected

18   the manifestation theory as it applied to third-party claims.

19       **THE COURT:**  All right.  Let me hear the response that,

20   number one, we should look at whether or not there is an

21   ambiguity at the time that the policy was made and, therefore,

22   ambiguities should be resolved in favor of the insured.

23       And, two, *Montrose* -- this distinction between third-party

24   and first-party and that under a third-party claim that the

25   continuous trigger theory, not the discovery theory, should

1   apply.

2   　　　　MR. SABNIS:  Your Honor, before the response, could I

3   just add to something that Mr. Kibel said?

4   　　　I agree essentially with everything he has indicated so

5   far.  Just to put a little more information out there on the

6   *Montrose* case and the holding and the definition of

7   manifestation, that comes out of the *Prudential* case which then

8   the *Montrose* case analyzes, that is -- it was adopted, as

9   Mr. Kibel said, in the context of first-party insurance.

10   　　　And specifically it involved disputes among insurers who

11   had issued successive first-party policies to an insured and a

12   determination of allocation of the obligation to indemnify

13   amongst those insurers.

14   　　　So that rule and that definition of manifestation comes

15   out of those cases and in particular tries to define when an

16   occurrence occurs in that specific situation.  We don't have

17   that situation here.

18   　　　And that's all I wanted to add, Your Honor.  Thank you.

19   　　　　THE COURT:  Okay.  Thank you.  All right.  Who is

20   going to respond to the --

21   　　　　MR. LIPSITZ:  I will, Your Honor.

22   　　　　THE COURT:  All right.

23   　　　　MR. LIPSITZ:  As you see, there were many points made

24   there.  I will do my best to try to track them.

25   　　　I believe the first issue that was raised was ambiguity,

1  and I think we know that -- in insurance coverage cases such as

2  this, that tends to be a catchall that is thrown in.

3      And in both briefs that is the case here.  Neither party

4  cites to a single case where there is any authority stating

5  that the term "manifest" or "manifestation" creates any

6  ambiguity.

7      The ambiguity argument is simply being thrown in because

8  the parties disagree with the interpretation in the application

9  that it has to the facts of this case.

10      And I think more importantly, one issue that is being

11  raised by all parties opposing Sentry is there is a blatant

12  conflation between the argument that Sentry is making and the

13  overall holding in *Montrose*.

14      As Your Honor accurately restated the definition of

15  "manifestation" that is put forth in *Montrose*, that's the main

16  purpose that Sentry cites to *Montrose*.

17      Sentry has explicitly made clear in its briefing that the

18  overall holding of *Montrose* is not what we are stating is

19  applicable to the facts of this case.

20      And, in fact, *Montrose* spends considerable time

21  differentiating between standard occurrence based policies and

22  policies that have differing language.

23      Sentry has made clear in its briefing that the business

24  owner's liability coverage provides that standard occurrence

25  based forum.

1     However, the Dry Cleaners Endorsement -- or the DCE, as

2  Your Honor has referred to it -- explicitly offers different

3  coverage.

4     Sentry is not arguing any type of trigger or manifestation

5  of trigger -- manifestation trigger that the parties point to

6  as being cited in *Montrose*.

7     The policy itself -- specifically the DCE itself --

8  provides a manifestation trigger under the definition of

9  occurrence.

10    That's wholly different than Sentry trying to jam a square

11 peg in a round hole or argue that this scenario requires a

12 specific approach.

13    The policy -- the DCE is explicit that "manifestation" is

14 the basis for how occurrence is defined.

15    And in this case, manifestation -- whether they want to

16 argue it is ambiguous or it just has a plain definition -- they

17 are -- the only time any property damage, quote-unquote,

18 manifested itself was when every single party to the suit

19 became aware of it when it was discovered in 2016.

20        **THE COURT:**  Well, that sort of begs the question.  I

21 mean, the policy doesn't actually define "manifest," does it?

22        **MR. LIPSITZ:**  No.  You are correct, Your Honor.

23        **THE COURT:**  And one could -- there is an English

24 reading of this that says "manifests" means -- when

25 something -- you know, it actually occurs.  There are some

1    things that are sort of latent, and there is no way -- you

2    know, maybe it is done at a certain level or it can't be

3    evident; but when there is some leakage or spillage, you know,

4    one could argue that manifest doesn't mean -- manifested means

5    apparent from somebody to the outside.  But it is just

6    discoverable at that point.  It is something that could be

7    seen; could be measured; could be, you know, detected.

