1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    CASA NIDO PARTNERSHIP,                    Case No.  20-cv-07923-EMC

8                      Plaintiff,

9           v.                                 ORDER GRANTING IN PART AND
                                               DENYING IN PART CASA NIDO'S
10   JAE KWON, et al.,                         MOTION FOR PARTIAL SUMMARY
                                               JUDGMENT, AND GRANTING IN
11                     Defendants.             PART AND DENYING IN PART
                                               SENTRY'S CROSS-MOTION FOR
                                               SUMMARY JUDGMENT
12
                                               Docket Nos. 148, 157
13

14

15                        I.        INTRODUCTION

16          This is an environmental cleanup case brought by Plaintiff Casa Nido Partnership ("Casa

17   Nido") against several defendants, including Defendants Catherine O'Hanks ("O'Hanks") and

18   Sentry Insurance Company ("Sentry").  Casa Nido is the owner of the building in which O'Hanks

19   operated a dry-cleaning business from 1960 to 1992.  *See* Docket No. 147 ("TAC").  Sentry issued

20   an insurance policy to O'Hanks with Casa Nido listed as an "Additional Insured."  *Id.*  Casa Nido

21   alleges O'Hanks, while operating the facility, released Tetrachloroethylene ("PCE") onto the floor

22   and into the groundwater below the facility, for which Casa Nido spent hundreds of thousands of

23   dollars remediating.  *Id.*  Casa Nido alleges it is entitled to indemnification and contribution from

24   O'Hanks under the federal Comprehensive Environmental Response, Compensation, and Liability

25   Act ("CERCLA").  *Id.*

26          O'Hanks counter-claimed against Casa Nido.  *See* Docket No. 51.  In response, Casa Nido

27   sent a Tender of Defense and Indemnity to Sentry, claiming Sentry has a duty to defend Casa Nido

28   against O'Hanks' counter-claim.  TAC ¶¶ 37–45.  Sentry subsequently informed Casa Nido that it

United States District Court
Northern District of California

1 | determined it has no duty to defend or indemnify. *Id.*; *see also* Docket No. 64, Ex. E ("Denial

2 | Letter").

3 | Now pending are Casa Nido's claims for declaratory relief and for partial summary

4 | judgment, as well as Sentry's cross-motion for summary judgment, on three issues: (1) whether

5 | Sentry owes a duty to defend against O'Hanks' cross-claim, (2) whether Sentry's costs of

6 | defending Casa Nido are limited to $100,000 pursuant to the DCE, and (3) whether Sentry's

7 | failure to defend Casa Nido constitutes a breach of the covenant of good faith and fair dealing.

8 | *See* Docket No. 148 ("Casa Nido Mot."); Docket No. 157 ("Sentry Cross-Mot.").

9 | As set forth below, the Court **GRANTS** Casa Nido's motion for partial summary judgment

10 | with respect to Sentry's duty to defend Casa Nido and **DENIES** Sentry's cross-motion for

11 | summary judgment as to the same.

12 | The Court **DENIES** Casa Nido's motion for summary judgment with respect to whether

13 | Sentry's costs of defending Casa Nido are limited to $100,000 pursuant to the DCE, and

14 | **GRANTS** Sentry's cross-motion for summary judgment as to the same.

15 | The Court **GRANTS** Sentry's cross-motion for summary judgment as to whether its

16 | refusal to defend Casa Nido against O'Hanks' counter-claim  constitutes a breach of the covenant

17 | of good faith and fair dealing.

18 | **II.       RELEVANT BACKGROUND**

19 | A.    Factual Background

20 | In 1976, Casa Nido purchased the real property (the "Property" or "Site") located at 12210

21 | San Pablo Avenue, Richmond, California, and is the current owner to this day.  *See* Docket No.

22 | 148-1 (Joint Stipulation to Agreed Facts) ("Fact Stip.") ¶ 5.  O'Hanks owned and operated a dry-

23 | cleaning facility at the Property from 1960 until 1992. *Id.* ¶ 8.

24 | In August 2016, Casa Nido learned of PCE subsurface contamination at the Property from

25 | a Site Assessment Report conducted by Pangea Environmental Services, Inc. ("Pangea").  *Id.* ¶ 7.

26 | Casa Nido stipulates that it "did not know, nor had any reason to know, before 2016, of the

27 | existence of the subsurface contamination."  *Id.* ¶ 8.  Casa Nido alleges that due to equipment

28 | malfunction or improper usage, "there were sudden and accidental spills and equipment overflows

United States District Court
Northern District of California

1    of PCE . . . during the 32-year period that Defendant O'Hanks operated the dry-cleaning business

2    on the Property . . . and these sudden and accidental spills and overflows resulted in PCE being

3    released."  *See* TAC ¶ 20.

4        Robert Clark-Riddell, a civil engineer at Pangea, submitted a declaration in support of

5    Casa Nido's motion stating that in his professional opinion:

6            [T]he risk of PCE spills, leaks, and accidental and sudden releases
             was significant during the 1960's, 1970's, and into the 1980's and
7            1990's.  This is because PCE usage by US drycleaners peaked in the
             late 1970s and drycleaning machine technology [] declined
8            significantly by 2000 . . . the risk of PCE spills, leaks, and accidental
             and sudden releases likely continued into the 1980's and 1990's due
9            to gradual implementation of new environmental laws and
             regulatory oversight.  In 1976, the Resource Conservation and
10           Recovery Act (RCRA) was enacted to address public concern about
             the serious problems related to disposal of hazardous wastes . . .
11           Section 3002 [of the RCRA] required standards for generators of
             hazardous waste covering record-keeping, reporting, labeling, use of
12           appropriate containers, and a manifest system.

