Rachel S. Doughty (CBN 255904)
Jennifer Rae Lovko (CBN 208855)
Richard A. Brody (CBN 100379)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fx: (510) 900-9502
rdoughty@greenfirelaw.com
rlovko@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASA NIDO PARTNERHSIP, a California Partnership,<br>Plaintiff,<br><br>v.<br><br>CATHERINE O'HANKS; SENTRY INSURANCE COMPANY; SANDRA KATE VERNELL (f/k/a SANDRA KATE ANDERSON) and EARL RAY ANDERSON,<br><br>Defendants.<br><br>AND ALL RELATED COUNTER AND CROSS CLAIMS | Case No. 20-cv-07923-EMC<br><br>**DECLARATION OF ROBERT CLARK-RIDDELL**<br><br>Date: August 22, 2024<br>Time: 1:30 p.m.<br>Judge: Edward M. Chen<br>Courtroom.: 5 – 17th Floor<br><br>Complaint Filed: November 10, 2020 |

I, Robert Clark-Riddell do declare and state:

1. If sworn as a witness, I could and would testify to my personal knowledge of the facts set forth herein.

2. My opinions in this declaration are based upon my education and background, materials referenced herein, as well as my experience in assessing and remediating volatile organic compounds ("VOCs") at the subject location at 12210 San Pablo Avenue, Richmond, California ("Site").

3. As addressed below, based upon my education, expertise, and the materials referenced herein, in my professional opinion, the drycleaning equipment used from 1960 through

1

1990 at the Site necessarily led to the discharge and release of PCE during operation, and as such, the discharges and releases occurred during each year from 1960 through 1990.

4. As addressed below, based upon my education, expertise, and the materials referenced herein, in my professional opinion, it is more probable than not that discharges and releases of PCE at the Site during 1960 through 1990 also occurred as the result of spills, leaks, and other accidental and sudden releases.

**Education and Background**

5. I am the President and Principal Engineer at Pangea Environmental Services, Inc. (hereinafter "Pangea"). I am registered in the State of California as a Civil Engineer (C49629).

6. I have over 30 years of experience specializing in the assessment, remediation, and/or mitigation of subsurface petroleum hydrocarbons and volatile organic compounds ("VOCs") in Northern California. In my current employment, I train and manage engineers, geologists, and scientist staff. I also coordinate and design investigation programs and apply proven and innovative remedial and mitigation technologies.

7. My experience includes assessment, remediation, and/or mitigation projects at over 200 sites in California for sites impacted by VOCs (e.g., drycleaner and industrial sites), retail gasoline stations, and development projects. I am involved with 30 or more current Pangea projects requiring assessment, remediation, and/or mitigation of PCE, the drycleaning chemical that is the subject of this matter.

8. My experience includes providing regulatory compliance services. As part of these services, I have assisted with compliance with California Department of Toxic Substances Control ("DTSC") Voluntary Cleanup Agreements.

9. I have assisted with litigation support and provided expert testimony on several matters involving drycleaner sites with PCE contamination, as well as involving retail gasoline stations and other properties.

10. Attached as **Exhibit 22** to Plaintiff's Compendium of Exhibits ("Compendium") is a true and correct copy of my CV.

**Site Overview**

11. The Site of this litigation is approximately 5,200 square feet (assessor parcel number 519-290-026-3) and is located at 12210 San Pablo Avenue, Richmond, California. It was commonly known as the former Omo's Cleaners site. The property currently is owned by Casa Nido. The building on the Site was demolished in July 2017, and the property is presently vacant with a partial concrete slab in the former building area, gravel surface within the area of urgent response action, and a small shed with remediation equipment. A small landscape area is located behind the eastern retaining wall.

12. The Site was occupied by a commercial drycleaning facility from approximately 1960 through June 2015. Defendant Catherine O'Hanks and her late husband, Roy O'Hanks, operated a drycleaning business at the Site from approximately 1960 to 1990.[1] Defendants Sandra Kate Vernell and Earl Ray Anderson entered into an agreement with the O'Hanks whereby they handled operation of the drycleaning facility at the Site from approximately 1978-1980.[2]

13. From 1960 through 1990, the same first-generation dry-cleaning equipment was utilized at the Site, and during the entirety of this time, PCE was used.[3] First generation drycleaning equipment also is referred to as transfer equipment because the wet clothing needs to be manually transferred from the drycleaning washer unit to the drying unit. Diagram 1, below, depicts the process flow for PCE in transfer drycleaning systems.[4]

---

[1] *See* Compendium, **Exhibit 30** (1/21/22 Letter from Catherine O'Hanks to Department of Toxic Substances Control) at Response to No. 1-4; Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 2.

[2] *See* Defendants Earl Ray Anderson and Sandra K. Vernell's Answer to Plaintiff's Third Amended Complaint, filed on March 13, 2023, at p.3 (Docket No. 177); Declaration of Sandra Kate Vernell at ¶8; Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 2.

