Rachel S. Doughty (CBN 255904)
Jessica L. Blome (CBN 314898)
Richard A. Brody (SBN 100379)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fx: (510) 900-9502
rdoughty@greenfirelaw.com
jblome@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NOTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASA NIDO PARTNERHSIP, a California Partnership, <br><br> Plaintiff, <br><br> v. <br><br> CATHERINE O'HANKS; SENTRY INSURANCE COMPANY; SANDRA KATE VERNELL (f/k/a SANDRA KATE ANDERSON) and EARL RAY ANDERSON, <br><br> Defendant. <br><br> ——————————————— <br><br> AND ALL RELATED COUNTER AND CROSS CLAIMS | Case No. 20-cv-07923-EMC <br><br> **DECLARATION OF SANDRA KATE VERNELL** |

I, SANDRA KATE VERNELL, do declare and state:

1. If sworn as a witness, I could and would testify to my personal knowledge of the facts set forth herein.

2. On or about May of 1976, I was hired as a manager-trainee by Roy O'Hanks to work at the dry-cleaning business at 12210 San Pablo Avenue, Richmond, California (Site).

3. On or about September of 1976, I became the manager of the dry-cleaning business at the Site.

4. In July of 1977, Defendant Catherine O'Hanks and her husband, Roy O'Hanks, agreed to sell the dry-cleaning facility and business at 12210 San Pablo Avenue, Richmond, California to me and my then-husband Earl Ray Anderson in exchange for a series of payments.

5. While operating the dry-cleaning business, expenses were paid from a bank account that had I and Earl Ray Anderson as signatories.

6. Regarding operation, I and Earl Ray Anderson operated the dry-cleaning facility for a total of approximately 20.5 to 22.5 months; I was the one in charge of daily operations during this time. We first operated the facility from August 1, 1977 to March 31, 1978, when Roy O'Hanks took her keys and took back possession and operation of the dry-cleaning facility. I and Earl Ray Anderson filed suit against the O'Hanks in April 1978. We regained possession and operation of the dry-cleaning facility from approximately May 1978 to August 1978, when the O'Hanks again took back possession and operation of the dry-cleaning facility. On July 14, 1979, I and Earl Ray Anderson again regained possession and operation of the dry- cleaning facility, when the court entered a preliminary injunction in our favor as against the O'Hanks, and we continued to operate the dry-cleaning facility until the court ultimately ruled against us and dissolved the preliminary injunction on June 6, 1980, after which I never possessed or operated the dry-cleaning facility again.

7. Both as an employee of the O'Hanks and as an operator of the dry-cleaning

business, I witnessed the use of tetrachlorethylene (more commonly known as "PCE") as part of the dry-cleaning process.

8. I do not have documentation or a specific recollection of the quantity of PCE used at the dry-cleaning facility. I do recall that the PCE was delivered to the facility by a tanker truck approximately every other month. The truck would park on the north side of the building, and the driver of the truck would run a hose from there to the dry-cleaning equipment, located on the southern side of the building, to deliver the PCE.

9. The dry-cleaning machines at the Site consisted of a separate washer and dryer. At no time during the years that I was at the Site, either as an employee of the O'Hanks or as an operator of the business, were these machines replaced.

10. Because there was a separate washer and dryer, wet clothes would be manually transferred from the washer into a cart, and from there, into the dryer.

11. During the timeframe that I worked as an employee of the O'Hanks, I witnessed Roy O'Hanks accidentally drop wet clothes onto the floor while trying to transfer them to the dryer.

12. Mr. O'Hanks trained me to use rags to wipe up PCE in the event of a spill or accident. During the timeframe that I worked at the Site as an employee of Roy O'Hanks, I saw Mr. O'Hanks use a rag to clean up PCE that had spilled onto the floor.

13. The dry-cleaning process resulted in a waste product being produced, which had to regularly be removed and disposed of. During the timeframe that I operated the dry-cleaning business, this waste product would be collected in a five-gallon plastic bucket and then transferred to a dumpster in the rear yard for retrieval.

14. During the timeframe that I operated the dry-cleaning business, approximately 5-10 gallons per week of this waste product was generated.

I make this declaration under penalty of perjury under the laws of the United States of America, executed this 16 day of May 2024, in Richmond California.

By: _____
Sandra Kate Vernell