# **EXHIBIT A**

Ronald J Piziali
13123 Regan Lane
Saratoga, Ca 95070
408-499-5723
June 4, 2020

Mr. Ian Utz
Environmental Scientist
Department of Toxic Substance Control

Good morning Mr. Utz:

 I am responding to your email message.  To the best of my knowledge, the Casa Nido Partnership that owns the property on San Pablo Avenue in Richmond, California has never incorporated as am LLC and therefore never dissolved itself an LLC—it always has been and remains a partnership, not an LLC.  As such, because the partnership has not been dissolved there are no successors to the partnership.  I confirmed this with our Partnership Attorney and he indicated that you possibly are looking at an unrelated entity.

Casa Nido Partnership intends to cooperate with reasonable and appropriate guidance from DTSC and to be responsible for related fees.  As Bob Clark-Ridell at Pangea Environmental may have mentioned to you, the Partnership is anxious to do what is necessary to receive an NFA from the Agency and market the property.  You may be interested in knowing that this property was purchased in the 70's when there were no environmental restrictions or guidance. *We are currently in our sixth year of working to remove toxins from these properties.*

The indicated properties are in the title of the Casa Nido Partnership.  Under separate emails I will forward you copies of the current property tax bills which confirm this.  There will be three separate emails with copies of the tax bills.  You will note that the title on those bills show as "Nido Casa".
We have already incurred a major amount of costs (in excess of $800,000) to do the right thing with regard to cleaning up these sites.  We intend on completing the work and urge DTSC to carefully review the work and pertinent reports prior to finalizing your request for additional remedial activities. I would expect that Pangea will be providing you various reports once they are finalized.  Casa Nido would greatly appreciate your efforts to keep agency oversight costs to a minimum, such as avoiding having multiple DTSC staff persons review the same documentation.  To the extent possible, Casa Nido Partnership would prefer to spend the limited assets it has available on the actual remedial work rather than on agency oversight costs for such remedial work.

Thank You,
s/ Ronald J. Piziali

DTSC000000151

# **EXHIBIT B**

**Casa Nido Partners**
**c/o B&T Bookkeeping, Inc.**
**3060 El Cerrito Plaza, #507**
**El Cerrito, CA 94530**

December 22, 2016

Sent by Email to Megan.Indermill@dtsc.ca.gov
Hardcopy by Regular Mail

Ms. Megan Indermill, Project Manager
Environmental Scientist, Brownfields and Environmental Restoration
California Department of Toxic Substances Control
700 Heinz Avenue, Suite 200
Berkeley, CA 94710-2721

Re:  The Former Omo Cleaners Site at 12210 San Pablo Avenue, Richmond, CA 94805 --
Proposed Voluntary Cleanup Agreement Between Casa Nido and DTSC

Dear Ms. Indermill:

First, I want to thank you and your colleagues for meeting with my environmental consultant, Bob Clark-Riddell of Pangea Environmental Services, Inc., and me in your offices on November 1, 2016. It was a very informative meeting which helped me better understand the role of the Department in overseeing our work to investigate the site and assure that health and the environment are protected.

During the meeting, one of the things we discussed was the possibility of the partnership and the Department entering into a Voluntary Cleanup Agreement ("VCA"). You were kind enough to send a copy of a draft VCA to Bob, who forwarded it promptly to me.  Being 18 pages in length, the draft VCA contains quite a lot of detail, and it took me longer than I expected to read through and understand it and discuss it with Bob, the other partners and our attorney, with the result that I am getting back to you over a month later. I hope you will not take the length of time for me to respond as an indication that the partnership is less than fully committed to cooperatively working with the Department in investigating and cleaning up the site. That commitment remains firm. However, the partnership is not willing to sign the proposed agreement, and I want to explain why.

The agreement simply does not seem to us to be a sufficiently positive contribution to carrying out the action. It is highly legalistic, and it places many burdensome requirements on the partnership that we feel will greatly increase costs, without providing real benefit. In addition, there are simply too many points in the agreement that seem unnecessary -- either (1) to Casa Nido achieving the investigation and cleanup, paying for work and paying for Department oversight, or (2) to the Department doing its job of oversight to assure that Casa Nido does the work right.

On our side, we will voluntarily do our work right. The partnership will continue to retain the services of an excellent environmental consultant; we will carry out the investigation and cleanup

DTSC000005105

DTSC000005106

Letter to Ms. Megan Indermill, Project Manager
California Department of Toxic Substances Control
December 22, 2016
Page 2

to the highest standards; we and our consultant will consult closely beforehand with the Department's expert staff to allow them to always be aware of, review and, where necessary in their judgment, approve of work being done; we will follow the Department's staff's advice and direction; and we will pay for it all.

On your side, you will get full cooperation, voluntarily. The Department, and its people, will always be accorded access to the site; to plans in advance; to data and its collection; to all necessary reports in a timely fashion; and to all the other things reasonably set out in the VCA. If anything does not seem right to Department staff, all they will need to do is contact Bob or me, who will be acting as the "project managers," on technical/scientific subjects and on authority and compliance subjects, respectively. The partnership will pay all the Department's reasonable costs based on the quarterly written billings as stated in the draft VCA. Our consultant will carry out all the tasks in the draft scope of work deemed necessary.

In short, we are confident that the Department will be very pleased with our voluntary performance. As evidence of the sincerity and reliability of our commitment, we trust you will credit all the work and expense that the partnership carried out and incurred in the past time period, even without advance oversight and without any agreement. It is our intention to continue and even exceed this high standard, and we do not need to sign an 18-page agreement to fulfill that intention faithfully.

Upon reaching an understanding on the next steps in the investigation and cleanup, I will provide an advance deposit to the Department to cover reasonable oversight costs. To demonstrate our genuine interest to proceed and follow Department staff advice and direction, I am prepared to provide a $20,000 deposit which exceeds the initial estimate for a desired advance deposit provided by the Department for this project.

Please feel free to contact Bob and me personally if there is any question or comment on this. I believe you have all Bob's contact information, and in case you need mine, here it is: *Phone*: 408-499-5723, *Email*: ronaldpiziali@gmail.com.

I expect we will be in regular contact in this matter for some time, and I look forward to working with you and the Department.

Very truly yours,

Ron Piziali, General Partner
Casa Nido Partnership

# **EXHIBIT C**

**[202121] OMO FABRICARE DRY CLEANER**
**TELECONFERENCE MEETING MINUTES**
**PAGE 1 OF 3**

<u>TELECONFERENCE MEETING MINUTES</u>

OMO FABRICARE DRY CLEANER (SITE CODE 202121)
NOVEMBER 19, 2020
9:00 AM to 10:40 AM
CONFERENCE LINE:  866-564-0930

1. **Attendees**

   - Ron Piziali (Proponent/Casa Nido Partnership Partner),

   - Paul Stanton Kibel, Esq. (Proponent's Counsel/Water and Power Law Group),

   - Bob Clark-Riddell (Proponent's Consultant/PANGEA Environmental Services),

   - Larry McDaniel, Esq.  (DTSC Office of Legal Counsel),

   - Whitney Smith (DTSC Unit Chief), and

   - Ian Utz (DTSC Project Manager).

2. **Agenda and Disclaimers**

   a. UTZ:  Standard roll call, this is not an open meeting, this is not being recorded, there are attorneys present for DTSC and Proponent (Casa Nido).

   b. UTZ:  The purpose of this teleconference, which Proponent's counsel requested, is to resolve the issue of an outstanding Workplan and Health and Safety Plan, and the issue of the Proponent running out of money allocated to this project.

   c. In advance of the teleconference, Proponent's counsel provided:

      i. Letter of November 5, 2020, entitled "Request for Meeting with DTSC to Discuss Responsible Parties and Sequencing of New Scope of Investigation Regarding Subterranean Creekbed."

      ii. E-mail of November 16, 2020, entitled "Case 4:20-cv-07923 Casa Nido Partnership v. Kwon et al Complaint," transmitting a filed lawsuit.

      iii. E-mails of November 2020, certain of which transmitted draft figures and an incomplete Health and Safety Plan.

   d. UTZ:  This discussion does <u>not</u> constitute DTSC agreement, approval, or any other affirmation of claims made in the matter of Casa Nido v. Kwon et al., nor of Power Law Group's communications throughout November 2020.   DTSC is not a party in the lawsuit.

3. **History**

   e. UTZ:  Thank you, Casa Nido for its participation in the Voluntary Cleanup Program, to cooperatively protect the people of the State through cleanup of the contaminated Site.

   f. KIBEL: Discussed initial involvement in the property (ownership, discovery of contamination, and dry cleaner operators).  KIBEL inherited this project from a previous attorney (Karl Morthole).   Casa Nido and/or its individual partners acquired the Site in the 1970s, when Environmental Site Assessment requirements did not yet exist, and allegedly discovered the contamination in the 2010s.  Some of the partners have since

DTSC000000208

acquired ownership interest through inheritance.  Casa Nido claims that under a fairness standard DTSC should allocate more responsibility for response and oversight costs to the operators of the dry cleaners (their tenants) and try to access the tenants' insurance policies.  Casa Nido represents that it did not carry commercial general liability (CGL) insurance, but was covered by being named an additional insured on tenants' CGL policies.  Casa Nido has not provided:  chain of title, history of tenancy/tenant operations, Workplan, or Health and Safety Plan, or completed Preliminary Endangerment Assessment (PEA) (with history of historical operators).  Casa Nido entered into a Voluntary Cleanup Agreement (VCA, or Enforceable Agreement), intending to use about $1 million in available funding from the partnership's sale of another property to address all the contamination at this Site. They then, without DTSC oversight, even though a VCA had been signed, made a business judgment to proceed quickly with several interim actions from 2017 to 2020, totaling almost $1 million, to address the known/discovered risk that this property poses to adjacent properties and the environment.  Having now run out of earmarked money because of that expenditure on activities conducted without DTSC oversight., Casa Nido has very little free capital to perform the environmental investigation/remediation anticipated under the VCA.

4. **Status of Voluntary Cleanup Agreement Scope of Work**

   a. KIBEL/PIZIALI:  Casa Nido claims that about $1 million was set aside after the sale of another property owned by Casa Nido, and was earmarked specifically for cleanup of the Site.  The Site is no longer generating an income for Casa Nido.   Casa Nido is projecting that within months, based on the contemplated near-term scope of work ($3,100/month for ongoing operation and maintenance of the Site and interim systems, and $40,000 for upcoming vapor intrusion investigation), the remaining earmarked funds will run out, and Casa Nido partners will be forced to pay for the remaining costs out of pocket as individuals.  Not all of the $1 million was spent on actual work at the Site; some went to legal fees, and additional sampling work, but the $1 million was the source of funds used so far to pay DTSC agency oversight costs

      a. KIBEL:  Casa Nido believes that reaching that point, where elderly and/or inheritor individuals are paying out of pocket, without DTSC having contacted other potentially responsible persons such as their tenants as former dry cleaner operators and their expected insurance, seems unfair and un-equitable.  Casa Nido refers DTSC to the CERCLA "Gore Factors" as a framework for allocating responsibility in a fair and equitable way.  KIBEL emphasized that Casa Nido has been attempting to expediently complete interim actions at the Site, based on potential liabilities under personal injury/tort liability law.

      b. UTZ: The cleanup work has so far not followed State or federal law or the voluntary agreement. Therefore, DTSC cannot determine whether the work was completed safely, or whether the work was effective, or necessary, or if that work would have been in compliance with National Contingency Plan (NCP).  In addition, there are already legal options to quickly completing emergency/time-critical removals. The work performed by the Owner and consultant did not follow those legal options as they moved forward without input from DTSC even though they had signed an Enforceable Agreement that would if followed had led them to an NCP-compliant cleanup and been protective of human health

and the environment.  The work that DTSC requested several years ago, which remains incomplete, was intended to ascertain whether surrounding properties were endangered. Casa Nido's exhaustion of the $1 million was a business decision. Casa Nido should perform its obligations under the Enforceable Agreement Statement/Scope of Work.

   c.  MCDANIEL/KIBEL:  Discussed insurance policies and the nature of pursuing cost recovery through insurance.

   d.  KIBEL:  Reiterated request for DTSC to pursue other alleged potentially responsible persons, in order to activate insurance policies.

  b.  UTZ:  DTSC is <u>still</u> expecting a Sampling and Analysis Workplan and Health and Safety Plan (HASP), pursuant to the VCA, which Casa Nido already agreed to complete, and which DTSC asked for several years ago (PEA – Task 2, Work Plan – Task 3, HASP – Task 19).  The Workplan and HASP were most recently due November 9, 2020 after prior extensions were granted. DTSC has not received the deliverables under Enforceable Agreement and no further extensions were granted.  The soil vapor extraction and sub-slab depressurization systems may or may not be the appropriate remedy and/or mitigation for the Site, because the remedy selection process was not followed, and because DTSC has not reviewed or approved these systems. However, at this point, to prevent an endangerment to the public that could result from cessation of interim operations, DTSC anticipates their continued operation.

  c.  CLARK-RIDDELL:  PANGEA has <u>not</u> <u>yet</u> delivered a variety of historical, sampling, and engineering documentation to DTSC that were generated during the last three years.

**5.  Path Forward**

   d.  KIBEL: Can DTSC order other parties to complete work while preserving the existing VCA with Casa Nido?

      a.  MCDANIEL:  DTSC policy is to not expend State time issuing orders when there is already an Enforceable Agreement that allows for parties to seek contribution from third parties.   Also, if an Order were to be issued, DTSC would need to identify "manageable" number of parties, including both owners and operators.

   e.  CLARK-RIDDELL:  Are there other options, at this juncture in the cleanup process, for DTSC to begin to involve other parties?

      a.  MCDANIEL:  DTSC can issue Information Requests, which carry a penalty of $25,000/day for noncompliance.

   f.  UTZ:  DTSC requires that Casa Nido finish its Workplan and HASP and perform the vapor intrusion investigation work, to ascertain safety of the adjoining properties.  This is the most urgent task at hand.

      i.  CLARK-RIDDELL:  Estimates that this will take 2 weeks.

   g.  UTZ:  Proponent should expect an e-mail from DTSC.  DTSC needs to confer on the best path forward.

# **EXHIBIT D**



 **Department of Toxic Substances Control** 

*Jared Blumenfeld*
Secretary for
Environmental Protection

Meredith Williams, Ph.D., Director
700 Heinz Avenue
Berkeley, California 94710-2721

*Gavin Newsom*
Governor

October 8, 2020

Casa Nido c/o Ronald Piziali
13123 Regan Lane
Saratoga, California 95070
ronaldpiziali@gmail.com

OMO FABRICARE DRY CLEANERS (SITE CODE 202121)

Dear Mr. Piziali,

The Department of Toxic Substances Control (DTSC) has reviewed the document entitled *Revised Offsite Vapor Intrusion Investigation Workplan*, prepared by PANGEA Environmental Services, Inc. (PANGEA), on behalf of Casa Nido, dated September 11, 2020 (Workplan). The Workplan proposes a vapor intrusion investigation at properties adjoining 12210 San Pablo Avenue in Richmond, Contra Costa, California (Site). DTSC has the following comments.

Please submit a revised Workplan no later than **October 26, 2020**.

## General Comments

1. *Terminology*. The unapproved remedial activities performed to date (e.g., soil excavation, soil amendments, permeable reactive barriers, soil vapor extraction, and sub-slab depressurization) shall hereafter be referred to as "interim actions." DTSC did <u>not</u> oversee, evaluate, or approve the interim actions.

2. *Terminology*. Replace all references to "subslab gas" with "sub-slab soil vapor" and all references of "soil gas" to "soil vapor," for consistency. Also, specifically identify wells/probes as "temporary" or "permanent," to distinguish whether the sampling locations/ports will be left in place, and thereafter maintained.

DTSC000000182

Ronald Piziali
October 8, 2020
Page 2 of 17

3. *Sampling Program.* DTSC disagrees that indoor air sampling should be further postponed. DTSC requires, at minimum, the following concurrent sampling program, to be completed a minimum of two times (e.g., one mobilization during wet season, and one mobilization during dry season), with the first sampling event lasting 24 hours. This should be reflected in Section 3.0 (Scope).

a. **North-Adjoining Property (12226 San Pablo Avenue)**

  i. Three indoor air sampling locations; and,

  ii. Three sub-slab soil vapor sampling locations.

b. **South-Adjoining Property (12200 San Pablo Avenue)**

  i. Three indoor air sampling locations; and,

  ii. Five sub-slab soil vapor sampling locations, including the three existing locations, and two new permanent sub-slab sampling ports (at northwest; and at southeast, possibly in the restroom).

c. **East-Adjoining Property (403 McLaughlin Street)**

  i. Three indoor air sampling locations; and

  ii. One sub-slab soil vapor sampling location (slab-on-grade); and,

  iii. One sub-slab soil vapor sampling location (paved crawlspace); and,

  iv. One soil vapor sampling location (unpaved crawlspace); and,

  v. One crawlspace air sampling location (paved/unpaved crawlspace).

d. **West-Adjoining Property (12201 San Pablo Avenue)**

  i. Three indoor air sampling locations; and,

  ii. Three sub-slab soil vapor sampling locations.

e. **Northeast-Adjoining Residence (423 McLaughlin Street)**

  i. One crawlspace air sampling location.

  ii. One nested soil vapor sampling location, between SG-6A and residence.

f. **General**

  i. Two outdoor air sampling locations upwind from the Site.

  ii. One duplicate indoor air sample and one duplicate sub-slab soil vapor sample.

Ronald Piziali
October 8, 2020
Page 3 of 17

4. *Schedule.* Add a schedule section to the Workplan. Include deadlines for: 1) Access agreement completion; 2) Interior survey form completion; 3) Clearance of sampling locations and implementation of COVID protocols (e.g., note potential interference from use of ethanol for hand sanitizer); 4) Field mobilizations; 5) Sample collection; 6) Sample analysis; 7) Results delivery; and 8) Report submittal.

5. DTSC (ian.utz@dtsc.ca.gov) shall be copied on electronic delivery of all laboratory analytical data, as indicated on chains of custody. DTSC requests expedited laboratory turnaround times.

6. *Privacy.* Please exclude the names and contact information of individual property owners who are not already associated with the Site, in both the Workplan and the upcoming report.

7. *Attenuation Factor.* At this stage, the scope of work cannot formally include calculation of empirical attenuation factors. Please remove this from the scope.

