1  WILLIAM NOEL EDLIN, ESQ. (SBN 107796)
   nedlin@eghblaw.com
2  CHRISTOPHER J. DOW, ESQ. (SBN 250032)
   cdow@eghblaw.com
3  ANDREW D. PEREZ, ESQ. (SBN 348645)
   aperez@eghblaw.com
4  EDLIN GALLAGHER HUIE + BLUM
   500 Washington Street, Suite 700
5  San Francisco, CA 94111
   Telephone:     (415) 397-9006
6  Facsimile:     (415) 397-1339

7
   Attorneys for Defendant
8  CATHERINE O'HANKS

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                         OAKLAND DIVISION

12

13 CASA NIDO PARTNERSHIP, a California      Case No. 3:20-cv-7923-EMC
   Partnership,
14                                          **DECLARATION OF ALBORZ WOZNIAK IN
             Plaintiff,                      SUPPORT OF DEFENDANT CATHERINE
15                                           O'HANKS' CROSS-MOTION FOR PARTIAL
        vs.                                  SUMMARY JUDGMENT AND IN
16                                           OPPOSITION TO PLAINTIFF CASA NIDO'S
   CATHERINE O'HANKS and JAE KWON            MOTION FOR PARTIAL SUMMARY
17 aka JAY KWON aka JAY KWON SHIK aka        JUDGMENT**
   JAY SHIK KWON; LYNNE MARIE
18 GARIBOTTI aka LYNNE GARIBOTTI            Date: August 22, 2024
   BLOWER aka LYNNE G. BLOWER,             Time: 1:30 p.m.
19 individually,   as trustee the Claudio  Judge: Edward M. Chen
   Garibotti                               Courtroom.: 5 – 17th Floor
   Trust, dated May 1, 1952; and SENTRY
20 INSURANCE COMPANY, SANDRA KATE
   VERNELL (f/k/a SANDRA KATE              Third Amended Complaint Filed: December
21 ANDERSON) and EARL RAY ANDERSON         16, 2022

22          Defendants.

23

24

25

26

27

28

                                        1

## DECLARATION OF ALBORZ WOZNIAK

I, Alborz Wozniak, declare as follows:

1.      I am the CEO and co-founder of Veritas Environmental Consulting, Inc located in Pleasant Hill, California.  I hold a Bachelor of Science in Chemical Engineering from the University of Massachusetts in Amherst and a Master of Science degree in Environmental Engineering from George Washington University in Washington, D.C.  I am a registered Civil Engineer in California and Washington; as well as a Board-Certified Environmental Engineer (BCEE) with the American Academy of Environmental Engineers and Scientists.

2.      Over the past 30 years, I have been involved in the characterization and remediation of contaminants in soil, sediment, and groundwater, as well as the planning and implementation of investigations and remedial actions at hundreds of hazardous waste sites, including numerous drycleaning facilities, across the United States.  In addition, I have examined and provided testimony on the performance of response actions at contaminated sites with respect to the question of whether those actions were conducted in a manner consistent with the National Contingency Plan (NCP). My curriculum vitae is included as **Exhibit A**.

3.      I have been retained by Catherine O'Hanks, as an expert witness as to the contamination of the property located at 12210 San Pablo Avenue in Richmond, California (the "Property").  Specifically, I have been retained to determine whether past response actions taken on behalf of Casa Nido Partnership (Casa Nido) were consistent with the requirements of the federal regulations that govern the cleanup of hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  These cleanup regulations are contained in the NCP, found at 40 Code of Federal Regulations (CFR) Part 300.

4.      I have personal knowledge of the facts stated herein and, if called as a witness, would competently testify to those facts as well as the opinions expressed herein. In preparing this declaration, I reviewed and relied upon the documents listed in **Exhibit B**.

5.      I prepared this Declaration to describe the procedures outlined in the NCP and the requirements for demonstrating that response actions taken by private parties seeking to recover costs were conducted in manner that was consistent with the NCP, when evaluated as a whole, and

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   resulted in a CERCLA-quality cleanup.  My Declaration provides the necessary facts related to Casa

2   Nido's response actions and examines the NCP requirements against those actions.  I have

3   conducted my analysis of Casa Nido's response actions for NCP consistency from an environmental

4   engineering perspective and as a practitioner for over 30 years.

