# **Exhibit B-18**

**[202121] OMO FABRICARE DRY CLEANER**
**TELECONFERENCE MEETING MINUTES**
**PAGE 1 OF 3**

<u>TELECONFERENCE MEETING MINUTES</u>

OMO FABRICARE DRY CLEANER (SITE CODE 202121)
NOVEMBER 19, 2020
9:00 AM to 10:40 AM
CONFERENCE LINE:  866-564-0930

1. **Attendees**

    - Ron Piziali (Proponent/Casa Nido Partnership Partner),
    - Paul Stanton Kibel, Esq. (Proponent's Counsel/Water and Power Law Group),
    - Bob Clark-Riddell (Proponent's Consultant/PANGEA Environmental Services),
    - Larry McDaniel, Esq.  (DTSC Office of Legal Counsel),
    - Whitney Smith (DTSC Unit Chief), and
    - Ian Utz (DTSC Project Manager).

2. **Agenda and Disclaimers**

    a. UTZ:  Standard roll call, this is not an open meeting, this is not being recorded, there are attorneys present for DTSC and Proponent (Casa Nido).

    b. UTZ:  The purpose of this teleconference, which Proponent's counsel requested, is to resolve the issue of an outstanding Workplan and Health and Safety Plan, and the issue of the Proponent running out of money allocated to this project.

    c. In advance of the teleconference, Proponent's counsel provided:

        i. Letter of November 5, 2020, entitled "Request for Meeting with DTSC to Discuss Responsible Parties and Sequencing of New Scope of Investigation Regarding Subterranean Creekbed."

        ii. E-mail of November 16, 2020, entitled "Case 4:20-cv-07923 Casa Nido Partnership v. Kwon et al Complaint," transmitting a filed lawsuit.

        iii. E-mails of November 2020, certain of which transmitted draft figures and an incomplete Health and Safety Plan.

    d. UTZ:  This discussion does <u>not</u> constitute DTSC agreement, approval, or any other affirmation of claims made in the matter of Casa Nido v. Kwon et al., nor of Power Law Group's communications throughout November 2020.   DTSC is not a party in the lawsuit.

3. **History**

    e. UTZ:  Thank you, Casa Nido for its participation in the Voluntary Cleanup Program, to cooperatively protect the people of the State through cleanup of the contaminated Site.

    f. KIBEL: Discussed initial involvement in the property (ownership, discovery of contamination, and dry cleaner operators).  KIBEL inherited this project from a previous attorney (Karl Morthole).   Casa Nido and/or its individual partners acquired the Site in the 1970s, when Environmental Site Assessment requirements did not yet exist, and allegedly discovered the contamination in the 2010s.  Some of the partners have since

acquired ownership interest through inheritance. Casa Nido claims that under a fairness standard DTSC should allocate more responsibility for response and oversight costs to the operators of the dry cleaners (their tenants) and try to access the tenants' insurance policies. Casa Nido represents that it did not carry commercial general liability (CGL) insurance, but was covered by being named an additional insured on tenants' CGL policies. Casa Nido has not provided: chain of title, history of tenancy/tenant operations, Workplan, or Health and Safety Plan, or completed Preliminary Endangerment Assessment (PEA) (with history of historical operators). Casa Nido entered into a Voluntary Cleanup Agreement (VCA, or Enforceable Agreement), intending to use about $1 million in available funding from the partnership's sale of another property to address all the contamination at this Site. They then, without DTSC oversight, even though a VCA had been signed, made a business judgment to proceed quickly with several interim actions from 2017 to 2020, totaling almost $1 million, to address the known/discovered risk that this property poses to adjacent properties and the environment. Having now run out of earmarked money because of that expenditure on activities conducted without DTSC oversight., Casa Nido has very little free capital to perform the environmental investigation/remediation anticipated under the VCA.