8            **MR. LIPSITZ:**  I suppose that's true.  I'm --

9            **THE COURT:**  Go ahead.

10           **MR. LIPSITZ:**  Sorry, Your Honor.  I was just saying I

11   suppose that is true in a general theory sense.

12       But in the specific facts and pleadings that we have here

13   in this case, I don't believe that is true.  And Sentry doesn't

14   believe that is true because we have essentially got this,

15   circuitous catch-22 that the parties are arguing.

16       I mean, Plaintiff Casa Nido says that contamination and

17   property damage wasn't discovered until 2016.

18       At the same time they argued that Ms. O'Hanks knew about

19   this damage even though she had no reason to be aware of it;

20   there was no evidence of it back in 1960 to 1992.

21       And then in Ms. Hank's pleadings and in her responsive

22   pleadings she formally denies she had any knowledge or any

23   reason to believe that any contamination or any property damage

24   occurred.

25       Yet, they all want to claim that property damage

1   manifested itself in the three-year period in which Sentry's

2   policy was effective.

3       It just seems like everyone is saying that, you know, we

4   didn't know about it until now but because Sentry issued a

5   policy 26 years ago, they should be on the hook for that.

6       And that just doesn't seem to comply with the case

7   authority that is from the highest court in the state.

8       **THE COURT:**  So what about the distinction between

9   first and third party; that it is fairer to define coverage

10  when the thing actually occurs or there is a leakage when it

11  becomes manifest, in terms of it being detectable --

12  potentially detectable, as opposed to reasonably could have

13  been discovered because in a third-party situation, normally,

14  you know, an insurance policy is not invoked until there has

15  been some action, some threat of a suit or a suit.

16      Whereas, first-party, you know, if something happened --

17  whether it is a fire or some other damage -- you know, you as

18  the first-party insured, have the full ability -- it is not

19  outside your control.  The circumstances are all within your

20  control to discover it, to report it, et cetera, et cetera.

21  But when you are a third party, you are sort of at the mercy of

22  something happening by others.

23      **MR. LIPSITZ:**  Yes, Your Honor.

24      And, I mean, as the Court is aware, there is a healthy

25  breadth of case authority in this state on first and third

party differences.

But even *Montrose* itself cites to prior Supreme Court authority in *Garvey*, which states that this -- *Montrose* neither holds nor suggests that all legal principles in first-party cases are inapplicable to third-party cases.

I mean, in this instance *Montrose* provides a definition of "manifestation."  That's merely the point that is being raised to provide context for policy language that is applicable here.

And as for Ms. O'Hanks not being put on notice potentially because this is a third-party context, I think that even goes more to the fact that the alleged property damage could not have manifested until 2016 because at no point had any party in the chain of ownership been alleged to had reason to know that contamination or property damage was occurring.

There was no reason, as the pleadings allege, that anyone had knowledge of it until it was brought to Plaintiff's attention four years ago or six years ago now.

THE COURT:  Well, if you use the "could have known" language, you know, I -- you could see an argument that, Well, if you are in the business, it doesn't take much to figure out if you have got a cleaners -- dry cleaners, that there is a good likelihood of PCEs having been leaked out and that sort of thing.

So, I mean, if you wanted to do a Phase II study, you could have done one back then.  Probably should have, you know.

1          It kind of opens the door.  I mean, if one were to adopt

2     the "could have" -- "should have known," that becomes more of a

3     fact question, seems to me, which is where I started.

4          Of course, your opponents are saying it shouldn't even go

5     there.  I should just say -- construe this to mean when it

6     occurred essentially -- when the leakage occurred.

7          **MR. LIPSITZ:**  I mean, Your Honor, here at the pleading

8     stage, there is simply no allegation that the insured,

9     Ms. O'Hanks knew or should have known of appreciable damage

10    occurring during the policy period or at the time she was in

11    possession of the dry-cleaning operation on the property.

12         The allegation is that simply it occurred.  And if that is

13    the case, that it occurred, the policy includes a very

14    straightforward and absolute pollution exclusion.

15         And no one argues -- no one is arguing in briefing that

16    that doesn't apply.  It is simply whether or not the

17    allegations of such to trigger the manifestation approach as it

18    is defined under the -- in the DCE.  And there are no

19    allegations in Sentry's opinion that rise to that level.