13   Docket No. 168-2 (Declaration of Robert Clark-Riddell) ("RCR Decl.") ¶ 17.  The Contra Costa

14   County Health Services Department, Environmental Health Division ("CCCEHD") performed

15   inspections of the Site in the 1980's and 1990's.  *See id.* ¶ 14.  A CCCEHD report from December

16   31, 1984 showed the average PCE waste generation of 25 gallons per month, with spent PCE

17   stored in a 55-gallon container that was picked up by a waste disposal service every two months.

18   *Id.*  The 1984 report stated that no plan of correction was necessary and found zero violations.

19   *See* RCR Decl. at Ex. B, App. D ("CCCEHD Records") at 719–20.  This inspection report was

20   signed by O'Hanks and the agency inspector Gabe Adebiyi.  *Id.*  A February 15, 1991 report,

21   signed by Jae Kwon and inspector Adebiyi, listed 10-15 gallons per month of PCE waste, and

22   recommended the need for employee training, a written contingency/emergency plan, and

23   required accumulation date on labels.  *Id.* at 721–23; RCR Decl. ¶ 17.  Specifically, the report

24   marked the following areas as "violations" of the California Administration Code: labels under

25   General, training under Prevention, and name list and copies under Contingency.  CCCEHD

26   Records at 721.

27       Mr. Clark-Riddell stated that the first agency inspections of the Site by the CCCEHD "are

28   the result of the changing laws and regulations in the early 1980's."  RCR Decl. ¶ 17.  He noted,

1    "PCE releases persisted at drycleaning facilities despite the increasing inspections, laws, and

2    regulations.  The CCCEHD inspection reports referenced above from 1984 to 1999 document

3    continued PCE usage, waste accumulation, and waste disposal during this period, and the 1991

4    inspection report identified the need for improved PCE handling[.]"  *Id.*

5        Mr. Clark-Riddell also opined, "[T]he fact that PCE leaks and releases can readily move

6    through concrete means that PCE can impact the subsurface quickly after the release and allow

7    for leaks and releases over time to continue to impact the site subsurface."  *Id.*  ¶ 18.  He further

8    stated, "[I]t is more probable than not that the PCE releases at the Site were the result of periodic

9    or ongoing spills and leaks, and possibly one or more sudden and accidental releases."  *Id.* ¶ 23;

10    Docket No. 168 ("Casa Nido Reply") at 2.  Mr. Clark-Riddell stated that based on the presence of

11    PCE found near and below soil level at the Site and the estimated 275 feet of PCE groundwater

12    plume length observed, "[T]he detected PCE is the result of PCE release(s) commencing in the

13    1960's or 1970's.  This characterizes the first releases at the Site but does not preclude nor make

14    unlikely later releases."  *Id.* at ¶ 26–27.  Mr. Clark-Riddell noted that the front-end of the

15    observed 275-foot PCE plume was most likely due to a release in 1984 or later.  *Id.* ¶ 26.

16        Sentry issued three consecutive policies to First Name Insured O'Hanks and Additional

17    Insured Casa Nido, all with policy No. 33-14146-01 ("Sentry Policies").  Fact Stip. ¶ 1–3.  The

18    Sentry Policies were effective from August 15, 1987 to August 15, 1990 ("Policy Period").  *Id.* ¶

19    4.  The policies are comprised of the following relevant sections: (1) the Businessowners Liability

20    ("BL") Coverage Form, and (2) the Dry Cleaners Endorsement ("DCE").  *See* Docket No. 74-1

21    ("Sentry Policies").

22        Notably, while the BL Coverage Form generally tracks standard CGL language, the DCE,

23    which provides the exception to the BL Coverage pollution exclusion, does not use standard CGL

24    language.

25        1.    The Businessowners Liability Coverage Form:

26            A.  COVERAGES

27            1. BUSINESS LIABILITY.  We will pay those sums that the
                insured becomes legally obligated to pay as damages because of
28              "bodily injury", "property damage", "personal injury" or

"advertising injury" to which this insurance applies.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under COVERAGE EXTENSION – SUPPLEMENTARY PAYMENTS.

    a.  This insurance applies only:

        (1) To "bodily injury" or "property damage":

            (a) That occurs during the policy period; and
            (b) That is caused by an "occurrence".  The "occurrence" must take place in the "coverage territory".

. . .

    b.  We will have the right and duty to defend any "suit" seeking those damages.  But

        (1) The amount we will pay for damages is limited as described in Section D – Limits of Insurance;

        (2) We may investigate and settle any claim or "suit" at our discretion; and

        (3) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements or medical expenses.

D.  LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE

1.  The Limits of Insurance shown in the Declarations and rules below fix the most we will pay regardless of the number of:

    a.  Insureds;
    b.  Claims made or "suits" brought; or
    c.  Persons or organizations making claims or bringing "suits".

Sentry Policies (BL Coverage Form) § (A)(1), (D)(1).

    2.    <u>The Businessowners Liability Coverage Form includes the Supplementary</u>

    <u>Payments Provision, in relevant part:</u>

    e.  COVERAGE EXTENSION – SUPPLEMENTARY PAYMENTS

    In addition to the Limit of Insurance, we will pay, with respect to any claim or "suit" we defend:

        (1) All expenses we incur.

United States District Court
Northern District of California

. . .

> (4) All reasonable expenses incurred by the insured
> at our request to assist us in the investigation or
> defense of the claim or "suit"[.]

Sentry Policies (BL Coverage Form) § (A)(1)(e).