[3] *See* Compendium, **Exhibit 30** (1/21/22 Letter from Catherine O'Hanks to Department of Toxic Substances Control) at Response to No. 6, p. 3-4; Compendium, **Exhibit 4** (Defendant Catherine O'Hanks' Objections and Responses to Plaintiff's Special Interrogatories, Set Two) at Responses to Interrogatory Nos. 18 and 25, p. 6 and 10; Compendium, **Exhibit 9** (Defendant Sandra Kate Vernell's Responses to Plaintiff's Special Interrogatories, Set One) at Responses to Interrogatory Nos. 9-10, 18 and 22, p. 6-7, 10-12; Compendium, **Exhibit 23** (Additional Characterization Report); Compendium, **Exhibit 12** (Plaintiff Casa Nido Partnership's Second Set of Requests for Admission to Sandra Kate Vernell (F/K/A Sandra Kate Anderson) at Exhibit 3 (Bill of Sale), p. Casa Nido009485- Casa Nido009487; Compendium, **Exhibit 13** (Defendant Sandra Kate Vernell's Responses to Plaintiff Casa Nido Partnership's Request for Admission, Set Two) at Response to Request for Admission No. 3, p. 2-3, admitting the genuineness of the Bill of Sale. **Exhibit 23** to the Compendium is a true and correct copy of the Additional Characterization Report authored by PANGEA Environmental Services, Inc. on December 4, 2020; Declaration of Sandra Kate Vernell at ¶¶7, 9.

[4] *See* Compendium, **Exhibit 25** (Profile of the Dry Cleaning Industry) at p. 16. **Exhibit 25** to the Compendium is a true and correct copy of Profile of the Dry Cleaning Industry by the EPA, dated September 1995.

*Diagram 1*



14. The transfer equipment at the Site included one Martin Extractor (the washer unit), one Martin Reclaimer (the dryer unit), and a filter-cooker-still filtration system.[5] PCE was delivered to the facility by a tanker truck, with the truck parking on the north side of the building and the driver of the truck running a hose to a 65-gallon storage tank located on the southern side of the building near the washer and dryer units.[6] The drycleaning operation also had two 55-

---

[5] *See* Compendium, **Exhibit 12** (Plaintiff Casa Nido Partnership's Second Set of Requests for Admission to Sandra Kate Vernell (F/K/A Sandra Kate Anderson) at Exhibit 3 (Bill of Sale), p. Casa Nido009485- Casa Nido009487; Compendium, **Exhibit 13** (Defendant Sandra Kate Vernell's Responses to Plaintiff Casa Nido Partnership's Request for Admission, Set Two) at Response to Request for Admission No. 3, p. 2-3, admitting the genuineness of the Bill of Sale.

[6] *See* Compendium, **Exhibit 30** (1/21/22 Letter from Catherine O'Hanks to Department of Toxic Substances Control) at Response to No. 6, p. 3-4, and Exhibit A diagram; Compendium, **Exhibit 12** (Plaintiff Casa Nido Partnership's Second Set of Requests for Admission to Sandra Kate Vernell (F/K/A Sandra Kate Anderson) at Exhibit 3 (Bill of Sale), p. Casa Nido009485- Casa Nido009487; Compendium, **Exhibit 13** (Defendant Sandra Kate Vernell's Responses to Plaintiff Casa Nido Partnership's Request for Admission, Set Two) at Response to Request for Admission No. 3, p. 2-3, admitting the genuineness of the Bill of Sale; Compendium, **Exhibit 9** (Defendant Sandra Kate Vernell's Responses to Plaintiff's Special Interrogatories, Set One) at Response to Interrogatory No. 9, p. 6; Declaration of Sandra Kate Vernell at ¶8.

gallon storage drums and two 15 gallon storage drums for PCE.[7]

15. Image 1, below, contains two photographs of the transfer machines.[8] The photograph on the left shows an open bucket that appears to be the receptacle for the contact water issued from the drycleaning equipment's vapor reclaimer and separator (as shown in Diagram 1 and addressed in Paragraph 24, below).

16. The location of the equipment in the Site building is depicted in Diagram 2, below.[9]

*Image 1*



**PCE Releases from First Generation Machines**

17. PCE became the solvent of choice for most drycleaners by 1960.[10] It is a toxic

---

[7] *See* Compendium, **Exhibit 12** (Plaintiff Casa Nido Partnership's Second Set of Requests for Admission to Sandra Kate Vernell (F/K/A Sandra Kate Anderson) at Exhibit 3 (Bill of Sale), p. Casa Nido009485- Casa Nido009487; Compendium, **Exhibit 13** (Defendant Sandra Kate Vernell's Responses to Plaintiff Casa Nido Partnership's Request for Admission, Set Two) at Response to Request for Admission No. 3, p. 2-3, admitting the genuineness of the Bill of Sale.
[8] *See* Compendium, **Exhibit 5** (Photographs of the subject site produced by Defendant Catherine O'Hanks) at p. COH-003792.
[9] *See* Compendium, **Exhibit 30** (1/21/22 Letter from Catherine O'Hanks to Department of Toxic Substances Control) at Exhibit A diagram.
[10] *See* Compendium, **Exhibit 29** (Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene) at p. 808. **Exhibit 29** to the Compendium is a true and correct copy of Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene by L. Gold et al., published in the Journal of Occupational and Environmental Hygiene in January 2009.