## **Specific Comments**

1. *Title.* Revise the title to be "*Draft Revised Off-Site Vapor Intrusion Investigation Workplan.*" Deliverables prepared pursuant to the *Voluntary Cleanup Agreement* dated May 8, 2017 are subject to DTSC review and commenting, and remain in draft form unless otherwise approved by DTSC.

2. *Links.* The header bookmark links appear in the bookmarks sidebar of Adobe®, but are not linked to corresponding pages. There might be a template error.

3. *Abbreviations.* Revise any use of the term PPM (part-per-million) to reflect the unit basis (e.g., volumetric).

4. *Section 1.0 (Introduction).* The goal statement should be revised to state that "This workplan proposes to collect soil vapor, sub-slab soil vapor, crawlspace air, indoor air, and ambient air samples at off-Site properties, to investigate potential vapor intrusion to off-Site properties. The purpose of this investigation is to evaluate whether exposure to vapor forming chemicals emanating from the subsurface into indoor air represents a complete exposure pathway and/or unacceptable human health risk or hazard."

5. *Section 2.0 (Site Background).* The Workplan fails to include a working Conceptual Site Model (CSM). Please revise Section 4.4 (Data Validation and Reporting) to state that the summary report will include an updated CSM. The

DTSC000000184

Ronald Piziali
October 8, 2020
Page 4 of 17

CSM is instrumental to evaluating the relevance of default screening criteria. CSM elements include, but are not limited to: 1) a list of contaminants of potential concern (COPCs);  2) known range/maximum concentrations or screening level exceedances of COPCs in each medium;  3) identification of the primary and secondary sources of COPCs;  4) location, depth, and phase(s) of COPCs;  5) release mechanism(s);  6) exposure media such as surface soil, drinking water and air; 7) potential human and ecological receptors and groundwater; and 8) unique features of the Site.  If these data do not exist, the CSM will state such.

6.  *Section 2.1 (Site Description and History)*.

   a.  Page 2, second paragraph.  A *Preliminary Endangerment Assessment (PEA) has not been completed for the Site, and therefore certain historical information remains unknown.*  For example: 1) Several entities operated the former dry cleaner; 2) The dry cleaner did not necessarily begin operations in 1966 (unless otherwise verified); and 3) The dry cleaner generated halogenated solvent hazardous wastes until at least 2000 (per the Hazardous Waste Tracking System).  Please revise the paragraph to state generally that a dry cleaner operated on Site from the 1960s until 2015, and generated halogenated solvent wastes, including tetrachloroethylene (PCE) from at least the 1980s to 2000s.

   b.  The Workplan does not state which hydrocarbon-based solvents were used at the Site, nor does it provide sampling data to rule out the potential for a release to have occurred from the use of such hydrocarbon-based solvents. Please include these data in the Workplan, or state that sampling has shown that these contaminants are not present at the Site and reference the documents that support this statement.  Otherwise, if there are no data evaluating potential hydrocarbon impacts at the Site, additional investigation may be recommended.

   c.  The Workplan does not state that isopropyl alcohol (IPA) has not been detected at the Site, even though IPA will be the vapor used for leak detection for subslab soil vapor sampling equipment. Please reference Site documents that show that IPA is not present. If there are no data regarding IPA, an alternate leak tracer gas, such as 1,1-Difluoroethane (1,1-DFA), should be used.

7.  *Section 2.3 (Interim Actions)*.

   a.  Page 2, both paragraphs.  Revise the text to read in active voice rather than passive voice, to clarify who completed the interim actions.  For

DTSC000000185

example, "PANGEA completed [interim actions]."  Examples of passive voice include "was excavated," and "was placed" and "was installed."  Who completed these activities, and under whose direction?

b. Page 2, fifth paragraph.  Replace with "Between 2018 and 2020, [entity] installed an interim soil vapor extraction (SVE) and sub-slab depressurization (SSD) system at the Site and south-adjoining property, without DTSC oversight.  The interim system is intended to limit off-Site migration and/or exposure to vapor-forming chemicals; however, the interim system has not yet been evaluated by DTSC."  The technical rationale and purpose of the interim work is open to interpretation, since it was not approved.

c. Page 3, second paragraph.  Replace second sentence with "These activities are summarized in draft reports that have not yet been reviewed by DTSC."  Remove the subsequent three bullets, and the final paragraph of this section.  The Workplan is not intended to evaluate interim actions.  However, add a sentence stating that "The SSD/SVE system will remain operational during the vapor intrusion investigation, to avoid delays due to post-shut-off re-equilibration."  Include DTSC's associated e-mail of August 11, 2020, in Appendix A.

8. *Section 2.4 (Adjacent Site Use and Public Participation)*.

a. For each building to be sampled, please list the square-footage and number of stories in both the text and figures.

b. The first two bullet points both state that the SVE system is designed to capture vapors toward the adjacent north and east properties.  It is unclear that the SVE system was necessarily designed to protect these adjacent properties, which appears to be inferred in the statements, as no information supporting this inference was provided.  The SVE discussion should be limited to the technical specifics of the installed system and it should be clearly stated that it was not installed under the oversight of DTSC and is not a function of any approved remedy for the Site.

c. Page 3, north bullet.  Remove the final sentence.  Include the assessor's parcel number (APN).

d. Page 3, south bullet.  Modify the final sentence to simply state that the SSD system is operating within this property, with the permission of the property owner, as received via (method) on (date).  Include the APN.

DTSC000000186

Ronald Piziali
October 8, 2020
Page 6 of 17

    e. Page 4, east bullet.  Remove the final sentence.  Include the APN.
Include the missing bullet symbol.

    f. Page 4, west bullet.  Update this information, including whether the
property owner responded.  Correct second sentence to "Based on data
collected between 2015 and 2019, on-Site impacts have migrated in
groundwater beneath the restaurant property, from approximately 10 to 60
feet below ground surface."

    g. Page 4, second non-bullet paragraph. State that "Although a formal
community profile has not yet been prepared, DTSC directed PANGEA to
conduct its activities in accordance with the 2012 DTSC *Vapor Intrusion
Public Participation Advisory* and in consultation with a DTSC Public
Participation Specialist.[1]  DTSC will send a letter, community update, and
vapor intrusion background information to each property to be sampled."

    h. State how sampling results will be conveyed to building occupants and
property owners (e.g., in a letter or teleconference, and within a certain
timeframe).

9. *Section 3.0 (Proposed Scope of Work).*

    a. Please revise this section to reflect DTSC's General Comment #3. For
example, the first bullet should reflect belowground and aboveground gas
sampling at <u>five</u> properties.  The use of the terms "initial" and "sequencing"
in this section will be unnecessary, since soil, soil vapor, sub-slab soil
vapor, and groundwater data have already been collected at certain of the
off-Site properties, and there will be no sequencing.

    b. Page 4.  Since laboratory analysis will be by USEPA Method TO-15,
replace "CVOCs" with "VOCs" in the first paragraph of Section 3.0. DTSC
has not approved any list of COPCs yet, in part because a PEA-equivalent
has not been completed, and in part because characterization is
incomplete.  There have been other screening criteria exceedances,
including for total petroleum hydrocarbons, and methylene chloride.

        i. DTSC recommends analyzing air samples in full scan mode. The
full scan mode will provide a more accurate identification of the
analytes and corresponding concentrations in the sample. Further,

---

[1] https://dtsc.ca.gov/wp-content/uploads/sites/31/2016/01/VIPPA_Final_03_05_12.pdf

DTSC000000187

in full scan mode, all compounds can be confirmed by a mass spectral library.  Selective ion mode (SIM) can achieve lower detection limits for contaminants and should be used when a known contaminant must be detected at relatively low concentrations.

c.  Page 4.  Scope Bullets.

i.  DTSC disagrees that expansion of an unapproved engineering control is the only logical next step, if a confirmed exceedance exists.  There are other short-term mitigative measures (e.g., running HVAC, evacuation of premises) and confirmatory procedures (e.g., repeated sampling) possible. Remove the latter three bullets and indicate that "If cumulative human health risk or hazard exceeds (value) at a given building, then (frequency) additional rounds of sampling will occur within (timeframe), and/or if concentrations of VOCs are confirmed to exceed (short-term action level), then PANGEA will work with DTSC to implement (mitigative measure)."

ii.  In addition, this bulleted list of scoped items does not include soil vapor sampling, nor is there a section below for soil vapor sampling (only sub-slab soil vapor, indoor air, and ambient air).  Each of the sections should describe or reference in appendix the installation method (e.g., sealing, tubing, capping, equilibration times).

iii.  There is not reference to field conditions in the workplan. Sampling cannot occur during or within five days of rain, for example.  What if there is wildfire smoke or a power outage?  Include a bullet for mobilization to conduct a field screening and preparation of each building, in consideration of COVID-19 as well as potential interior confounding factors.

iv.  Note that since there is not a true barrier limiting vapor intrusion when a crawlspace is present, indoor air samples within the residence are more informative.  Crawlspace samples are sometimes not used during health risk/hazard evaluations because they are difficult to interpret and incorporate.

d.  Page 5.  First paragraph.  Correct the references using the document flow chart DTSC provided PANGEA:  Indicate the correct document author (e.g., DTSC instead of Cal-EPA) and include the 2011 *Vapor Intrusion Guidance* (which should have directly informed the Workplan).

DTSC000000188

Ronald Piziali
October 8, 2020
Page 8 of 17

e. Page 5. Second paragraph. Correct to "PANGEA proposes to monitor differential pressure at (properties) with (instruments) in order to evaluate the potential radius of influence of operational interim engineering technologies on (type of pressure) beneath (buildings)." The purpose of this study is to investigate vapor intrusion, not evaluate engineering control performance.

f. Page 5. Second paragraph. Attenuation factors estimate attenuation to indoor air from soil vapor through any medium, like concrete or soil, not just attenuation through slabs. The last sentence of this section states that sampling will be conducted to facilitate the determination of a Site-specific vapor intrusion building attenuation factor for the restaurant at 12200 San Pablo Avenue. At that this stage, DTSC does not consider the development of a Site-specific attenuation factor for vapor intrusion to be acceptable for this Site and all references should be removed from the document. The Site characterization is not complete and substantial levels of chlorinated VOCs have been observed in soil vapor and groundwater. Despite the SVE/SSD system implementation, the magnitude of the situation still warrants the active remediation of all soil, soil vapor, and groundwater contamination associated with the on-Site source and off-Site contamination. DTSC does not consider the use of a Site-specific building attenuation factor, predicated on the assumed protective capacity of an existing building construction, to be appropriate here as a means to reduce monitoring requirements or supplement an active remedy. DTSC notes that reliance on the current operating conditions of the building to provide adequate protection of human health would require administrative controls and monitoring to ensure conditions do not change resulting in an unacceptable risk or hazard.

10. *Section 3.1 (Subslab Probe Installation).*

a. First, indicate if/when a preliminary building survey was completed to determine building foundations per building, and how (e.g., visual observations, interview, building records).

b. Second, discuss procedures for handling and disposing of investigation-derived waste in accordance with local, state, and federal requirements.

c. Third, indicate the length of time that the pins are designed to remain in place, per manufacturer's specifications and DTSC guidance (e.g., temporary vs. permanent).

DTSC000000189

    d. Fourth, indicate the intended depth of installation (e.g., in feet below ground surface, or feet below slab).

    e. 12200 San Pablo Avenue.  Indicate whether the existing probes are adequate for repeated monitoring, given the time lapse since their installation, and the potential for their degradation.  Also, in the forthcoming report, include:  1) photographs of the existing probe locations in an appendix, along with 2) three rough schematics for their installation (e.g., so DTSC can see how SS-9 depth accounts for the fact it is at a "raised dining area").

    f. Other Properties.  Clerical errors. "Fix" not "Fixed" and "will be installed" not "will installed."

        i. 403 McLaughlin Street: PANGEA will need to collect subsurface vapor samples at the three foundational compartments of the house (i.e., one sub-slab at paved crawlspace; one sub-slab inside building; and one soil vapor at the dirt crawlspace).  This is reflected in DTSC's required scope, above.

11. *Section 3.2 (Subslab Probe Sampling).*

    a. Define SUMMA® canister (passivated stainless steel canister).

    b. Page 6, second paragraph.  What is the shroud constructed of?

    c. Page 6, second paragraph.  Replace "IPA will be maintained…" with "IPA concentrations will be maintained…"

    d. Page 6, third paragraph.  DTSC requires modifications to the quality assurance/control (QA/QC) program.  See comments on Section 4.3. DTSC recommends consolidating all QA/QC scope in Section 4.3.

        i. The Workplan states that "one replicate gas sample will be collected to evaluate the reproducibility (precision) of the laboratory's analytical ability and to estimate sample variability." Add "in the field" to the end of this sentence, and replace "laboratory's analytical ability" with "field samples."  A replicate gas sample in the field (e.g., duplicate) would indicate reproducibility and precision of field samples, but not necessarily inform a laboratory's analytical ability as indicated.  A laboratory split sample would inform quality assurance of its analytical precision.

Ronald Piziali
October 8, 2020
Page 10 of 17

    e.  Page 6, third paragraph.  DTSC suggests that a separate section be added to consolidate all statements regarding "Laboratory Analysis," wherein analysis for all gas samples is by a single (fixed or mobile?) laboratory by USEPA Method TO-15, in addition to analysis for fixed gases (carbon dioxide, oxygen, and methane) and leak check compound (isopropyl alcohol).

    f.  Page 6, third paragraph.  It is not clear what the purpose of a shroud sample will be, since a photo-ionization detector (PID) will be used, and samples themselves will already be analyzed for leak check compound. DTSC recommends removal, to focus on other sampling priorities.

12. *Sections 3.3 and 3.4 (SVE/SSD System Expansion).*

    a.  Remove this section.

    b.  Replace these sections with sections entitled *Soil Vapor Probe Installation,* and *Soil Vapor Probe Sampling.*

13. *Section 3.5 (Concurrent Subslab Gas and Indoor Air Sampling).*

    a.  Rename this section entitled *Indoor Air Sampling.*

    b.  Remove all references to "sequencing" or otherwise postponing sampling of indoor air.  Based on the absence of a sufficient rationale, and a review of existing data, DTSC has determined that indoor air sampling shall be prioritized.  Revise this section to reflect the DTSC-required minimum scope of work (General Comment #3).

    c.  Pre-Sampling Survey.  What about windows?  HVACs, fans, hoods, etc. should not be operated during this first sampling event, at any of the five buildings, for consistency.

    d.  Indoor Air Sampling.  Revise to state that "All samples will be collected in accordance with DTSC's 2011 *Vapor Intrusion Guidance.*"

    e.  Please include language that the sampling technician will check for sources of vapor intrusion in foundation penetrations (i.e., drains, piping, etc.) with a PID and will position indoor air sample containers near the foundation penetrations and away from vents in the crawlspace of the residence.  Vents should be noted on the field survey diagram of residences.

14. *Section 3.6 (Cross-Slab Differential Pressure).*

    a.  First paragraph of section.  Remove last sentence.

DTSC000000191

Ronald Piziali
October 8, 2020
Page 11 of 17

    b. The permanent sub-slab sampling ports, including the two new ports required by this letter, should allow for soil vapor samples to be collected and for the pressure differential to be evaluated across the slab.  Note that it will likely be necessary to install additional permanent soil vapor probes within the footprint of the restaurant building in order to properly define the CSM and to ultimately evaluate progress towards meeting cleanup goals. Samples collected from Vapor Pins® generally reflect conditions directly below the slab and DTSC would expect that additional data on contaminant concentrations at deeper points in the vadose zone, beneath the building, will be necessary to understand the vertical distribution of contamination and to evaluate the efficacy of the selected remedy, over time. It may be prudent to begin delineating the vertical extents of soil vapor contamination beneath the building to further define the CSM.

15. *Section 4.1 (Data Quality Objectives)*.

    a. No data quality objectives (DQOs) are stated.  The final sentence does not make sense.  Please use USEPA guidance to set clear DQOs.

    b. For example, DTSC requires that one DQO be that laboratory analytical reporting limits be lower than than the screening criteria values.

16. *Section 4.3 (Quality Control Checks)*.

    a. Remove the first sentence.

    b. Indicate whether decontaminated canisters will be batch or individually certified.  Batch certification is acceptable for the first mobilization.

    c. State that final canister pressures will be checked and recorded in the field and at the lab as received.

    d. Previous investigations suggest leaks in high-risk samples (e.g., SG-3 DUP in December 2017).  DTSC recommends the implementation of new engineering or administrative controls to eliminate leaks

    e. For each mobilization, DTSC requires a minimum of <u>one</u> field duplicate sub-slab soil vapor or soil vapor; and <u>one</u> field duplicate for indoor air; and <u>one</u> laboratory replicate; as well as laboratory QA/QC reporting protocols (e.g., reporting limit verification, data qualification).

17. *Section 4.4 (Data Validation and Reporting)*.

    a. State that the laboratory analytical reports will include case narratives.

Ronald Piziali
October 8, 2020
Page 12 of 17

    b. Ensure that the "Data validation will include…" statement reflects the requested quality assurance/control protocols of the laboratory. DTSC notes that certain of the listed controls are not commonly included for USEPA Method TO-15.

    c. State whose "quality requirements" are being compared against. DTSC recommends referencing USEPA DQO guidance.

18. *Section 5 (Reporting)*.

    a. The report shall be entitled "*Off-Site Vapor Intrusion Investigation Report*."

    b. Section 5 (Reporting) does not actually describe the planned format of the ultimate report. Per 2015 guidance[2], the report shall include: 1) Description of field operations (including shut-in testing and leak check compounds, and purge volume data); 2) Analytical methods used; 3) Analytical results; 4) Revised CSM; 5) Deviations from the approved workplan; 6) Data inconsistencies; 7) Data gaps identified based on the revised CSM; and 8) Conclusions and recommendations. Attachments shall include elements listed on page 7 of the 2015 guidance.

    c. Include chromatograms in laboratory analytical reports.

    d. State that results will be compared to the default residential human health risk/hazard vapor intrusion screening criteria presented in Table 1 of the Workplan.

    e. State that the report will calculate estimated cumulative cancer risk and non-cancer hazard using the <u>maximum</u> detected VOC concentrations in indoor air, and separately crawlspace air if applicable, at each building. Include a tabular **Contingency Plan** with:

        i. Qualitative Rules: The Workplan states that the SVE/SSD systems will be rapidly expanded to mitigate potential vapor intrusion issues if soil vapor sampling results suggest it is warranted. DTSC recommends that the Workplan be revised to state that sampling will be conducted, and the data will be evaluated on an expedited schedule to determine the most appropriate action.