5   **NCP Procedures and Consistency Test**

6       1.      The procedures for implementing CERCLA-quality investigation and remediation

7   (cleanup process) are described in the NCP.  Over the decades, various USEPA and state regulatory

8   guidance documents have expanded on the specific steps and requirements of the cleanup process.

9   The process begins with the discovery and reporting of a release of hazardous substances and

10  progresses methodically through remedial investigation (RI) phases where the nature and extent of

11  the contamination is defined; to a feasibility study (FS) where remedial technologies and alternatives

12  are identified, evaluated, and compared; and culminates in a remedial design and implementation

13  phase.  To be consistent with the NCP, public participation is included throughout the process (Ex.

14  B-1).

15      2.      State regulations have relied on the NCP procedures for their specific policies and

16  rules.  For example, DTSC's early policy, after its inception, for "Oversight and Supervision of

17  Investigations and Removal and Remedial Actions at Hazardous Substance Sites" (SM #92-01)

18  states that "The Department follows the National Contingency Plan (NCP), which is the major

19  framework regulation for the federal hazardous substances response program (42 U.S.C., section

20  9605 a8 amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), P.L. 99-

21  499)." (Ex. B-2).

22      3.      The degree to which a private party seeking to recover its response costs conformed

23  with the NCP warrants careful evaluation of the response actions against the NCP requirements.

24  Based on my experience, the objective of this evaluation is intended to differentiate between those

25  response actions that generally follow something akin to the CERCLA cleanup process (e.g. some

26  investigation followed by remediation) without specifically adhering to the requirements of the NCP

27  (e.g. considering applicable or relevant and appropriate requirements [ARARs], preparing a

28  Remedial Investigation and Feasibility Study (RI/FS) Report, public participation) and those actions

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

that are in substantial compliance with the NCP requirements during the course of implementing the response action and result in a CERCLA-Quality Cleanup.

4.    In the March 1990 NCP, the USEPA provided guidelines regarding private party cost recovery actions and the requirements for evaluating consistency with the NCP.  The consistency requirements were described under Section 300.700(c)(3)(i) as follows: "For the purpose of cost recovery under Section 107(a)(4)(B) of CERCLA: (i) A private party response action will be considered ''consistent with the NCP'' if the action, when evaluated as a whole, is in <u>substantial</u> compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup." (Ex. B-3).

5.    According to the USEPA, the NCP consistency test requires a two-part analysis. First, the response action needs to be in substantial compliance with the relevant sections of the NCP (depending on whether a Removal or Remedial Action is taken), when evaluated as a whole. Second, the response action must result in a "CERCLA-Quality Cleanup."  The USEPA, in the 1990 NCP Preamble, provided guidance on what was meant by a "CERCLA-Quality Cleanup" by introducing three criteria including: 1)satisfy the three basic CERCLA remedy selection elements: (a) protectiveness of human health and the environment; (b) utilization of permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and (c) cost-effectiveness, 2) attain applicable or relevant and appropriate requirements (ARARs); and, 3) provide for meaningful public participation (Ex. B-3, p.8793).  The relevant sections of the NCP for examining whether response actions were consistent with its procedures are presented below.

| NCP Section | Summary Description |
|---|---|
| 300.150 | **Worker Health and Safety** – Requires that response actions be conducted in compliance with worker health and safety regulations under 29 CFR 1910.120 and other OSHA regulations. |
| 300.155 | **Public Information and Community Relations** – Requires that the public be promptly and accurately informed of the release of the hazardous substance and the subsequent response actions taken. |
| 300.160 | **Documentation and Cost Recovery** – Provides provisions to ensure proper documentation and cost information is gathered and maintained throughout the course of the response actions. |

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

| NCP Section | Summary Description |
|---|---|
| 300.405 | **Discovery or Notification** – Describes the steps for notification and reporting of the release of a hazardous substance to authorities. |
| 300.410 | **Removal Site Evaluation** – Describes the preliminary assessment and, if necessary, site inspection procedures to determine if a removal action is required. |
| 300.415 | **Removal Action** – Describes the factors to consider when evaluating the need for a removal action and the process to follow for implementing the removal action including the documentation of the selection of a removal action (through the engineering evaluation/cost analysis [EE/CA] and action memorandum [AM]) and the required community involvement steps. |
| 300.420 | **Remedial Site Evaluation** – Describes the process including preliminary assessment and site inspections necessary to evaluate the conditions caused by the release of hazardous substances. |
| 300.430 | **Remedial Investigation/Feasibility Study (RI/FS) & Selection of Remedy** – Describes the agency's goals and principals for the evaluation and selection of remedial actions and presents the procedures and requirements for implementing investigations and conducting feasibility studies.  This section describes the need to prepare proper work plans (sampling plans, quality assurance plans), initial identification of ARARs, development of formal community relations plans, implementation of remedial investigations, performance of risk assessments, the methods for preparing feasibility studies (e.g. explaining the nine criteria necessary for a detailed analysis of remedial alternatives), the process for selecting a remedial action and the necessary steps to memorialize the decision (through the proposed plan and record of decision documents) including the public comments and input on the overall remedial selection. |
| 300.435 | **Remedial Design/Remedial Action, Operation and Maintenance** – Describes the requirements for the design, implementation, reporting, and long-term maintenance and monitoring of the remedial action. |