4. **Status of Voluntary Cleanup Agreement Scope of Work**

    a. KIBEL/PIZIALI: Casa Nido claims that about $1 million was set aside after the sale of another property owned by Casa Nido, and was earmarked specifically for cleanup of the Site. The Site is no longer generating an income for Casa Nido. Casa Nido is projecting that within months, based on the contemplated near-term scope of work ($3,100/month for ongoing operation and maintenance of the Site and interim systems, and $40,000 for upcoming vapor intrusion investigation), the remaining earmarked funds will run out, and Casa Nido partners will be forced to pay for the remaining costs out of pocket as individuals. Not all of the $1 million was spent on actual work at the Site; some went to legal fees, and additional sampling work, but the $1 million was the source of funds used so far to pay DTSC agency oversight costs

        a. KIBEL: Casa Nido believes that reaching that point, where elderly and/or inheritor individuals are paying out of pocket, without DTSC having contacted other potentially responsible persons such as their tenants as former dry cleaner operators and their expected insurance, seems unfair and un-equitable. Casa Nido refers DTSC to the CERCLA "Gore Factors" as a framework for allocating responsibility in a fair and equitable way. KIBEL emphasized that Casa Nido has been attempting to expediently complete interim actions at the Site, based on potential liabilities under personal injury/tort liability law.

        b. UTZ: The cleanup work has so far not followed State or federal law or the voluntary agreement. Therefore, DTSC cannot determine whether the work was completed <u>safely</u>, or whether the work was <u>effective</u>, or necessary, or if that work would have been in compliance with National Contingency Plan (NCP). In addition, there are already legal options to quickly completing emergency/time-critical removals. The work performed by the Owner and consultant did not follow those legal options as they moved forward without input from DTSC even though they had signed an Enforceable Agreement that would if followed had led them to an NCP-compliant cleanup and been protective of human health

      and the environment. The work that DTSC requested several years ago, which remains incomplete, was intended to ascertain whether surrounding properties were endangered. Casa Nido's exhaustion of the $1 million was a business decision. Casa Nido should perform its obligations under the Enforceable Agreement Statement/Scope of Work.

    c. MCDANIEL/KIBEL: Discussed insurance policies and the nature of pursuing cost recovery through insurance.

    d. KIBEL: Reiterated request for DTSC to pursue other alleged potentially responsible persons, in order to activate insurance policies.

b. UTZ: DTSC is still expecting a Sampling and Analysis Workplan and Health and Safety Plan (HASP), pursuant to the VCA, which Casa Nido already agreed to complete, and which DTSC asked for several years ago (PEA – Task 2, Work Plan – Task 3, HASP – Task 19). The Workplan and HASP were most recently due November 9, 2020 after prior extensions were granted. DTSC has not received the deliverables under Enforceable Agreement and no further extensions were granted. The soil vapor extraction and sub-slab depressurization systems may or may not be the appropriate remedy and/or mitigation for the Site, because the remedy selection process was not followed, and because DTSC has not reviewed or approved these systems. However, at this point, to prevent an endangerment to the public that could result from cessation of interim operations, DTSC anticipates their continued operation.

c. CLARK-RIDDELL: PANGEA has not yet delivered a variety of historical, sampling, and engineering documentation to DTSC that were generated during the last three years.

**5. Path Forward**

    d. KIBEL: Can DTSC order other parties to complete work while preserving the existing VCA with Casa Nido?

        a. MCDANIEL: DTSC policy is to not expend State time issuing orders when there is already an Enforceable Agreement that allows for parties to seek contribution from third parties. Also, if an Order were to be issued, DTSC would need to identify "manageable" number of parties, including both owners and operators.

    e. CLARK-RIDDELL: Are there other options, at this juncture in the cleanup process, for DTSC to begin to involve other parties?

        a. MCDANIEL: DTSC can issue Information Requests, which carry a penalty of $25,000/day for noncompliance.

    f. UTZ: DTSC requires that Casa Nido finish its Workplan and HASP and perform the vapor intrusion investigation work, to ascertain safety of the adjoining properties. This is the most urgent task at hand.

        i. CLARK-RIDELL: Estimates that this will take 2 weeks.

    g. UTZ: Proponent should expect an e-mail from DTSC. DTSC needs to confer on the best path forward.