20         **MR. KIBEL:**  Your Honor, may I respond?

21         **THE COURT:**  Yeah.  Briefly.

22         **MR. KIBEL:**  Briefly.  I disagree with Mr. Lipsitz that

23    there are no allegations.

24         The complaint specifically alleges that there were

25    malfunctions in the equipment during the policy period that

1  related -- that resulted in the releases of pollutants, and

2  these were releases that would have occurred while Ms. O'Hanks

3  was the operator.

4      So I think there are allegations that there was releases

5  and discharges during the period that would have been clearly

6  observable by the operator; so I think his contention that

7  there is no statements there.

8      The last thing I will mention is that he -- opposing

9  Counsel states that it is clear that the policy adopts the

10  manifestation theory.

11      I respectfully disagree.  I think it is clear because they

12  are importing -- I think actually misconstruing language from

13  six to eight years later in *Montrose* into interpreting the

14  policy.

15      The language of the policy itself speaks of an occurrence

16  as relating to the discharge or release of pollutants.

17      **THE COURT:**  Well, but the DCE also uses the term

18  "manifest."  We know that.

19      **MR. KIBEL:**  I agree.  But that in itself -- you have

20  the definition of "occurrence;" that is, the discharge or

21  release of pollutants.

22      You have an explanation of the word "manifest" that is

23  tied to occurrence.  And we didn't draft that language.

24      That conflicting, ambiguous language was drafted by

25  Sentry, and it was drafted by Sentry years before *Montrose* was

1    decided.

2        So I guess I would just simply conclude by stating that

3    you need to look at this from the reasonable expectations -- I

4    would ask that you look at it -- of the insured entering into a

5    dry-cleaning endorsement policy about pollutants about the

6    discharge and release of pollutants.

7        And I think -- I agree there is some circular reasoning

8    going on here, but it is essentially going in a time machine

9    into *Montrose* and trying to import, I think, a misconstruction

10   of that holding into the understanding of the parties at the

11   time they entered into it.

12       **THE COURT:**  What paragraph has the thing about

13   Ms. O'Hanks knowing about the release -- the malfunction, the

14   release of the PCEs?  Do you know where --

15       **MR. SABNIS:**  I do have those, Your Honor.

16       **THE COURT:**  What paragraph is that?

17       **MR. SABNIS:**  I believe it is 511, 13 through 16 and

18   32.  I know that is more than one paragraph.  That may be more

19   than actually encompasses the allegations that you are

20   specifically referring to.  And that was actually in Docket

21   Number 38.

22                    (Pause in proceedings.)

23       **THE COURT:**  Which is the paragraph that actually has

24   about the malfunction and the release?  Is that 16?

25       **MS. TAYLOR:**  Your Honor, if you are in the second

```
1   amended complaint, which is document 88, I believe it is in
2   paragraph 18.
3            THE COURT:  All right.  Let me make sure I got it.
4   And this is document 38; right?
5            MS. TAYLOR:  I'm in document 88, which is the second
6   amended complaint.  We can go -- I think 38 may be the first
7   amended complaint, if I'm not mistaken.
8            THE COURT:  All right.  Document 88 and paragraph --
9   which one?
10           MS. TAYLOR:  Taylor 18.
11           MR. SABNIS:  Your Honor, can I respond to something?
12           MS. TAYLOR:  And 19 as well.
13           THE COURT:  Okay.  Wait a minute.
14                    (Pause in proceedings.)
15           THE COURT:  All right.  Thank you.  There was a
16   comment.  Someone wanted to make a comment?
17           MR. SABNIS:  Yes, Your Honor.  I was just wondering if
18   I can briefly respond to two things that were added there.
19           THE COURT:  Yes.
20           MR. SABNIS:  I mean, Ms. O'Hanks argues that these
21   allegations purportedly infer that she should have known of the
22   damage.
23        I mean, that's argued in their briefing.  Those
24   allegations and inference fall short of California's standard
25   of evaluating and determining whether a duty to defend exists
```

1    under a policy; i.e., comparing the complaint allegations with

2    the policy.

3          They are instead requesting that inference be made to

4    create that coverage, and Sentry doesn't believe that that is

5    appropriate.

6          And in the terms of the overall policy construction here

7    and the DCE, I think it is important to note that the DCE

8    provides limited coverage for pollution under the -- under the

9    endorsement.