3.    The Businessowners Liability Coverage Form further includes a pollution

exclusion ("Pollution Exclusion"), which states:

> B.  EXCLUSIONS
>
> 1.  APPLICABLE TO BUSINESS LIABILITY COVERAGE –
> This insurance does not apply to:
>
> . . .
>
>> f. (1) "Bodily injury" or "property damage" arising out of
>> the actual, alleged or threatened discharge, dispersal,
>> release or escape of pollutants[]
>>
>> Pollutants means any solid, liquid, gaseous or thermal
>> irritant or contaminant including smoke, vapor, soot,
>> fumes, acids, alkalis, chemicals and waste.  Waste includes
>> materials to be recycled, reconditioned or reclaimed.

Sentry Policies (BL Coverage Form) § (B)(1)(f).

4.    Definition of "occurrence":

> F.  LIABILITY AND MEDICAL EXPENSES DEFINITIONS
>
> . . .
>
> 9.  "Occurrence" means an accident, including continuous
> or repeated exposure to substantially the same general
> harmful conditions.

Sentry Policies (BL Coverage Form) § (F)(9).

5.    The DCE entitled "Dry Cleaners Additional Coverages" in the Policy states:

> II.  LIABILITY
> The following provisions are added to the Businessowners
> Liability Coverage Form.
>
> . . .
>
> M. POLLUTION LIABILITY INSURANCE
>
>> 1. The pollution liability exclusion (B.1.f.) does not
>> apply to "bodily injury" or "property damage" covered by
>> the following paragraph.

6

1

2. This insurance applies to "bodily injury" or "property
damage" arising from the actual, alleged or threatened
discharge, dispersal, release or escape of pollutants.
Pollutants means any solid, liquid, gaseous or thermal
irritant or contaminant, including smoke, vapor, soot,
fumes, acids, alkalis, chemicals and waste.  Waste includes
materials to be recycled, reconditioned or reclaimed.

a.  A separate pollution limit of $100,000 applies to
all damages, including sums paid under Coverage
Extension – Supplementary Payments, for all
occurrences during the policy period.

. . .

b.  For purposes of pollution liability, including
limits of liability, **occurrence is the date on which
"bodily injury" or "property damage" first
manifests itself**.  The policy in effect at that time,
and no other, shall apply to the "bodily injury" or
"property damage," including any enhanced injury
or damage resulting from continued or repeated
exposure to the same pollutants beyond the policy
period.

Sentry Policies (DCE) § (II)(M) (emphasis added).

## III.   LEGAL STANDARDS

A.   Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the

nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "The mere

existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment

stage, evidence must be viewed in the light most favorable to the nonmoving party and all

justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff

bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    When parties file cross-motions for summary judgment or partial summary judgment,

2 "[T]he mere fact that the parties make cross-motions for summary judgment does not necessarily

3 mean that there are no disputed issues of material fact and does not necessarily permit the judge to

4 render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th

5 Cir. 1975).  However, summary judgment in favor of one party may be appropriate where "the

6 parties in fact agree[ ] that all of the underlying material facts [are] those reflected by the written

7 record before the court," and only a legal dispute remains. *Id.*; *USF Ins. Co. v. Clarendon Am.*

8 *Ins. Co.*, 452 F. Supp. 2d 972, 984 (C.D. Cal. 2006).

9    B.    Interpretation of Insurance Policy

10    The interpretation of the terms of an insurance policy generally is a question of law.

11 *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 44 (Cal. 1995).  "Interpretation of insurance

12 contracts under California law requires [that courts] employ general principles of contract

13 interpretation." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)

14 (citing *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635 (2003)).

15    The California Supreme Court explained:

16    The fundamental rules of contract interpretation are based on the
   premise that the interpretation of a contract must give effect to the
17    "mutual intention" of the parties. "Under statutory rules of contract
   interpretation, the mutual intention of the parties at the time the
18    contract is formed governs interpretation.  Such intent is to be
   inferred, if possible, solely from the written provisions of the
19    contract.  The 'clear and explicit' meaning of these provisions,
   interpreted in their 'ordinary and popular sense,' unless 'used by the
20    parties in a technical sense or a special meaning is given to them by
   usage', controls judicial interpretation."  A policy provision will be
21    considered ambiguous when it is capable of two or more
   constructions, both of which are reasonable.  But language in a
22    contract must be interpreted as a whole, and in the circumstances of
   the case, and cannot be found to be ambiguous in the abstract.
23    Courts will not strain to create an ambiguity where none exists.

24 *Waller*, 11 Cal. 4th at 18–19 (citations omitted).  In an insurance coverage dispute, "coverage is

25 interpreted broadly so as to afford the greatest possible protection to the insured, [whereas]

26 exclusionary clauses are interpreted narrowly against the insurer." *Manzarek*, 519 F.3d at 1032

27 (citing *MacKinnon*, 31 Cal. 4th at 648).  An "exclusionary clause must be conspicuous, plain and

28 clear." *Id.* (quoting *MacKinnon*, 31 Cal. 4th at 648).  "The burden is on the insured to establish

8

1    that the claim is within the basic scope of coverage and on the insurer to establish that the claim is

2    specifically excluded." *MacKinnon*, 31 Cal.4th at 648.  If the insurer can show the occurrence is

3    specifically excluded, the burden shifts back to the insured to show an "exception affords

4    coverage." *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1192 (1998), *as modified on*

5    *denial of reh'g* (Oct. 14, 1998).  Here, the BL Coverage Form provides the basic scope of

6    coverage, which excludes pollution coverage, and the DCE provides an exception to that

7    exclusion.  Thus the burden rests on the insured to show the exception affords coverage.

8    C.       Duty to Defend

9             Under California law, an insurer's duty to defend an insured is broader than the duty to

10   indemnify and may apply where no damages are ultimately awarded.  *Horace Mann Ins. Co. v.*

11   *Barbara B.*, 4 Cal. 4th 1076, 1081 (1993); *Gray v. Zurich Ins. Co.,* 65 Cal. 2d 263, 278 (1966).