1 chemical known to cause both short-term health effects, as well as long-term health effects.[11] It has been listed as a known carcinogen under California's Proposition 65 since 1988.[12]

*Diagram 2*



---

[11] *See* Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 5.

[12] *See* Proposition 65 list from the California Office of Environmental Health Hazard Assessment website at https://oehha.ca.gov/proposition-65/proposition-65-list, last accessed on April 16, 2024.

18. Once released into the environment, PCE can contaminate soil and groundwater for tens to hundreds of years. PCE readily moves through concrete and cracks in concrete floors.[13] PCE readily evaporates at room temperature.[14]

19. First Generation machines used significantly more PCE than later generations of machines.[15] Their design necessarily led to the release and discharge of PCE during operation, and historically, poor housekeeping, business, and maintenance practices contributed to a high frequency of additional spills and discharges.[16]

20. Some releases will result in PCE leaked or spilled as pure product, dissolved in water, or released as a vapor.

21. Because of their design, the release and discharge of PCE from first generation machines necessarily occurred (1) from evaporation when transferring wet fabrics from the washer to the dryer unit, (2) from evaporation associated with the filter-cooker-still filtration system, (3) from dryer exhaust vented into the atmosphere, and (4) from contact water.[17] There also is residual vapor release from clothes after they are removed from the dryer and when pressed or steamed.[18] After the garments were dried, they contained at least 3-6 percent PCE by weight.[19]

22. The transfer of wet fabrics is a significant source of PCE emissions in first

---

[13] *See* Compendium, **Exhibit 27** (Dry Cleaner Releases and Forensic Considerations) at p. 15; Compendium, **Exhibit 28** (Study of Potential for Groundwater Contamination from Past Dry Cleaner Operations in Santa Clara County) at p. 37.
[14] *See* Compendium, **Exhibit 26 (**Conducting Contamination Assessment Work at Drycleaning Sites) at p. 34.
[15] *See* Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 4. **Exhibit 26** to the Compendium is a true and correct copy of Conducting Contamination Assessment Work at Drycleaning Sites by the State Coalition for Remediation of Drycleaners, published in October 2010.
[16] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 1-2, 2-4 – 2-7; Compendium, **Exhibit 25** (Profile of the Dry Cleaning Industry) at p. 16-18, 26-27; Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 2, 16. **Exhibit 24** is a true and correct copy of Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems by the EPA, published in December of 1978.
[17] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 2-4 – 2-7; Compendium, **Exhibit 25** (Profile of the Dry Cleaning Industry) at p. 17-18; Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 2, 11-12.
[18] *See* Compendium, **Exhibit 25** (Profile of the Dry Cleaning Industry) at p. 27; Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 27; Compendium, **Exhibit 29** (Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene) at p. 810-11, 816.
[19] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 2-5.

generation transfer systems.[20] In addition to PCE release as a result of evaporation, as the clothes were saturated with PCE, there were occasional drips of PCE onto the floor during transfer.

23. As regards the filter-cooker-still filtration system, the waste product generated (sometimes referred to as muck) contains "considerable solvent"--"as high as 56% by weight."[21]

24. "Contact water is any water that has come into contact with drycleaning solvents or drycleaning solvent vapors. Contact water will contain some concentration of dissolved solvent."[22] One type of contact water is the water ultimately recovered after a drycleaning cycle has completed. This recovered water was "generally routed to a five-gallon plastic bucket... [and was] saturated with respect to solvent."[23] Prior to the mid-1980s, it was common for drycleaning businesses to discharge PCE-contaminated contact water to sanitary sewers.[24]

25. Studies also have shown that the disposal of waste materials (filters, spent filtrate material or "muck," discharged water) is a significant source of PCE contamination at drycleaning facilities.[25]

26. PCE emissions associated with business and maintenance practices include the release or discharge of PCE from (1) overfilling storage tanks, (2) dropping wet clothes on the floor when transferring from the washer unit to the dryer unit, (3) solvent spills, leaks from valves, flanges, seals, covers, hoses, and ductwork associated with first-generation equipment,