---

[2] https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/01/VI_ActiveSoilGasAdvisory_FINAL.pdf

DTSC000000193

Ronald Piziali
October 8, 2020
Page 13 of 17

    ii.  Quantitative Rules:  Establish quantitative decision rules, using the contingency plan matrix on page x of the 2020 *Draft Supplemental Guidance*[3].  For example, validated cumulative cancer risk greater than 1.0E-04 or non-cancer hazard greater than 1.0 will necessitate mitigative or remedial measures, under DTSC oversight.

    iii.  This section should establish a decision rule for crawlspace air results as they compare to applicable indoor air screening criteria (based on assumed default attenuation factor of 1.0).

19. *Health and Safety*.

    a.  Add a section for health and safety matters.

    b.  State that all work will be completed in accordance with applicable local, state, and federal laws and regulations, including with regards to occupational health and safety.

    c.  State that work shall be conducted in accordance with a Site-specific *Health and Safety Plan*, on file with DTSC, which includes established COVID-19 protocols including use of personal protective equipment such as masks/respirators.  See the enclosed Cal-OSHA guidance.

    d.  State that utility location will take place, including at the two minimum soil vapor (i.e., not sub-slab soil vapor) sampling locations.

20. *Table 1 (Draft Subslab Gas and Soil Gas Analytical Data)*.

    a.  Draft.  Since Table 1 relies on data collected as part of work completed without DTSC oversight or approval, Table 1 should be labeled as DRAFT and a disclaimer should be added that the data are draft and remain unapproved by DTSC as of the date of the Workplan.

    b.  Screening Criteria.  Correct the sub-slab soil vapor and soil vapor screening criteria derived from DTSC and USEPA indoor air screening criteria for total xylenes (15,000, not 1,500 micrograms per cubic-meter) and trichloroethylene (100 micrograms per cubic-meter, not "—").

    c.  Screening Criteria.  Correct the screening criteria names:

---

[3] https://dtsc.ca.gov/wp-content/uploads/sites/31/2020/02/Public-Draft-Supplemental-VI-Guidance_2020-02-14.pdf

Ronald Piziali
October 8, 2020
Page 14 of 17

        i. Lines 1 and 2:  For 2019 Environmental Screening Levels (ESLs), specify that the values are soil vapor and sub-slab soil vapor. There is no medium specified.

        ii. Line 3:  For 2020 DTSC and USEPA "derived" values, specify the values are for soil vapor and sub-slab soil vapor, as derived from both DTSC (HERO Note 3) and USEPA (Regional Screening Level) default screening criteria for indoor air.  There is no in-line attribution.

        iii. Line 4:  For 2014 USEPA "derived" value, specify the value is derived from the USEPA.  Please also reference the 2014 USEPA Accelerated Response Level memorandum in the footnotes.  There is no in-line or footnoted attribution.

d. Quality Assurance.  The existing Table 1 indicates that there is not yet an established quality assurance program, except for the use of two replicates (see separate comment below about replicates) out of 35 sampling data points for at least five batches of samples.  Per our guidance, DTSC recommends at least one lab replicate and one field duplicate per batch or 20 samples.  A spot check analytical data reported in April 2020 indicates that the laboratory has qualified a significant number of values for, at least, analysis out of hold time.  Update the tables to reflect data validation.

e. Values.  The non-detect (ND) values are defined as "not detected above detection limits," implying no detection in excess of method detection limits (i.e., statistically absent).  However, a spot check of April 2020 soil vapor analytical data received from McCampbell Analytical, Inc., transmitted to DTSC in July 2020, suggests that certain non-detects should instead be defined as "not detected above laboratory reporting limits," implying some potential detection, but no statistically rigorous quantitation (i.e., potentially present but difficult to quantify).  Please clarify.

f. Values.  Note that over half of the analytical data include ND reporting limits that are one to four orders of magnitude greater than the screening criteria, and therefore cannot be used for health risk/hazard screening purposes (or must simply be assumed to be exceedances).

g. Methods.  The table indicates that Tedlar™ bag samples are analyzed by USEPA Method 8260 (version unstated) whereas the SUMMA® canister samples are analyzed by USEPA Method TO-15 (version unstated).

DTSC000000195

Ronald Piziali
October 8, 2020
Page 15 of 17

Going forward, samples should be consistently analyzed by a single method to avoid, for example, differences in reporting limits.

h. Footnotes. The USEPA Regional Screening Level on which derived values are based should assume target hazard quotient of 1.0, not 0.1.

i. Shading. At this early stage in the project, the gray shading should be redefined to highlight exceedances of the residential--not commercial/industrial--screening criteria. Clarify in the table footnotes that PANGEA has selected the lowest value among the vapor intrusion human health risk (cancer) and hazard (non-cancer) values, from 2019 ESLs. There are two possible endpoints for "HHRL" values (cancer, non-cancer).

j. Analytes. Include columns for the remaining detected compounds, including but not limited to total petroleum hydrocarbons and 1,1,1-trichloroethane. DTSC recommends that the table be formatted in landscape (wide) layout to accommodate this change.

k. Replicates. Describe the difference between a "duplicate" and a "replicate" (e.g., SG-3 DUP and SG-4A REP). If they are both secondary field replicates (i.e., duplicates) intended to evaluate field and laboratory precision, then they should be similarly named with -DUP. If the replicates are laboratory replicates intended to evaluate laboratory precision, please state such in the footnotes. Please clarify whether SG-3 DUP should be renamed SG-3B DUP.

l. Locations. Differentiate between on-Site and off-Site sample locations.

21. *Figures 2 and 3.*

a. The Workplan does not include a layout of the building at north (12226 San Pablo Avenue), west (12201 San Pablo Avenue), or east (403 McLaughlin Street) including interior walls/rooms. The locations of the sub-slab vapor probes and the indoor air samples should consider the layout of the building and areas where occupants spend their time. Please include an approximate layout of the buildings' interiors that also depicts the layout of any interior walls in the crawlspace beneath the residence at 403 McLaughlin Street.

b. Include the full layout of known utilities (e.g., include the remaining utility lines depicted at San Pablo Avenue, in PANGEA's existing draft reports).

c. Add a disclaimer that all features are approximate, since it is not a surveyor, engineering, or other stamped drawing.

d. Add sources for data (e.g., utilities, property lines, and concentrations).

DTSC000000196

Ronald Piziali
October 8, 2020
Page 16 of 17

   e. Include the date for soil excavation.

   f. Correct 413 McLaughlin Street to <u>423</u> McLaughlin Street.

   g. Figure 2 does not include groundwater monitoring well locations.  Please include the locations of the existing monitoring wells in this figure to allow coordination of the Workplan with previous investigations done on Site.

   h. Include groundwater iso-concentration contours on Figure 3.  Areas of the highest concentrations in groundwater inform the placement of soil vapor samples.

   i. Include groundwater flow direction(s).

22. *Appendix C (Indoor Air Screening Log).*

   a. The log form should be edited to include PID calibration information.

23. *Appendix C (Building Survey Form).*

   a. Please revise the Building Survey Form to match the suggested data included in Attachment 5 of the 2020 *Draft Supplemental Guidance* or use the forms provided in Attachment 5.

24. *Appendix C (Soil Gas Purging/Sampling Log).*

   a. The Workplan does not include an example of a sub-slab soil vapor sampling log. GSU accepts the use of the Soil Gas Purging/Sampling Log for sub-slab soil vapor sampling, if the following items are also included in the field data: slab thickness, locations of moisture or staining on the slab, slab condition (i.e., concrete deterioration, large cracks or extensive cracking), odors from hole drilled for the vapor pins are noted, soil type under slab, vapor barrier type/present, and other observed conditions noted.

25. Please note the enclosures attached herein.

If you have any questions, please contact me at 510-859-8107 or ian.utz@dtsc.ca.gov.

Sincerely,

Ian Utz, Project Manager
Site Mitigation and Restoration Program – Berkeley Office
Department of Toxic Substances Control

Ronald Piziali
October 8, 2020
Page 17 of 17

Enclosures (4):

- *2020 DTSC Draft Community Update;* and
- *2020 DTSC Draft Letter to Adjoining Properties*
- *2020 Cal-OSHA COVID-19 Safety and Health Guidance*
- *2012 DTSC Guidelines for Access Agreements*

cc:     (via e-mail)

Marsha Conwill
Casa Nido
mtc10860@aol.com

Bob Clark-Riddell, P.E.
PANGEA Environmental Services, Inc.
briddell@pangeaenv.com

Ron Scheele, P.G.
PANGEA Environmental Services, Inc.
rscheele@pangeaenv.com

Jesse Negherbon, Ph.D., P.E.
DTSC Engineering and Special Projects Office
jesse.negherbon@dtsc.ca.gov

Vivek C. Mathrani, Ph.D., DABT
DTSC Human and Ecological Risk Office
vivek.mathrani@dtsc.ca.gov

Theodore Mazzoli, P.G.
DTSC Geological Services Branch
theodore.mazzoli@dtsc.ca.gov

Alejandro Vivas
DTSC Public Participation
alejandro.vivas@dtsc.ca.gov

DTSC000000198

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CASA NIDO PARTNERSHIP, a      )
California Partnership,       )
                             )
            Plaintiff,        )
                             )
   vs.                        )
                             )
CATHERINE O'HANKS and JAE     )
KWON aka JAY KWON aka JAY     ) No.
KWON SHI aka JAY SHIK         ) 3:20-CV-7923-EMC
KWON; LYNNE MARIE
GARIBOTTI aka LYNNE
GARIBOTTI BLOWER aka
LYNNE G. BLOWER,
individually as trustee
the Claudio Garibotti
Trust, dated May 1, 1952;
and SENTRY INSURANCE
COMPANY,
            Defendants.

REMOTE DEPOSITION
OF IAN UTZ
VOLUME 1

DATE:          Thursday, February 29, 2024
TIME:          10:08 a.m. - 1:54 p.m.
LOCATION:      Via Web Video Conference


Magna Legal Services
866-624-6221
www.MagnaLS.com
REPORTED BY:  JAMIE DAVIS, CSR NO. 14209



Page 21

1   going to refer to 12210 San Pablo Avenue, Richmond,
2   California, as the site.  Is that okay?
3        A. Yes.
4        Q. All right.  Mr. Utz, if we go to paragraph
5   six of the voluntary cleanup agreement, which is on
6   DTSC -- let's see, 8683, that is the Bates number.
7           But paragraph six says scope of work and
8   DTSC oversight.
9           Do you see that, Mr. Utz?
10          MR. HURTADO:  I think you were muted, Ian.
11          THE WITNESS:  Yes.
12   BY MR. DOW:
13       Q. And the document states, DTSC shall review
14   and provide proponent with written comments and all
15   proponent's deliverables as described in Exhibit C,
16   scope of work, correct?
17          MR. HURTADO:  Objection.  Document speaks
18   for itself.
19          MR. BRODY:  Join.
20          THE WITNESS:  Yes.
21   BY MR. DOW:
22       Q. Okay.  And the proponent in this case is
23   Casa Nido Partnership, correct?
24       A. I believe the proponent in this case is
25   described as only Casa Nido in this VCA.



1          THE WITNESS:  To some extent.

2     BY MR. DOW:

3          Q. Okay.  As far as the tasks that are listed

4     in Exhibit C of the voluntary cleanup agreement, was

5     it your charge to see that those tasks were

6     fulfilled by Casa Nido?

7          A. I don't know what you are referring to.

8          Q. I'm referring to Exhibit C, scope of work

9     in the voluntary cleanup agreement and there is a

10    list of tasks.

11          And let me ask you this, Mr. Utz, are you

12    somebody that can tell me the extent to which these

13    tasks were completed under the voluntary cleanup

14    agreement by Casa Nido?

15          MR. BRODY:  Objection.  Overbroad.  Lacks

16    foundation.  Calls for speculation.

17          MR. HURTADO:  I will join in those.

18          THE WITNESS:  I don't fully understand the

19    question.

20    BY MR. DOW:

21          Q. Again, Mr. Utz, I am just asking you as to

22    Exhibit C, the voluntary cleanup agreement, do you

23    have any knowledge as to whether the tasks

24    enumerated in the agreement starting with task 1

25    were fulfilled by Casa Nido?



Page 25

1            MR. BRODY:  Objection.  Overbroad.  Lacks
2    foundation.  Calls for speculation.
3            THE WITNESS:  To my knowledge, the tasks
4    listed in Exhibit C in their totality were not
5    completed by Casa Nido.
6            MR. DOW:  Okay.
7            MR. HURTADO:  I'll also object to legal
8    conclusion.
9            THE WITNESS:  Based on the information
10   available to me.
11   BY MR. DOW:
12       Q.  Okay.  So -- and I don't mean to make you
13   repeat yourself, Mr. Utz.  But -- so are you telling
14   me -- so we have from task 1 all the way to task 19.
15   You are telling me that none of these activities
16   were completed by Casa Nido under the VCA; is that
17   correct?
18           MR. BRODY:  Objection.
19           MR. HURTADO:  Misstates the deponent.
20           MR. BRODY:  Join.
21           MR. HURTADO:  Argumentative.
22           MR. BRODY:  I apologize.  I keep
23   interrupting.  Join.
24           MR. HURTADO:  Yeah.
25           THE WITNESS:  Your representation is not an



```
 1   DTSC's supervision, would you know that?
 2           MR. HURTADO:  Objection.  Calls for
 3   speculation.
 4           MR. BRODY:  Join.
 5           THE WITNESS:  I don't know.
 6   BY MR. DOW:
 7       Q.  Was it done pursuant to the voluntary
 8   cleanup agreement?
 9           MR. HURTADO:  Objection.  Legal conclusion.
10   Calls for speculation.  Lacks foundation.
11           MR. BRODY:  Join.
12           THE WITNESS:  I don't know.
13   BY MR. DOW:
14       Q.  Well, earlier, Mr. Utz, you told me that
15   Casa Nido completed no task under the voluntary
16   cleanup agreement based on the information you have,
17   correct?
18       A.  No.
19           MR. BRODY:  Misstates testimony.
20   BY MR. DOW:
21       Q.  Okay.  Then what did you tell me, Mr. Utz?
22           MR. HURTADO:  Objection.  Asked and
23   answered.
24           THE WITNESS:  I believe I told you that the
25   scope of work listed in Exhibit C of the voluntary
```



1   cleanup agreement dated 2017 in its totality,

2   meaning describing all of the items together not

3   individually, to my knowledge based on the

4   information available to me had not been completed.

5   BY MR. DOW:

6        Q. Okay.  But you're telling me you can't tell

7   me if that 450 tons of soil was removed under DTSC's

8   oversight, correct?

9            MR. HURTADO:  Objection.  Calls for

10  speculation.  Asked and answered.

11           MR. BRODY:  Join.  Lacks foundation.

12           THE WITNESS:  I believe my previous answer

13  was I don't know.

14  BY MR. DOW:

15       Q. Can you tell me why you don't know?

16           MR. HURTADO:  Objection.  Argumentative.

17           MR. BRODY:  Join.

18           THE WITNESS:  No, I can't tell you why I

19  don't know.

20  BY MR. DOW:

21       Q. Okay.  Mr. Utz, have you ever seen this

22  letter before I showed it to you today?

23       A. I'm not sure.

24       Q. Okay.  Okay.  I just dropped another letter

25  into the chat.  This will be the next exhibit.



Page 46

```
 1          Q.  Okay.  Mr. Utz, if we look at page 2 of 3
 2   of this letter, it states the quote, However
 3   investigation and removal activities at the site,
 4   including the demolition of onsite structures,
 5   proceeded without DTSC oversight for nearly two
 6   years.
 7               Can you -- it says for nearly two years.
 8   Can you tell me what years you are referring to in
 9   this letter approximately?
10          A.  The two years preceding my project
11   management role.
12          Q.  Okay.  So you were -- I think we have
13   already established that you came on board sometime
14   in 2020.  So would it be fair to say that that two
15   years is 2019 and 2018 approximately?
16          A.  It could be.
17          Q.  Okay.  Thank you.
18               Mr. Utz, can you tell me why it is
19   important that DTSC have oversight of investigation
20   and removal activities?
21               MR. HURTADO:  Objection.  Too general.
22   Ambiguous.  Vague.
23               MR. BRODY:  Join.
24               THE WITNESS:  Can you repeat the question,
25   please?
```



Page 47

```
1    BY MR. DOW:
2         Q. Yes.  And the premise for the question is
3    that here you are pointing out to Mr. Piziali that
4    there were investigation and removal activities at
5    the site for approximately two years without DTSC
6    oversight.
7         And I am just asking you:  Why is DTSC
8    oversight important?
9         MR. HURTADO:  Same objections.
10        THE WITNESS:  Why is DTSC oversight
11   important?  DTSC is a regulator for the State of
12   California, and its oversight of hazardous
13   substances cleanup sites is intended, in part, to
14   ensure that cleanups occur safely and legally.
15   BY MR. DOW:
16        Q. Thank you.
17        Mr. Utz, do you recall -- okay.  Let me
18   back up.
19        My understanding is that eventually an
20   offsite vapor intrusion and investigation work plan
21   was conditionally approved by DTSC for this site; is
22   that correct?
23        A. An offsite investigation work plan for
24   vapor intrusion investigation was ultimately
25   approved for this site, correct.
```



1        Q. Okay.  And at some point, it was not

2    conditionally approved, it was just flat out

3    approved; is that correct?

4        A. I don't know.

5        Q. Okay.  Can you tell me, were there any

6    other work plans for the site that were approved by

7    DTSC to your knowledge?

8            MR. BRODY:  Objection.  Calls for

9    speculation.  No foundation.

10           THE WITNESS:  I don't know of any other

11   work plans that DTSC approved for the site

12   personally.

13           MR. DOW:  Okay.  Thank you.

14           Okay.  I am going to need a ten-minute

15   break myself.

16           Does anyone mind if we take a ten-minute

17   break?

18           MR. HURTADO:  That's fine.

19           (Break taken.)

20   BY MR. DOW:

21       Q. Mr. Utz, did DTSC oversee any soil

22   excavation by Casa Nido at the site?