6.      Upon the discovery of contamination at a hazardous waste site, the first issue that is often raised is whether the presence of the hazardous substances poses an imminent risk to human health or the environment and whether that risk needs to be addressed in a relatively short period of time.  To address imminent risks, the USEPA, under the NCP, included an initial step (Removal Site Evaluation, §300.410) to allow the responding agency or private party to consider whether to implement a Removal Action.  As the term suggests and as the NCP and subsequent regulatory guidelines describe, the idea of the Removal Action was tied to an exigency that included the concepts of emergency, time-critical (and eventually non-time critical) actions that needed to be implemented in a short period of time (days, weeks or months depending on the situation) due to a substantial risk.  Furthermore, it was recognized that conducting Removal Actions should generally

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  not require significant resources, would be relatively easy to execute, and require limited assessment

2  and evaluation.  An example of a Removal Action is fencing to prevent public access to a highly

3  contaminated area.

4     7.  By contrast, Remedial Actions are designed to address contamination that does not

5  pose an immediate risk to human health and the environment, requires a more thorough

6  characterization and evaluation of the extent of the problem, and are designed to be a permanent and

7  long-term remedy of the hazardous substances released in the environment.  According to the NCP,

8  Remedial Actions are to be selected through the RI/FS process.

9     8.  I have evaluated the environmental response actions conducted by Casa Nido to

10  determine whether: 1) those actions were equivalent to a CERCLA Removal or Remedial Action and

11  2) whether, when evaluated as a whole, the actions were in substantial compliance with the NCP and

12  resulted in a CERCLA-Quality Cleanup.  As noted in the NCP, its preamble, and the associated

13  USEPA policies, of paramount importance to the NCP consistency test are conformance to the

14  procedures outlined in the regulations and ensuring the public's awareness and opportunity for

15  involvement in the cleanup process, both of which are necessary to ensure substantial compliance

16  and a CERCLA-quality cleanup outcome.

17     9.  Casa Nido conducted its actions in a haphazard manner, without regulatory input

18  approval, and without following the requirements of the NCP.  Casa Nido has alleged, years after

19  conducting its response actions and without any supporting evidence, that an imminent threat and an

20  exigency was the driver for their response actions.  My declaration will demonstrate that even

21  assuming that its actions were in response to an imminent threat, which they were not, it did not

22  comply with any of the requirements of the NCP and its actions did not result in a CERCLA-quality

23  cleanup.

24  **Casa Nido's Response Actions**

25     10.  Casa Nido, through its environmental consultant Pangea Environmental Services, Inc.

26  (Pangea), performed response actions over three time periods including from 2014 to 2017, 2017

27  through 2020, and 2021 forward.  These periods are defined by the manner in which Casa Nido

28  performed its environmental investigation and remediation at the Site.  During the first period, 2014

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1    – 2017, Casa Nido performed response actions in an independent manner and with no agency or

2    public involvement, and without preparing plans and documents that are required under the NCP

3    procedures.  In the second period, 2017 – 2021, Casa Nido had entered into a voluntary cleanup

4    agreement (VCA) with the California Department of Toxic Substances Control (DTSC or

5    Department) and was supposed to perform its response actions consistent with the requirements of

6    the VCA.  However, Casa Nido ignored the VCA requirements and again conducted its work

7    independent of the DTSC, without any public involvement, and without preparing the necessary

8    plans and documents required under the NCP.  In the third and final period, 2021 – present, Casa

9    Nido was under tight direction and close management by the DTSC due to its past failures to comply

10   with the VCA, to involve the agency in its response actions, to prepare the necessary documentation,

11   and to inform/involve the public.  During this third period, Casa Nido continued to fail to meet the

12   necessary requirements for NCP consistency.