10         I mean, the occurrence based form explicitly excludes

11   pollution liability.  This was a buyback of minimal coverage.

12         It was manifested -- to the extent manifestation is

13   utilized in that endorsement, that was a term that was agreed

14   upon by the parties, and Ms. O'Hanks paid a premium for that

15   limited coverage.

16         Now, essentially the parties are trying to hold Sentry

17   hostage and give this limited coverage no effect whatsoever and

18   to have it just be a blanket assertion coverage at any point in

19   time, regardless of when it manifested and that's all I have

20   got, Your Honor.

21         **THE COURT:**  All right.  I'm ready to rule.

22         I'm going to deny the motion to dismiss.  There are two

23   potential interpretations of the policy here.

24         One is to adopt the manifestation objective test that is

25   set forth in *Montrose*.  Arguably, maybe that was for first

1  party, not third party.

2       But nonetheless, it is a "should have known -- "knew or

3  should have known" standard.

4       And if it is a "should have known" standard, paragraphs --

5  the second amended complaint have enough information here to

6  suggest that there is at least a factual issue of when that

7  should have known been.

8       And, therefore, even within that definition, there is a --

9  at least for 12(b)6 purposes, a claim stated.

10      The other, of course, interpretation is the one that the

11  insureds are advocating; and that is, you know, drawing all

12  inferences and ambiguities in their favor; that "manifest" is

13  not a discovery triggered mechanism but one where the actual

14  release and -- is the manifestation.

15      And, perhaps, "manifestation" in that context could mean

16  something like detectable in which case you are at the same

17  place.

18      Either way, there is enough here to at least state a

19  claim.  I'm not saying that that's going to be -- you know,

20  there may be some issues.  Obviously that's not the end of the

21  case.

22      So I don't have to decide at this juncture exactly which

23  definition.  I think under either of those two definitions the

24  complaint survives at this point.

25      So I don't mean to kick the can down the road, but I'm

 1   only going to kick it as far as I need to; and that's as far as

 2   it needs to be kicked.

 3       So, on that basis I'm going to deny the motion to dismiss.

 4   Do we have a status conference in this matter?

 5           **MS. TAYLOR:**  We do, Your Honor.

 6           **MR. JACOBUS:**  We do, Your Honor.  I believe, document

 7   90 is the parties' operative case management statement.

 8           **THE COURT:**  Right.  All right.  So, the question is

 9   where do we go from here?

10       And my first question always is one of whether there is a

11   potential value in an ADR process here.

12       And seeing that Casa Nido is interested in an early

13   mediation; O'Hanks is interested; Insurance is not willing to

14   mediate within 60 days but wants to see what the ruling is,

15   which I have just given you -- the question is -- I would like

16   to see this go to mediation sooner rather than later.

17       On the other hand, I can bring that horse to water; but I

18   can't force that horse to drink.

19       So let me ask:  Now that I have ruled, what -- what are

20   the parties' interest in terms of going to ADR?  I assume it is

21   mediation that you are interested in.

22           **MS. TAYLOR:**  Yes, Your Honor, this is --

23           **THE COURT:**  Ms. Taylor?

24           **MS. TAYLOR:**  Plaintiffs are still interested in

25   mediation.  I think that earlier on in this case Casa Nido and

```
 1   Ms. O'Hanks had talked about trying to do an early mediation

 2   because additional parties had been brought in.

 3        That idea has been slowed and halted a bit.  I know that

 4   Ms. Garibotti has expressed an intention to file an early

 5   motion for summary judgment, and -- I won't speak for

 6   Ms. Garibotti's Counsel -- but it is my understanding that she

 7   was uninterested in mediation prior to that.

 8        And Sentry has made similar statements to us about

 9   potential early mediation, but Casa Nido is still very

10   interested in a mediation of this case.

11        THE COURT:  All right.  Let me first hear from Sentry.

12   What is your view at this point?

13        MR. LIPSITZ:  Yes, Your Honor.

14        Sentry would always be open to a potential mediation or

15   ADR proceeding; but in light of the Court's ruling today, we

16   believe that some discovery would likely be necessary and may

17   consider bringing in some other carriers because the parties

18   initial disclosures and the joint case statement identify other

19   carriers that could potentially be involved in this case.

20        And to potentially mediate with only Sentry at the table

21   seems to do nothing.  But if we are able to reach a resolution;

22   create more work for Sentry on the back-end.

23        And we think it is reasonable to the extent other carriers

24   are potentially implicated by these allegations, they should

25   also be at the table during mediation.
```

 1          **MR. SABNIS:**  Let me give just a little bit of a

 2     response there.