12   An insurer has a duty to defend against lawsuits brought against its insured that potentially seek

13   covered damages; an insurer has a duty to indemnify its insured when the insured has been found

14   liable for damages actually covered by the policy.  *See Collin v. Am. Empire Ins. Co.*, 21 Cal. App.

15   4th 787, 803 (1994).

16            "[T]he determination whether the insurer owes a duty to defend usually is made in the first

17   instance by comparing the allegations of the complaint with the terms of the policy.  Facts

18   extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim

19   may be covered by the policy." *Waller*, 11 Cal. 4th at 19.  "If any facts stated or fairly inferable in

20   the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially

21   covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer

22   negates all facts suggesting potential coverage.  On the other hand, if, as a matter of law, neither

23   the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to

24   defend does not arise in the first instance." *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th

25   643, 655 (2005).  "In general, doubt as to whether an insurer owes a duty to defend 'must be

26   resolved in favor of the insured.'" *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th

27   277, 287 (2014) (internal citation omitted).

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# IV.     DISCUSSION

A.     Duty to Defend

Whether Sentry has a duty to defend Casa Nido depends on whether the pollution, *i.e.*, the PCE contamination, occurred within the Policy Period.  If the pollution occurred outside of the Policy Period, then Sentry would not have a duty to defend because there would be no possibility of coverage.  Whether the pollution occurred within the Policy Period depends on what the trigger of coverage is under the Sentry Policies.  "'[T]rigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise.  The issue is largely one of time—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'?" *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 655 n. 2 (1995) (emphasis in original).  Casa Nido argues that the "continuous injury trigger" applies to the Policies.  *See* Casa Nido Reply at 3.  Sentry argues that the "manifestation trigger" as defined by *Montrose* applies here.  *See* Sentry Cross-Mot. at 8–10.

1.     Interpretation of "First Manifests"

The Sentry Policies cover pollution-based property damage "[t]hat occurs during the policy period."  Sentry Policies (DCE) § (I)(A).  For purposes of pollution liability under the DCE, property damage "occurs" when it "first manifests itself."  Sentry Policies (DCE) § (II)(M).  In *Montrose*, the California Supreme Court explained that the manifestation trigger is an objective "should have known" standard: coverage is triggered at "that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered."  *Montrose*, 10 Cal. 4th at 674.

However, because *Montrose* was decided five to eight years after the policies in question were written, the Court examines the meaning of the trigger language when the parties contracted.  As such, the relevance of *Montrose* turns on the extent it accurately described California law on the meaning of "manifests" in the insurance context at the time the parties entered into the contract.

United States District Court
Northern District of California

1    Here, it is clear that the meaning of the term "manifests" at the time the parties entered the

2    contract was in accord with the objective standard articulated in *Montrose*. *See, e.g.*, *Cal. Union*

3    *Ins. Co. v. Landmark Ins. Co.*, 145 Cal. App. 3d 462, 476 (Ct. App. 1983); *Home Ins. Co. v.*

4    *Landmark Ins. Co.*, 205 Cal. App. 3d 1388, 1392 (Ct. App. 1988) (first citing *Cal. Union Ins. Co.*,

5    145 Cal. App. 3d 462; and then citing *Snapp v. State Farm Fire & Cas. Co.*, 206 Cal. App. 2d 827

6    (Ct. App. 1962)). In *Cal. Union Ins. Co.*, a case determining two insurance companies' coverage

7    obligations for property damage, the court held that coverage is triggered when "the damage first

8    becomes apparent[.]" 145 Cal. App. 3d at 476. Applying this standard to the facts before it, the

9    court stated that the property "damage first *manifested* itself" in 1980, "albeit its cause had its

10   genesis in June 1979 when the pool was installed and filled." *Id.* (emphasis added). Later, in

11   *Home Ins. Co.*, the court stated that "in property damage cases 'manifestation' routinely refers to

12   when the damage first 'becomes apparent.'" 205 Cal. App. 3d at 1392. *See also Clemco Indus. v.*

13   *Com. Union Ins. Co.*, 665 F. Supp. 816, 822, 826-27 (N.D. Cal. 1987), *aff'd*, 848 F.2d 1242 (9th

14   Cir. 1988); *Todd Shipyards Corp. v. Black*, 717 F.2d 1280, 1290 (9th Cir. 1983) (explaining an

15   injury manifests itself "when it becomes *reasonably capable of medical diagnosis*." (internal

16   citation omitted) (emphasis added)); *Urie v. Thompson*, 337 U.S. 163, 170 (1949) ("The record

17   before us is clear that Urie became too ill to work in May of 1940 . . . There is no suggestion that

18   Urie *should have known* he had silicosis at any earlier date . . . 'It follows that no specific date of

19   contact with the substance can be charged with being the date of injury . . . consequently the

20   afflicted employee can be held to be "injured" only when the accumulated effects of the

21   deleterious substance manifest themselves.'" (quoting *Associated Indem. Corp. v. State Indus.*

22   *Acc. Comm'n*, 124 Cal. App. 378, 381 (Cal. Ct. App. 1932) (emphasis added)). There can be no

23   doubt that a determination as to the time at which damage becomes "apparent" is based on an

24   objective standard.[1]  It follows, then, that California courts have long understood the manifestation

25   _____

26   [1] As Sentry notes, the dictionary definitions of the term "manifest" comport with the objective
     interpretation of the manifestation trigger eventually set forth in *Montrose*. Sentry Reply at 6.