---

[20] *See* 86 FR 73207, National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities Technology Review, at p. 73211; *see also* Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 2 (when garments were removed from the washer unit, they contained approximately 25 percent PCE by weight); Compendium, **Exhibit 27** (Dry Cleaner Releases and Forensic Considerations) at p. 4-6 (before drying, 100 pounds of clothes may contain 2-3 gallons, or approximately 27-40 lbs) of PCE). **Exhibit 27** is a true and correct copy of Dry Cleaner Releases and Forensic Considerations by B. Wespestad, et al., published in the Environmental Claims Journal in 2020.
[21] Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 14.
[22] Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 12.
[23] Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 12; *see also* Compendium, **Exhibit 29** (Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene) at p. 816.
[24] *See* Compendium, **Exhibit 28** (Study of Potential for Groundwater Contamination from Past Dry Cleaner Operations in Santa Clara County) at p. 31. **Exhibit 28** is a true and correct copy of Study of Potential for Groundwater Contamination from Past Dry Cleaner Operations in Santa Clara County by the Santa Clara Valley Water District, published in 2007.
[25] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 1-2; Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 18.

and (4) leaks from storage tanks or other storage containers.[26] Leaks can cause PCE or PCE-contaminated water emissions; leaks also can result in PCE vapors being directly emitted into the air.[27]

27.  In 1998, the International Fabricare Institute reported solvent losses of 1.5 gallons per 1000 pounds of clothing can be anticipated from interior leaks and spills.[28]

**PCE Releases at Site and Response Action**

28.  In October 2014, Casa Nido retained Pangea to perform an initial site investigation to determine if a past release of hazardous substances had occurred at the Site. Pangea's initial investigation discovered volatile organic compounds ("VOCs") in shallow soil gas (also known as subslab gas or subslab vapor) under the Site building floor slab. The highest PCE concentrations were detected in subslab gas approximately 5 feet north and south, respectively, from the drycleaning equipment. These highest PCE concentrations of 1,700,000 and 1,900,000 $\mu g/m^3$ exceeded the DTSC-derived screening level of 67 $\mu g/m^3$ by approximately 28,000 times and exceeded the DTSC response action level of 6,700 $\mu g/m^3$ by approximately 280 times, indicating the need for additional and urgent action.

29.  In early 2015, consistent with the first step of national contingency plan ("NCP") compliance involving an "initial scoping meeting," Casa Nido retained Pangea to gather information to prepare for the initial scoping meeting. This first NCP compliance step for voluntary agreements is described on *DTSC's Voluntary Agreements – Assessment and Cleanup Process Quick Reference Guide*. Attached as **Exhibit 38** to the Compendium is a true and correct copy of this guide.

30.  According to this DTSC guidance, after DTSC enters into a Voluntary Cleanup Agreement ("VCA") with a "Proponent," the first step is to conduct an initial scoping meeting that includes discussion of: "Property History: Ownership, historic operations and land use;

---

[26] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 3-5 – 3.7; Compendium, **Exhibit 25** (Profile of the Dry Cleaning Industry) at p. 17, 27; **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 16-17; Compendium, **Exhibit 29** (Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene) at p. 816-817.
[27] *See* Compendium, **Exhibit 24** (Control of Volatile Organic Emissions from Perchloroethylene Dry Cleaning Systems) at p. 3-6; Compendium, **Exhibit 26** (Conducting Contamination Assessment Work at Drycleaning Sites) at p. 17.
[28] *See* Compendium, **Exhibit 27** (Dry Cleaner Releases and Forensic Considerations) at p. 15.

chemical use; regulatory status; permits; <u>prior assessments; investigations; cleanup or mitigation; etc</u>." In this guidance, DTSC acknowledges that a Proponent can perform assessments, cleanup, or mitigation prior to the start of the VCA.

31. Therefore, in 2015 and early 2016, additional testing was conducted to provide further characterization of the extent of VOCs to help evaluate the potential exposure to sensitive receptors (e.g., human health and the environment) and help facilitate engagement with local regulatory agencies and an "initial scoping meeting." The investigation documented the presence of elevated concentrations of hazardous substances related to prior dry-cleaning operations: tetrachloroethene ("PCE") and its breakdown product trichloroethene ("TCE"). The PCE and TCE presence was documented in soil, groundwater, and subslab gas. Groundwater assessment also was conducted to help determine if agency oversight was appropriate by the San Francisco Bay Regional Water Quality Control Board ("Regional Water Board"). A well survey, sanitary sewer video inspection, and an underground utility study were conducted to identify potential sensitive receptors and potential preferential pathways for contaminant migration to assist with the initial scoping meeting. The PCE and TCE presence was found beneath the Site building and immediately adjacent to the Thai restaurant located directly south of the Site. The gathered information demonstrated the need for urgent response to hazardous substances at the Site.