23           MR. BRODY:  Objection.  Vague as to time.

24           MR. HURTADO:  Calls for speculation.

25           THE WITNESS:  I don't know.



Page 50

```
 1   Mr. Piziali, right?

 2        A. Yes.

 3        Q. Okay.  So the letter under general comments

 4   terminology it says, The unapproved remedial

 5   activities performed to date, EG soil excavation,

 6   soil amendments, permeable reactive barriers, soil

 7   vapor extractions, and sub-slab depressurization,

 8   shall hereafter be referred to "interim actions."

 9   DTSC did not oversee, evaluate, or approve the

10   interim actions.

11        So based on your statement to Mr. Piziali,

12   I will ask you again.  I just want to know, was

13   there any -- to your recollection, was there any

14   soil excavation that Casa Nido did that was approved

15   by DTSC?

16        MR. HURTADO:  Objection.  Calls for

17   speculation.

18        MR. BRODY:  Join.

19        THE WITNESS:  I don't know.

20   BY MR. DOW:

21        Q. Okay.  Well, would it be accurate to say

22   that as of October 8, 2020, the soil excavation done

23   by Casa Nido at the site was not overseen by DTSC;

24   is that correct?

25        MR. HURTADO:  Same objection.
```



Page 52

```
 1           MR. BRODY:  No foundation.  And join.
 2           THE WITNESS:  I'm not aware of any
 3  submittals to the department with the name of the
 4  submittal being a preliminary endangerment
 5  assessment, and by department, I mean DTSC.
 6  BY MR. DOW:
 7      Q. And on page 5 of 17, it talks about the
 8  installation -- well, you're suggesting revisions to
 9  Mr. Piziali relative to the soil vapor extraction
10  system.  And are you asking him to insert into this
11  document that you are commenting on that the interim
12  system has not yet been evaluated by DTSC?
13           My question is, was the SVE system ever
14  evaluated by DTSC to your knowledge?
15           MR. BRODY:  Objection.  Vague and
16  overbroad.  Lacks foundation.
17           THE WITNESS:  No.  Not in the sense that I
18  meant in this letter here.
19  BY MR. DOW:
20      Q. Okay.  I am just not super clear.  So --
21  okay.  No, I think I get your answer.  Thanks.
22           What about the sub-slab depressurization
23  system?  To your knowledge, was that ever evaluated
24  by DTSC?
25           MR. BRODY:  Same objections.
```



Page 53

1              THE WITNESS:  Not in the sense that I

2    intended in this letter to mean by the term

3    evaluation.

4    BY MR. DOW:

5         Q. So your answer is no?

6              MR. HURTADO:  Objection.  Asked and

7    answered.

8              MR. BRODY:  Join.

9              THE WITNESS:  That is not the answer that I

10   gave you.

11   BY MR. DOW:

12        Q. Okay.  Because you -- I'm not trying to

13   make you repeat yourself, Mr. Utz, but I am just

14   trying to -- I mean -- I mean, what does evaluation

15   mean to you in the context that you are talking

16   about it here?

17        A. In the context of this letter, evaluate

18   would have included a review of written

19   documentation, including engineering plans, permits,

20   other standard engineering documents for an

21   engineered system such as the one described here,

22   the SVE and SSD system.

23        Q. Okay.  So in other words, for the SVE

24   system, DTSC did not evaluate any of the types of

25   documents you just mentioned, correct?



Page 54

1        A. Based on the comments provided by Dr. Jesse

2   Negherbon, the professional engineer, the documents

3   required for such an evaluation had not been

4   provided.

5        Q. Okay.  And to your knowledge, had such

6   documents been provided for the sub-slab

7   depressurization system?

8        A. No.  That is what I meant by SVE and SSD,

9   so it would be for the depressurization system.

10  They are physically different and similar in some

11  ways.  At the site they are physically very close to

12  each other, but they are different engineered

13  systems.

14       Q. Okay.  Okay.  Scrolling down to page 8 of

15  17.  You state the site characterization is not

16  complete and substantial levels of chlorinated VOCs

17  have been observed in soil vapor and groundwater.

18           Mr. Utz, can you tell me what site

19  characterization is, please?

20           MR. HURTADO:  Objection.  Calls for a

21  lengthy explanation.

22  BY MR. DOW:

23       Q. It does not have to be lengthy.

24       A. As used in this letter, the term site

25  characterization is a term of art.  It refers to



Page 55

```
 1   investigation of hazardous substances or waste

 2   release, including in some cases sampling data of

 3   environmental media.

 4        Q. And what is the point of site

 5   characterization?  Like, what is the goal of site

 6   characterization, assuming there is one?

 7             MR. HURTADO:  Objection.  Vague.

 8             MR. BRODY:  Join.

 9             THE WITNESS:  There are a number of

10   potential or possible goals for site

11   characterization.

12   BY MR. DOW:

13        Q. Let me ask it this way, at the site we are

14   talking about, the site that is the subject of this

15   voluntary cleanup agreement, why is -- assuming site

16   characterization is necessary, why is it necessary?

17             MR. HURTADO:  Objection.  Vague.  Too

18   general.  Expert opinion.

19             MR. BRODY:  Join.

20             THE WITNESS:  As discussed or as it relates

21   to this letter, site characterization is important

22   for many reasons.  One of them is to understand the

23   scope of the contamination, the types of

24   contaminants, the lateral and vertical extent of the

25   contaminants in environmental media and the
```



1   potential risks, for example, they impose to human

2   health or the environment.

3   BY MR. DOW:

4        Q. Thank you.

5           Let me ask you this, was site

6   characterization ever completed for this site?

7           MR. HURTADO:  Objection.  Calls for expert

8   opinion.  Lacks foundation.

9           MR. BRODY:  Join.  And overbroad.

10          THE WITNESS:  Based on the information

11  available to me, this site remains in the site

12  characterization phase of cleanup, and therefore, it

13  was not completed at the site.

14  BY MR. DOW:

15       Q. Mr. Utz, over the course of a history of a

16  cleanup, from start to finish, would you say

17  characterization occurs early in the cleanup

18  process?

19          MR. HURTADO:  Objection.  Incomplete

20  hypothetical.  Vague and ambiguous.

21          MR. BRODY:  Join.

22          THE WITNESS:  Site characterization can

23  occur at any time in the cleanup process, including

24  before or after the cleanup process.

25  BY MR. DOW:



Page 58

1    completing hazardous waste operations as it is

2    defined.

3    BY MR. DOW:

4         Q. So you are saying that the VCA requires

5    that Casa Nido submit a health and safety plan; is

6    that correct?

7              MR. HURTADO:  Objection.  Misquotes the

8    deponent.

9              MR. BRODY:  Join.

10             THE WITNESS:  What I was just referring to

11   was the order for the site, the imminent and

12   substantial endangerment determination and order and

13   remedial action order.

14   BY MR. DOW:

15        Q. Okay.  Let me show you a document.  Okay.

16   This document is dated October 19, 2020.  And this

17   will be the next exhibit.

18             (Exhibit 8 marked.)

19             THE COURT REPORTER:  Just for the record,

20   it will be 8.

21   BY MR. DOW:

22        Q. Mr. Utz, can you see -- if you look at my

23   screen, Mr. Utz, you will see an e-mail from you

24   dated October 19, 2020, to Bob Clark-Riddell, and

25   some other folks.



Page 59

```
 1              Can you tell me who Bob Clark-Riddell is?
 2         A. In the context of this e-mail, Mr. Bob
 3    Clark-Riddell is a licensed professional engineer
 4    and a contractor with Pangea Environmental Services,
 5    Inc., working on behalf of Casa Nido, a general
 6    partnership.
 7         Q. Thank you.
 8              It appears here that you are asking Bob
 9    Clark-Riddell and Ron Piziali to stop work at that
10    site; is that correct?
11         A. In this e-mail or the following e-mail?  I
12    can't see what you are referring to on this.
13         Q. Can you see the highlight in yellow on my
14    screen?
15         A. Yes, I can see it.
16         Q. I'm sorry.  I did not mean to interrupt
17    you.  Oh, okay.  You can see the highlight.  This is
18    DTSC 14974.
19              And I will just cut to the chase, it looks
20    like -- it looks to me you are asking Bob and Ron to
21    stop work because there is no adequate health and
22    safety plans and procedures for the site; is that
23    correct?
24         A. Correct.
25         Q. So would it be correct to say that under
```



Page 60

```
 1   the VCA, DTSC was requiring Casa Nido to submit
 2   health and safety plans and procedures?
 3           MR. BRODY:  Objection.
 4           MR. HURTADO:  Objection.  Calls for legal
 5   conclusion.
 6           MR. BRODY:  And misstates prior testimony,
 7   I believe.
 8           THE WITNESS:  The scope of work, I believe
 9   listed in Exhibit C of the voluntary cleanup
10   agreement dated 2017 between Casa Nido and DTSC,
11   would have included health and safety plan or health
12   and safety plans and procedures.
13   BY MR. DOW:
14       Q. Thank you.
15           To your knowledge, Mr. Utz, did Casa Nido
16   ever submit health and safety plans and procedures
17   to DTSC for review?
18           MR. BRODY:  Objection.  No foundation.
19   Calls for speculation.
20           THE WITNESS:  Yes.  Pangea submitted -- I
21   should say Casa Nido submitted multiple health and
22   safety plans for DTSC review.
23   BY MR. DOW:
24       Q. And were any of those health and safety
25   plans ultimately approved by DTSC to your knowledge?
```



Page 61

1        A. DTSC does not approve health and safety

2    plans.  DTSC accepts health and safety plans, which

3    are the responsibility of the employer of workers.

4        Q. Did DTSC ever accept any health and safety

5    plans from Casa Nido for the site?

6            MR. HURTADO:  Objection.  Calls for

7    speculation.

8            MR. BRODY:  Join.

9            THE WITNESS:  I recall one health and

10   safety plan being accepted in relation to vapor

11   intrusion investigation work offsite.

12   BY MR. DOW:

13       Q. And is that the only health and safety plan

14   you recall, Mr. Utz?

15       A. I recall only one being accepted under my

16   project management supervision.

17       Q. Thank you.

18            As project manager for the site, if any

19   other health and safety plans had been accepted for

20   the site before you became project manager, would

21   you have a record of that?

22       A. I don't know.

23       Q. When you became project manager for the

24   site, Mr. Utz, did you ever read or review any

25   records from prior project managers for the site?



1   that work was occurring without a health and safety

2   plan.

3           So what I will ask you is, you know, how

4   did you know that they were working -- they were

5   conducting work at the site without a health and

6   safety plan?

7       A. I don't agree with your representation of

8   my comments here.

9       Q. Okay.  Well, may I ask you what you meant

10  by H and S is now the limiting factor to work

11  continuing at the site?

12      A. I recall that at the time of this e-mail,

13  inadequate health and safety plans and procedures

14  had been submitted to the department, and at the

15  recommendation of my consulting certified industrial

16  hygienist, I asked that work stop -- physical work

17  stop at the site with regard to hazardous waste

18  operations until such a time that DTSC had accepted

19  health and safety plans for the site.

20      Q. Okay.  Thanks.

21          Mr. Utz, over the course of your role as

22  project manager at the site, did you ever direct

23  Casa Nido and its consultant, Pangea, to sources of

24  grant funding to complete work at the site?

25      A. You asked during my time as project



Page 70

1    safety plan.

2           Can you recall what work plan was still

3    due?  Just the specifics of the work plan that you

4    are saying is still due here, like, what that was?

5           MR. HURTADO:  Objection.  Vague and

6    ambiguous.  Compound.

7           MR. BRODY:  Join.

8           THE WITNESS:  I believe the work plan

9    referenced in this e-mail is the offsite vapor

10   intrusion investigation work plan that we discussed

11   earlier in our deposition.

12          MR. DOW:  Okay.  Thank you.  Okay.  I am

13   going to drop another exhibit into the chat here.

14          Okay.  The next document is dated November

15   23, 2020.

16          THE COURT REPORTER:  It will be 10, for the

17   record.

18          (Exhibit 10 marked.)

19          MR. HURTADO:  I'm sorry.  Did you say that

20   this was number 10?

21          THE COURT REPORTER:  Yes.

22          MR. HURTADO:  Okay.  Thanks.

23   BY MR. DOW:

24       Q. So Mr. Utz, this is a teleconference

25   meeting minutes.



Page 71

```
 1          Do you know who created this document,
 2  Mr. Utz?
 3       A. Yes, I know who created this document.
 4       Q. Okay.  It is dated November 19, 2020.
 5  Could you please tell me who created this document?
 6       A. I created this document, but it was edited
 7  by multiple people.
 8       Q. Okay.  So did you create the initial --
 9  well, yeah.  Did you create the initial draft of
10  this document, Mr. Utz?
11          MR. HURTADO:  Objection.  Deliberative
12  process.  Privilege.
13  BY MR. DOW:
14       Q. Okay.  Well, I don't want to ask about
15  anything that has to do with attorneys or anything
16  else.  I am not asking you -- so if this document
17  was reviewed and edited by attorneys, I don't want
18  to know anything about that.
19          But Mr. Utz, is it fair to say that you
20  initiated this document?
21       A. I created the original draft.
22       Q. All right.  Thank you.
23          Okay.  So as I said, this document
24  indicates that the teleconference was on November
25  19, 2020.  Did you create this initial document at
```



1   the time or near the date of this teleconference on

2   November 19, 2020?

3            MR. HURTADO:  Objection.  Vague and

4   ambiguous.

5            THE WITNESS:  I believe that the meeting

6   minutes were sent within about a month or less of

7   the teleconference.

8   BY MR. DOW:

9        Q. They were sent.  So could you tell me where

10  they were sent?

11       A. I believe we transmitted the final

12  teleconference meeting minutes to -- we may have

13  transmitted it to Casa Nido, but I knew it was -- we

14  posted it to public envirastore, which is our online

15  database which at the time it became a publicly

16  disclosable document.

17       Q. And I don't mean to make you repeat

18  yourself, Mr. Utz, but would it be fair to say that

19  you started to draft this document soon after this

20  meeting was held?

21            MR. HURTADO:  Objection.  Vague.

22            THE WITNESS:  I would say I began drafting

23  this document soon after the teleconference.

24  BY MR. DOW:

25       Q. All right.  Thank you.



Page 73

1              In the course of your role as the senior

2    environmental scientist and project manager at DTSC,

3    would it be usual for you to make memos such as this

4    of teleconferences?

5              MR. HURTADO:  Objection.  Vague and

6    ambiguous.

7              THE WITNESS:  Can you repeat the question,

8    please?

9    BY MR. DOW:

10        Q. Yeah.  Let me ask you this:  Was this

11   memorandum drafted by you as part of your role as a

12   project manager for the site?

13        A. These are meeting minutes, not a

14   memorandum.  And I drafted them as part of my role

15   as project manager for this site.

16        Q. Okay.  Thank you.  And I will refer to them

17   as meeting minutes.

18              Is it -- have you made meeting minutes

19   after calls and other matters?  Like, is this

20   something that you would do in your role as project

21   manager?

22        A. I can't recall any other instances where I

23   have written meeting minutes, but I can recall

24   instances where I have written meeting notes to be

25   shared with external parties.



Page 74

1        Q. All right.   And would you say that these
2    particular meeting minutes -- would you say that
3    they are a reasonably accurate account of what
4    transpired at the November 29, 2020, teleconference?
5        A. Yes.
6        Q. All right.   Thank you.
7           Okay.   I want to ask you some questions
8    based on the highlights that are on this document.
9    Well, you actually have already told me that the
10   document is accurate.
11          But in this document, you make this
12   statement, you say that cleanup work has so far not
13   followed state or federal law or the voluntary
14   agreement.   This was as of November 2020.
15          I guess what I would ask you is -- and, you
16   know, you are not an attorney, but you make the
17   statement here, and so what I would ask you is that,
18   from the time while you took over as project manager
19   for the site until such time that the voluntary
20   agreement was terminated by Casa Nido, would you say
21   that the cleanup work did not follow state or
22   federal law or the voluntary agreement?
23          MR. HURTADO:   Objection.   Calls for legal
24   analysis and conclusion.
25          MR. BRODY:   Join.   And vague and ambiguous.



Page 81

```
 1            THE WITNESS:  A remedy decision -- or
 2    excuse me, a decision document can occur at a number
 3    of different points in the cleanup lifecycle.  And
 4    can also be -- can also occur at varying -- with
 5    varying availability of data.
 6    BY MR. DOW:
 7        Q. And is there a decision document for this
 8    site, Mr. Utz, pertaining to the SVE and SSD
 9    systems?
10            MR. BRODY:  Objection.  Vague.
11            THE WITNESS:   To my knowledge under DTSC
12    oversight, no.
13    BY MR. DOW:
14        Q. So without that decision document, Mr. Utz,
15    is it fair to say we don't know at this time if the
16    SVE system and the sub-slab depressurization system
17    are an appropriate remedy for the site?
18            MR. HURTADO:  Objection.  Calls for legal
19    analysis and conclusion.  Expert opinion.
20            MR. BRODY:  Join.
21            THE WITNESS:   In the absence of a decision
22    document, I can't tell you whether the SVE and/or
23    SSD systems or system would be selected as a removal
24    or remedial action at that site.  That is part of
25    the decision document.
```



Page 82

1    BY MR. DOW:

2         Q. It goes on to say that -- well, I think it

3    is -- probably just states it on its face, but is

4    it -- by the time Casa Nido terminated the VCA up to

5    that point, would you say that the remedy selection

6    process had been followed or not?

7              MR. HURTADO:  Objection.  Legal analysis

8    and conclusion.  Lacks foundation.  Calls for

9    speculation.

10             MR. BRODY:  Join.

11             THE WITNESS:  At the time of the voluntary

12   cleanup agreement dated 2017 determination in 2023,

13   the remedy selection process had not been started.

14   BY MR. DOW:

15        Q. Okay.  And then towards the end of the

16   paragraph, right before the last sentence, it says,

17   DTSC has not reviewed or approved these systems.

18             I assume "these systems" means the SVE

19   system and the sub-slab depressurization system.

20             (Court reporter lost Internet connection.)

21             (Record read.)

22   BY MR. DOW:

23        Q. Okay.  Well, the question I asked -- feel

24   free to correct me if I'm wrong anybody, but my

25   question to Mr. Utz -- and I guess I will repeat



1    it -- is that up until today, February 29, 2024, is

2    it still the case that DTSC has not reviewed or

3    approved the soil vapor extension system and the

4    sub-slab depressurization?

5              Mr. Utz, do you mind answering that again?

6    And you can give the exact same answer you just did

7    if you want.  I mean, thank you.

8         A.  I believe I said DTSC has not as of today

9    approved the SSD or SVE systems.

10        Q.  Thank you.

11             Okay.  That's it for this one.  Okay.  I am

12   going to drop the next exhibit into the chat.  This

13   is dated November 23, 2020.

14             THE COURT REPORTER:  And just for the

15   record, this will be 11.

16             (Exhibit 11 marked.)

17             MR. DOW:  Thank you.  Yes.

18   BY MR. DOW:

19        Q.  So this is a November 23, 2020, e-mail we

20   can just go -- Mr. Utz, feel free to review this.