13        11.      Sometime in the Fall 2014, Casa Nido contracted with Pangea to perform an

14   assessment of the subsurface conditions at the Property and determine if drycleaning operations had

15   caused a release of hazardous substances (Ex. B-4).

16        12.      Between 2014 and 2016, Pangea conducted multiple phases of environmental

17   investigations.  Pangea did not prepare any work plans to describe the objectives and methods for its

18   sampling and analysis, a health and safety plan, a quality assurance plan, or to recommend any

19   notification of the discovery of the contamination to a government agency or the public.  The four

20   phases of the Pangea investigations included (Ex. B-5, p. 10):

21        a.   In October 2014, Pangea performed the first investigation phase including a sewer

22             video inspection and soil and soil gas sampling inside the building.

23        b.   In June/July 2015, Pangea performed a second investigation phase consisting of soil,

24             soil gas and groundwater sampling inside the building.

25        c.   In September/November 2015, Pangea performed a third investigation phase by

26             installing groundwater monitoring wells on- and off-Property.

27        d.   In March/May 2016, Pangea performed a fourth investigation phase to delineate the

28             lateral and vertical extent of groundwater contamination.

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

13.     In August 2016, Pangea prepared a report for Casa Nido titled "Site Assessment Report" (Ex B-5).  The report was not provided to the DTSC or any other agency at the time.

14.     All the actions and incurred response costs were conducted with no agency or public involvement and did not follow any of the NCP required steps.  Casa Nido had not conducted a Removal Site Evaluation to determine whether there was an imminent threat or an exigency that would warrant a Removal Action (required under §300.410).

15.     In late 2016 and early 2017, Casa Nido entered into discussions with the DTSC to request agency oversight under a voluntary program.  There is no record to indicate that Casa Nido was concerned about potential imminent risk to any offsite individuals or that it was contemplating conducting a Removal Action.

16.     Casa Nido demonstrated that it was unfamiliar with the cleanup process requirements and regulatory involvement.  Casa Nido was reluctant to sign a VCA with the DTSC.  Casa Nido stated the following regarding the VCA: "It is highly legalistic and it places many burdensome requirements on the partnership that we feel will greatly increase costs, without providing any real benefit. In addition, there are simply too many points in the agreement that seem unnecessary…". (Ex. B-6)

17.     In May 2017, Casa Nido signed a VCA with the DTSC (Ex. B-7).  The VCA included an Exhibit C, which listed the tasks Casa Nido was required to complete.  Several of the tasks are listed below (and notably are similar to the NCP process requirements).

a.  Task 1 – Submittal of Existing Data and Scoping Meeting

b.  Task 2 – Preliminary Endangerment Assessment (PEA)

c.  Task 3 – Additional Site Characterization

d.  Task 4 – Risk Evaluation and Cleanup Level Determination

e.  Task 5 – Feasibility Study

f.  Task 6 – Remedy Selection Documents (Removal Action Workplan / Remedial Action Plan)

g.  Task 7 – California Environmental Quality Act (CEQA)

h.  Task 8 – Remedial Design and Implementation Plan

i.   Task 9 – Implementation of Final Removal Action Workplan (RAW)

j.   Task 10 – Implementation of Final Remedial Action Plan (RAP)

k.   Task 11 – Implementation Report

l.   Task 13 – Public Participation

m. Task 19 – Health and Safety Plan (HSP)

18.     In May 2017, concurrent with signing the VCA, and without input from the DTSC, Casa Nido began the permitting process for building demolition and remediation (Ex. B-8).

19.     In June 2017, Pangea submitted a groundwater monitoring report to Casa Nido, but <u>not</u> to the DTSC.  There is no basis for failing to submit the report to the DTSC, especially in light of the recently signed VCA requesting the agency's oversight of Casa Nido's response actions.

20.     In July 2017, Casa Nido demolished the building on the Property (Ex. B-9, p. 1).

21.     In October 2017, the DTSC sent Pangea its annual cost estimate for the period of July 2017 to June 2018 (Ex. B-10).  The DTSC included a project activity schedule for the time period that presumed its involvement in reviewing a Site Assessment Report and a RI/FS Workplan.  No mention of any Removal Action or addressing an imminent risk was included in the correspondence.  The DTSC was unaware of Casa Nido's plans for conducting its alleged Removal Actions.  Casa Nido never submitted an RI/FS Work Plan, as required by the VCA and as would have been required for compliance with the NCP (§300.430).