 3          There are other carriers that issued policies, and they

 4     are defending under a reservation of rights.  So, I think they

 5     would be involved at this point.

 6          **THE COURT:**  Are they already in the case then?

 7          **MR. SABNIS:**  They are not named as parties in the

 8     case, but they are providing Ms. O'Hanks with a defense and

 9     potential indemnity.

10          **THE COURT:**  So they would be at the table, in other

11     words?

12          **MR. SABNIS:**  They would be at the table.

13          **THE COURT:**  Do any more need to be named or brought

14     into this case than what you have got so far?

15          **MR. SABNIS:**  Your Honor, we are still looking at if

16     there are potential additional policies that may be applicable.

17          Given the years of coverage, it has not been an easy

18     process.  It is an ongoing process.  So we continue in that.

19          So there is a potential in that, I think.  I can't say

20     with certainty at this point, though, whether there would be

21     any more coming to the table.

22          **THE COURT:**  So how long would it take to know who is

23     going to be at this table before it makes sense to -- I mean,

24     you could go on forever trying to look for the last carrier.

25          On the other hand, at some point, you know, it makes sense

1  to try to see what can be done.

2      What would be your sense of what would be a good time --

3  target date to try to get to mediation?

4          MR. SABNIS:  We have been in touch with one additional

5  carrier who is still doing a policy search.

6      They are continuing to do that, and we are planning to do

7  some further investigation potentially with an insurance

8  archeologist.

9      So I would say that process to play out -- probably going

10 to be -- you know, to the extent we can find documents and get

11 people on those policies, I would say at least 60 days,

12 probably 90, to let that play out.

13          THE COURT:  Okay.  And what about Ms. Garibotti?

14          MR. JACOBUS:  Your Honor, there's two considerations

15 here.

16     One is the expense of mediation.  Ms. Garibotti is 80

17 years old.  She is uninsured for this claim.

18     Even if we mediated it, I'm not sure we could do much to

19 even peak anyone's interest in terms of what we would be able

20 to do to offer to settle the case.

21     The second is that, as we indicated in our motion to

22 dismiss and in our anticipated motion for summary judgment,

23 Ms. Garibotti was a beneficiary of a trust that was associated

24 with this property a long time ago.  The trust was created in

25 the '50s when, I believe, she was 40 years old.

1      And so we believe that based on her status as a

2   beneficiary, not as a trustee, that we have a path for a motion

3   for summary judgment that may well be cheaper than trying to

4   mediate the case.

5      I understand that Casa Nido has some arguments that a

6   beneficiary can still be responsible.  We don't think that

7   those are going to stand up ultimately.

8      I did have a conversation with Casa Nido's Counsel

9   yesterday about trying to narrow some of the issues.

10      It may be that if the issues are narrowed and the parties'

11   expectation are correct as to what Ms. Garibotti can do or

12   likely what she can't do, it might be something that we would

13   explore; but I think that would depend in certain respects on

14   further conversations with the other parties and what they

15   would expect out of Ms. Garibotti given her circumstances.

16         **MS. TAYLOR:**  And just to chime in, if I may for a

17   moment --

18         **THE COURT:**  Yeah.

19         **MS. TAYLOR:**  -- about the conversations that I had

20   with Ms. Garibotti's Counsel yesterday, we are in the process

21   of trying to identify some additional trust documents that may

22   be informative here.

23      Mr. Jacobs and I are meeting and conferring about some

24   discovery that Casa Nido has already propounded on

25   Ms. Garibotti.

 1      And we hope to find additional documentation and

 2   additional information, maybe even insurance policies, if that

 3   process continues.

 4      **THE COURT:**  Well, I hope you will exhaust those

 5   meet-and-confer issues before any motions work is done because

 6   that is more water under the bridge, seems to me, that we can

 7   avoid.

 8      **MS. TAYLOR:**  We certainly will, yes.

 9      **THE COURT:**  And I also think that, you know, once you

10   get that, the parties will have a better sense of what role

11   Ms. Garibotti may or may not have in terms of the roundtable we

12   are talking about.