27   Courts often refer to dictionary definitions in interpreting insurance policies. *Northrop Grumman*
     *Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 784 (9th Cir. 2009). The Oxford English Dictionary

28   defines manifest as "[c]learly revealed to the eye, mind, or judgement; open to view or
     comprehension; obvious." Manifest, Oxford English Dictionary (3rd ed. 2000). The American

1    trigger in a manner akin to the objective manifestation standard set forth in *Montrose*, and thus

2    that presumably was what the parties herein intended when they contracted.[2]

3            However, the more critical question concerns whether in light of the "first manifest"

4    standard, there are multiple "occurrences" when there are multiple spills, such that the "first

5    manifests" test can apply to each discrete spill.  As noted above, the DCE provides, "For purposes

6    of pollution liability, including limits of liability, occurrence is the date on which 'bodily injury'

7    or 'property damage' *first* manifests itself."  Sentry Policies (DCE) § (II)(M) (emphasis added).

8    According to Sentry, "the word 'first' [] modifies the word 'manifest[,]'" such that coverage is

9    triggered only if *overall* PCE contamination in the aggregate at the site first became reasonably

10   discoverable during the policy period.  *See* Sentry Mot. at 9.  In Sentry's view, that would be a

11   one-time occurrence.   Relying on this interpretation, Sentry argues the PCE contamination at

12   issue is not covered because the overall PCE contamination most likely first manifested before the

13   Policy Period in the early 1980s.  *See* RCR Decl. ¶ 26.  In contrast, Casa Nido, relying on *Morrow*

14   *Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422 (E.D. Va. 2000), argues that the question

15   is not when PCE contamination in the aggregate first became discoverable, but when each discrete

16   release of PCE first became discoverable, *i.e.*, the point at which each successive release of PCE

17   first manifested itself.  *See id.* at 432–33 ("Simply because there may have been prior damage

18   caused by earlier PCE contamination does not mean that subsequent releases did not cause damage

19   that 'first manifested itself' at the time of those later releases.").  Sentry counters, asserting "the

20

21   _____

22   Heritage Dictionary defines manifest as "[c]learly apparent to the sight or understanding;
     obvious."  Manifest, American Heritage Dictionary (5th ed. 2022).

23   [2] This understanding was consistent with a national consensus on the meaning of the term
     "manifests" in the insurance context.  *See*, *e.g.*, *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*,

24   633 F.2d 1212 (6th Cir. 1980) ("The date of manifestation is the date when the worker knew or
     should have known he has asbestosis, or the date that asbestosis is medically diagnosed,

25   whichever came first.") (emphasis added); *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682
     F.2d 12, 16 (1st Cir. 1982) (Under the manifestation theory, coverage is triggered when an injury

26   "first manifest[s] itself by way of medically diagnosable symptoms"); *see also Am. Home Prod.*
     *Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1489 (S.D.N.Y. 1983) (explaining that

27   manifests "has been defined to mean when the injury was diagnosed or when it produced
     symptoms that placed or should have placed the injured person on notice"); *Keene Corp. v. Ins.*

28   *Co. of N. Am.*, 667 F.2d 1034, 1043 (D.C. Cir. 1981) (stating that an injury does not become
     manifest "until cellular damage advances to the point of becoming a recognizable disease").

1   word 'first' loses its significance if 'every iterative discharge' constitutes PCE contamination."

2   Sentry Reply at 9.

3          The Court interprets the DCE language consistent with *Morrow*.  At the very least, the

4   language of the policy regarding occurrence is ambiguous and must be read in the insured's favor.

5   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1032 (9th Cir. 2008) ("In the event

6   of an ambiguity, we must interpret contractual terms to 'protect the objectively reasonable

7   expectations of the insured.'" (quoting *Boghos v. Certain Underwriters at Lloyd's of London*, 36

8   Cal. 4th 495, 501 (2005)).  The policy language supports Casa Nido's interpretation.  The standard

9   BL Policy provides, an "'[o]ccurrence' means an accident, including continuous or repeated

10  exposure to substantially the same general harmful conditions."  Sentry Policies (BL Coverage

11  Form) § (F)(9).  While the DCE specifies the manifestation *trigger* for coverage of an occurrence,

12  the basic definition of "occurrence" in the DCE is consistent with that in the BL Coverage Form:

> For purposes of pollution liability, including limits of liability, occurrence is the date on which "bodily injury" or "property damage" first manifests itself.  *The policy in effect at that time, and no other, shall apply to the "bodily injury" or "property damage," including any enhanced injury or damage resulting from continued or repeated exposure to the same pollutants beyond the policy period.*

17  Sentry Policies (DCE) § (II)(M) (emphasis added).  Under both the Policy and the DCE, "property

18  damage" may be said to "occur" when there is a spill which results in contamination of the soil.

19  That property damage can occur each time there is such a spill.  Thus, for instance, if there is a

20  spill that occurred one time each year, each yearly spill could be deemed an occurrence.  That

21  could be true if spills occurred twice a year, monthly, or weekly.

22         To be sure, the language "including any . . . damage resulting from continued or repeated

23  exposure of the same pollutants," Sentry Policies (DCE) § (II)(M), could suggest that each

24  repeated exposure of the same pollutant constitutes a single occurrence.  But it need not.  As for

25  the plain language, simply because damage resulting from continued or repeated exposure *may*

26  constitute a single occurrence does not mean it *must* constitute a single occurrence.  And, because

27  the provision appears in the DCE, a portion of the Policy that provides an exception to the

28  pollution exclusion in the standard Businessowners Liability Coverage, it must be construed in

13

favor of the insured.  *See E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004)

("[E]xceptions to exclusions are broadly construed in favor of the insured." (quoting *Aydin Corp.*

*v. First State Ins. Co.*, 18 Cal. 4th 1183, 1192 (1998)).  Moreover, it appears the explicit purpose

of the provision *within* the DCE is to extend coverage to subsequent discharges that occur outside

the Policy Period: "including any enhanced injury or damage resulting from continued or repeated

exposure to the same pollutants *beyond the policy period*."  Sentry Policies (DCE) § (II)(M)

(emphasis added).  That is, if discharges subsequent to the triggering discharge are continuous or

repetitive of the triggering discharge, the subsequent discharges would be covered even if they

first manifest outside of Policy Period, as they would be considered part of a single occurrence

that first manifested during the Policy Period.  Since courts "consider policy language in context

to discern its intended function," *McMillin Homes Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*,

35 Cal. App. 5th 1042, 1050 (2019) (internal citation omitted), a reasonable distinction could be

made between an interpretation of "occurrence" which extends coverage in one context from one

which limits coverage in another.  *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003)

("[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the

insured." (citations omitted)).  In each instance, ambiguity may be interpreted in the insured's

favor.  *Manzarek*, 519 F.3d at 1032.