32. On August 16, 2016, Pangea issued a Site Assessment Report ("2016 Site Assessment"). The 2016 Site Assessment, including attachments, totals 442 pages, and is in the record as Joint Index Exhibit B (**ECF 148-2**, pp. 92-534). This assessment was performed to investigate subsurface conditions due to former site dry cleaning operations that used PCE and to help direct next steps toward source removal and case closure efforts. The 2016 Site Assessment includes my professional opinion at that time that one or more historic releases of PCE had impacted the Site soil, groundwater, and subslab/soil gas. In that report, Pangea made several recommendations, including soil removal, a vapor intrusion evaluation, and additional groundwater monitoring of Site wells.

33. In August 2016, Casa Nido also submitted an application for agency oversight from the Regional Water Board, who referred agency oversight for this Site to DTSC. In September of

2016, DTSC indicated determination of DTSC selection as the oversight agency; however, the following month, DTSC stated it currently did not have the staff to manage the project.

34. In May of 2017, after DTSC was able to find staff to manage the project and after additional agency interaction, Casa Nido entered a Voluntary Cleanup Agreement ("VCA") with DTSC. Attached as **Exhibit 41** to Plaintiff's Compendium of Exhibits is a true and correct copy of the VCA.

35. On December 7, 2017, DTSC issued its first agency request for an investigation workplan. With this workplan request, DTSC initiated the second procedural step of NCP Compliance of "Evaluation/Characterization" identified in the DTSC guidance for voluntary cleanups. No request was made for a Preliminary Endangerment Assessment or Supplemental Site Investigation at that time.

36. On April 3, 2018, DTSC assigned a new caseworker to the Site and approved an extension for the requested investigation workplan. On July 17, 2018, Casa Nido submitted the *Offsite Vapor Intrusion Assessment Workplan* for compliance with DTSC's request.

37. On September 7, 2018, DTSC issued a letter with comments and recommendations, requesting a revised workplan. At this time, DTSC also included a statement from Human and Ecological Risk Office ("HERO") recommending interim hazard mitigation measures (e.g., ventilation) for the adjacent Thai restaurant until subslab vapor samples could be collected and vapor intrusion risk assessed.

38. In October 2018, Pangea designed and implemented an interim action at the Site involving the removal of approximately 454 cubic yards of impacted soil and construction of a permeable reactive barrier to treat groundwater at the Site. This interim remedial action was necessary to help safeguard human health and improve conditions in soil, soil vapor, and groundwater.

39. Between 2018 and 2020, Pangea designed and installed a combined interim soil vapor extraction remediation system and sub-slab depressurization mitigation system ("SVE/SSD system") at the Site and the south-adjoining property which was intended to limit off-Site migration and exposure to vapor-forming chemicals. After a long delay by PG&E for electrical

service connection, the SVE/SSD system was started up in April 2020 and has operated nearly continuously to date.

40. For vapor intrusion mitigation, DTSC recognizes that "the most commonly accepted mitigation techniques are systems that dilute contamination by ventilation (SSV) and systems that reduce contamination by lowering pressure (SSD systems)."[29]

41. The remediation/mitigation work has been Pangea's focus since 2018, with a vapor intrusion assessment for adjacent properties per regulatory oversight.

42. On May 5, 2020, DTSC once again changed the caseworker assigned the Site project with a new supervisor. On December 4, 2020, Pangea submitted a Draft Additional Characterization Report with additional background research as requested by this new caseworker.

43. In October 2021, DTSC finally approved the first workplan for investigation at the Site.

44. On December 4, 2020, Pangea issued an Additional Characterization Report, which contains additional assessment data for soil, groundwater, and subslab/soil gas.[30]

45. During a meeting with DTSC on August 4, 2022, DTSC Supervisor Whitney Smith with oversight of the Site project thanked Casa Nido for their initial response actions at the Site. He confirmed that Casa Nido would get credit for the significant source removal, remediation, and mitigation measures, and that DTSC would eventually review response action documentation to determine if any additional removal or remediation is merited at the Site. DTSC confirmed the future remedy for the site could only involve "monitored natural attenuation" or continued operation of the existing remediation/mitigation system, without the need for additional soil or groundwater remediation.

46. On October 6, 2023, DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order, finding that Catherine O'Hanks, Earl Anderson, Sandra Vernell, and Casa Nido are responsible parties or liable persons as defined in

---

[29] Compendium, **Exhibit 39** (Vapor Intrusion Mitigation Advisory) at p. x. **Exhibit 39** is a true and correct copy of a document promulgated by DTSC in 2011.
[30] *See* Compendium, **Exhibit 23** (Additional Characterization Report).