21   Is this a -- well, we know -- I think we can

22   determine that you sent this e-mail because it has

23   got your signature block at the bottom.  And this is

24   to -- let's see, yeah, it is dated November 23,

25   2020, sent at 2:50 p.m., and seems to concern the



1    preliminary endangerment assessment.

2            And if we go down to the last paragraph, it

3    says, Because the PEA requirement has not been

4    filed, DTSC does not have an adequate understanding

5    of the owners, operators, nature or extent of known

6    threaten releases or potential exposure pathways at

7    the site.

8            And my question, Mr. Utz, is as of today

9    regarding this site, is this highlighted statement

10   still true?

11        A. Which highlighted statement?

12        Q. Excuse me.  The one at the last paragraph

13   that starts, Because the PEA requirements -- or

14   excuse me -- requirement has not been fulfilled.

15        A. I'm not sure whether DTSC has accepted the

16   information submitted to date as what we would call

17   a PEA equivalent, but I know that we have not

18   approved any documents during my time as project

19   manager with the title PEA or preliminary

20   endangerment assessment.

21        Q. Okay.  Mr. Utz, is it true that over the

22   course of your work with Casa Nido under the VCA

23   that you granted several extensions for completion

24   of the health and safety plan for the site or one of

25   the health and safety plans?



Page 85

1          A. Yes, I believe I did at least once.

2          Q. Okay.  Putting a document into the chat,

3     dated 12-08-2020.

4              THE COURT REPORTER:  It will be 12, for the

5     record.

6              (Exhibit 12 marked.)

7              MR. DOW:  Okay.  So this is a long e-mail.

8     First page is DTSC 1729.  It appears to involve a

9     submission of a work plan and a health and safety

10    plan.  It appears it is a work plan and health and

11    safety plan were submitted and they were incomplete.

12    BY MR. DOW:

13         Q. Mr. Utz, looking at the very top of the

14    document, you sent an e-mail to Bob Clark-Riddell

15    and others on December 8, 2020, and you reference --

16    and correct me if I'm wrong, you believe you are

17    referencing an incomplete work plan, an incomplete

18    health and safety plan.  You asked when these things

19    are going to be completed by Casa Nido and/or

20    Pangea.  And then you state I am not granting any

21    more extensions.

22              So can you surmise from this, Mr. Utz, that

23    you had granted multiple extensions to Casa Nido to

24    complete these documents?

25         A. I don't know if I am referring to



1   extensions on these documents or on other documents.

2       Q. Okay.  So you could be referring to

3   extensions that you had granted in the past on

4   documents other than these, correct?

5       A. It is conceivable.

6       Q. Okay.  And you say I am not granting any

7   more extensions.  Does this reflect -- does that

8   statement reflect any frustration either on your

9   part or on DTSC's part with the pace of which Casa

10  Nido was attempting to complete work under the VCA?

11          MR. HURTADO:  Objection.  Calls for

12  speculation.

13          MR. BRODY:  Join.

14          MR. HURTADO:  Lacks foundation.

15          MR. BRODY:  Join.

16          THE WITNESS:  I can't recall.

17  BY MR. DOW:

18      Q. So you can't recall why you stated to them

19  I am not granting any more extensions?

20          MR. HURTADO:  Objection.  Misquotes the

21  deponent.

22          THE WITNESS:  I said I can't recall.  You

23  asked about frustration.

24  BY MR. DOW:

25      Q. Oh, okay.



Page 87

1           A. And with pace, and I -- my answer is I

2    cannot recall.

3           Q. Okay.  Let me ask you this, do you know why

4    you wrote, I am not granting any more extensions?

5           A. In this case, I don't know, but typically

6    we grant extensions when there is sufficient cause

7    and also when -- when appropriate.   And I know that

8    at the time of this e-mail, DTSC was concerned about

9    the pace of -- of work being completed as requested

10   by DTSC and the implications to human health and the

11   environment.

12          Q. Okay.  Thank you.

13          All right.  I just dropped another exhibit

14   into the chat.  It is dated January 20, 2020.

15          THE COURT REPORTER:  It will be 13.

16          (Exhibit 13 marked.)

17   BY MR. DOW:

18          Q. This is a memorandum, Mr. Utz, from Eric --

19   I'm not sure how to pronounce it -- Brocales to you.

20   It is a review of the health and safety plan for the

21   former Omo's cleaners.

22          Just let me ask, Mr. Utz, do you

23   remember -- do you recall receiving this -- do you

24   recognize this memorandum from Mr. Brocales?

25          A. It looks familiar.



1    in his opinion, the submitted health and safety plan

2    does not meet minimum requirements.  So what I am

3    asking you is to the extent you can recall, was it

4    typical for Pangea to submit documents requested by

5    DTSC relative to the site that were insufficient

6    because they did not meet requirements?  That could

7    be the CCR.  It could be any requirement that DTSC

8    considered mandatory.

9            MR. HURTADO:  Same objection as before.

10           MR. BRODY:  Join.

11           THE WITNESS:  Yes.

12   BY MR. DOW:

13       Q. Thank you.

14           Okay.  Now, I am going to submit -- excuse

15   me, not submit.  Let's see.

16           Mr. Utz, do you recall instances where you

17   informed either Pangea or Casa Nido that given their

18   performance under the voluntary cleanup agreement,

19   you were considering recommending that the agreement

20   be converted to a more compulsory agreement such as

21   an INFC order?

22           (Exhibit 14 marked.)

23       A. An INFC order is not an agreement.

24       Q. Well, thank you for correcting me.  And let

25   me just give you the document I am referring to.  I



Page 97

1              REPORTER'S CERTIFICATE

2          I, JAMIE DAVIS, CSR No. 14209, a Certified

3    Shorthand Reporter, do hereby certify:

4          That prior to being examined, the witness

5    named in the foregoing deposition, IAN UTZ, was by

6    me duly sworn to testify the truth, the whole truth,

7    and nothing but the truth;

8          That said deposition was taken before me at

9    the time and place set forth and was taken down by

10   me in shorthand and thereafter reduced to

11   computerized transcription under my direction and

12   supervision; and I hereby certify the foregoing

13   deposition is a full, true and correct transcript of

14   my shorthand notes so taken.

15         Further, that if the foregoing pertains to

16   the original transcript of a deposition in a federal

17   case, before completion of the proceedings, review

18   of the transcript [X] was [ ] was not requested.

19         I further certify that I am neither counsel

20   for nor related to any party to said action nor in

21   any way interested in the outcome thereof.

22         IN WITNESS WHEREOF, I have hereunto

23   subscribed my name on March 11, 2024.

24                     ___ _Jamie Davis_

                       Jamie Davis,

25                     CSR No. 14209



Page 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


CASA NIDO PARTNERSHIP, a           Case No. 3:20-cv-7923-EMC
California Partnership,

         Plaintiff,

    vs.

CATHERINE O'HANKS and JAE KWON
aka JAY KWON aka JAY KWON SHIK
aka JAY SHIK KWON; LYNNE MARIE
GARIBOTTI aka LYNNE GARIBOTTI
BLOWER aka LYNNE G. BLOWER,
individually, as trustee the
Claudio Garibotti Trust, dated
May 1, 1952; and SENTRY INSURANCE
COMPANY,

         Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
AND RELATED CROSS-ACTIONS.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOCONFERENCE DEPOSITION OF

IAN UTZ

VOLUME II

February 29, 2024

2:45 p.m.

Berkeley, California

Reported by Arleen Jimenez, CSR No. 4240

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



Page 109

1    different people on this chain.  But this top email, you

2    sent this email to Mr. Brocales, right?

3        A    Yes.

4        Q    And down here, this next email below, it's from

5    you to Bob Clark-Riddell.  And you sent this email, too,

6    correct?

7        A    Please scroll down.

8        Q    Sure.

9        A    Yes.

10       Q    Okay.  All right.

11            MR. DOW:  I'll drop another in the chat.  This is

12   a March 26th, 2021 email.  Share this, too.

13            MR. BRODY:  And Mr. Dow, before you ask any

14   questions, can we go off the record and have a short

15   discussion?

16            MR. DOW:  Yes, sir.

17            MR. BRODY:  We are off the record?

18            MR. DOW:  Yes.

19            (Discussion held off the record.)

20            MR. DOW:  Let's go on the record, please.  All

21   right.  So, in exchange for -- we've come to an

22   agreement -- excuse me?

23            MR. BEAM:  Apologies.  Continue.

24            MR. DOW:  So we've come to an agreement amongst

25   counsel for Casa Nido and Defendants Anderson and Vernell



Page 110

1    and my client, Kathy O'Hanks.   And the agreement is,

2    generally speaking, to stipulate to the authenticity of

3    the documents produced by DTSC in response to Ms. O'Hank's

4    subpoena to the agency.

5            MR. MINK:   If I can narrow that and see if this

6    is agreeable to you.   I would enter into the stipulation

7    for Ms. Vernell as to documents that purport to either be

8    authored by DTSC, sent by DTSC or received by DTSC.

9            Like, in 21,000 pages, there could be stuff that

10   isn't any of those.   I doubt you want them, but those, I

11   wouldn't be willing to stipulate to.   You guys can feel

12   free to stipulate around me to make it broader, though.

13           MR. DOW:   I think I'm fine with that because that

14   covers -- yeah.   I'm only -- for purposes of this

15   stipulation, I think, if it's, you know, sent from DTSC or

16   sent to DTSC, or what you just said, James, then all I

17   would want from Casa Nido is not to object to the

18   authenticity of those documents.

19           MR. BRODY:   I'm willing to enter into the

20   stipulation as to authenticity and I believe we all also

21   agree that all objections as to admissibility are

22   preserved and reserved and not waived in any way by this

23   stipulation.

24           MR. DOW:   Yes.   Exactly.   All right.   So --

25           MR. MINK:   So stipulated.



Page 111

1           MR. BEAM:   So stipulated.

2           MR. DOW:   How about you, I guess, Beam?  Did you

3   stipulate?

4           MR. BEAM:   So stipulated.

5           MR. DOW:  Thank you, sir.  Okay.  Then, well, you

6   know, hopefully -- well, not even hopefully.  I guess it

7   doesn't matter, for my purposes, if Garibotti and Sentry

8   agree because, again, the main beef here is between Casa

9   Nido and plaintiff, obviously.

10          So plaintiff having made that representation, I'm

11  going to, in return, not go through a bunch of documents

12  with Mr. Utz to get them authenticated and just finish up

13  on the issues starting now.  Thank you.

14          I think, with all that said, I only have one more

15  document I need Mr. Utz to look at.  I would just add

16  that, if there's any time after Richard is done, I reserve

17  the right to ask more questions, and the other parties who

18  want to question.

19          Okay.  So let me just -- okay.  This next

20  exhibit, it's an October 16, 2023 letter from Casa Nido to

21  DTSC and I'll share it now.  Make sure it's the right one.

22          THE REPORTER:  Will this be Exhibit 17?

23          MR. DOW:  Let me share it.

24          MR. MINK:  Wasn't Exhibit 17 the May 21, 2021 or

25  did that document not get marked?



Page 112

 1          MR. DOW:  I don't remember.  Do you know, Madam

 2    Reporter?

 3          THE REPORTER:  I can look back.  And I'm

 4    discussing this off the record.

 5          (Discussion held off the record.)

 6          (Exhibit 17 marked.)

 7    BY MR. DOW:

 8     Q    Mr. Utz, thank you for your patience.  So what I

 9    have on my screen now is an October 16th, 2023 letter that

10    was sent to you from Paul Kibel, one of Casa Nido's

11    attorneys.  And since this letter was sent to you, I

12    wanted to ask you about a paragraph towards the end of it.

13          At the beginning of this paragraph, Casa Nido

14    states -- or Mr. Kibel states, "To fully reserves its

15    rights and those of the other parties named in the

16    October 6, 2023 order, by this letter Casa Nido requests

17    an administrative hearing to challenge the following

18    aspects of the order."

19          And one of those aspects is, he states, "The

20    improper inclusion of several requested studies and

21    investigations in the order which should not be required

22    given that Casa Nido (operating pursuant to the Voluntary

23    Cleanup Agreement) had to proceed with the remedial work

24    without DTSC oversight due to the failure of DTSC to

25    respond to requests for agency oversight, and given that



Page 113

1    Casa Nido consultant Pangea has already provided DTSC with
2    much, if not most of the data, testing results and
3    analysis that would be included in the studies and
4    investigations requested in the order."
5         So, essentially, Mr. Kibel is saying that Casa
6    Nido had to proceed with the remedial work without DTSC
7    oversight because of DTSC's failure to respond to requests
8    for agency oversight.
9         Mr. Utz, are you -- in your time as project
10   manager for this site, are you familiar with or have you
11   seen any requests from Casa Nido for agency oversight?
12   That's my first question.
13        A    Casa Nido submitted several documents for our
14   review.  I would say that is the primary way that Casa
15   Nido would have requested oversight under the Voluntary
16   Cleanup Agreement that is referenced here.  But --
17        Q    Let me ask it this way.  Do you recall any
18   correspondence from Casa Nido in which they state
19   expressly that the agency is failing to oversee their work
20   and please oversee our work?
21        MR. BRODY:  Objection, vague, ambiguous.
22        THE WITNESS:  I don't recall correspondence from
23   Casa Nido representing that DTSC, during my time as
24   project manager, was failing to provide oversight.
25



Page 115

1    conclusion.

2             MR. BRODY:  Join.

3             THE WITNESS:  I believe you're referencing an

4    imminent and substantial endangerment determination and

5    order and remedial action order for which there are four

6    named respondents, including Catherine O'Hanks, Casa Nido,

7    a general partnership, Earl Ray Anderson and Sandra

8    Vernell; is that true?

9             MR. DOW:  That is true, yes.

10            THE WITNESS:  Okay.  Now, please repeat the

11   question.

12   BY MR. DOW:

13        Q    Okay.  Is Mr. Kibel's statement that Pangea has

14   already provided DTSC with much, if not most, of the data

15   testing results and analysis that would be included in the

16   studies and investigations requested in the ISE order

17   true?

18            MR. HURTADO:  Objection, lacks foundation and

19   legal conclusion.

20            MR. BRODY:  Join.

21            THE WITNESS:  To the extent that Mr. Kibel is

22   representing or claiming that certain requirements of the

23   order that we issued were unnecessary because they had

24   already been completed, that is incorrect.

25



Page 119

```
 1   BY MR. DOW:

 2       Q    You know what?  I'm going to drop it.  You've

 3   made it clear enough for me.

 4            Let's see.  And just to dot my Is and cross my

 5   Ts, you do recognize this document as the October 6th,

 6   2023 order, correct?

 7       A    Yes.

 8       Q    Okay.  Thank you.  Let's see.  If we look at the

 9   calendar of tasks and schedules in the order -- excuse me.

10   Calendar -- yeah, calendar of tasks and schedules, is it

11   correct to say that task -- and there may be others, but

12   these are the only ones I'm really concerned with for

13   purposes of this question.

14            Is it correct to say that tasks 10 through 35

15   are, at this time, unfulfilled and outstanding?

16            MR. HURTADO:  Objection, vague and ambiguous.

17            MR. BRODY:  Join.

18            THE WITNESS:  10 through -- please repeat the

19   final number.

20   BY MR. DOW:

21       Q    10 through 35.

22       A    To some extent.

23       Q    Let me ask you this.  Are any of the tasks 10

24   through 35 fully complete?

25            MR. HURTADO:  Objection, vague and ambiguous,
```



**MAGNA**
**LEGAL SERVICES**

Page 120

1    calls for a legal conclusion.

2            MR. BRODY:  Join.

3            MR. HURTADO:  Expert opinion.

4            MR. BRODY:  Also join.

5            THE WITNESS:  To clarify, these are the same --

6    this is the same range of tasks you just asked me a

7    question on?

8            MR. DOW:  Yeah.

9            THE WITNESS:  To my knowledge, no.

10   BY MR. DOW:

11       Q    Okay.  Thank you.  I usually ask this question up

12   front, but, Mr. Utz, is there any reason today that you

13   couldn't give me your truthful testimony?

14       A    No.

15       Q    Okay.  So there's no medications or anything like

16   that, that would interfere with you giving your truthful

17   testimony today?

18       A    No medications.

19       Q    Okay.

20           MR. DOW:  All right.  That's all I have for now.

21   I'll reserve to ask questions if there is time left.

22           MR. BRODY:  Okay.  Then, if no one objects, I'll

23   go next.  Any objections?  Okay.

24

25



1    Exhibit 19?

2            MR. DOW:  I'd have to ask the reporter.

3            MR. MINK:  Yes.

4            MR. DOW:  Thank you.

5            THE REPORTER:  I agree.

6            MR. MINK:  That's what counts.

7            MR. DOW:  Thanks for the assistance.

8            THE WITNESS:  Yes.

9    BY MR. DOW:

10     Q    Okay.  I hate to do this, but was that "yes" in

11   response to my question -- let me ask the question again,

12   Mr. Utz.  I apologize.

13            On March 18th, 2022, you wrote an email to Coby

14   Graham of DTSC in which you stated that Casa Nido has

15   demonstrated a disregard for the scope of the Voluntary

16   Cleanup Agreement.  Is that true?

17     A    I stated, "They have demonstrated a disregard for

18   its scope."  I meant by "they," Casa Nido.

19     Q    And by "its," what did you mean?

20     A    The voluntary agreement scope.

21     Q    Okay.  Thank you.  Mr. Utz, as far as earlier, we

22   talked about a vapor intrusion work plan that was either

23   approved or conditionally approved by DTSC.  Isn't it true

24   that Casa Nido never implemented the vapor intrusion work

25   plan?



Page 176

1           MR. BRODY:  Objection, vague and assumes facts

2     and assumes there's only one.

3           THE WITNESS:  Casa Nido did not fully implement

4     the work plan.

5           MR. DOW:  Okay.  Thank you.  Okay.  I'm going

6     to -- rather than make you remember -- you probably can't

7     remember this, so I'm going to -- let's see, 3-17-2022.

8     I'm going to drop another document in the chat.  This is

9     the next exhibit.  It's a March 17th, 2022 email.

10          THE REPORTER:  So Exhibit 20?

11          MR. DOW:  Yeah.

12          (Exhibit 20 marked.)

13    BY MR. DOW:

14      Q    And feel free to read as much of this document as

15    you want, Mr. Utz, for context.  What I'm interested in is

16    the highlighted portion -- it's highlighted in green on

17    the page marked DTSC 4740.  So, please read that

18    highlighted portion and as much of the document as you

19    need to, and I'm going to ask you a question based on the

20    statement highlighted in green.  So please let me know

21    when you're done reading.