22.     In October 2017, Pangea conducted another round of groundwater monitoring (Ex. B-11, Table 1).  Pangea did not document the testing results in a monitoring report.  Casa Nido did not inform the DTSC of its intended plans and findings.  If Casa Nido had an intension to conduct its work consistent with the NCP, or to comply with the VCA, Pangea would have notified the agency of its groundwater monitoring activities and provided a report of its findings to the agency.

23.     Between October 2017 and April 2018, Pangea conducted multiple independent investigations, without any notification or involvement of the DTSC.  These investigations included the following (Ex. B-9, section 3.2):

///

///

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

a.  In October 2017, three soil borings were advanced to delineate soil contamination inside the building and six soil vapor probes were installed near the adjacent restaurant;

b.  In December 2017, four soil borings were advanced to delineate soil contamination outside the building and six soil vapor probes were installed to delineate the lateral extent of contamination to the north and east of the Property;

c.  In February 2018, six soil borings were advanced to delineate soil contamination outside the building and two soil vapor probes were installed to further delineate impacts to the north; and,

d.  In April 2018, seven soil borings were advanced to delineate soil contamination outside the building.

24.     Pangea did not prepare any work plans to document the objectives and methods for the investigation, a sampling and analysis plan, a health and safety plan, or a quality assurance plan. Pangea did not prepare a report to document the findings of the investigations.  Years later, at the requirement of the DTSC, Casa Nido agreed to inform the agency of what had happened during the October 2017 and April 2018 period (Ex. B-12).  If Casa Nido had an intension to conduct its work consistent with the NCP, or to comply with the VCA, Pangea would have notified the agency of its plans, would have prepared an RI Work Plan (§300.430), would have prepared a HSP (as required by the VCA and under the NCP §300.150), would have prepared an RI Report, and would have complied with the public participation requirements of the VCA and the NCP (§300.430).  Assuming that Casa Nido believed that a Removal Action was necessary, its consultant would have followed the requirements of the NCP §300.415(b)(4)(ii) for development of sampling and analysis plans that would require agency approval.

25.     In December 2017, the DTSC provided Casa Nido comments on the Pangea August 2016 Site Assessment Report (Ex. B-13).  The DTSC provided multiple recommendations for further investigation, unaware that Casa Nido had already embarked on conducting independent investigations without work plans or agency involvement.  The DTSC requested that Pangea prepare a Remedial Investigation (RI) Workplan by March 15, 2018.

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    26.    In April 2018, Pangea submitted a request to DTSC for an extension to submit the RI

2    Workplan (Ex. B-14).  Casa Nido did not inform the DTSC that it had already conducted multiple

3    investigations during October 2017 and April 2018.  If Casa Nido intended to comply with the

4    requirements of the VCA or the NCP (§300.415 for Removal Action and §300.430 for Remedial

5    Action), it would have submitted the necessary work plans in advance of its implementation as

6    required by the DTSC.  Casa Nido made no mention of its intentions or plans to conduct any

7    Removal or Remedial Actions at the Site.

8    27.    In July 2018, Pangea submitted an Offsite Vapor Intrusion Investigation Workplan to

9    the DTSC (Ex. B-15).  This document was not the RI Work Plan as required by the DTSC in its

10   December 2017 letter.

11   28.    In September 2018, the DTSC provided comments to Casa Nido regarding the Offsite

12   Vapor Intrusion Investigation Workplan (Ex. B-16). The DTSC comments confirm that it was

13   unaware that Casa Nido was about to implement a remediation at the Property.

14   29.    In September 2018, just a month prior to Casa Nido initiating major remediation

15   activities, the DTSC sent Casa Nido an annual cost estimate for the period of July 2018 to June 2019

16   (Ex. B-17). The DTSC included a project activity schedule for the time period that included work on

17   an RI/FS Workplan, RI/FS data collection efforts, and the preparation of the RI/FS Report.  The

18   document again confirms that the agency had no idea that remediation was about to begin at the Site.