13      It seems to me that we ought to try to figure out a

14   timeframe and how to get there and not let litigation expenses

15   continue to incur.

16      How much is involved here?  What were -- how much was the

17   cleanup costs?

18      **MR. KIBEL:**  I will take a shot at this.  So far there

19   has been in the neighborhood of maybe $1.1 million spent

20   cleanup and some uncertainty as to the future amount that will

21   be required by the regulatory agencies, but I would probably

22   put it somewhere in the 1 to $2 million range if we are talking

23   in terms of hard remedial costs.

24      **THE COURT:**  Right.

25      **MR. KIBEL:**  That is separate from legal defense costs

1    just given that we are dealing with the obligation to defend

2    regarding Sentry.

3        So there's some legal defense issues that are important,

4    and I don't think we have those quantified yet; but we believe

5    there is a duty to defend that has been breached.

6        **THE COURT:**  All right.  Well, you know, I mean, it is

7    important to know because -- all the more reason why I think

8    that we ought to figure out a way to get to ADR sooner rather

9    than later because last thing we want to do is have the legal

10   bills outstrip what is at issue.

11       Especially when you have got so many parties, it makes

12   sense to try to see what can be worked out sooner rather than

13   later.

14       I take it the venue for ADR would be private mediation.

15   Is that what the parties are thinking about as opposed to some

16   other form?

17       **MS. TAYLOR:**  I think that's what was initially

18   discussed.  We are open to discussing other options as well,

19   but none have been brought up so far that I'm aware of.

20       **THE COURT:**  All right.  So nobody has taken a step of

21   actually starting to try to identify who the mediator might be?

22       **MS. TAYLOR:**  Not at this time, Your Honor, no.

23       **THE COURT:**  Why don't we do this:  I would like the

24   parties to meet and confer.  There are so many different issues

25   here in terms of gathering the potential insurers; making sure

1    they are maximized at the table; figuring out the situation of

2    Ms. Garibotti.

3         I think within the next 60 to 90 days you will have a

4    better sense of, you know, who is at the table, who is not at

5    the table, what you can do.

6         And then at that point I would like for you to come up and

7    present a plan of mediation, maybe thereafter, within the next

8    60 days or something.  And if you need any kind of documents or

9    anything, you know, to prepare for mediation -- I'm not sure

10   what more you need, but -- well, let me ask.

11        What kind of formal discovery would the parties need to

12   prepare for mediation?

13             **MR. DOW:**  Your Honor, this is Chris Dow for Catherine

14   O'Hanks.

15             **THE COURT:**  Yeah.

16             **MR. DOW:**  I'm actually looking at a list of documents

17   we would need in order to proceed with mediation, and these are

18   all relative to documents relating to the costs of Plaintiff's

19   cleanup.

20             **THE COURT:**  Yeah.

21             **MR. DOW:**  You know, in order to really know how much

22   was spent and also how much Plaintiff can recover.

23        I think there may be an issue down the road where we find

24   that, you know, Plaintiff may well be out of luck given how the

25   cleanup was conducted in terms of past costs.  And that is

1  another reason to get this into mediation.

2      And also, to comment on Counsel for Ms. Garibotti's point,

3  it is clear, at least outside the Ninth Circuit, that a

4  beneficiary of a trust that owns contaminated property is an

5  owner under CERCLA like any other.

6      Now, California hasn't expressly so ruled yet.  But my

7  understanding of the structure of trusts and estate law in

8  California and other states that have so found that a

9  beneficiary is an owner under CERCLA, that California law jives

10  with those decisions.

11      So there is not surety here how the Court would rule; but

12  based on Ms. O'Hanks research, we think it is pretty evident

13  that Ms. Garibotti will remain in this case; and we would think

14  that a motion for summary judgment on that issue would be

15  successful.

16      On the other hand, in terms of Plaintiff, we think if

17  there are arguments that Plaintiff would be out of luck trying

18  to recoup its past costs -- and this is because the cleanup was

19  not conducted under the auspices of DTSC, as it should have

20  been and certain rules were not complied with.

21      And just as important as a company's liability under

22  CERCLA is how the cleanup was conducted, and there are very

23  strict rules that must be followed.

24      And we are not talking about in this instance whether

25  Plaintiff followed the rule or not in an interpretive sense.

1          We are talking about basic things that just were not done

2     that the regulations require.