　　　　In any event, even if "occurrence" is interpreted to encompass any repeated or continuous

exposure irrespective of context, the term is sufficiently ambiguous to give rise to a factual

question whether the timing and frequency of the PCE spillage at the Site during the Policy Period

could be deemed "repeated or continuous" within the meaning of the Sentry Policies.  There is

evidence sufficient to create an issue of fact regarding the nature and timing of the spills here.

Casa Nido alleges that "there were sudden and accidental spills and equipment overflows of PCE

. . . during the 32-year period that Defendant O'Hanks operated the dry-cleaning business on the

Property . . . and these sudden and accidental spills and overflows resulted in PCE being released."

TAC at 4–5.  Casa Nido's expert, Mr. Clark-Riddell, opined that "it is more probable than not that

the PCE releases at the Site were the result of periodic or ongoing spills and leaks, and possibly

one or more sudden and accidental releases" beginning in the 1960's or 1970's, but that "the risk

of PCE spills, leaks, and accidental and sudden releases likely continued into the 1980's and 1990's[.]" RCR Decl. ¶ 17. In addition, the underlying complaint and Mr. Clark-Ridell's report allege "sudden and accidental" PCE discharges rather than a continuous pattern. *See*, *e.g.*, TAC ¶¶ 20, 23, 26; RCR Decl. ¶ 17.

*Morrow* is persuasive on this point. The policies at issue in *Morrow* included an exception to a pollution exclusion for damage from "sudden and accidental" discharges of pollution. *See Morrow Corp.*, 101 F. Supp. 2d at 430. Sentry argued that the damage was not covered because "the underlying complaint allege[d] not sudden and accidental PCE discharges, but rather a continuous pattern of discharges during the time plaintiffs were in business[.]" *Id.* at 432. The court was not convinced. It noted that the underlying complaint did not allege that "the PCE discharges occurred as a continuous pattern or that the allegations are limited to such a pattern; instead, [. . .] the underlying complaint uses terms ('spilled,' 'discharged,' 'released') which encompass releases that are sudden and accidental, as well as releases that are part of a continuous pattern." *Id.* Thus, while the court noted that "Sentry may ultimately succeed in proving that all or a portion of the Greenbriar settlement is attributable to damages owing to a continuous pattern of PCE pollution that occurred during the 1987–89 coverage period[,]" it concluded that "[a]t this stage, the inquiry is not whether the releases were in fact sudden and accidental, but simply whether the underlying complaint's allegations reasonably included sudden and accidental releases of PCE." *Id.*; *see also Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (Cal. 1995) ("[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy."). In essence, *Morrow* recognized that the dispute at issue rested on a distinction between continuous and repetitive pollution and non-continuous and non-repetitive pollution, and concluded the resolution was a factual question for a later stage. *Morrow* supports the conclusion that whether the pollution was continuous or repetitive is not a question that can be resolved at the summary judgment stage, but a question of fact.

Finally, contrary to Sentry's claim, the word "first" does not lose "its significance if 'every iterative discharge constitutes PCE contamination.'" Sentry Reply at 9. Rather, the Court's

United States District Court
Northern District of California

1  interpretation recognizes that certain discharges might have first manifested before the Policy

2  Period, certain discharges might have first manifested during the Policy Period, and certain

3  discharges might have first manifested after the Policy Period, but only those that first manifested

4  during the Policy Period are covered.  Thus, Sentry has a duty to defend claims arising out of

5  those discrete discharges, and only those discrete discharges, for which Casa Nido establishes a

6  possibility of first manifestation during the Policy Period.

7       2.   <u>Duty to Defend</u>

8       Because there is a question of fact as to whether there were occurrences within the policy

9  period, the question arises when any such occurrences were first manifest, the trigger to coverage

10  here.  Typically, the point at which a reasonable insured should have known of the damage or at

11  which the damage became reasonably discoverable would be a factual question reserved for the

12  jury, precluding summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

13  (1986).  That is the case here, particularly where the issue is Sentry's duty to defend.  Casa Nido

14  need only prove that the damage is *potentially* covered by the policy, not that the damage is

15  *actually* covered.  *See Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 803 (1994).  To that

16  end, "[I]t is well-established that when 'coverage depends on an unresolved dispute over a *factual*

17  question, the very existence of that dispute would establish a possibility of coverage and thus a

18  duty to defend.'"  *Liberty Surplus Ins. Corp. v. Landmark Am. Ins. Co.*, No. 17-cv-1401-DMS

19  (AGS), 2018 WL 3413865, at *5 (S.D. Cal. May 29, 2018) (quoting *Mirpad, LLC v. Cal. Ins.*

20  *Guarantee Assn.*, 132 Cal. App. 4th 1058, 1068 (Cal. Ct. App. 2005)).  Thus, if Casa Nido can

21  demonstrate the mere possibility that a reasonable insured should have known of at least some

22  PCE contamination during the Policy Period, and said contamination includes a sufficiently

23  discrete incident as to constitute an "occurrence" within meaning of the DCE policy, then there is

24  a potential for coverage and Casa Nido must prevail on its motion for summary judgment as to the

25  duty of Sentry to defend.