Health and Safety Code section 25323.5.[31] The Order also found that there had been a "release" or "threatened release" of PCE at the Site, that this release may present an imminent and substantial endangerment to the public health or welfare or to the environment, and that action is necessary to abate a public nuisance and/or protect and preserve the public health.[32] Based on this, DTSC has ordered CASA NIDO, O'HANKS, VERNELL, and ANDERSON to engage in a number of future response actions, all of which will result in incurred costs consistent with the NCP.[33] DTSC also ordered that the SVE/SSD system that has been in use since April of 2020 continue to operate.[34]

47. During Pangea's investigation and remediation efforts, I have had the opportunity to observe the Site and better understand and characterize the situation regarding the released PCE at the Site.

48. I have reviewed Defendant Sandra Vernell's responses to discovery in this action, as well as the Declaration of Sandra Vernell. From these responses, it is known that:

(a) PCE was delivered by a tanker truck approximately every other month.

(b) PCE-contaminated charcoal or carbon material (muck) was generated during the drycleaning process in the amount of approximately 5-10 gallons per week. This waste was collected in a five-gallon plastic bucket and then transferred to a dumpster for retrieval.

(c) During the timeframe of May 1976 through September 1976, Mr. O'Hanks used rags to wipe up spilled PCE.

(d) During the timeframe of May 1976 through September 1976, Mr. O'Hanks accidentally dropped wet clothes on the ground while transferring them from the washer to the dryer.

49. In 1984, CATHERINE O'HANKS reported to the Contra Costa County Health

---

[31] Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 62.
[32] Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 62.
[33] Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 27-29.
[34] Compendium, **Exhibit 37** (Imminent and Substantial Endangerment Determination and Order and Remedial Action Order) at p. 27.

1 Services Department, Environmental Health Division, that her drycleaning business generated an average 25 gallons per month of PCE waste.[35]

50.  Based upon my education, experience, and the materials cited herein, it is my professional opinion that Tetrachloroethene ("PCE") was used as the drycleaning solvent for drycleaning/martinizing operations at the Site from 1960 through 1990.

51.  Based upon my education, expertise, and the materials referenced herein, in my professional opinion, the risk of PCE spills, leaks, and accidental and sudden releases at the Site was significant during the 1960's, 1970's, and into the 1980's. PCE usage by US drycleaners peaked in the late 1970s and declined significantly by 2000, largely due to transition from transfer machines to dry-to-dry machines using closed-loop technology. Prior to 1990, the Site used transfer machines. Under Jay Kwon's ownership after 1990, the transfer machines were changed out. Further information about modifications or equipment are not known.

52.  An excerpt of the true and correct original groundwater monitoring report prepared by Pangea for the Site is included in the 2016 Site Assessment at **ECF 148-2**, p. 130. Pangea conducted the initial subsurface investigation in October 2014 to evaluate subslab gas conditions (beneath the concrete floor slab) to determine if PCE releases occurred at the site near the drycleaning machine. In June 2015, Pangea conducted additional subslab gas sampling to evaluate PCE presence beneath the concrete floor slab beneath the rest of the then-existing building. The highest PCE concentrations of 1,700,000 and 1,900,000 μg/m$^3$ were detected approximately 5 feet north and south, respectively, from the drycleaning equipment. PCE concentrations in subslab gas decreased significantly with increasing distance from the former drycleaning machine. Based upon my education, experience, and the materials referenced herein, in my professional opinion, this initial assessment information indicates that PCE release(s) occurred near the Site's transfer machines and penetrated the nearby concrete floor slab. *See* 2016 Site Assessment, Figure 6, ECF 148-2, p. 127.

53.  My prior investigations at drycleaner sites typically discovered PCE beneath the

---

[35] *See* Compendium, **Exhibit 31** (Hazardous Waste Generator Inspection and Compliance Form). **Exhibit 31** is a true and correct copy of a form sent to me by the Contra Costa County Health Services Department, Environmental Health Division, upon a request made by Pangea.

concrete floor adjacent to the drycleaning machine(s), as PCE readily moves through concrete. In my professional opinion, based upon my education, experience, and the documents referenced herein, the fact that PCE leaks and releases can readily move through concrete means that PCE can impact the subsurface quickly after the release and allow for leaks and releases over time to continue to impact the site subsurface.

54. There were several reasons why the subsurface contamination identified in the 2016 Site Assessment appeared to Pangea to be attributable to above-ground discharges and releases associated with the drycleaning operations, including: the location and proximity of subsurface contamination to above-ground dry-cleaning equipment and operation; the fact that PCE was necessarily discharged and released during the use of transfer machines; the tendency of drycleaning equipment operating during this period of drycleaning operations to accidentally overflow and spill onto the floors (PCE readily moves through concrete and cracks in concrete floors were common paths for spilled PCE or PCE wastewater to reach the subsurface) and nearby drains; the unpaved/earthen area outside the former drycleaning business building where it appears drums of PCE wastewater or other PCE-bearing equipment and supplies were stored (such drums often accidentally leaked and high concentrations of subsurface PCE were located immediately below this unpaved/earthen area);

55. Pangea first conducted soil assessment in 2014 and 2015. The results of this assessment are presented in Table 1 and Figure 7 of the 2016 Site Assessment, **ECF 148-2**, pp. 138-139, 128. The highest PCE concentrations we detected in *soil* during this investigation were near the sanitary sewer cleanout (0.25 foot depth, sample location 'Cleanout-0') and approximately 10 feet east the former dry cleaning equipment and near the storage area (at 5 foot depth). Based upon my education, experience, and the materials referenced herein, in my professional opinion, these results indicate that PCE release(s) occurred near or between the drycleaning machine and the storage area, and near the sanitary sewer.