22      A    Okay.  I've reviewed the email dated March 17th,

23    2022, sent at 2:10 p.m. from myself to the City of

24    Richmond and our contractors.

25      Q    So, in this email under -- let's see.  On page



Page 177

1    DTSC 4740, under a section that's bolded entitled,

2    "Background," you describe, generally speaking, work that

3    Casa Nido had done at the site, correct?

4        A    You're asking what the term, "this work," means

5    in the sentence that is highlighted?

6        Q    Well, not yet.  I mean, but when you say "this

7    work" -- when you say -- yes, let's do it this way.  When

8    you make the statement, quote, "a lot of this work,"

9    it's -- isn't it true that you're referencing the building

10   demolition at the site that occurred in 2017?

11       A    I'm referring to the work that was described in

12   the preceding sentence.  The work is dated 2017 to 2020,

13   according to my sentence.

14       Q    So when you say "a lot of this work," you're

15   referring to building demolition in 2017, soil removal and

16   treatment to 15 feet below ground done in 2018 and

17   installation of pipes for sucking air out of the ground,

18   which was done from 2018 to 2020, correct?

19       A    Correct.

20       Q    And you were telling the people you sent this

21   email to that, quote, "A lot of this work happened without

22   our approval because the owner has been reluctant to

23   communicate and plan with us and is trying to save money,"

24   end of quote, correct?

25            MR. HURTADO:  Objection, document speaks for



Page 178

```
 1    itself.
 2              MR. BRODY:  Join.
 3              THE WITNESS:  Correct.
 4              MR. DOW:  Thank you.
 5    BY MR. DOW:
 6        Q    Mr. Utz, I'm going to next show you a document
 7    that has to do with -- well, actually, I think -- let's
 8    see.  Well, let me ask you this question.
 9              As far as the site goes, as of August 2022, the
10    current phase of the work at the site was
11    characterization; is that correct?
12        A    Can you please scroll up so I can see the date of
13    the email?
14        Q    Yeah.
15        A    Okay.  The date of the email is August 4th, 2022,
16    and at that time, the email says that "The current phase
17    of work at the site was characterization."
18        Q    Is this email correct in stating that?
19        A    Yes.
20              MR. DOW:  Okay.  And I'm going to throw that into
21    the chat because I didn't -- 2022 --
22              So, Madam Reporter, can I just mark that document
23    I just dropped in, 08-04-2022, as the next exhibit?
24              THE REPORTER:  I think that's Exhibit 21.
25              MR. DOW:  Sounds right to me.
```



Page 179

```
 1              (Exhibit 21 marked.)
 2              MR. DOW:  Okay.  One more.  This time I promise.
 3    And let me drop this into the chat, just so I'm doing
 4    these things in order.  Okay.  This email is dated
 5    March 21st, 2022, and it will be Exhibit 22.
 6              (Exhibit 22 marked.)
 7    BY MR. DOW:
 8      Q    Mr. Utz, feel free to read this email.  I'm
 9    primarily interested in the green highlights.  But read as
10    much of it as you need for context and let me know when
11    you're done reading, please.
12      A    Okay.
13      Q    Okay.  So this email references testing that was
14    done by Pangea at 403 McLaughlin Street in Richmond,
15    California.
16              Mr. Utz, are you aware that 403 McLaughlin Street
17    is a residential home?
18      A    Yes.
19      Q    Okay.  And are you aware that this residential
20    home is directly adjacent to the site to the east?
21      A    Yes.
22      Q    Okay.  And what this email says is that Pangea
23    submitted to DTSC samples that were collected in 2020,
24    September, of two sub slab soil gas samples and that this
25    work was done at 403 McLaughlin Street and that it was
```



1   done without a work plan or DTSC approval.  Is that
2   correct?
3          MR. HURTADO:  Objection, document speaks for
4   itself.
5          MR. BRODY:  Join.
6          THE WITNESS:  Among other things, yes, that is
7   correct.
8   BY MR. DOW:
9      Q    Okay.  And then, if we look at the second
10  highlighted paragraph, you state, "However, these sample
11  names and locations are different from those in the work
12  plan we conditionally approved in October 2021.  Further,
13  the chain of custody on page 60 states that these samples
14  were collected on September 11th, 2020 and September 14th,
15  2020, whereas the draft table 3 on page 5 states the
16  samples were collected on September 21st, 2020, whereas
17  page 39, figure 3 states the samples were collected on
18  September 23rd, 2020, whereas the cover letter text
19  indicates they were collected in September 23rd, 2021."
20          So my question to you, Mr. Utz, is given this
21  paragraph, did this work submitted to DTSC by Pangea
22  present chain of custody issues?
23          MR. BRODY:  Objection, vague and ambiguous, calls
24  for expert opinion.
25          MR. HURTADO:  And a legal conclusion.



Page 181

1           THE WITNESS:  The paragraph speaks to the

2    difference between dates referenced in technical reports

3    that are summarizing the actual work and the dates that

4    are included in a single chain of custody document or

5    multiple chain of custody documents.

6           So I can't speak to whether or not there was an

7    issue in the chain of custody document, which relates to

8    chain of custody.

9    BY MR. DOW:

10        Q     It is true that, based on Pangea's submission to

11   DTSC of this work, you couldn't tell where these samples

12   were taken from?

13           MR. BRODY:  Objection, vague, calls for

14   speculation.

15           THE WITNESS:  To some extent, I did not know

16   where these samples were taken from, other than the

17   information that I believe was included in the tables

18   referenced in this document in this email, which it would

19   have stated the address that the samples were taken from.

20           But my email indicates that -- suggests that

21   there was no map -- or that the -- excuse me.  That,

22   because of the discrepancy between the sample locations

23   included here and the sample locations referenced in the

24   work plan that hadn't been implemented yet, that it was

25   unclear what the actual locations of the samples was --



Page 182

1    were.  The actual locations were.

2            So it was unclear, from the information submitted

3    by Pangea, where the samples were truly collected given

4    all these discrepancies between the information that they

5    submitted.

6    BY MR. DOW:

7        Q    Thank you.  And according to your question 2

8    below question 1, you also had some trouble discerning on

9    what date these samples were collected and analyzed; is

10   that true?

11       A    Based on the discrepancies between the chain of

12   custody and all the other documents I referenced, it was

13   also -- correct.  It was unclear whether the samples that

14   were summarized in the tables were, in fact, the samples

15   referenced in the chain of custody and, therefore, when

16   they were sampled.

17       Q    Okay.  So, as far as the issues we just discussed

18   pertaining to where the samples were located and when they

19   were collected and analyzed, would it be fair to state

20   that this was a failure of quality assurance and quality

21   control on the part of Pangea?

22           MR. BRODY:  Objection, calls for a legal opinion,

23   calls for an expert opinion, argumentative, vague and

24   ambiguous.

25           MR. HURTADO:  Join.



Page 183

```
 1              THE WITNESS:  These mistakes are fundamental
 2    mistakes and they represent an issue of quality control
 3    and quality assurance.
 4    BY MR. DOW:
 5       Q    Mr. Utz, how could have these mistakes been
 6    avoided by Pangea, in your estimation?
 7              MR. MINK:  Objection, calls for speculation.
 8              MR. HURTADO:  Objection, calls for speculation.
 9              MR. MINK:  I'll join.
10              THE WITNESS:  There are a number of ways.  One of
11    the ways is that the work was planned in advance and
12    documented in a work plan.
13    BY MR. DOW:
14       Q    And so these issues you raise demonstrate the
15    value of having a completed and approved work plan before
16    actual work in the field is started; is that correct?
17              MR. BRODY:  Objection, argumentative, vague and
18    ambiguous.
19              THE WITNESS:  This mistake illustrates the
20    importance of work plans.
21    BY MR. DOW:
22       Q    Mr. Utz, do you have any idea or theory as to why
23    Pangea was doing field work without a work plan?
24              MR. BRODY:  Objection, calls for speculation, no
25    foundation.
```


MAGNA
LEGAL SERVICES

Page 187

1                    REPORTER'S CERTIFICATION

2

3             I, Arleen Jimenez, a Certified Shorthand

4    Reporter, in and for the State of California, do hereby

5    certify:

6

7             That the foregoing witness was by me duly sworn;

8    that the deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and later

11   transcribed into typewriting under my direction; that the

12   foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15            In witness whereof, I have subscribed my name

16   this 12th day of March, 2024.

17   (Signature requested)

18

19

20                        _____

21                        Arleen Jimenez, CSR No. 4240

22

23

24

25



1          - - - - - -
              E R R A T A
2          - - - - - -

3

| 4 PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|--------|------|-------------|----------|--------|
| 5 10 | 18 | two years | one year | Mis-Approximation |
| 6 15 | 21 | Substance | Substances | Mis-Spelling |
| 7 17 | 9 | contaminate state | contaminant fate | Mis-Spelling |
| 8 51 | 5 | whole | hole | Mis-Spelling |
| 9 56 | 1 | impose | pose | Mis-Spelling |
| 10 72 | 14 | envirastore | EnviroStor | Mis-Spelling |
| 11 80 | 10 | Right? | -- | Was not said. |
| 12 82 | 12 | determination | terminated | Mis-Spelling |
| 13 90 | 23 | INFC | I&SE | Mis-Spelling |
| 14 138 | 24 | don't know | I don't know | Missing word |
| 15 149 | 22 | Associated | associated | Mis-Capitalization |
| 16 163 | 13 | has one | has been one | Missing word |
| 17 176 | 24 | our | their | Wrong word. |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

1  ACKNOWLEDGMENT OF DEPONENT

2

   I, Ian Utz_____, do

3 hereby certify that I have read the
  foregoing pages,  1 - XXS, and that the 190

4 same is a correct transcription of the
  answers given by me to the questions

5 therein propounded, except for the
  corrections or changes in form or

6 substance, if any, noted in the attached
  Errata Sheet.

7

8 Ian Utz_____ 5/2/2024_____
  WITNESS NAME  DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

# EXHIBIT F

| Message | |
|---------|---|
| **From:** | Mary Phelps [Mary_Phelps@ci.richmond.ca.us] |
| **Sent:** | 3/21/2022 2:24:17 PM |
| **To:** | Utz, Ian@DTSC [Ian.Utz@dtsc.ca.gov]; Jayne A. Lopez [jalopez@carollo.com]; daniel@wrforde.net |
| **CC:** | Smith, Whitney@DTSC [Whitney.Smith@dtsc.ca.gov]; Graham, Coby@DTSC [Coby.Graham@dtsc.ca.gov]; Mazzoli, Theodore@DTSC [Theodore.Mazzoli@dtsc.ca.gov]; Gino Ficco [gino@wrforde.net]; Tony Perez [tony@wrforde.net]; David Voorhis [dave@wrforde.net]; Yader Bermudez [Yader_Bermudez@ci.richmond.ca.us]; Joe Leach [joe_leach@ci.richmond.ca.us] |
| **Subject:** | RE: [202121] Omo Fabricare Dry Cleaner - Sewer Repair Work |

EXTERNAL:

Ian:

Yes. City staff received it.

Best,

## Mary Phelps
**Project Manager I**
*she/her/hers*
**Public Works Department**
*Water Resource Recovery Division*
450 Civic Center Plaza
Richmond  CA 94804
(510) 621-1269 (direct)
(510) 685-0820 (cell)
(510) 307-8195 (fax)

*The information in this electronic mail is intended for named recipients only.  Unauthorized use or  disclosure is prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and delete all copies of this communication from your system.  Thank you in advance for your cooperation.*

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Monday, March 21, 2022 2:19 PM
**To:** Jayne A. Lopez <jalopez@carollo.com>; Mary Phelps <Mary_Phelps@ci.richmond.ca.us>; daniel@wrforde.net
**Cc:** Smith, Whitney@DTSC <Whitney.Smith@dtsc.ca.gov>; Graham, Coby@DTSC <Coby.Graham@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Gino Ficco <gino@wrforde.net>; Tony Perez <tony@wrforde.net>; David Voorhis <dave@wrforde.net>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - Sewer Repair Work

This email originated from outside of the City's email system. Do not open links or attachments from untrusted sources.

Mary,

Can you confirm that the City has received the below information?  Thanks!

**Ian Utz**
Environmental Scientist
Site Mitigation and Restoration Program
510-540-3845

DTSC000004738

ian.utz@dtsc.ca.gov
Department of Toxic Substances Control
700 Heinz Avenue, Suite 200, Berkeley, California 94710-2721
California Environmental Protection Agency

 

   

This communication is subject to the California Public Records Act (Government Code § 6250 et seq.). Public disclosure may be expected unless applicable law provides a valid basis for not releasing this document and its attachments.

**From:** Utz, Ian@DTSC
**Sent:** Thursday, March 17, 2022 2:42 PM
**To:** Jayne A. Lopez <jalopez@carollo.com>; Mary Phelps <Mary_Phelps@ci.richmond.ca.us>; daniel@wrforde.net
**Cc:** Smith, Whitney@DTSC <Whitney.Smith@dtsc.ca.gov>; Graham, Coby@DTSC <Coby.Graham@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Gino Ficco <gino@wrforde.net>; Tony Perez <tony@wrforde.net>; David Voorhis <dave@wrforde.net>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - Sewer Repair Work

Thank you for being so responsive and helpful.  We are glad that the City's team is a well-oiled machine.  We just required the site owner to post "hazardous substance area" **signage around the site by April 4**, and to **inform future contractors that it is contaminated**.  These hazards can be controlled, so long as everyone is informed, and the right folks are involved.

Ian Utz
Environmental Scientist
Site Mitigation and Restoration Program
510-540-3845
ian.utz@dtsc.ca.gov
Department of Toxic Substances Control
700 Heinz Avenue, Suite 200, Berkeley, California 94710-2721
California Environmental Protection Agency

 

   

This communication is subject to the California Public Records Act (Government Code § 6250 et seq.). Public disclosure may be expected unless applicable law provides a valid basis for not releasing this document and its attachments.

**From:** Jayne A. Lopez <jalopez@carollo.com>
**Sent:** Thursday, March 17, 2022 2:18 PM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>; Mary Phelps <Mary_Phelps@ci.richmond.ca.us>; daniel@wrforde.net
**Cc:** Smith, Whitney@DTSC <Whitney.Smith@dtsc.ca.gov>; Graham, Coby@DTSC <Coby.Graham@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Gino Ficco <gino@wrforde.net>; Tony Perez <tony@wrforde.net>; David Voorhis <dave@wrforde.net>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - Sewer Repair Work

DTSC000004739

EXTERNAL:

Thank you Ian,

As discussed, attached is the Contractor's Design-Build drawing for this segment of work.

Thank you for your efforts to ensure the continued health and safety of our work crews.

Best regards,

Jayne Lopez
Collection Systems Project Manager
jalopez@carollo.com
602 908 9705

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Thursday, March 17, 2022 2:10 PM
**To:** Mary Phelps <Mary_Phelps@ci.richmond.ca.us>; daniel@wrforde.net; Jayne A. Lopez <jalopez@carollo.com>
**Cc:** Smith, Whitney@DTSC <Whitney.Smith@dtsc.ca.gov>; Graham, Coby@DTSC <Coby.Graham@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** [202121] Omo Fabricare Dry Cleaner - Sewer Repair Work

Hi Mary, Daniel, and Jayne,

It was great to speak to you all about the former dry cleaner site at 12210 San Pablo Avenue, Richmond, and your ~300 feet of sewer main repair work north of Nevin Avenue, along San Pablo Avenue. We understand this work has been planned for about 2 years, but did not start until last week.

### BACKGROUND

Since 2017, the State of California has been overseeing cleanup of this former dry cleaner, which is now just fenced open lot. Yesterday, we were visiting to inspect soil gas and indoor air sampling at the neighboring residences, restaurant, and veterinary clinic. Previous work included building demolition (2017), soil removal and treatment to 15 feet below ground (2018), and installation of pipes for sucking air out of the ground (2018 to 2020). But, a lot of this work happened without our approval, because the owner has been reluctant to communicate and plan with us, and is trying to save money.

### WEBSITE FOR OUR CLEANUP SITE

https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=60001434

### RECOMMENDATIONS

I spoke with Jayne and Mary this afternoon, and I understand that Daniel and his team are wrapping up work this week (backfilling, concrete pouring, manhole installation). Laterals were repaired yesterday, and work already occurred inside the dry cleaner site. No new excavation will happen. Please let us know if you need to dig again, so that we can work with you.

For City of Richmond, this is about the contract. We are available to help introduce your staff to Envirostor, so that work capital projects include "stop work" options and plan for "contingencies" or "lump sums" in case there are contamination concerns.

For W.R. Forde Associates, Inc. and Carollo Engineers, Inc. this is a matter of worker protection and waste management.  For any future work planned at or near this site, we want you to know:

1. **Worker Hazards.**  There are <u>chemical hazards</u> in environmental media (soil, groundwater, soil gas) in/near work area. Chemicals include dry cleaning chemicals like volatile organic compounds (VOCs):  tetrachloroethylene (PCE) and breakdown chemicals like trichloroethylene (TCE), cis-1,2-dichloroethylene (cis-1,2-DCE), and vinyl chloride, as well as benzene.

2. **Soil Testing.**  Soil removed within the dry cleaner parcel next to the dry cleaner might contain chemicals, and should be tested before disposal at a landfill. Tell the landfill that the material is from near a dry cleaner, and ask what testing they require.  You need to make sure it is not hazardous waste.  One option is laboratory testing by USEPA Method 8260.

3. **Website.**  There are additional maps available on our project <u>website</u>.

4. **Worker Exposure Limits.**  <u>OSHA</u> has worker air limits for VOCs, called permissible exposure limits (PELs) and short-term exposure limits (STELs), that the construction work must follow.  Construction companies must protect their workers from a maximum 15-minute exposure to the STEL.

5. **Industrial Hygienist.**  For any future work at this site, you should hire an in-house or consulting certified industrial hygienist (CIH) to the project.  The CIH can help make sure that the OSHA worker exposure limits are not exceeded.  Workers at this site can have exposure (breathing, maybe skin), but all of this should be manageable under planning/oversight of a qualified CIH.  CIH should prepare some sort of construction Safe Work Plan or Health and Safety Plan.  DTSC can help comment on these, but we cannot approve the Safe Work Plan or Health and Safety plan, since they're employer's responsibility.  At this site, for example, we suggest that the CIH consider a photoionization detector (PID) device, and carefully check the ionization potential of PID lamp vs. tetrachloroethylene (PCE), and determine a response factor correction for PCE vs. their calibration gas.  The CIH should make the final decision on monitoring equipment, and pre-construction testing, etc.