19   30.    In October 2018, Pangea oversaw a remediation at the Property which included

20   excavation and offsite disposal of 454 cubic yards of contaminated soil and placement of 3,300

21   pounds of a treatment chemical in the bottom of the excavation and within three permeable reactive

22   barrier trenches.  No communication was sent to DTSC regarding Casa Nido's intention for such a

23   response action.  If Casa Nido intended to comply with the NCP, it would have prepared an

24   Engineering Evaluation/Cost Analysis (EE/CA) for a Removal Action as required under the NCP

25   (§300.415(b)(4)(i) or a Feasibility Study (FS) for a Remedial Action under §300.430.  The EE/CA is

26   required to evaluate various removal action alternatives (for example soil excavation versus soil

27   vapor extraction to address soil contamination), their effectiveness, implementability and cost.  An

28   EE/CA is a streamlined FS.  An FS would have been required under a Remedial Action to support

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1 | the selection of the remedial objectives, evaluate ARARs, and compare remedial alternatives against

2 | the required nine criteria under the NCP.

3 | 31.    Casa Nido not only failed to notify the DTSC, but it also failed to follow the required

4 | public and community involvement for Removal Action (§300.415(m)) or for Remedial Action

5 | (§300.430).

6 | 32.    Between 2018 and 2020, Pangea implemented another soil remediation involving

7 | installation of a soil vapor extraction/sub-slab depressurization (SVE/SSD) system.  Again, Casa

8 | Nido failed to follow the requirements of the NCP by not preparing an EE/CA to explain the purpose

9 | of its removal action and to compare various alternative against the criteria of effectiveness,

10 | implementability and cost (§300.415(b)(4)(i)), by not notifying the DTSC and involving the agency

11 | in its decision-making process as required by the VCA, and for not notifying the public (§300.155,

12 | §300.415(m)).  Casa Nido has still not provided the necessary technical documentation to the DTSC

13 | required for an engineering evaluation of the SVE/SSD systems installed at the Site.  In late 2020,

14 | DTSC's project manager for the Site, Mr. Ian Utz, stated "The soil vapor extraction system and sub-

15 | slab depressurization systems may or may not be the appropriate remedy and/or mitigation for the

16 | Site because the remedy selection process was not followed and because DTSC has not reviewed or

17 | approved these systems." (Ex. B-18, p. 3).  Ian Utz testified that as of February 29, 2024 (the date of

18 | his deposition) the DTSC has still not received "written documentation, including engineering plans,

19 | permits, other standard engineering documents for an engineered system such as the one described

20 | here, the SVE and SSD systems [installed by Pangea for Casa Nido]" (Ex. B-19, p. 53).

21 | 33.    Casa Nido did not prepare Removal Action Work Plans (as required by the VCA,

22 | Task 6) for any of its remediation efforts between 2018 and 2020.

23 | 34.    In 2019, Pangea conducted a groundwater monitoring event (Ex. B-20).  Again, no

24 | notice of the sampling or report were provided to the DTSC at the time, confirming that Casa Nido

25 | was not intending to involve the agency or the public in any of its response actions.

26 | 35.    In May 2020, DTSC notified Casa Nido of a new project manager, Mr. Ian Utz, for

27 | the Site (Ex. B-21).

28 | ///

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

36.     In June 2020, Pangea notified the DTSC of the investigations and remediation that Casa Nido had conducted between 2017 and 2020, without DTSC involvement (Ex. B-12).  At the direction of the new DTSC case manager, the SVE/SSD system operation results were summarized in the SVE/SSD System Startup Report and submitted to the DTSC in June 2020 (Ex. B-22).  The DTSC has considered this summary report as inadequate and incomplete for an engineering evaluation of its design and operational performance (Ex. B-18).

37.     In August 2020, the DTSC sent Casa Nido a letter requesting the expedited submittal of a workplan for an off-Site vapor intrusion investigation.  Within the letter, the DTSC made the following statement: "In correspondence dated December 7, 2017 and September 7, 2018, DTSC requested additional vapor intrusion-related subsurface investigation and risk characterization activities under DTSC oversight. However, investigation and removal activities at the Site, including the demolition of on-Site structures, proceeded without DTSC oversight, for nearly two years" (Ex. B-23).

38.     In October 2020, the DTSC provided comments to the Revised Offsite Vapor Intrusion Investigation Workplan submitted by Pangea in September.  DTSC stated "The unapproved remedial activities performed to date (e.g. soil excavation, soil amendments, permeable reactive barriers, soil vapor extraction, and sub-slab depressurization) shall hereafter be referred to as 'interim actions'. DTSC did not oversee, evaluate, or approve the interim actions" (Ex. B-24).