3          And for this reason, Your Honor, we need to get this case

4     into ADR or mediation because --

5          **THE COURT:**  All right.  So, all right.  What I want to

6     know to cut to the chase because it is now 4:30, I just want to

7     know:  Do you need -- beyond documentation production, do you

8     need any other kind of formal discovery to get to mediation?

9          **MR. DOW:**  I would say yes, Your Honor.

10         **THE COURT:**  You need depositions?

11         **MR. DOW:**  We definitely need document discovery.

12         **THE COURT:**  Yeah.

13         **MR. DOW:**  I don't know that we will need depositions.

14         **THE COURT:**  Well, that was my question.  I'm saying in

15    addition to document discovery, do you need anything else just

16    to get to mediation?

17         **MR. DOW:**  Your Honor, would you allow us a period of

18    time to figure out that question for you and get back?

19         **THE COURT:**  Yeah.

20         All right.  Let's do this:  I'm going to allow discovery

21    to proceed in terms of, you know, document exchange because I

22    want to get that moving.  I don't want that to hang up the time

23    of mediation.

24         I'm going to have you-all come back here in, let's say, 75

25    days.  At that point I also want you to come back with a

1  mediation plan and tell me what that plan is in terms of timing

2  and who it is going to be.

3      And hopefully by that time you will also know who is in

4  the case, who is not in the case, and what more discovery you

5  need.

6      I just firmly want to get this on the mediation track.  In

7  the back of my mind I'm looking at mediation within the next

8  five months, something like that, not a year from now.

9      So let's -- Vicky, let's set a status conference date 75

10  days would be about ten -- so weeks out -- 10 to 11 weeks out.

11          **THE CLERK:**  That will be in April.  Let's see what we

12  have.

13          **MR. DOW:**  Your Honor, may I introduce one more issue?

14          **THE COURT:**  Let me get this date first.

15          **MR. DOW:**  Okay, thank you.

16          **THE CLERK:**  April 12th at 2:30, Your Honor.

17          **THE COURT:**  April 12th at 2:30.

18          **MR. JACOBUS:**  Your Honor, I'm scheduled to be in a

19  jury trial that week.

20          **THE COURT:**  Okay, the week after then?

21          **MR. JACOBUS:**  It is three weeks.  Can we do it the

22  week of the 25th, please?

23          **THE CLERK:**  April 26th.

24          **THE COURT:**  Twenty-sixth at 2:30 at which point I want

25  to see your discovery -- you know, find out about any further

```
 1   discovery, so any discovery plan beyond the documents, if any,

 2   and your mediation plan.

 3       And I will call it a gathering of players.  I hope that

 4   will be in place by then so that the next step would be setting

 5   the mediation.  And my expectations would be that after that

 6   mediation would occur within 60 to 90 days.

 7       MS. TAYLOR:  Your Honor, on the topic of discovery, I

 8   know you asked Mr. Dow what other discovery O'Hanks would need,

 9   and he was unsure about whether he would need depositions or

10   not.

11       We do anticipate needing at least the deposition of

12   Ms. O'Hanks, potentially others.

13       So I know that may be part of the discovery plan we

14   propose to you.  I think it is important that we do note it

15   here; that we do intend to take at least a couple of

16   depositions.

17       THE COURT:  All right.  I would like to see if you can

18   work that out -- see if you can work out a stipulation.  Again,

19   I'm trying to keep a lid on costs.  If you take a deposition,

20   make sure it is something that you really, really need.

21       So let's do that.  My focus right now -- especially this

22   case given all the complexities and everything else -- is to

23   get this to an ADR process as quickly as possible.

24       So, we have got to take a few steps, but we will reconvene

25   on the 25th of April to discuss any further discovery, the
```

1  mediation plan, which will include the collection of all the

2  interests and players that need to be at that table.  Hopefully

3  that will be clarified by that point.

4          MR. JACOBUS:  Your Honor, is it April 25 or 26?

5          THE COURT:  I'm sorry, 26th.  Can't read my own

6  writing here.

7          MR. LIPSITZ:  Your Honor, can I mention one thing?

8          THE COURT:  Yeah.

9          MR. LIPSITZ:  I just wanted to bring this to the

10  Court's attention because it was in our statement; and so I

11  don't want it to sound like it comes out of the blue later if

12  we bring it up.