26       Sentry argues that Casa Nido has not established a genuine issue of material fact as to

27  whether the PCE contamination at the Property "first manifest[ed] itself" during the Policy Period

28  or even a possibility of coverage.  Sentry's argument hinges almost entirely on Casa Nido's

United States District Court
Northern District of California

16

stipulation that it "did not know, nor had any reason to know, before 2016, of the existence of the subsurface contamination." Fact Stip. ¶ 8.  However, this stipulation of fact is not dispositive. The question here is not merely whether Casa Nido should have known of the PCE contamination, but whether *a reasonable insured* should have known of the PCE contamination.  *See Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 674 (1995).  For that matter, there is no equally definitive statement about what O'Hanks, the first-party insured, should have known during the Policy Period.

Notably, in addition to the evidence of spills discussed above, Mr. Clark-Riddell notes that the front-end of the observed 275-foot PCE plume is most likely due to a release in 1984 or later. *Id.* ¶ 26.  Further, Mr. Clark-Riddell notes changing practices in the dry-cleaning industry.  For example, "In 1976, the Resource Conservation and Recovery Act (RCRA) was enacted to address public concern about the serious problems related to disposal of hazardous wastes."  *Id.*  The CCCEHD performed inspection and compliance reports at the Site in the 1980's and 1990's when O'Hanks operated the business.  The earliest CCCEHD report on record is from December 31, 1984, which showed the average PCE waste generation of 25 gallons per month.  The report stated that no plan of correction was necessary, presumably meaning that O'Hanks was in compliance with the PCE usage and waste protocols as of December 31, 1984.  *See* CCCEHD Records at 719–20.  Seven years later, the 1991 CCCEHD report identified the need for improved PCE handling at the Site by recommending employee training, a written contingency/emergency plan, and required accumulation date on labels.  *See id.* at 721–23; RCR Decl. ¶ 17.  Given the 1991 report made this finding one year after the Policy Period ended, the possibility certainly exists that O'Hanks and Casa Nido knew, or should have known, of contamination due to their PCE usage and disposal during the years immediately preceding the 1991 report (*i.e.*, during the Policy Period of 1987 to 1990).

The general awareness of the risks of PCE usage in the dry-cleaning industry, the continuing risk of spills in the 1980's and 1990's, the CCCEHD reports, and the fact that the front of the PCE plume is likely the result of a release in 1984 or later suggests a possibility that Casa Nido or O'Hanks should have known of occurrences of PCE contamination and that spills, leaks,

17

1    and accidental and sudden releases first manifested during the Policy Period.

2           Thus, Casa Nido has established "a possibility that the claim may be covered by the

3    policy," *Waller*, 11 Cal.4th at 19, and Sentry has failed to "negate[] all facts suggesting potential

4    coverage." *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th 643, 655 (2005).

5           Therefore, the Court finds that Sentry has a duty to defend because a possibility of

6    coverage exists under the Policy.  The Court **GRANTS** Casa Nido's motion for partial summary

7    judgment with respect to Sentry's duty to defend Casa Nido and **DENIES** Sentry's cross-motion

8    for summary judgment as to the same.

9    B.     Defense Costs Coverage Limit

10          After finding that Sentry has a duty to defend Casa Nido, the next inquiry is whether

11   Sentry's costs of defending Casa Nido are limited to $100,000 pursuant to the DCE.  Casa Nido

12   argues that defense costs should not be included in the "Supplementary Payments" provision

13   because § (A)(1)(b) of the Businessowners Liability Coverage Form overrides any separate

14   provisions limiting defense costs.  Sentry argues that the DCE expressly limits defense costs to

15   $100,000 that would otherwise not be limited under the "Supplementary Payments" provision.

16          In this case, the Supplementary Payment provision provides in part: "we will pay, with

17   respect to any claim or 'suit' *we defend*: (1) All expenses we incur . . . (4) All reasonable expenses

18   incurred by the insured at our request to assist us in the investigation or defense of the claim or

19   'suit'[.]"  Sentry Policies (BL Coverage Form) § (A)(1)(e) (emphasis added).  A "suit" is defined

20   to mean a civil proceeding in which damages because of . . . 'property damage' . . . to which this

21   insurance applies are alleged."  Sentry Policies (BL Coverage Form) § (F)(13).  As the italicized

22   words indicate, the supplementary payments provision providing "All expenses we incur" is a

23   function of the Sentry's defense obligation.  *See Prichard v. Liberty Mut. Ins. Co*., 84 Cal. App.

24   4th 890, 911 (2000) ("'We will pay, with respect to any claim or "suit" *we defend:* [¶] ... [¶] 5. All

25   costs taxed against the insured in the "suit."'  [. . .]  As the italicized words indicate, the

26   supplementary payments provision providing all 'costs taxed' is a function of the insurer's defense

27   obligation, not its indemnity obligation.").  The DCE then provides, however, that a "separate

28   pollution limit of $100,000 applies to all damages, including sums paid under Coverage Extension

18

United States District Court
Northern District of California

– Supplementary Payments, for all occurrences during the policy period."  Sentry Policies (DCE) § (II)(M).

Here, Sentry's duty to defend is triggered by the DCE because pollution coverage is otherwise excluded by the Sentry Policies.  As such, Sentry's duty is subject to any limitations set forth in the DCE, including the $100,000 limit to coverage of sums paid under Coverage Extension – Supplementary Payments.  As noted, the Coverage Extension – Supplementary Payments provides that Sentry "will pay, with respect to any claim or 'suit' *we defend*[.]"  Sentry Policies (BL Coverage Form) § (A)(1)(e) (emphasis added).  It follows, then, that the $100,000 limitation in the DCE applies to Sentry's duty to defend.