56. Between November 2017 and April 2018, Pangea performed a total twenty soil borings to further delineate source soil impact near the former dry cleaning equipment area, in the northeast corner of the property outside the building door in the backyard, beneath the nearby

sink/sewer piping, along the sewer lateral exiting the property in the eastern corner, and in the backyard and eastern portion of the Site. The collected results are presented in the 2020 Additional Characterization (**Exhibit 23** to Plaintiff's Compendium of Exhibits), Table 1 and Figure 3. PCE was the only VOC Pangea detected in soil above DTSC screening levels for a commercial/industrial scenario. PCE concentrations exceeded the DTSC soil screening level of 2.7 mg/kg in the center of the former dry cleaner building and extending to the eastern property boundary. The highest PCE concentrations in soil were found at these four locations: at 5 foot depth just outside the rear door at boring B-23 (350 milligrams/kilogram), about 7 feet away near the toilet/sewer piping at boring B-24 at 7 foot depth (120 mg/kg), south of the drycleaning machine and west of storage area at boring B-37 at 3 foot depth (140 depth), and 1 foot east of the drycleaning machine at boring B-20 at 3 foot depth (15.6 mg/kg). Based upon my education, experience, and the materials referenced herein, in my professional opinion, this soil data indicates that PCE releases likely occurred at the Site outside the rear door, near the toilet/sink or from the sanitary sewer piping near the rear door, near the drycleaning machine, and possibly near the storage area.

57.     Pangea's completed groundwater investigation documented the highest PCE concentrations near the former drycleaning machine (13,000 ug/L, boring B-1), in the eastern dirt yard area (12,200 micrograms/liter [ug/L], boring B-26), and in groundwater well MW-1 north of the drycleaning machine (14,000 ug/L). All groundwater samples were collected near 13-foot depth. This data is compiled in Table 2 and Figures 4 and 5 in the 2020 Additional Characterization. In my professional opinion, based upon my education, experience, and the materials referenced herein, the PCE presence in groundwater is consistent with PCE releases near the drycleaning machine/equipment, outside the service door in the rear yard, and possibly from sanitary sewer releases.

58.     Based upon my education, experience, and the materials referenced herein, in my professional opinion, PCE releases at the Site occurred as the result of transfer machine operation and waste handling, periodic or ongoing spills and leaks, and one or more sudden and accidental releases. Discharges and releases necessarily occurred during each year from 1960 through 1990.

1  This opinion is further based on the observed distribution of PCE within subsurface media, my
2  experience working on other drycleaner projects with historical operations dating back to the
3  1960s, and industry seminars and reference material. Our future site assessment activities will
4  help further investigate the extent of PCE in the Site subsurface and help investigate the PCE
5  release mechanisms at the Site.

6  59.  In May 2016, Pangea detected PCE at relatively low concentrations in offsite
7  groundwater within boring HP-1 located approximately 260 feet from the Omo's PCE release(s)
8  area, indicating a PCE groundwater plume length of approximately 275 feet or greater in the
9  western, downgradient direction. If a PCE release occurred as early as 1960 when drycleaning
10 operations started at the Site, the corresponding PCE migration rate in groundwater based on the
11 2015 data would be 5 feet per year. I note also that, based on groundwater monitoring data for
12 Site monitoring wells, the calculated groundwater gradient is very low (0.0005 to 0.001 ft/ft); a
13 gradient of 0.001 ft/ft means the groundwater elevation drops only 1 foot for every lateral 1,000
14 feet. This data is presented in the 2016 Site Assessment, **ECF 148-2**, pp. 133-136 (Figures 12-15).