Please forward this e-mail to your employer's health & safety program.  Let me know if you have any questions.

DTSC000004741



**Former Omo's Cleaners**
12210 San Pablo Avenue
Richmond, California

**PANGEA**

**Proposed Sampling Locations**

**Figure 3**

**Ian Utz**
Environmental Scientist
Site Mitigation and Restoration Program
510-540-3845
ian.utz@dtsc.ca.gov
Department of Toxic Substances Control
700 Heinz Avenue, Suite 200, Berkeley, California 94710-2721
California Environmental Protection Agency



This communication is subject to the California Public Records Act (Government Code § 6250 et seq.). Public disclosure may be expected unless applicable law provides a valid basis for not releasing this document and its attachments.

DTSC000004742

# EXHIBIT G

| Message | |
|---|---|
| **Sent**: | 11/23/2020 5:02:50 PM |
| **To**: | Paul Kibel [pskibel@waterpowerlaw.com]; Ron Piziali [ronaldpiziali@gmail.com]; Bob Clark-Riddell [briddell@pangeaenv.com] |
| **CC**: | Smith, Whitney@DTSC [Whitney.Smith@dtsc.ca.gov]; Larry McDaniel (Larry.McDaniel@dtsc.ca.gov) [Larry.McDaniel@dtsc.ca.gov]; Graham, Doyle@DTSC [Doyle.Graham@dtsc.ca.gov] |
| **Subject**: | [202121] Omo Fabricare Dry Cleaner - Additional Information/Preliminary Endangerment Assessment |

Hello:

This is the second of three follow-up e-mails to our teleconference of November 19, 2020.

On November 19, 2020, during our teleconference, I explained that the Preliminary Endangerment Assessment (PEA) scope requirement of the Voluntary Cleanup Agreement (scope task #2) has only partially been fulfilled through existing reports/information (e.g., the 2016 site assessment, groundwater data, and soil vapor data). Incomplete PEA elements include, but are not limited to:

- Historical evaluation of surrounding properties, including for owners/operators and known/threatened releases.
- Historical evaluation of the site, including for owners/operators, hazardous materials/waste use/generation, inspections, permits, etc.
- Development of conceptual site model that lists the potential exposure pathways from contamination.
- Identification/listing of chemicals of potential concern (COPCs) through a screening evaluation process with data quality objectives.
- Human health and ecological screening evaluation, including calculation of cumulative risk and hazard.

While on the surface level some of these items have been contemplated or started, they have not been completed per our guidance: https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/01/PEA_Guidance_Manual.pdf

Casa Nido has stated that it acquired the Site in the 1970s, prior to the promulgation of certain environmental laws and regulations. In addition, via e-mail on August 18, 2020, PANGEA indicated that it was not aware of any historical Phase I Environmental Site Assessments completed at the Site. Finally, as of today, Casa Nido has not provided DTSC any owner/operator primary sources of information (e.g., deeds, chains of title, lease agreements, waste manifests, chemical inventories and purchasing records, etc.), but is currently seeking contribution from third parties who/which it alleges were owners/operators, and may have been involved with the release of hazardous substances (e.g., alleged dumping to an exterior area).

Because the PEA requirement has not been fulfilled, DTSC does not have an adequate understanding of the owners/operators, nature or extent of known/threatened releases, or potential exposure pathways at the site. Accordingly, by **December 4, 2020**, please forward me information regarding historical owners/operators (e.g., contact information, relationship to site, proof of relationship to site as contemplated above) that would enable DTSC to fill such data gaps through, for example, information requests.

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

DTSC000009626

# EXHIBIT H

**Utz, Ian@DTSC**

| | |
|---|---|
| **From:** | Negherbon, Jesse@DTSC |
| **Sent:** | Tuesday, August 4, 2020 3:42 PM |
| **To:** | Utz, Ian@DTSC |
| **Subject:** | Omo Fabricare Cleaners - ESPO comments on SVE/SSDS startup report |

| | |
|---|---|
| **Follow Up Flag:** | Follow Up |
| **Flag Status:** | Flagged |

Hi Ian,

As a follow-up to our call yesterday, I wanted to further document a couple of elements related to the SSDS/SVE startup report and the future cleanup process for this site:

1) Taken together, the monitoring data collected for the SVE, SSDS, and PRB technologies installed at the Site are not sufficient to demonstrate a protective impact on the surrounding residences and places of business. Additionally, there is an absence of indoor air monitoring data for the restaurant, both at baseline and after startup of the SSDS. Thus, we cannot discern the degree to which contamination under the building may have impacted indoor air concentrations and we cannot properly evaluate the efficacy of the SSDS. We would expect the pressure differential across the building slab to be used as a proxy of SSDS efficacy only after a reliable relationship has been demonstrated between pressure differential and the achievement of indoor air COC concentrations that are below the applicable screening levels. We would expect the pressure differential to be monitored regularly, and at enough points to demonstrate the reliable achievement of a minimum pressure differential across the extents of the building slab, using dedicated monitoring ports. The first bullet point of the Conclusions section in the SVE/SSDS startup document opines that the SVE/SSDS is mitigating VI conditions at neighboring buildings, based on the soil gas data and pressure differential data. However, the monitoring network is limited and it does not demonstrate containment of a soil gas plume, and the most direct line of evidence (indoor air data) to support the conclusion is not available. We do not concur with the conclusion stated in the document.

2) The areal and vertical extents of the groundwater, soil, and soil gas contamination, on-site and off-site, should be delineated and I would recommend that a workplan is drafted to describe the efforts and commitments that will be undertaken to complete this work. For off-site properties, we recommend that both sub-slab soil gas samples and indoor air samples are collected during investigation. The conclusions of the SSDS/SVE document appear to only recommend the collection of soil gas samples at limited locations. Given the apparent cVOC concentrations in soil gas and groundwater, a thorough site characterization should be completed to document on-site and off-site impacts.

3) The RP and consultant should provide all design details and records of construction for the SVE system, the SSDS, and the Permeable Reactive Barrier. This information should include all bore logs for the wells that have been installed to support work associated with contamination from the site, and it should include all historical documentation of the construction process and any QA/QC data, similar in detail to what we would expect for a remedy construction or remedial action completion report. However, we also note that these technologies and/or mitigation measures were not part of an approval remedy decision document and they were not installed and commissioned under the oversight of DTSC. Therefore, in addition to data gaps in the site characterization, the RP should recognize that there will be a need to formally identify constituents of concern (COCs) and COC cleanup goals, and the final remedy must be selected through a formal remedy selection process, with an associated decision document.

4) For purposes of vapor intrusion investigations, the analytical detection limits for indoor air should be sufficiently below the applicable human health screening levels. Likewise, the detection limits for subslab soil gas data should be sufficiently below the soil gas screening levels. Several of the samples in the SVE/SSDS startup report

DTSC000013419

were collected with tedlar bags and analyzed with EPA Method 8260, which did not yield sufficiently low limit of detection. The document should also discuss the process and equipment used to measure vacuum/pressure differential.

Thanks
Jesse

Jesse Negherbon, Ph.D., P.E.
Senior Hazardous Substances Engineer
Engineering and Special Projects Office
Department of Toxic Substances Control
Office: 916.255.6577
Jesse.negherbon@dtsc.ca.gov

DTSC000013420

# **EXHIBIT I**

Message

| | |
|---|---|
| **Sent**: | 8/4/2022 12:57:53 PM |
| **To**: | Smith, Whitney@DTSC [Whitney.Smith@dtsc.ca.gov] |
| **Subject**: | [202121] Omo - Draft Meeting Minutes (Please Edit by COB Today) |

Thank you Marsha, Ron, Paul, and Bob for joining Whit and me today.

As I mentioned by e-mail below, we expect to return comments to you shortly on some of the recent work, and unanswered PANGEA questions.

DTSC made no decisions in today's meeting, and all decisions must be in writing.

To recap:

1. Casa Nido provided us with their history of the site, intentions, concerns about red tape, and requests for cost control and scope clarity.
2. Casa Nido provided us with information about its financial status, upcoming court-ordered mediation, and understanding of cleanup progress to date.
3. DTSC expressed appreciation for Casa Nido voluntarily cleaning up the site.
4. DTSC expressed its intent to work as a partner in this cleanup.
5. DTSC provided information regarding:
    a. Context for the regional groundwater contamination, and known sources.
    b. The definition of the Omo site—the source area (dry cleaner) and where the contamination has migrated.
    c. The current phase of Omo work—characterization.
    d. The additional Omo characterization needed right now, namely 1) the second round of indoor air and soil gas sampling (already planned); and 2) more downgradient groundwater samples (not yet planned).
    e. General guidance about the availability of screening values and drinking water values as reference points to help guess future characterization needs based on reasonably ascertainable information.
    f. General guidance about the directionality of future characterization, namely 1) the same adjoining buildings, and 2) groundwater plume moving southwest.
    g. General interpretation of preliminary results from recent indoor air and soil gas testing.
    h. General information about State policies on liability for migrating groundwater plumes and orders versus voluntary cleanup.
6. DTSC provided recommendations:
    a. Prioritize the second round of indoor air and soil gas sampling.
    b. Prioritize the downgradient groundwater sampling.
    c. Use expertise of your consultants to identify data gaps, incomplete reports, and estimate costs.
    d. Follow the established process and ensure that DTSC is treated as a partner, and that concerns are raised directly to DTSC.

**Ian Utz**
Environmental Scientist
Site Mitigation and Restoration Program
510-540-3845
ian.utz@dtsc.ca.gov
Department of Toxic Substances Control
700 Heinz Avenue, Suite 200, Berkeley, California 94710-2721
California Environmental Protection Agency

DTSC000009863



This communication is subject to the California Public Records Act (Government Code § 6250 et seq.). Public disclosure may be expected unless applicable law provides a valid basis for not releasing this document and its attachments.

# **EXHIBIT J**

| Message | |
|---|---|
| From: | Utz, Ian@DTSC [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=997116E6CE7D4A178736AF39716BA874-UTZ, IAN] |
| Sent: | 10/20/2020 10:31:15 AM |
| To: | Bob Clark-Riddell [briddell@pangeaenv.com]; Ron Scheele [rscheele@pangeaenv.com] |
| CC: | Mazzoli, Theodore@DTSC [Theodore.Mazzoli@dtsc.ca.gov]; Smith, Whitney@DTSC [Whitney.Smith@dtsc.ca.gov] |
| Subject: | RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing |

Hi Bob and Ron,

Please confirm receipt. The existing health and safety documentation are inadequate for the purposes of hazardous waste cleanup.

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-540-3845 (direct)
ian.utz@dtsc.ca.gov

**From:** Utz, Ian@DTSC
**Sent:** Monday, October 19, 2020 2:38 PM
**To:** 'Bob Clark-Riddell' <briddell@pangeaenv.com>; 'Ron Scheele' <rscheele@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Smith, Whitney@DTSC <Whitney.Smith@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing
**Importance:** High

Hi Bob and Ron,

I hope you had a nice weekend. Nice to have some fresh air for a change.

I am following up on health and safety (H&S) matters. Please confirm receipt.

- **Stop Work.** H&S is now the limiting factor to work continuing at this site. As I mentioned on Thursday (10/15; see below), our CIH recommends that work stops until such a time that adequate H&S plans and procedures are established. Had you already gone out to conduct groundwater sampling for 2020? Has there been servicing of the SVE's activated carbon vessels, with condensate?

- **Subcontracting.** Let me know if you have a CSP or CIH on staff, who can help create the HASP. If not, DTSC will require that PANGEA subcontract the HASP development to a CIH, so that the document can be drafted by an appropriately trained person. I would like that to start immediately, so that this issue does not unnecessarily further delay work into the holiday season. If we can get a better plan drafted in one go, it will save everyone time and money.

- **HASP Guidance.** I am attaching DTSC's draft HASP guidance, which helps to give context to what DTSC is looking for. The existing HASP, for example, lacks job hazard analysis, which would help connect the workplan to the expected hazards. It also does not discuss training requirements (e.g., HAZWOPER). In addition, there are nuances to the use of numeric occupational exposure limits, particularly with respect to known carcinogens.

- **Authority.** Note that the basis for DTSC's authority to require the above work is, among other things, Task 19 of the signed VCA:

TASK 19.

Health and Safety Plan.  The Proponent will submit a Site Health and Safety Plan in accordance with California Code of Regulations, Title 8, section 5192.  This plan should include, at a minimum the following elements:
(a) Site Background/History/Workplan;
(b) Key Personnel and Responsibilities
(c) Job Hazard Analysis/Summary;
(d) Employee Training;
(e) Personal Protection;
(f) Medical Surveillance;
(g) Air Surveillance;
6(h) Site Control;
(i) Decontamination;
(j) Contingency Planning;
(k) Confined Space Operations;
(l) Spill Containment;
(m) Sanitation;
(n) Illumination; and
(o) Other applicable requirements based on the work to be performed.

DTSC's *Interim Draft Site Specific Health and Safety Plan Guidance Document for Site Assessment/Investigation, Site Mitigation Projects, Hazardous Waste Site Work Closure, Post Closure, and Operation and Maintenance Activities* (DTSC, December 2000) can be used as a reference tool, The Health and Safety Plan should  cover all measures, including contingency plans, which will be taken during field activities to protect the health and safety of the workers at the Site and the general public from exposure to hazardous waste, substances or materials.  The Health and Safety Plan should describe the specific personnel, procedures and equipment to be utilized.

All contractors and all subcontractors shall be given a copy of the Health and Safety Plan prior to entering the Site.  Any supplemental health and safety plans prepared by any subcontractor shall also be prepared in accordance with the regulations and guidance identified above.  The prime contractor responsible for this subcontractor will

be responsible for ensuring that all subcontractor supplemental health and safety plans follow these regulations and guidelines.

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-540-3845 (direct)
ian.utz@dtsc.ca.gov

---

**From:** Utz, Ian@DTSC
**Sent:** Thursday, October 15, 2020 6:49 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>; Ron Scheele <rscheele@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing

Bob and Ron—I hope all is well.  I don't have the full picture yet, because I won't meet with our CIH until this coming Monday, but here was their initial feedback on the HASP.  Do you have a safety professional who can help update the HASP as necessary?  Are your staff HAZWOPER trained?  Do you have any questions for me to ask our CIH when I meet with them?  Thanks!

DTSC000014975

- *"This health and safety plan (HASP) has some serious problems due to the omission of many required components under HAZWOPER and the CSOs/GISOs...I advocate for the postponement of work until the health and safety of all persons at the site and residences can be ensured via an acceptable plan and document. As a courtesy, I recommend that a certified safety professional (e.g., CSP, CIH) write, or at least review, the HASP and COVID-19 Prevention Plan."*

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-540-3845 (direct)
ian.utz@dtsc.ca.gov

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Sent:** Thursday, September 24, 2020 9:57 AM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing

Ian – Here is our site safety plan.

Please contact me with any questions or comments.  Bob

Bob Clark-Riddell, P.E.
Pangea Environmental Services, Inc.
Mobile/Work (510) 435-8664

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Wednesday, September 23, 2020 10:03 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** Re: [202121] Omo Fabricare Dry Cleaner - HASP Missing

OK, thanks.  -Ian

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Sent:** Wednesday, September 23, 2020 8:03:24 PM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing

DTSC000014976

Ian,

It should be ready tomorrow.  Bob

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Wednesday, September 23, 2020 6:37 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** Re: [202121] Omo Fabricare Dry Cleaner - HASP Missing

Bob—When do you expect to have a HASP ready for this intended work?  Thanks,
-Ian

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

---

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Date:** Sunday, September 13, 2020 at 11:59 AM
**To:** "Utz, Ian@DTSC" <Ian.Utz@dtsc.ca.gov>
**Cc:** "Mazzoli, Theodore@DTSC" <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - HASP Missing

OK.  Bob

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Sunday, September 13, 2020 11:40 AM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** [202121] Omo Fabricare Dry Cleaner - HASP Missing

Hi Bob,

Please also send an updated HASP, per item number two of my workplan request letter of August 14, 2020.  DTSC will continue to review this workplan, but my goal is to have the HASP include COVID-19 protocols, to be protective of your employees/contractors, but also the building occupants.  If PPE are in short supply, then they are also "long lead" supplies that we strongly recommend you prepare in advance.

-Ian

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)

DTSC000014977

ian.utz@dtsc.ca.gov

---

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Date:** Sunday, September 13, 2020 at 11:18 AM
**To:** "Utz, Ian@DTSC" <Ian.Utz@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - "Sequencing" Question

Good to hear.  Bob

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Saturday, September 12, 2020 12:21 AM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** Re: [202121] Omo Fabricare Dry Cleaner - "Sequencing" Question

Received, thank you for sending this on Sept 11.

We have both a letter to adjoining properties and an interim "fact sheet" undergoing final approval by public participation.   I will be pushing for expedited comments on this workplan on our end.

-Ian

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

---

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Sent:** Friday, September 11, 2020 11:56:42 PM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaner - "Sequencing" Question

Hello Ian,

As requested, Pangea is providing the attached Revised Offsite Vapor Intrusion Investigation Workplan by September 11, 2020.  Please review and contact me with any questions or comments.  Note Pangea has obtained contact information for the adjacent properties and is coordinating site access.

Bob

Bob Clark-Riddell, P.E.
Principal Engineer
Pangea Environmental Services, Inc.
Mobile/Work (510) 435-8664

DTSC000014978

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Wednesday, September 2, 2020 4:32 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>
**Subject:** Re: [202121] Omo Fabricare Dry Cleaner - "Sequencing" Question

Hi Bob,

Are you on track to complete the workplan?  I sent some draft public outreach materials to public participation for internal review.

I have questions about an adjoining off-Site property to Omo, at northeast—the residence at 423 McLaughlin Street (APN 519-290-011).  Your figures for the SSD/SVE draft report do not indicate the use of that property, including its at least two buildings, per Google Earth.  According to the assessor, it is residential.

- Have you determined if the small shed-like feature at southwest is occupied as a residence?  It is immediately adjacent to SG-6A, where you reported 466 ug/m3 of PCE in 2020, in excess of the 2019 SFRWQCB HHRL VI ESL of 15 ug/m3, by an order of magnitude.  In 2017, PCE concentrations were two orders of magnitude higher than ESLs.  Since 2017, other detected analytes have included BTEX, TCE, cis-1,2-DCE, and methylene chloride.