39.     On November 19, 2020, during a meeting between representatives of Casa Nido and DTSC, the Department noted that "The cleanup work has so far not followed State or federal law or the voluntary agreement.  Therefore, DTSC cannot determine whether the work was completed safely, or whether the work was effective, or necessary, or if that work would have been in compliance with National Contingency Plan (NCP)." (Ex. B-18, page 2).  DTSC noted that Casa Nido had failed to submit the basic required documents at the beginning of the RI, stating "DTSC is still expecting a Sampling and Analysis Workplan and Health and Safety Plan (HASP), pursuant to the VCA, which Casa Nido already agreed to complete, and which DTSC asked for several years ago" (Ex. B-18, page 3).

///

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

40.     In December 2020, Pangea submitted the Additional Characterization Report to DTSC (Ex. B-9).  This report only summarized the environmental data collected and the unauthorized/unapproved activities performed by Pangea.  It did not meet any NCP planning or reporting requirement for a Removal or Remedial Action.

41.     Between September 2020 and March 2021, Pangea revised the Offsite Vapor Intrusion Investigation Plan multiple times, due to the poor quality of the documents.  In a late 2021 response to a letter from Paul Kibel written on behalf of Casa Nido, Ian Utz stated "If the quality of technical work improves, then DTSC editing costs and turnaround time will reduce. A case in point is the rudimentary transcription errors that continue to exist in Table 1 in the [Offsite Vapor Intrusion Investigation] work plan, leading to incorrect screening values and soil vapor concentration values incorrectly copied and pasted from other documents. …These are basic errors that shouldn't exist in state level cleanups and add unnecessary costs to correct." (Ex. B-25).

42.     In 2022, Pangea implemented two rounds of vapor intrusion assessment testing.  The results were submitted to the DTSC in 2023.  The DTSC was not satisfied with the vapor intrusion work conducted by Pangea as it noted several deficiencies including "Despite the work plan requirement to have the data third-party validated against laboratory reports and work plan data quality objectives, that has still not taken place", and "We noted the absence of several applicable SFRWQCB or DTSC screening criteria… As a result, the table as submitted is insufficient for risk management (screening level) purposes." (Ex. B-26).

43.     In December 2022, Casa Nido notified the DTSC that it was terminating the VCA as of March 1, 2023 (Ex. B-27).

**Casa Nido's Response Actions Where Not Consistent with the NCP and Did Not Result in a CERCLA-Quality Cleanup.**

44.     Casa Nido, through its environmental contractor Pangea, conducted investigations without complying with the process and procedures outlined in the NCP.  The following demonstrate the lack of NCP consistency of the Casa Nido response actions taken between 2014 and 2023.

45.     It is clear from the records and documentation that Casa Nido had no intention to comply with the NCP or perform work that would be considered substantially consistent with the

NCP requirements, when evaluated as a whole.  Clear evidence supporting this opinion is provided below:

      a.  Casa Nido did not perform a Removal Site Evaluation (§300.410) to establish whether an imminent threat to the public existed and to document its findings to support the determination of a need for a Removal Action (§300.410(f) requires that the results of a Removal Site Evaluation be documented, which Casa Nido's never did);

      b.  Case Nido did not prepare the technical documents required under the NCP such as work plans, sampling and analysis plans, quality assurance plans, health and safety plans (§300.415(b)(4)(ii) for Removal Actions and §300.430(b)(6) and (8) for Remedial Actions). Consistent with the NCP, the DTSC under the VCA required the preparation of RI/FS Work Plans and RI Work Plans which Casa Nido failed to comply with.

      c.  For a Removal Action, Casa Nido was to prepare an EE/CA (under §300.415(b)(4)(i). Casa Nido never prepared an EE/CA.  Casa Nido did not prepare any documents to rationalize the selection of the remediation it conducted between 2018 and 2024.

      d.  Casa Nido did not prepare the appropriate remedial investigation reports (§300.430(d)), human health risk assessments (§300.430(d)(4)), and feasibility studies (§300.430(e));

      e.  Casa Nido did not involve or notify the public of its response actions as required under multiple sections of the NCP (§300.155, (§300.415 (m), 300.430(c), 300.435(c));

      f.  Casa Nido conducted an independent cleanup that was not based on a complete RI and human health risk assessment, did not include an EE/CA or FS, and did not consider ARARs.