13      Sentry is still considering dispositive motions to summary

14  judgment.  And I know we had mentioned potential bifurcation of

15  the coverage and bad faith issues.

16      I just wanted that to be on the Court's radar.  We are

17  cognizant of the Court's docket these days with everything that

18  is transpiring and probably the likely intent to resolve

19  matters on one case.

20      But I just wanted that to be on the Court's radar since

21  there's obviously some complex environmental issues here and

22  coverage issues that would be separate.

23          THE COURT:  All right.  Well, I appreciate that.  But

24  I'm not going to allow any summary judgment motions yet.

25      I want to see if we can get at least past this round, so

1    we can see what is coming.  It sounds like there may be some

2    fireworks if it doesn't resolve.

3          **MR. DOW:**  Your Honor, I just wanted to also mention

4    that Ms. O'Hanks received a request for information from the

5    Department of Toxic Substances Control, which we will answer in

6    a few days.

7          So I just wanted to -- and my understanding from the

8    Department is that we are not the only party in this case that

9    received this letter.

10         That being the case, even if a party in this litigation

11   managed to get out of it, DTSC -- I mean, this is all a prelude

12   to DTSC ordering all the parties to do something.  This is

13   another reason to get this into mediation, as you want to.

14         **THE COURT:**  Well, and I have seen these cases where

15   knowing there is some uncertainty in the future but part of the

16   mediation process is to figure out the allocation of those

17   risks as well.

18         So, yeah -- no.  It is complicated.  As I understand it,

19   everything is -- could be a moving target here.

20         **MS. TAYLOR:**  Your Honor, I'm sorry to prolong this

21   anymore.  There is just one other item that was noted in our

22   joint case management statement as well.

23         I think everyone has provided their initial disclosures to

24   date except for Mr. Kwon.  I have requested his initial

25   disclosures from him.  Casa Nido has also served discovery on

1    him, but he hasn't responded.

2         I know Mr. Kwon is unrepresented, but we are reaching a

3    risk of where, you know, motion practice may have to come into

4    play to get discovery responses; and it is another opportunity

5    where costs may be driven up.

6         So I just wanted to bring that to the Court's attention.

7              THE COURT:  All right.  So, Mr. Kwon, it sounds like

8    there have been requests for documents.  If you are in the

9    case, you do have to respond to it.

10        And I don't know whether you have tried to find somebody

11   to help you or talked with our help desk, the self help -- the

12   pro se help desk, but you do have to respond to requests one

13   way or another.

14             MR. KWON:  Okay.

15             THE COURT:  So -- and if you don't, there could be --

16   you know, the other side would bring a motion to force you to

17   produce the documents, and then you could be liable for fees

18   and all sorts of stuff.

19        So, you know, I should forewarn you that you need to pay

20   attention to the documents and any requests.  And we do have

21   a -- I think I may have mentioned this before -- we have a

22   manual for people who don't have lawyers that is on our website

23   that can answer some questions, and we do have a pro bono help

24   desk with lawyers to give advice and maybe assist people like

25   yourself who don't have a lawyer.

1      So you might want to give them a call or e-mail them.

2          **MR. SABNIS:**  Your Honor, just so the Court is aware

3  and also so Mr. Kwon is aware too -- somebody can correct me if

4  I'm wrong -- but I don't believe he has filed any responsive

5  pleading to date.

6          **THE COURT:**  Okay.  And he has been served and all of

7  that?

8          **MR. SABNIS:**  Yes, Your Honor.

9          **MS. TAYLOR:**  Yes, Your Honor.

10         **THE COURT:**  You also have to respond to the complaint.

11 And the rules set forth what you can do in response, but you do

12 have to respond.  You can't just let things sit.

13     So, again, I would recommend those resources to you; but

14 ultimately it is your responsibility to respond.  So, we will

15 see everybody in April.  All right.  Thank you.

16         **MR. KIBEL:**  Thank you, Your Honor.

17         **MS. TAYLOR:**  Thank you, Your Honor.

18         **MR. SABNIS:**  Thank you, Your Honor.

19             (Proceedings adjourned at 4:36 p.m.)

20                      ---oOo---

21

22

23

24

25

## CERTIFICATE OF REPORTER

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Monday, February 7, 2022



_Marla Knox_
_____

    Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
  United States District Court - Official Reporter