The case law is in accord.  In *Albert D. Seeno Constr. Co. v. Aspen Ins. UK Limited*, 17-cv-3765-SI, 2020 WL 5760170 (N.D. Cal. Sept. 28, 2020), the Court held that defense costs are considered "supplementary payments" that erode the policy limits.  *Id.* at *1.  *Cf. Karsant Fam. Ltd. P'ship v. Allstate Ins. Co.*, No. C 08-01490 SI, 2009 WL 188036, at *7 (N.D. Cal. Jan. 27, 2009) (finding that identical language refers to the duty to defend and that costs "taxed against the insured" includes attorneys' fees but the costs "of defending any suit" does not include attorneys' fees).  In *Nat'l Union Fire Ins. Co. v. West Lake Academy*, 548 F.3d 8 (1st Cir. 2008), the First Circuit held that an endorsement policy that limits defense costs to $300,000 overrides the general Supplementary Payments provision that on its own does not limit coverage, therefore, defense costs were limited to $300,000.  *See id.* at 17–18.

For the foregoing reasons, the Court **DENIES** Casa Nido's motion for summary judgment with respect to whether Sentry's costs of defending Casa Nido are limited to $100,000 pursuant to the DCE, and **GRANTS** Sentry's cross-motion for summary judgment as to the same.

C.     Breach of the Covenant of Good Faith and Fair Dealing

Lastly, Sentry seeks summary judgment with respect to Casa Nido's claim that Sentry breached the covenant of good faith and fair dealing.  *See* Sentry Cross-Mot. at 15–16.  Casa Nido alleges Sentry breached the covenant when Sentry relied on *Montrose* to deny Casa Nido's claims and because Sentry failed to adequately investigate whether Casa Nido's claims were covered.  *See* Casa Nido Reply at 13–14.

1    "To establish breach of the implied covenant [of good faith and fair dealing], the insured

2    must show that: (1) benefits due under the policy were withheld, and (2) such withholding was

3    unreasonable." *O'Keefe v. Allstate Indem. Co.*, 953 F. Supp. 2d 1111, 1115 (S.D. Cal. 2013).

4    Ordinarily, "reasonableness of an insurer's claims-handling conduct is . . . a question of fact [and

5    only] becomes a question of law where the evidence is undisputed and only one reasonable

6    inference can be drawn from the evidence." *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*,

7    181 Cal. App. 4th 60, 86 (2010) (citing *Chateau Chamberay Homeowners Ass'n v. Associated*

8    *Int'l Ins. Co.*, 90 Cal. App. 4th 335 (2001)).  However, "[w]hen the issue of the insurer's objective

9    reasonableness depends on an analysis of legal precedent, reasonableness is a legal issue" for the

10   court.  *See CalFarm Ins. Co. v. Krusiewicz*, 131 Cal. App. 4th 273, 287 (2005).

11   Whether Sentry breached the covenant of good faith and fair dealing by relying on

12   *Montrose* to deny Casa Nido's claims is a question of law for the Court.  *See id*.  The Court finds

13   that it was reasonable for Sentry to rely on *Montrose* to deny Casa Nido's claims because, as

14   explained above, the manifestation trigger as defined by *Montrose* applies to the Sentry Policies.

15   This finding is not impacted by the Court's ultimate determination that Sentry has a duty to defend

16   for a number of reasons.  First, Casa Nido has principally argued coverage on a theory that the

17   continuous injury trigger applies to the Sentry Policies, a theory with which the Court disagrees,

18   and Sentry fairly rejected.  Second, as explained in the Court's previous order, it was appropriate

19   for Sentry to look to *Montrose* because it is "not unreasonable to look to dictum from the Supreme

20   Court of California when interpreting California insurance law."  *See* Docket No. 144 at 9–10

21   (citing *United Steelworkers of Am. v. Bd. of Educ.*, 162 Cal. App. 3d 823, 835 (Ct. App. 1984)).

22   Third, the central basis for the Court's determination that Sentry has a duty to defend is based on

23   an ambiguity in the meaning of "first" in "first manifests," an ambiguity that even if resolved in

24   Casa Nido's favor still reasonably supports Sentry's interpretation.  And as noted above, Casa

25   Nido's claim for coverage if far from compelling.  It requires a favorable interpretation of the

26   DCE policy and a construction of the facts drawn in Casa Nido's favor based on a chain of

27   inferences.  As such, the Court **GRANTS** Sentry's motion for summary judgment as to whether its

28   reliance on *Montrose* to deny Casa Nido's claims constitutes a breach of the covenant of good

United States District Court
Northern District of California

20

faith and fair dealing and with respect to the adequacy of its investigation of Casa Nido's claims.

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Casa Nido's motion for partial summary judgment with respect to Sentry's duty to defend Casa Nido and **DENIES** Sentry's cross-motion for summary judgment as to the same.

The Court **DENIES** Casa Nido's motion for summary judgment with respect to whether Sentry's costs of defending Casa Nido are limited to $100,000 pursuant to the DCE, and **GRANTS** Sentry's cross-motion for summary judgment as to the same.

The Court **GRANTS** Sentry's cross-motion for summary judgment as to whether its reliance on *Montrose* to deny Casa Nido's claims constitutes a breach of the covenant of good faith and fair dealing and whether its investigation of Casa Nido's claims were sufficiently adequate as to not constitute a breach of the covenant of good faith and fair dealing.

This order disposes of Docket Nos. 148 and 157.


**IT IS SO ORDERED**.


Dated: June 5, 2023

_____
EDWARD M. CHEN
United States District Judge