15 60.  For comparison purposes, I reviewed estimated migration times for PCE or TCE
16 migration in groundwater from other Pangea drycleaning projects in the San Francisco Bay area.
17 For one San Bruno project, a TCE and degradation product cis-1,2-DCE plume migrated
18 approximately 110 feet within an estimated 32-year period (about 3.5 feet of TCE migration per
19 year); this project had a groundwater gradient of approximately 0.012 ft/ft that is approximately
20 ten to twenty times greater than the Omo's Cleaner site (and would lead to a faster migration time
21 for the San Bruno site). For a project in Lafayette, PCE migrated approximately 210 feet in
22 groundwater within an estimated 66 years (about 3 feet of migration per year); this project had a
23 groundwater gradient of approximately 0.04 ft/ft that is approximately forty to eighty times
24 greater than the Omo's Cleaner site (this gradient corresponds to a groundwater elevation drop of
25 40 feet for every 1,000 ft, which would lead to a faster migration time for the Lafayette site). For
26 the Napa project with approximately 15 years of drycleaning operations (1998 to 2013), the PCE
27 groundwater plume was approximately 40 feet in length downgradient of the drycleaning machine
   (about 3 feet of migration per year).
28

61. In my professional opinion, based upon my education, the materials referenced herein, and my experience, including in remediating these other comparable local project sites, it is more probable than not that the PCE at the front of the estimated 275-foot plume length observed at the Site is the result of PCE release(s) dating back to the 1960's. For the front end of the 275-foot plume length to be attributed to a release from 1984 or later, this would correspond to a PCE migration rate of 9 feet per year, much faster than the migration rate of 3 to 4 feet per year observed at the other referenced Pangea projects (despite the groundwater gradient about ten to forty times flatter or less steep than at the other projects). This characterizes the first releases at the Site but does not preclude nor make unlikely later releases.

62. I also note that PCE has been detected fairly deep in Site groundwater. (See 2016 Assessment Report, **ECF 148-2**, pp. 134-136 (Figures 13-15)). The PCE detected at location HP-1 approximately 260 feet from the drycleaning machine release area was located in deeper groundwater present vertically downward at 52 to 56 foot depth, which is up to 40 feet below the top of the water table. This PCE was detected in deeper groundwater within a thin zone of hydraulically conductive coarse-grained soil (e.g., sand/gravel) overlain by approximately 25 feet of fine-grained material (e.g., silt/clay) of estimated low hydraulic conductivity/permeability. This is also significant because hydraulic conductivity/permeability is generally much lower in the vertical direction than in the horizontal/lateral direction. In my professional opinion, based upon my education, experience, and the materials referenced herein, the presence of PCE found 260 feet from the drycleaning machine area, 40 feet below the top of the water table, and beneath an apparent 25-foot-thick silt/clay soil layer further supports my conclusion and professional opinion that detected PCE is the result of PCE release(s) commencing in the 1960's. This characterizes the first releases at the Site but does not preclude nor make unlikely later releases.

63. Despite my observations presented in this declaration, which are based upon extensive work by Pangea, uncertainty remains regarding the full extent of the PCE distribution in the Site soil gas and groundwater, and the effectiveness of completed and ongoing remedial action on residual PCE concentrations in soil beyond the limits of the excavation and residual PCE in soil gas and groundwater. There is also uncertainty about how much PCE concentrations could

rebound when the SVE/SSD remediation/mitigation system is turned off to evaluate PCE re-equilibration in the Site subsurface. This re-equilibration and rebound could have a significant effect on the need for additional investigation, remediation, and installation of additional vapor intrusion mitigation measures for nearby adjacent structures (and any future structure on the subject property).

64. **Exhibit 33** to Plaintiff's Compendium of Exhibits contain true and correct copies of Pangea invoices which correctly identify Pangea's services and costs from 2/17/15 through 12/20/23. If sworn as a witness, I could and would testify to my personal knowledge of the facts set forth therein.

65. The Declaration of Marsha Conwill (accompanying Plaintiff's Second Motion for Summary Judgment) references exhibits that identify response action and costs for the Site, including costs associated with work performed by Pangea and DTSC. It is my opinion that the response action and associated costs, taken as a whole, were necessary and either consistent with the national contingency plan (NCP) or in substantial compliance with the NCP. This opinion is based upon my experience, my review of invoices and costs, the materials referenced herein, discussions with DTSC Supervisor Whitney Smith for the Site on August 4, 2022, and DTSC's Imminent and Substantial Endangerment Determination and Order and Remedial Action Order. My opinion is further explained and supported by **Exhibit 40** to Plaintiff's Compendium of Exhibits. This exhibit is a true and correct copy of a September 20, 2022 letter that I wrote to Rachel Doughty with Greenfire Law PC on the subject of "Analysis of Remedial Work at Omo's Cleaners Site and NCP Compliance." If sworn as a witness, I could and would testify to my personal knowledge of the facts set forth therein.

I make this declaration under penalty of perjury under the laws of the United States of America, executed this 15th day of May 2024, in Berkeley, California.

GREENFIRE LAW, PC

By: */s/ Robert Clark-Riddell*
ROBERT CLARK-RIDDELL

Under N.D. Cal. Local Rule 5-1(i)(3), in lieu of a signature, I attest that I obtained approval, on May 15, 2024, from Robert Clark-Riddell for the filing of this declaration.

/s/ *Jennifer Rae Lovko*
Jennifer Rae Lovko
ATTORNEY FOR PLAINTIFF