- Is SG-6A, installed at 6 feet below ground surface, the only sampling location in that direction and along that property?

- Had you considered addressing that property as part of your upcoming workplan?

- Has Casa Nido contacted that property?

Please let me know.  Thanks.



Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program

Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

---

**From:** "Utz, Ian@DTSC" <Ian.Utz@dtsc.ca.gov>
**Date:** Tuesday, August 25, 2020 at 6:39 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** "Mazzoli, Theodore@DTSC" <Theodore.Mazzoli@dtsc.ca.gov>, "Vivas, Alejandro@DTSC" <Alejandro.Vivas@dtsc.ca.gov>
**Subject:** [202121] Omo Fabricare Dry Cleaner - "Sequencing" Question

Hi Bob,

During today's teleconference, you proposed de-prioritizing ("sequencing") indoor air sampling of certain of the four adjoining off-Site properties referenced in DTSC's letter dated August 14, 2020.  PANGEA proposes to de-prioritize new sampling of exposure-point media (i.e., indoor air), and re-prioritize additional sampling of subsurface media (e.g., soil vapor, sub-slab soil vapor).  My initial response was, generally, "PANGEA would need to put such a proposal in writing, along with contingency plans for screening criteria exceedances at those locations."  I am following up to that question, with more questions.

- **North-Adjoining Property**:  PANGEA provided DTSC with draft** soil vapor data, dated June 2020, which reports the presence of 7,200 micrograms per cubic-meter of PCE in soil vapor at 6 feet below ground surface (bgs), at SG-7A, located within approximately 10 feet of the occupied commercial building, according to draft figures.  As a frame of reference, this reported concentration exceeds the 67 micrograms per cubic-meter 2019 SFRWQCB ESL for vapor intrusion human health risk in a commercial/industrial scenario, with cancer endpoint, by two orders of magnitude.  (Interestingly, in 2020, PANGEA reported a <u>lower</u> concentration of PCE in deeper soil vapor collected from co-located SG-7B at 11 feet bgs.)  PANGEA has reported similar concentrations of PCE at SG-6A, which is also near the occupied commercial building.  Why wait to collect additional subsurface data at the north-adjoining property?  If, hypothetically, PANGEA proposes to collect sub-slab soil vapor data from inside the building at the north-adjoining property, and finds VOC concentrations are similarly high, then PANGEA would then need to remobilize for indoor air sampling, thus creating at least two intrusive interior sampling events during a pandemic, increasing contractor costs, and increasing tenant exposure to contractors.  Not to mention the need for post-slab-drilling indoor air equilibration concerns, and the potential absence of concurrent sampling data due to separate sampling mobilizations.

- **East-Adjoining Property**:  I generally already indicated during our teleconference that, based on the apparent short distance of the residence from the former dry cleaner (<20 feet, based on Google Earth), the existence of potential preferential pathways (rear utility corridors), the absence of any subsurface sampling data within the east-adjoining property, the known elevated concentrations of VOCs in nearby soil vapor and/or groundwater at the Site and restaurant, and the lapse in time, it is not appropriate to wait for additional subsurface data to be collected at the east-adjoining property.  As such, no further discussion is necessary here.

- **South-Adjoining Property**:  You concurred today that, based on the sampling data collected to date, there is sufficient data to justify indoor air sampling at the south-adjoining property.  As such, no further discussion is necessary here.

- **West-Adjoining Property**:  If PANGEA proceeds with its "sequencing" proposal, please include the rationale for prioritizing additional subsurface sampling at the west-adjoining property.  To date, PANGEA has presented draft data that report the continued presence of elevated concentrations of PCE in shallow groundwater at or immediately adjoining the occupied commercial property, at approximately 11 to 14 feet bgs.  The draft

DTSC000014980

reported VOC concentrations in groundwater appear to be at the same order of magnitude as those encountered at the north-adjoining property, where there were both groundwater and soil vapor screening criteria exceedances. Furthermore, the west-adjoining property is reported to be in the downgradient direction from the former dry cleaner. What would the "sequence" of additional subsurface sampling be? How does this property differ from the north-adjoining or south-adjoining properties? Consider referring to the 2020 draft supplementary vapor intrusion guidance (e.g., regarding presence of contaminated groundwater plume and undue delay, and whether the building(s) are connected to potential conduits that intersect contamination). Consider how concurrent sampling, rather than staggered, would help in the attribution of any indoor air VOCs to/away from subsurface plume(s). See comments above, regarding time/cost considerations.

Thanks for your help on this matter. It was nice to speak with you today. PANGEA's action items from today's meeting were to: 1) determine if off-Site access agreements are necessary for the contemplated work; 2) provide DTSC with telephone numbers for the adjoining properties, as available. I will work with Alejandro to draft a letter for the four adjoining properties. We look forward to your workplan.

(**Discussion of draft data does not necessarily constitute approval of such data or associated reports.)

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

# **<u>EXHIBIT K</u>**



## Department of Toxic Substances Control



**Jared Blumenfeld**
Secretary for
Environmental Protection

Meredith Williams, Ph.D.
Director
700 Heinz Avenue
Berkeley, California 94710



**Gavin Newsom**
Governor

### M E M O R A N D U M

**TO:**     Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Cleanup Program – Berkeley Office

**FROM:**   Eric Brocales, Associate Industrial Hygienist
Health and Safety Program

**DATE:**   January 20, 2021

**SUBJECT:** Review of Health and Safety Plan (HASP) Former Omo's Cleaners
(Site) Pangea Environmental Services, Inc. for Site
Characterization

**PROJECT:** Omo's Cleaner 12210 San Pablo Avenue, Richmond CA, 94804
Site Code - 202121; Work Phase - 11; PCA Code - 11018

The DTSC Site Mitigation and Restoration Program ("SMRP") in Berkeley
requested the Health & Safety Program ("HSP") review the Health and Safety
Plan ("HASP") prepared by Exponent, Inc. for Pangea Environmental Services
Inc. for Site Characterization at the Former Omo's Cleaners located on 12210
San Pablo Avenue, Richmod, CA 94804. The HASP was dated December 15,
2020.

## GENERAL COMMENTS

The HASP is required to be a stand-alone document. The minimum required
information necessary to ensure the health and safety of personnel on the Site
must be contained within the HASP. The HASP may refer to other documents
for community safety and health information, such as a community air
monitoring plan and dust control plan, which are often included with the work
plan for a Site.

When separate HASPs are submitted for contractors and subcontractors, these
plans must state who has the overall responsibility for site operations.
Regardless of the methodology used, DTSC will only accept HASPs that

DTSC000004726

address all aspects of the project. Sub-contractors not covered by the primary contractor's HASP must also submit their own HASP to the HSP for review. A project shall not commence until all relevant HASPs are reviewed by DTSC.

The Department has reviewed the HASP for conformance with Title 8 of the California Code of Regulations, section 5192, "Health and Safety for Hazardous Waste Operations and Emergency Response" [8 CCR § 5192], and Chapter 4, Subchapter 4, "Construction Safety Orders," and Subchapter 7, "General Safety Orders." Additionally, the requirements of Title 40 of the Code of Federal Regulations, Title 22 of the CCR, and the California Health and Safety Code, as well as DTSC Policies and Procedures, were also considered in the DTSC HSP review.

Some of the general areas of concern include field safety issues such as electrical hazards (including overhead and buried electrical lines); controlling hazards through engineering, administrative, work practice controls and personal protective equipment; slip trip and fall hazards; lighting issues; heavy equipment safety; noise; and chemical hazards. Please note that in addition to the requirements of these citations, the employer is responsible for the implementation of an effective Injury and Illness Prevention Program which is required by 8 CCR §§ 1509 & 3203. The requirements of those sections were not included in this review.

If the scope of work changes significantly (an unanticipated chemical, physical, or biological hazard is discovered or introduced to the Site) then the new hazard must be addressed in an addendum to the HASP and submitted to the Department for review.

DTSC review of the HASP does not constitute a guarantee that all potential hazards have been anticipated, recognized, and addressed, or that the HASP will be properly and safely implemented. The DTSC is unable to foresee every health and safety hazard in the workplace by reviewing the HASP. Effective implementation and regulatory compliance are the employer's responsibilities. Continuous surveillance of the Site and creation of an effective health and safety program by the employer will reduce workplace injuries and liability.

The HASP was reviewed for scientific content. Minor grammatical or typographical errors that do not affect interpretation have not been noted. However, these errors, if any, should be corrected in future versions of the document.

Finally, an industrial hygienist from the DTSC may perform a field audit to confirm the implementation of the provisions and specifications presented in the HASP.

DTSC000004727

## SPECIFIC COMMENTS

*Comment 1*: The submitted HASP does not meet the minimum requirements stated in 8 CCR 5192(d) Site Control.
- o Please include a section on site control procedures (8 CCR 5192(d) to control employee exposures to hazardous substance before clean-up work begins.
- o The HASP shall address site control elements specified in 8 CCR 5192(d)(3).
- o Please provide the required information in a revised HASP.

*Comment 2*: The submitted HASP information does not meet the minimum requirements stated in 8 CCR 5192(e) Training.
- o The HASP shall address training elements specified in 8 CCR 5192(e)(2)(A-G).
- o Please provide the required information in a revised HASP.

*Comment 3*:  The submitted HASP does not meet the minimum requirements stated in 8 CCR 5192(g) Engineering controls, work practices, and Personal Protective Equipment (PPE) or a combination of these to protect employees from exposure to hazardous substances and safety and health hazards.
- o The PPE program shall address the elements specified in 8 CCR 5192 (g)(5)(A-J).
- o Please provide the required information in a revised HASP.

*Comment 4*:  The submitted HASP does not meet the minimum requirements stated in 8 CCR 5192 (h)(1-4).
- o Please provide the required information in a revised HASP.

## CONCLUSION

The areas of the HASP where the HSP has requested changes, additional information, and/or clarification must be corrected and resubmitted for further review. Future changes in the document should be clearly identified.

DTSC000004728

# **EXHIBIT L**

Message

| | |
|---|---|
| **From:** | Brocales, Eric@DTSC [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8A90B0AEAC3947FF88C94BD9A523B46E-BROCALES, E] |
| **Sent:** | 3/4/2021 1:16:18 PM |
| **To:** | Utz, Ian@DTSC [Ian.Utz@dtsc.ca.gov] |
| **Subject:** | RE: [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter |

Hi Ian,

Let me know if you need HSP support to review any revised HASPs or CAMPs for OMO Cleaners.


Thanks,

Eric

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Tuesday, February 16, 2021 9:50 AM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Cc:** mtc10860@aol.com; Rachel Doughty <rdoughty@greenfirelaw.com>; Paul Kibel <pskibel@waterpowerlaw.com>; Ron Scheele <rscheele@pangeaenv.com>; Graham, Doyle@DTSC <Doyle.Graham@dtsc.ca.gov>; Negherbon, Jesse@DTSC <Jesse.Negherbon@dtsc.ca.gov>; Mathrani, Vivek@DTSC <Vivek.Mathrani@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Vivas, Alejandro@DTSC <Alejandro.Vivas@dtsc.ca.gov>; Moran, Patricia@DTSC <Patricia.Moran@dtsc.ca.gov>; Brocales, Eric@DTSC <Eric.Brocales@dtsc.ca.gov>; Michael McCoy <mmccoy@exponent.com>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter

Hi Bob:

First, thank you for your continued communication.  I'm going to compromise and approve an extension to **02/26/2021**, which will have allowed for 14 total business days for this revision.  My justification for this is:

1. One goal of USEPA's data quality objectives process is to have workplans frontload decisions, so that the field work and data evaluation require fewer on-the-fly decisions.   This is a workplan that will guide several months of work.

2. Several of the comments are repeat comments.  This workplan has been in revision since 2018.

3. Work expands to fit the schedule.  I'm going to be Casa Nido's advocate here and say that it took me about a day to review, and a day to write these comments, so shouldn't take much longer to make the edits, some of which consist of copying and pasting.  Please call me if you have questions, or disagree with, a comment.

Second, it's not clear to me why the health and safety plan (HASP) is not yet complete.  Why is it taking so long?  Keep in mind that we didn't ask for two HASPs—we asked for one HASP, and now we are in a position of editing two.  Thank you,

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)

DTSC000005194

ian.utz@dtsc.ca.gov

---

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Sent:** Monday, February 15, 2021 11:11 PM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Cc:** Ron Piziali <ronaldpiziali@gmail.com>; Ron Scheele <rscheele@pangeaenv.com>; Paul Kibel <pskibel@waterpowerlaw.com>
**Subject:** FW: [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter

EXTERNAL:

Mr. Utz,

Pangea prepared this email to request an extension for the revised workplan. Your February 5, 2021 letter provided 12 pages of comments on the *Draft Revised Off-site Vapor Intrusion Workplan* dated December 16, 2020. The letter provided only 5 business days to submit a revised workplan by February 15, 2021.

Pangea requires additional time respond to agency comments, which require the identification and use of subconsultant to assist with comments on the Quality Assurance Plan and the laboratory data validation aspect of the project. Based on the significant amount of remaining effort required to complete these tasks, Pangea requests an extension to submit the revised workplan by **March 15, 2020**.

Please note that this additional round of revisions further increases the cost to Casa Nido, due to workplan revision and DTSC review. Casa Nido requests that DTSC do everything in its capacity to help control cost related to workplan review and preparation. These additional costs further deplete the available resources for actual site work. Thank you for your consideration, Bob

Bob Clark-Riddell, P.E.
Pangea Environmental Services, Inc.
Mobile/Work (510) 435-8664

---

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Saturday, February 6, 2021 7:24 PM
**To:** Bob Clark-Riddell <briddell@pangeaenv.com>; Ron Piziali <ronaldpiziali@gmail.com>
**Cc:** mtc10860@aol.com; Rachel Doughty <rdoughty@greenfirelaw.com>; Paul Kibel <pskibel@waterpowerlaw.com>; Ron Scheele <rscheele@pangeaenv.com>; Graham, Doyle@DTSC <Doyle.Graham@dtsc.ca.gov>; Negherbon, Jesse@DTSC <Jesse.Negherbon@dtsc.ca.gov>; Mathrani, Vivek@DTSC <Vivek.Mathrani@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Vivas, Alejandro@DTSC <Alejandro.Vivas@dtsc.ca.gov>; Moran, Patricia@DTSC <Patricia.Moran@dtsc.ca.gov>; Brocales, Eric@DTSC <Eric.Brocales@dtsc.ca.gov>; Michael McCoy <mmccoy@exponent.com>
**Subject:** Re: [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter

Thank you for confirming receipt. If you have questions about these comments, please call me on Monday. If PANGEA cannot meet this deadline, please request/justify an extension date.

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721

DTSC000005195

510-859-8107 (mobile)
ian.utz@dtsc.ca.gov

**From:** Bob Clark-Riddell <briddell@pangeaenv.com>
**Date:** Saturday, February 6, 2021 at 6:48 PM
**To:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>, Ron Piziali <ronaldpiziali@gmail.com>
**Cc:** mtc10860@aol.com <mtc10860@aol.com>, Rachel Doughty <rdoughty@greenfirelaw.com>, Paul Kibel
<pskibel@waterpowerlaw.com>, Ron Scheele <rscheele@pangeaenv.com>, Graham, Doyle@DTSC
<Doyle.Graham@dtsc.ca.gov>, Negherbon, Jesse@DTSC <Jesse.Negherbon@dtsc.ca.gov>, Mathrani,
Vivek@DTSC <Vivek.Mathrani@dtsc.ca.gov>, Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>,
Vivas, Alejandro@DTSC <Alejandro.Vivas@dtsc.ca.gov>, Moran, Patricia@DTSC
<Patricia.Moran@dtsc.ca.gov>, Brocales, Eric@DTSC <Eric.Brocales@dtsc.ca.gov>, Michael McCoy
<mmccoy@exponent.com>
**Subject:** RE: [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter

EXTERNAL:

Hello Ian,

Pangea has received your comment letter. We are very glad to hear that DTSC appreciates our workplan changes and
that the workplan may be final after this next round of revision. We will commence incorporation of the requested
revisions. With all due respect, your February 15 deadline only provides 5 working days to incorporate 14 pages of
comments. I suspect we will require additional time, and will email you next week about the anticipated completion
date after reviewing our progress.

As an aside, I was asked to communicate that ongoing agency review and workplan revisions are diminishing limited
available financial resources for the actual indoor air sampling and future site work. Any reduction in agency review and
required document revision would help preserve these limited funds. Thank you for any consideration, Bob

Bob Clark-Riddell, P.E.
Pangea Environmental Services, Inc.
Mobile/Work (510) 435-8664

**From:** Utz, Ian@DTSC <Ian.Utz@dtsc.ca.gov>
**Sent:** Friday, February 5, 2021 4:07 PM
**To:** Ron Piziali <ronaldpiziali@gmail.com>
**Cc:** mtc10860@aol.com; Rachel Doughty <rdoughty@greenfirelaw.com>; Paul Kibel <pskibel@waterpowerlaw.com>;
Bob Clark-Riddell <briddell@pangeaenv.com>; Ron Scheele <rscheele@pangeaenv.com>; Graham, Doyle@DTSC
<Doyle.Graham@dtsc.ca.gov>; Negherbon, Jesse@DTSC <Jesse.Negherbon@dtsc.ca.gov>; Mathrani, Vivek@DTSC
<Vivek.Mathrani@dtsc.ca.gov>; Mazzoli, Theodore@DTSC <Theodore.Mazzoli@dtsc.ca.gov>; Vivas, Alejandro@DTSC
<Alejandro.Vivas@dtsc.ca.gov>; Moran, Patricia@DTSC <Patricia.Moran@dtsc.ca.gov>; Brocales, Eric@DTSC
<Eric.Brocales@dtsc.ca.gov>; Michael McCoy <mmccoy@exponent.com>
**Subject:** [202121] Omo Fabricare Dry Cleaners - Revised Workplan Comment Letter

Hello,

Enclosed is DTSC's comment letter on the revised workplan for vapor intrusion investigation transmitted
12/16/2020. These comments expand upon data validation, public participation, and scheduling—all of which are
especially important during investigation of off-site indoor air. We hope that addressing these comments will result in a

DTSC000005196

final draft, so that implementation can proceed in a timely manner.  Thank you very much and please call me with any questions.

Sincerely,
Ian Utz

Ian Utz, Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
California Environmental Protection Agency
700 Heinz Avenue, Suite 200
Berkeley, California 94710-2721
510-859-8107 (mobile)
ian.utz@dtsc.ca.gov