    46.    Under §300.150, Worker Health and Safety, and as required by the DTSC under the terms of the VCA (Ex. B-7, Exhibit C p. 6), Casa Nido was required to prepare a Health and Safety Work Plan prior to initiating its investigation and remediation.  Casa Nido failed to prepare such

documentation in support of its actions between 2014 and December 2020.  Casa Nido's first Health and Safety Plan for Site Characterization was prepared in December 2020, after completion of its investigation and remedial actions (Ex. B-28). In October 2020, DTSC stated "The existing health and safety documentation are inadequate for the purposes of hazardous waste cleanup" (Ex. B-29). In December 2020, DTSC responded to the receipt of the HASP with "Based on the… incomplete HASP, I ask again when you expect to have these [referring to the HASP and an associated work plan] complete? I am not granting any more extensions" (Ex. B-30).

47.     Under §300.410, Removal Site Evaluation, Casa Nido did not perform a removal preliminary assessment (§300.415(c)) a removal site inspection ((§300.415(d)) or document its findings (§300.415(f)) to justify the need for a Removal Action based on an exigency or imminent threat to human health related to the PCE contamination discovered at the Property.

48.     The 2017 VCA also required immediate notification to the DTSC of conditions that are an imminent threat to public health (Ex. B-7, page 2).  Casa Nido failed to notify the DTSC and comply with the VCA.

49.     Under §300.430, RI/FS, or §300.15(b)(4)(ii), Removal Action, Casa Nido did not prepare work plans for any of its eight (8) phases of environmental investigations between 2014 and 2018.  None of the investigation phases were conducted in accordance with the standard of practice and NCP rules that require preparation of work plans (sampling and analysis plans, quality assurance plans, health and safety plans) and review and approval by an agency.

50.     Under §300.415(b)(4)(i), the Casa Nido did not prepare an EE/CA to rationalize the basis for conducting a soil excavation, installation of reactive barriers, and installation of an SVE, without comparing among various removal action alternatives and how any would be effective, implementable and be cost effective to address an imminent risk.  The soil remediation efforts conducted during 2018-2024 were not performed in compliance with the NCP requirements.

51.     As required by the NCP under multiple sections including §300.155 (Public Information and Community Relations), §300.415 (m) (for Removal Action), §300.430(c) (Community Relations during RI/FS), §300.430(f) (2), (3), and (6) (Community Relations during Remedy Selection) and §300.435(c) (Community Relations during Remedial Action) and as required

1 for purposes of achieving a CERCLA-quality cleanup, no public participation was performed by

2 Casa Nido between 2014 and 2021.

3      52.     DTSC noted during the November 2020 agency meeting with Casa Nido that it had

4 been left out of the required regulatory review and approval of all Casa Nido efforts.  Casa Nido

5 performed response actions without DTSC or the public awareness and involvement.

6      53.     When evaluated as a whole, all of the response actions taken by Casa Nido between

7 2014 and 2024, were not consistent with the NCP and did not result in a CERCLA-quality cleanup.

8

9      I declare under the penalty of perjury under the laws of the United States and the State of

10 California that the foregoing is true and correct and that this declaration was executed by me on July

11 25, 2024, in the city of Pleasant Hill, in Contra Costa County, California.

12

13

14         _____

15      Alborz Wozniak, P.E., BCEE

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT CATHERINE O'HANKS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Re:     **Casa Nido Partnership v. Catherine O'Hanks, et al.**
        **United States District Court, Northern District Case No. 3:20-cv-7923**

## CERTIFICATE OF SERVICE – L.R. 5-3.2

I am a citizen of the United States and an employee in the state of California. I am over the age of eighteen (18) years and not a party to the within action. My business address is EDLIN GALLAGHER HUIE + BLUM, 515 S. Flower St. Ste. 1020. Los Angeles, California 90071.

     I hereby certify that on July 26, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF ALBORZ WOZNIAK IN SUPPORT OF DEFENDANT**

**CATHERINE O'HANKS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**AND IN OPPOSITION TO PLAINTIFF CASA NIDO'S MOTION FOR PARTIAL**

**SUMMARY JUDGMENT**

  **X**  **BY ELECTRONIC SERVICE**:  I caused such document to be electronically served the United States District Court Case Filing website on the recipients designated on the electronic service list that is located on the Pacer website.

     I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on July 26, 2024, at Los Angeles, California.

_____
ANAHIT AVETISYAN

5561867

1

CERTIFICATE OF SERVICE