# Exhibit B-24





# Department of Toxic Substances Control

Meredith Williams, Ph.D., Director
700 Heinz Avenue
Berkeley, California 94710-2721



**Jared Blumenfeld**
Secretary for
Environmental Protection

**Gavin Newsom**
Governor

October 8, 2020

Casa Nido c/o Ronald Piziali
13123 Regan Lane
Saratoga, California 95070
ronaldpiziali@gmail.com

OMO FABRICARE DRY CLEANERS (SITE CODE 202121)

Dear Mr. Piziali,

The Department of Toxic Substances Control (DTSC) has reviewed the document entitled *Revised Offsite Vapor Intrusion Investigation Workplan*, prepared by PANGEA Environmental Services, Inc. (PANGEA), on behalf of Casa Nido, dated September 11, 2020 (Workplan).  The Workplan proposes a vapor intrusion investigation at properties adjoining 12210 San Pablo Avenue in Richmond, Contra Costa, California (Site).  DTSC has the following comments.

Please submit a revised Workplan no later than **October 26, 2020**.

## General Comments

1. *Terminology*.  The unapproved remedial activities performed to date (e.g., soil excavation, soil amendments, permeable reactive barriers, soil vapor extraction, and sub-slab depressurization) shall hereafter be referred to as "interim actions."  DTSC did <u>not</u> oversee, evaluate, or approve the interim actions.

2. *Terminology*.  Replace all references to "subslab gas" with "sub-slab soil vapor" and all references of "soil gas" to "soil vapor," for consistency.  Also, specifically identify wells/probes as "temporary" or "permanent," to distinguish whether the sampling locations/ports will be left in place, and thereafter maintained.

Ronald Piziali
October 8, 2020
Page 2 of 17

3. *Sampling Program.*  DTSC disagrees that indoor air sampling should be further postponed.  DTSC requires, at minimum, the following concurrent sampling program, to be completed a minimum of two times (e.g., one mobilization during wet season, and one mobilization during dry season), with the first sampling event lasting 24 hours.  This should be reflected in Section 3.0 (Scope).

    **a. North-Adjoining Property (12226 San Pablo Avenue)**

        i. Three indoor air sampling locations; and,

        ii. Three sub-slab soil vapor sampling locations.

    **b. South-Adjoining Property (12200 San Pablo Avenue)**

        i. Three indoor air sampling locations; and,

        ii. Five sub-slab soil vapor sampling locations, including the three existing locations, and two new permanent sub-slab sampling ports (at northwest; and at southeast, possibly in the restroom).

    **c. East-Adjoining Property (403 McLaughlin Street)**

        i. Three indoor air sampling locations; and

        ii. One sub-slab soil vapor sampling location (slab-on-grade); and,

        iii. One sub-slab soil vapor sampling location (paved crawlspace); and,

        iv. One soil vapor sampling location (unpaved crawlspace); and,

        v. One crawlspace air sampling location (paved/unpaved crawlspace).

    d. **West-Adjoining Property (12201 San Pablo Avenue)**

        i. Three indoor air sampling locations; and,

        ii. Three sub-slab soil vapor sampling locations.

    e. **Northeast-Adjoining Residence (423 McLaughlin Street)**

        i. One crawlspace air sampling location.

        ii. One nested soil vapor sampling location, between SG-6A and residence.

    f. **General**

        i. Two outdoor air sampling locations upwind from the Site.

        ii. One duplicate indoor air sample and one duplicate sub-slab soil vapor sample.

Ronald Piziali
October 8, 2020
Page 3 of 17

4. *Schedule.*  Add a schedule section to the Workplan.  Include deadlines for: 1) Access agreement completion;  2) Interior survey form completion;  3) Clearance of sampling locations and implementation of COVID protocols (e.g., note potential interference from use of ethanol for hand sanitizer);  4) Field mobilizations;  5) Sample collection;  6) Sample analysis;  7) Results delivery; and 8) Report submittal.

5. DTSC (ian.utz@dtsc.ca.gov) shall be copied on electronic delivery of all laboratory analytical data, as indicated on chains of custody.  DTSC requests expedited laboratory turnaround times.

6. *Privacy.*  Please exclude the names and contact information of individual property owners who are not already associated with the Site, in both the Workplan and the upcoming report.

7. *Attenuation Factor.*  At this stage, the scope of work cannot formally include calculation of empirical attenuation factors.  Please remove this from the scope.

## Specific Comments

1. *Title*.  Revise the title to be "*Draft Revised Off-Site Vapor Intrusion Investigation Workplan.*"  Deliverables prepared pursuant to the *Voluntary Cleanup Agreement* dated May 8, 2017 are subject to DTSC review and commenting, and remain in draft form unless otherwise approved by DTSC.

2. *Links*.  The header bookmark links appear in the bookmarks sidebar of Adobe®, but are not linked to corresponding pages.  There might be a template error.

3. *Abbreviations.*  Revise any use of the term PPM (part-per-million) to reflect the unit basis (e.g., volumetric).

4. *Section 1.0 (Introduction)*.  The goal statement should be revised to state that "This workplan proposes to collect soil vapor, sub-slab soil vapor, crawlspace air, indoor air, and ambient air samples at off-Site properties, to investigate potential vapor intrusion to off-Site properties.  The purpose of this investigation is to evaluate whether exposure to vapor forming chemicals emanating from the subsurface into indoor air represents a complete exposure pathway and/or unacceptable human health risk or hazard."

5. *Section 2.0 (Site Background)*.  The Workplan fails to include a working Conceptual Site Model (CSM).  Please revise Section 4.4 (Data Validation and Reporting) to state that the summary report will include an updated CSM.  The

Ronald Piziali
October 8, 2020
Page 4 of 17

CSM is instrumental to evaluating the relevance of default screening criteria. CSM elements include, but are not limited to: 1) a list of contaminants of potential concern (COPCs);  2) known range/maximum concentrations or screening level exceedances of COPCs in each medium;  3) identification of the primary and secondary sources of COPCs;  4) location, depth, and phase(s) of COPCs;  5) release mechanism(s);  6) exposure media such as surface soil, drinking water and air; 7) potential human and ecological receptors and groundwater; and 8) unique features of the Site.  If these data do not exist, the CSM will state such.

6. *Section 2.1 (Site Description and History).*

    a. Page 2, second paragraph.  A *Preliminary Endangerment Assessment* (PEA) has not been completed for the Site, and therefore certain historical information remains unknown.  For example: 1) Several entities operated the former dry cleaner; 2) The dry cleaner did not necessarily begin operations in 1966 (unless otherwise verified); and 3) The dry cleaner generated halogenated solvent hazardous wastes until at least 2000 (per the Hazardous Waste Tracking System).  Please revise the paragraph to state generally that a dry cleaner operated on Site from the 1960s until 2015, and generated halogenated solvent wastes, including tetrachloroethylene (PCE) from at least the 1980s to 2000s.

    b. The Workplan does not state which hydrocarbon-based solvents were used at the Site, nor does it provide sampling data to rule out the potential for a release to have occurred from the use of such hydrocarbon-based solvents. Please include these data in the Workplan, or state that sampling has shown that these contaminants are not present at the Site and reference the documents that support this statement.  Otherwise, if there are no data evaluating potential hydrocarbon impacts at the Site, additional investigation may be recommended.

    c. The Workplan does not state that isopropyl alcohol (IPA) has not been detected at the Site, even though IPA will be the vapor used for leak detection for subslab soil vapor sampling equipment. Please reference Site documents that show that IPA is not present. If there are no data regarding IPA, an alternate leak tracer gas, such as 1,1-Difluoroethane (1,1-DFA), should be used.

7. *Section 2.3 (Interim Actions).*

    a. Page 2, both paragraphs.  Revise the text to read in active voice rather than passive voice, to clarify who completed the interim actions.  For

example, "PANGEA completed [interim actions]."  Examples of passive voice include "was excavated," and "was placed" and "was installed."  Who completed these activities, and under whose direction?

b.  Page 2, fifth paragraph.  Replace with "Between 2018 and 2020, [entity] installed an interim soil vapor extraction (SVE) and sub-slab depressurization (SSD) system at the Site and south-adjoining property, without DTSC oversight.  The interim system is intended to limit off-Site migration and/or exposure to vapor-forming chemicals; however, the interim system has not yet been evaluated by DTSC."  The technical rationale and purpose of the interim work is open to interpretation, since it was not approved.

c.  Page 3, second paragraph.  Replace second sentence with "These activities are summarized in draft reports that have not yet been reviewed by DTSC."  Remove the subsequent three bullets, and the final paragraph of this section.  The Workplan is not intended to evaluate interim actions.  However, add a sentence stating that "The SSD/SVE system will remain operational during the vapor intrusion investigation, to avoid delays due to post-shut-off re-equilibration."  Include DTSC's associated e-mail of August 11, 2020, in Appendix A.

8.  *Section 2.4 (Adjacent Site Use and Public Participation).*

a.  For each building to be sampled, please list the square-footage and number of stories in both the text and figures.

b.  The first two bullet points both state that the SVE system is designed to capture vapors toward the adjacent north and east properties.  It is unclear that the SVE system was necessarily designed to protect these adjacent properties, which appears to be inferred in the statements, as no information supporting this inference was provided.  The SVE discussion should be limited to the technical specifics of the installed system and it should be clearly stated that it was not installed under the oversight of DTSC and is not a function of any approved remedy for the Site.

c.  Page 3, north bullet.  Remove the final sentence.  Include the assessor's parcel number (APN).

d.  Page 3, south bullet.  Modify the final sentence to simply state that the SSD system is operating within this property, with the permission of the property owner, as received via (method) on (date).  Include the APN.

Ronald Piziali
October 8, 2020
Page 6 of 17

    e. Page 4, east bullet.  Remove the final sentence.  Include the APN. Include the missing bullet symbol.

    f. Page 4, west bullet.  Update this information, including whether the property owner responded.  Correct second sentence to "Based on data collected between 2015 and 2019, on-Site impacts have migrated in groundwater beneath the restaurant property, from approximately 10 to 60 feet below ground surface."

    g. Page 4, second non-bullet paragraph. State that "Although a formal community profile has not yet been prepared, DTSC directed PANGEA to conduct its activities in accordance with the 2012 DTSC *Vapor Intrusion Public Participation Advisory* and in consultation with a DTSC Public Participation Specialist.[1]  DTSC will send a letter, community update, and vapor intrusion background information to each property to be sampled."

    h. State how sampling results will be conveyed to building occupants and property owners (e.g., in a letter or teleconference, and within a certain timeframe).

9. *Section 3.0 (Proposed Scope of Work).*

    a. Please revise this section to reflect DTSC's General Comment #3. For example, the first bullet should reflect belowground and aboveground gas sampling at <u>five</u> properties.  The use of the terms "initial" and "sequencing" in this section will be unnecessary, since soil, soil vapor, sub-slab soil vapor, and groundwater data have already been collected at certain of the off-Site properties, and there will be no sequencing.

    b. Page 4.  Since laboratory analysis will be by USEPA Method TO-15, replace "CVOCs" with "VOCs" in the first paragraph of Section 3.0.  DTSC has not approved any list of COPCs yet, in part because a PEA-equivalent has not been completed, and in part because characterization is incomplete.  There have been other screening criteria exceedances, including for total petroleum hydrocarbons, and methylene chloride.

        i. DTSC recommends analyzing air samples in full scan mode. The full scan mode will provide a more accurate identification of the analytes and corresponding concentrations in the sample. Further,

---

[1] https://dtsc.ca.gov/wp-content/uploads/sites/31/2016/01/VIPPA_Final_03_05_12.pdf

Ronald Piziali
October 8, 2020
Page 7 of 17

in full scan mode, all compounds can be confirmed by a mass spectral library.  Selective ion mode (SIM) can achieve lower detection limits for contaminants and should be used when a known contaminant must be detected at relatively low concentrations.

c.  Page 4.  Scope Bullets.

    i.  DTSC disagrees that expansion of an unapproved engineering control is the only logical next step, if a confirmed exceedance exists.  There are other short-term mitigative measures (e.g., running HVAC, evacuation of premises) and confirmatory procedures (e.g., repeated sampling) possible. Remove the latter three bullets and indicate that "If cumulative human health risk or hazard exceeds (value) at a given building, then (frequency) additional rounds of sampling will occur within (timeframe), and/or if concentrations of VOCs are confirmed to exceed (short-term action level), then PANGEA will work with DTSC to implement (mitigative measure)."

    ii.  In addition, this bulleted list of scoped items does not include soil vapor sampling, nor is there a section below for soil vapor sampling (only sub-slab soil vapor, indoor air, and ambient air).  Each of the sections should describe or reference in appendix the installation method (e.g., sealing, tubing, capping, equilibration times).

    iii.  There is not reference to field conditions in the workplan. Sampling cannot occur during or within five days of rain, for example.  What if there is wildfire smoke or a power outage?  Include a bullet for mobilization to conduct a field screening and preparation of each building, in consideration of COVID-19 as well as potential interior confounding factors.

    iv.  Note that since there is not a true barrier limiting vapor intrusion when a crawlspace is present, indoor air samples within the residence are more informative.  Crawlspace samples are sometimes not used during health risk/hazard evaluations because they are difficult to interpret and incorporate.

d.  Page 5.  First paragraph.  Correct the references using the document flow chart DTSC provided PANGEA:  Indicate the correct document author (e.g., DTSC instead of Cal-EPA) and include the 2011 *Vapor Intrusion Guidance* (which should have directly informed the Workplan).

Ronald Piziali
October 8, 2020
Page 8 of 17

e.  Page 5.  Second paragraph.  Correct to "PANGEA proposes to monitor differential pressure at (properties) with (instruments) in order to evaluate the potential radius of influence of operational interim engineering technologies on (type of pressure) beneath (buildings)."  The purpose of this study is to investigate vapor intrusion, not evaluate engineering control performance.

f.  Page 5.  Second paragraph.  Attenuation factors estimate attenuation to indoor air from soil vapor through any medium, like concrete or soil, not just attenuation through slabs.  The last sentence of this section states that sampling will be conducted to facilitate the determination of a Site-specific vapor intrusion building attenuation factor for the restaurant at 12200 San Pablo Avenue.  At that this stage, DTSC does not consider the development of a Site-specific attenuation factor for vapor intrusion to be acceptable for this Site and all references should be removed from the document.  The Site characterization is not complete and substantial levels of chlorinated VOCs have been observed in soil vapor and groundwater.  Despite the SVE/SSD system implementation, the magnitude of the situation still warrants the active remediation of all soil, soil vapor, and groundwater contamination associated with the on-Site source and off-Site contamination.  DTSC does not consider the use of a Site-specific building attenuation factor, predicated on the assumed protective capacity of an existing building construction, to be appropriate here as a means to reduce monitoring requirements or supplement an active remedy.  DTSC notes that reliance on the current operating conditions of the building to provide adequate protection of human health would require administrative controls and monitoring to ensure conditions do not change resulting in an unacceptable risk or hazard.

10. *Section 3.1 (Subslab Probe Installation).*

a.  First, indicate if/when a preliminary building survey was completed to determine building foundations per building, and how (e.g., visual observations, interview, building records).

b.  Second, discuss procedures for handling and disposing of investigation-derived waste in accordance with local, state, and federal requirements.

c.  Third, indicate the length of time that the pins are designed to remain in place, per manufacturer's specifications and DTSC guidance (e.g., temporary vs. permanent).

    d.  Fourth, indicate the intended depth of installation (e.g., in feet below ground surface, or feet below slab).

    e.  12200 San Pablo Avenue.  Indicate whether the existing probes are adequate for repeated monitoring, given the time lapse since their installation, and the potential for their degradation.  Also, in the forthcoming report, include:  1) photographs of the existing probe locations in an appendix, along with 2) three rough schematics for their installation (e.g., so DTSC can see how SS-9 depth accounts for the fact it is at a "raised dining area").

    f.  Other Properties.  Clerical errors. "Fix" not "Fixed" and "will be installed" not "will installed."

        i.  403 McLaughlin Street: PANGEA will need to collect subsurface vapor samples at the three foundational compartments of the house (i.e., one sub-slab at paved crawlspace; one sub-slab inside building; and one soil vapor at the dirt crawlspace).  This is reflected in DTSC's required scope, above.

11. *Section 3.2 (Subslab Probe Sampling).*

    a.  Define SUMMA® canister (passivated stainless steel canister).

    b.  Page 6, second paragraph.  What is the shroud constructed of?

    c.  Page 6, second paragraph.  Replace "IPA will be maintained…" with "IPA concentrations will be maintained…"

    d.  Page 6, third paragraph.  DTSC requires modifications to the quality assurance/control (QA/QC) program.  See comments on Section 4.3.  DTSC recommends consolidating all QA/QC scope in Section 4.3.

        i.  The Workplan states that "one replicate gas sample will be collected to evaluate the reproducibility (precision) of the laboratory's analytical ability and to estimate sample variability."  Add "in the field" to the end of this sentence, and replace "laboratory's analytical ability" with "field samples."  A replicate gas sample in the field (e.g., duplicate) would indicate reproducibility and precision of field samples, but not necessarily inform a laboratory's analytical ability as indicated.  A laboratory split sample would inform quality assurance of its analytical precision.

Ronald Piziali
October 8, 2020
Page 10 of 17

     e.  Page 6, third paragraph.  DTSC suggests that a separate section be added to consolidate all statements regarding "Laboratory Analysis," wherein analysis for <u>all</u> gas samples is by a single (fixed or mobile?) laboratory by USEPA Method TO-15, <u>in addition to</u> analysis for fixed gases (carbon dioxide, oxygen, and methane) and leak check compound (isopropyl alcohol).

     f.  Page 6, third paragraph.  It is not clear what the purpose of a shroud sample will be, since a photo-ionization detector (PID) will be used, and samples themselves will already be analyzed for leak check compound.  DTSC recommends removal, to focus on other sampling priorities.

12. *Sections 3.3 and 3.4 (SVE/SSD System Expansion).*

     a.  Remove this section.

     b.  Replace these sections with sections entitled *Soil Vapor Probe Installation,* and *Soil Vapor Probe Sampling.*

13. *Section 3.5 (Concurrent Subslab Gas and Indoor Air Sampling).*

     a.  Rename this section entitled *Indoor Air Sampling.*

     b.  Remove all references to "sequencing" or otherwise postponing sampling of indoor air.  Based on the absence of a sufficient rationale, and a review of existing data, DTSC has determined that indoor air sampling shall be prioritized.  Revise this section to reflect the DTSC-required minimum scope of work (General Comment #3).

     c.  Pre-Sampling Survey.  What about windows?  HVACs, fans, hoods, etc. should not be operated during this first sampling event, at any of the five buildings, for consistency.

     d.  Indoor Air Sampling.  Revise to state that "All samples will be collected in accordance with DTSC's 2011 *Vapor Intrusion Guidance*."

     e.  Please include language that the sampling technician will check for sources of vapor intrusion in foundation penetrations (i.e., drains, piping, etc.) with a PID and will position indoor air sample containers near the foundation penetrations and away from vents in the crawlspace of the residence.  Vents should be noted on the field survey diagram of residences.

14. *Section 3.6 (Cross-Slab Differential Pressure).*

     a.  First paragraph of section.  Remove last sentence.

    b.  The permanent sub-slab sampling ports, including the two new ports required by this letter, should allow for soil vapor samples to be collected and for the pressure differential to be evaluated across the slab.  Note that it will likely be necessary to install additional permanent soil vapor probes within the footprint of the restaurant building in order to properly define the CSM and to ultimately evaluate progress towards meeting cleanup goals. Samples collected from Vapor Pins® generally reflect conditions directly below the slab and DTSC would expect that additional data on contaminant concentrations at deeper points in the vadose zone, beneath the building, will be necessary to understand the vertical distribution of contamination and to evaluate the efficacy of the selected remedy, over time. It may be prudent to begin delineating the vertical extents of soil vapor contamination beneath the building to further define the CSM.

15. *Section 4.1 (Data Quality Objectives)*.

    a.  No data quality objectives (DQOs) are stated.  The final sentence does not make sense.  Please use USEPA guidance to set clear DQOs.

    b.  For example, DTSC requires that one DQO be that laboratory analytical reporting limits be lower than than the screening criteria values.

16. *Section 4.3 (Quality Control Checks)*.

    a.  Remove the first sentence.

    b.  Indicate whether decontaminated canisters will be batch or individually certified.  Batch certification is acceptable for the first mobilization.

    c.  State that final canister pressures will be checked and recorded in the field and at the lab as received.

    d.  Previous investigations suggest leaks in high-risk samples (e.g., SG-3 DUP in December 2017).  DTSC recommends the implementation of new engineering or administrative controls to eliminate leaks

    e.  For each mobilization, DTSC requires a minimum of <u>one</u> field duplicate sub-slab soil vapor or soil vapor; and <u>one</u> field duplicate for indoor air; and <u>one</u> laboratory replicate; as well as laboratory QA/QC reporting protocols (e.g., reporting limit verification, data qualification).

17. *Section 4.4 (Data Validation and Reporting)*.

    a.  State that the laboratory analytical reports will include case narratives.

Ronald Piziali
October 8, 2020
Page 12 of 17

    b. Ensure that the "Data validation will include…" statement reflects the requested quality assurance/control protocols of the laboratory.  DTSC notes that certain of the listed controls are not commonly included for USEPA Method TO-15.

    c. State whose "quality requirements" are being compared against.  DTSC recommends referencing USEPA DQO guidance.

18. *Section 5 (Reporting).*

    a. The report shall be entitled "*Off-Site Vapor Intrusion Investigation Report*."

    b. Section 5 (Reporting) does not actually describe the planned format of the ultimate report.  Per 2015 guidance[2], the report shall include: 1) Description of field operations (including shut-in testing and leak check compounds, and purge volume data);  2) Analytical methods used;  3) Analytical results;  4) Revised CSM;  5) Deviations from the approved workplan;  6) Data inconsistencies;  7) Data gaps identified based on the revised CSM;  and 8) Conclusions and recommendations.  Attachments shall include elements listed on page 7 of the 2015 guidance.

    c. Include chromatograms in laboratory analytical reports.

    d. State that results will be compared to the default residential human health risk/hazard vapor intrusion screening criteria presented in Table 1 of the Workplan.

    e. State that the report will calculate estimated cumulative cancer risk and non-cancer hazard using the <u>maximum</u> detected VOC concentrations in indoor air, and separately crawlspace air if applicable, at each building. Include a tabular **Contingency Plan** with:

        i. Qualitative Rules:  The Workplan states that the SVE/SSD systems will be rapidly expanded to mitigate potential vapor intrusion issues if soil vapor sampling results suggest it is warranted.  DTSC recommends that the Workplan be revised to state that sampling will be conducted, and the data will be evaluated on an expedited schedule to determine the most appropriate action.

---

[2] https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/01/VI_ActiveSoilGasAdvisory_FINAL.pdf

Ronald Piziali
October 8, 2020
Page 13 of 17

    ii.  Quantitative Rules:  Establish quantitative decision rules, using the contingency plan matrix on page x of the 2020 *Draft Supplemental Guidance*[3].  For example, validated cumulative cancer risk greater than 1.0E-04 or non-cancer hazard greater than 1.0 will necessitate mitigative or remedial measures, under DTSC oversight.

    iii.  This section should establish a decision rule for crawlspace air results as they compare to applicable indoor air screening criteria (based on assumed default attenuation factor of 1.0).

19. *Health and Safety*.

    a.  Add a section for health and safety matters.

    b.  State that all work will be completed in accordance with applicable local, state, and federal laws and regulations, including with regards to occupational health and safety.

    c.  State that work shall be conducted in accordance with a Site-specific *Health and Safety Plan*, on file with DTSC, which includes established COVID-19 protocols including use of personal protective equipment such as masks/respirators.  See the enclosed Cal-OSHA guidance.

    d.  State that utility location will take place, including at the two minimum soil vapor (i.e., not sub-slab soil vapor) sampling locations.

20. *Table 1 (Draft Subslab Gas and Soil Gas Analytical Data)*.

    a.  Draft.  Since Table 1 relies on data collected as part of work completed without DTSC oversight or approval, Table 1 should be labeled as DRAFT and a disclaimer should be added that the data are draft and remain unapproved by DTSC as of the date of the Workplan.

    b.  Screening Criteria.  Correct the sub-slab soil vapor and soil vapor screening criteria derived from DTSC and USEPA indoor air screening criteria for total xylenes (15,000, not 1,500 micrograms per cubic-meter) and trichloroethylene (100 micrograms per cubic-meter, not "—").

    c.  Screening Criteria.  Correct the screening criteria names:

---

[3] https://dtsc.ca.gov/wp-content/uploads/sites/31/2020/02/Public-Draft-Supplemental-VI-Guidance_2020-02-14.pdf

      i. Lines 1 and 2:  For 2019 Environmental Screening Levels (ESLs), specify that the values are soil vapor and sub-slab soil vapor. There is no medium specified.

      ii. Line 3:  For 2020 DTSC and USEPA "derived" values, specify the values are for soil vapor and sub-slab soil vapor, as derived from both DTSC (HERO Note 3) and USEPA (Regional Screening Level) default screening criteria for indoor air.  There is no in-line attribution.

      iii. Line 4:  For 2014 USEPA "derived" value, specify the value is derived from the USEPA.  Please also reference the 2014 USEPA Accelerated Response Level memorandum in the footnotes.  There is no in-line or footnoted attribution.

d. Quality Assurance.  The existing Table 1 indicates that there is not yet an established quality assurance program, except for the use of two replicates (see separate comment below about replicates) out of 35 sampling data points for at least five batches of samples.  Per our guidance, DTSC recommends at least one lab replicate and one field duplicate per batch or 20 samples.  A spot check analytical data reported in April 2020 indicates that the laboratory has qualified a significant number of values for, at least, analysis out of hold time.  Update the tables to reflect data validation.

e. Values.  The non-detect (ND) values are defined as "not detected above detection limits," implying no detection in excess of method detection limits (i.e., statistically absent).  However, a spot check of April 2020 soil vapor analytical data received from McCampbell Analytical, Inc., transmitted to DTSC in July 2020, suggests that certain non-detects should instead be defined as "not detected above laboratory reporting limits," implying some potential detection, but no statistically rigorous quantitation (i.e., potentially present but difficult to quantify).  Please clarify.

f. Values.  Note that over half of the analytical data include ND reporting limits that are one to four orders of magnitude greater than the screening criteria, and therefore cannot be used for health risk/hazard screening purposes (or must simply be assumed to be exceedances).

g. Methods.  The table indicates that Tedlar™ bag samples are analyzed by USEPA Method 8260 (version unstated) whereas the SUMMA® canister samples are analyzed by USEPA Method TO-15 (version unstated).

Ronald Piziali
October 8, 2020
Page 15 of 17

      Going forward, samples should be consistently analyzed by a single method to avoid, for example, differences in reporting limits.

h.  Footnotes.  The USEPA Regional Screening Level on which derived values are based should assume target hazard quotient of 1.0, not 0.1.

i.  Shading.  At this early stage in the project, the gray shading should be <u>redefined</u> to highlight exceedances of the <u>residential</u>--not commercial/industrial--screening criteria.  Clarify in the table footnotes that PANGEA has selected the lowest value among the vapor intrusion human health risk (cancer) and hazard (non-cancer) values, from 2019 ESLs.  There are two possible endpoints for "HHRL" values (cancer, non-cancer).

j.  Analytes.  Include columns for the remaining detected compounds, including but not limited to total petroleum hydrocarbons and 1,1,1-trichloroethane.  DTSC recommends that the table be formatted in landscape (wide) layout to accommodate this change.

k.  Replicates.  Describe the difference between a "duplicate" and a "replicate" (e.g., SG-3 DUP and SG-4A REP).  If they are both secondary field replicates (i.e., duplicates) intended to evaluate field and laboratory precision, then they should be similarly named with -DUP.  If the replicates are laboratory replicates intended to evaluate laboratory precision, please state such in the footnotes.  Please clarify whether SG-3 DUP should be renamed SG-3<u>B</u> DUP.

l.  Locations.  Differentiate between on-Site and off-Site sample locations.

21. *Figures 2 and 3.*

a.  The Workplan does not include a layout of the building at north (12226 San Pablo Avenue), west (12201 San Pablo Avenue), or east (403 McLaughlin Street) including interior walls/rooms.  The locations of the sub-slab vapor probes and the indoor air samples should consider the layout of the building and areas where occupants spend their time.  Please include an approximate layout of the buildings' interiors that also depicts the layout of any interior walls in the crawlspace beneath the residence at 403 McLaughlin Street.

b.  Include the full layout of known utilities (e.g., include the remaining utility lines depicted at San Pablo Avenue, in PANGEA's existing draft reports).

c.  Add a disclaimer that all features are approximate, since it is not a surveyor, engineering, or other stamped drawing.

d.  Add sources for data (e.g., utilities, property lines, and concentrations).

Ronald Piziali
October 8, 2020
Page 16 of 17

    e.  Include the date for soil excavation.

    f.  Correct 413 McLaughlin Street to <u>423</u> McLaughlin Street.

    g.  Figure 2 does not include groundwater monitoring well locations.  Please include the locations of the existing monitoring wells in this figure to allow coordination of the Workplan with previous investigations done on Site.

    h.  Include groundwater iso-concentration contours on Figure 3.  Areas of the highest concentrations in groundwater inform the placement of soil vapor samples.

    i.  Include groundwater flow direction(s).

22. *Appendix C (Indoor Air Screening Log).*

    a.  The log form should be edited to include PID calibration information.

23. *Appendix C (Building Survey Form).*

    a.  Please revise the Building Survey Form to match the suggested data included in Attachment 5 of the 2020 *Draft Supplemental Guidance* or use the forms provided in Attachment 5.

24. *Appendix C (Soil Gas Purging/Sampling Log).*

    a.  The Workplan does not include an example of a sub-slab soil vapor sampling log. GSU accepts the use of the Soil Gas Purging/Sampling Log for sub-slab soil vapor sampling, if the following items are also included in the field data: slab thickness, locations of moisture or staining on the slab, slab condition (i.e., concrete deterioration, large cracks or extensive cracking), odors from hole drilled for the vapor pins are noted, soil type under slab, vapor barrier type/present, and other observed conditions noted.

25. Please note the enclosures attached herein.

If you have any questions, please contact me at 510-859-8107 or ian.utz@dtsc.ca.gov.

Sincerely,

Ian Utz, Project Manager
Site Mitigation and Restoration Program – Berkeley Office
Department of Toxic Substances Control

Ronald Piziali
October 8, 2020
Page 17 of 17


Enclosures (4):

- *2020 DTSC Draft Community Update;* and
- *2020 DTSC Draft Letter to Adjoining Properties*
- *2020 Cal-OSHA COVID-19 Safety and Health Guidance*
- *2012 DTSC Guidelines for Access Agreements*

cc:    (via e-mail)

Marsha Conwill
Casa Nido
mtc10860@aol.com

Bob Clark-Riddell, P.E.
PANGEA Environmental Services, Inc.
briddell@pangeaenv.com

Ron Scheele, P.G.
PANGEA Environmental Services, Inc.
rscheele@pangeaenv.com

Jesse Negherbon, Ph.D., P.E.
DTSC Engineering and Special Projects Office
jesse.negherbon@dtsc.ca.gov

Vivek C. Mathrani, Ph.D., DABT
DTSC Human and Ecological Risk Office
vivek.mathrani@dtsc.ca.gov

Theodore Mazzoli, P.G.
DTSC Geological Services Branch
theodore.mazzoli@dtsc.ca.gov

Alejandro Vivas
DTSC Public Participation
alejandro.vivas@dtsc.ca.gov

October 2020

# COMMUNITY UPDATE

**Department of Toxic Substances Control** – Our mission is to protect the people, communities, and environment of California from harmful chemicals by cleaning up contaminated sites, enforcing hazardous waste laws, and compelling the development of safer products.

# FORMER OMO'S FABRICARE DRY CLEANER

The California Department of Toxic Substances Control (DTSC) is overseeing investigation and cleanup activities at the former Omo's Dry Cleaner at 12210 San Pablo Avenue in Richmond, Contra Costa County, California, 94804 (Site). Soil, groundwater, and soil vapor at the Site are contaminated with volatile organic compounds (VOCs). The project is still in the investigation phase. The purpose of the investigation phase is to find what the contamination is, where it has gone, and if there are any public health concerns. Based on the information collected so far, DTSC is requesting the Site owner to sample groundwater, soil vapor, and indoor air at nearby off-Site properties.

## SITE LOCATION AND HISTORY

The Site is an approximately 5,000-square-foot vacant property, adjoined by a veterinary clinic (north), a residence (east), and two restaurants (south and west). The Site is owned by Casa Nido, a general partnership. The Site was undeveloped until 1940, when a commercial building was constructed. Subsequent occupants included various commercial businesses (1940s to 1950s) and a dry cleaner (1960s to 2015). The dry cleaner was known by several names, including Omo's Fabricare Cleaners, Inc. In 2017, the building was demolished.

The dry cleaner produced hazardous wastes during its operations, including halogenated solvents from the 1980s to 2000s, and hydrocarbon-based solvents beginning in the 1990s. Known contamination at the Site includes halogenated solvents, petroleum-related compounds, and/or breakdown chemicals, including: tetrachloroethylene (PCE), trichloroethylene (TCE), vinyl chloride, and benzene. Casa Nido is still investigating, and additional chemicals might be added to this list.

## REGIONAL ENVIRONMENTAL INVESTIGATIONS

Since 2005, DTSC has investigated regional groundwater contamination with VOCs. In 2011, DTSC identified the Site as a potential source of this regional groundwater contamination. Since 2014, tests have found VOC contamination at other nearby properties, including the north-adjoining veterinary clinic, and the south-adjoining restaurant. In 2017, Casa Nido entered into a *Voluntary Cleanup Agreement* with DTSC, to investigate and clean up the contamination. Since 2017, Casa Nido has completed independent sampling and cleanup activities at the Site, including, but not limited to: soil removal; soil treatment; and installation of permeable reactive barriers, soil vapor extraction, and sub-slab depressurization systems. DTSC has not yet evaluated these interim actions.

Department of Toxic Substances Control

**WHAT HAPPENS NEXT?**

On August 14, 2020 and October 8, 2020, DTSC requested an off-Site vapor intrusion investigation of the five adjoining occupied properties to the north, south, east, and west, based on the high VOC concentrations in groundwater and soil vapor.  At each property, the required testing would include sampling of underground soil vapor and aboveground air.  Based on the results of this testing, DTSC will determine next appropriate actions to ensure the safety of human health and the environment.

**INFORMATION REPOSITORIES**

DTSC is committed to informing the public.  However, due to the COVID-19 pandemic, normal in-person information repositories might be temporarily unavailable (e.g., libraries).  At all times, final electronic documents will be stored on DTSC's EnviroStor database, located at the following website:

- http://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=60001434

To sign up for DTSC e-mail alerts for new documents, select the top-right link on the EnviroStor page for the Site (see link above).  For more information about DTSC, visit our website (www.dtsc.ca.gov).

**CONTACT INFORMATION**

For more information about the cleanup process or related documents, please contact:

- Ian Utz, Project Manager (ian.utz@dtsc.ca.gov)
- Alejandro Vivas, Public Participation Specialist (alejandro.vivas@dtsc.ca.gov)
- You can also call Alejandro at (510) 540-3911, or toll-free at (866) 495-5651.

For media inquiries, please contact:

- Barbara Zumwalt, Public Information Officer barbara.zumwalt@dtsc.ca.gov

**Department of Toxic Substances Control**

## Site Map



All locations are approximate.

 **Hearing impaired** individuals may use the California Relay Service at 711 or 800-735-2929 TTY/VCO/HCO to voice. 

 Additional information on DTSC sites can be found through our **EnviroStor**.  (rev. 5-2020)



## Department of Toxic Substances Control



Meredith Williams, Ph.D., Director
700 Heinz Avenue
Berkeley, California 94710-2721



**Jared Blumenfeld**
Secretary for
Environmental Protection

**Gavin Newsom**
Governor

[DATE]

[NAME]
[ADDRESS]
[CITY, STATE, ZIP]

INVESTIGATION ACTIVITIES CONTINUE AT OMO FABRICARE DRY CLEANERS

Dear [NAME]:

As you are likely aware, Casa Nido, is investigating and cleaning up the subsurface contamination at neighboring 12210 San Pablo Avenue, Richmond (Site), with oversight from the California Department of Toxic Substances Control (DTSC). Within [TIMEFRAME], a representative of PANGEA Environmental Services, Inc. will call you to invite your participation in a soil vapor and indoor air sampling program.

DTSC appreciates and needs your voluntary participation to prepare an accurate assessment of contamination concentrations near your building. The sampling will help us understand if contamination at the Site has moved beneath or inside your building. We are hoping to visit at least four buildings in your neighborhood, where PANGEA will collect underground and aboveground air samples. Sampling is scheduled for [MONTH, YEAR].

Known contamination at the dry cleaner is made of VOCs. VOCs can move up through soil, if conditions are right. If the VOCs move under a building, it is possible for them to come inside, such as through foundation cracks or piping. This is called "vapor intrusion." DTSC wants to make sure your building has no vapor intrusion. DTSC will oversee the sampling to make sure it is done correctly. Without sampling, DTSC would not be able to know if the VOCs pose a concern at your building.

If you agree to participate, we will schedule a convenient time to conduct four visits to your home or business. The first visit will allow us to work with you to identify the best sampling locations. Due to the COVID-19 pandemic, we might need to conduct this visit over the phone or internet. The second visit will allow us to set up the sampling equipment. The third visit will allow us to conduct the sampling. The fourth visit, about six months later, will allow us to collect another set of samples. The visits will use the same locations and equipment. All visitors will use [PERSONAL PROTECTIVE EQUIPMENT], due to the COVID-19 pandemic.

[NAME]
[DATE]
Page 2 of 2

To help you understand the testing process, please read these attachments:

- **Community Update, describing Site history.**

- **Fact Sheets describing sampling activities.**

- **Access Agreement to allow sampling at your building.** (as applicable)

- **Pre-paid return envelope for the Access Agreement.**

PANGEA will mail you the sampling results for your building when they become available, about [NUMBER OF WEEKS] after removal of the sampling equipment. Sampling results will also be provided to DTSC.  We will make sure that reports or information shared with the public regarding the sampling will protect your privacy.

DTSC is a regulatory agency responsible for overseeing environmental cleanup throughout the State of California.  Our job is to protect people and the environment. For more information about DTSC, please visit our website (www.dtsc.ca.gov).

If you have any questions or concerns about the proposed sampling program, please contact Ian Utz at (510) 859-8107.  We look forward to speaking with you soon.

Sincerely,


**DRAFT**                                                           **DRAFT**

Ian Utz, Project Manager                                    Alejandro Vivas
Environmental Scientist                                       Public Participation Specialist
Site Mitigation and Restoration Program


Enclosures (#)



# SAFETY AND HEALTH GUIDANCE
## COVID-19 Infection Prevention in Construction

July 20, 2020

California employers are required to establish and implement an Injury and Illness Prevention Program (IIPP) to protect employees from all worksite hazards, including infectious diseases. This guidance does not impose any new legal obligations. It contains information for construction employers on ways to update their IIPPs to include information on employee training and preventing the spread of coronavirus (SARS-CoV-2), the virus that causes COVID-19, at construction sites. This is mandatory in most California workplaces since COVID-19 is widespread in the community.

### Train Employees on COVID-19

Provide training in a form that is readily understandable by all employees on the following topics:

- Information related to COVID-19 from the Centers for Disease Control and Prevention (CDC) — check for updates frequently — including:
  - **What COVID-19 is and how it is spread**.
  - **Preventing the spread of COVID-19 if you are sick**.
  - **Symptoms of COVID-19 and when to seek medical attention**.
  - How an infected person can spread COVID-19 to others even when they don't feel sick.
- California's COVID-19 **Industry Guidance for Construction**.
- The importance of frequent hand-washing with soap and water (or using hand sanitizer as a last resort where employees cannot feasibly get to a sink or hand-washing station), including:
  - Following CDC guidelines to scrub for at least 20 seconds.
  - When employees arrive at work and before they leave work.
  - Before and after eating or using the toilet.
  - After close interaction with other persons.



  - After contacting shared surfaces, equipment or tools.
  - Before and after wearing masks or gloves.
  - After blowing nose or sneezing.

NOTE: Hand sanitizers must have at least 60% ethyl alcohol. They are less effective than hand-washing in preventing the spread of COVID-19 but can be used as an interim measure if a hand-washing station is not immediately available.

- Maintaining more than six feet of separation with others and eliminating close contact with others (see Physical Distancing information on next page).
- Methods to avoid touching eyes, nose and mouth.
- The mandatory use of cloth face coverings, as required by the **California Department of Public Health (CDPH) guidelines**, including:
  - Cloth face coverings are not personal protective equipment (PPE) and do not protect the person wearing the face covering.
  - **CDC has issued guidelines** that everyone should **use cloth face coverings** when around other persons.

*(Continued on next page)*

- ○ Cloth face coverings can help protect people near the wearer, but do not replace the need for physical distancing and frequent hand-washing.

- ○ Employees should wash or sanitize hands before and after using or adjusting face coverings.

- ○ Face coverings should be washed after each shift and should be discarded if they no longer cover the nose and mouth, have stretched out or damaged ties or straps, cannot stay on the face, or have holes or tears.

- ○ The employer is responsible for providing and ensuring employees use face covers at work.

- Coughing and sneezing etiquette, including covering a cough or sneeze with a tissue or a sleeve instead of a hand.

- Safely using **cleaners and disinfectants**, which includes:

  - ○ Carefully following label directions.

  - ○ The hazards of the cleaners and disinfectants used at the worksite.

  - ○ Ventilation requirements.

  - ○ Wearing personal protective equipment (such as gloves).

  - ○ Ensuring cleaners and disinfectants are used in a manner that does not endanger employees.

- The importance of not coming to work if they have **symptoms of COVID-19** as described by the CDC, such as a fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea, vomiting, or diarrhea or if they live with or have had close contact with someone who has been diagnosed with COVID-19.

- To seek medical attention if the symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on **CDC's webpage**.

- Use repeated safety stand-downs or toolbox/tailgates — while maintaining physical distancing — to re-emphasize the training.

- Designate a site-specific COVID-19 officer at every job site to observe and ensure site workers are implementing what they have been trained to do.

- Information on employer or government-sponsored leave benefits the employee may be entitled to receive that would make it financially easier to stay at home. See additional information on **government programs supporting sick leave and workers' compensation for COVID-19**, including employees' sick leave rights under the **Families First Coronavirus Response Act**, and employees' rights to workers' compensation benefits and presumption of the work-relatedness of COVID-19 pursuant to the **Governor's Executive Order N-62-20** while that Order is in effect. Some cities and counties also require employers to provide sick leave benefits to employees.

## Increase Cleaning and Disinfection

Establish and implement the following procedures to help prevent the spread of COVID-19:

- Make hand-washing stations more readily available and encourage their use.

- Employers should change productivity expectations to allow extra time for employees to wash their hands thoroughly and frequently.

- Establish procedures to routinely clean and disinfect commonly touched surfaces and objects (e.g., door handles, steering wheels, touch screens, mobile equipment controls, carts, shared power tools) throughout the workday, including:

  - ○ Using disinfectants that are **EPA-approved** for use against the virus that causes COVID- 19.

  - ○ Providing EPA-registered disposable wipes for employees to wipe down commonly used surfaces before and after use.

  - ○ Following the manufacturer's instructions for all cleaning and disinfection products (e.g., safety requirements, protective equipment, proper dilution, contact time).

  - ○ Following safe work practices such as never mixing products together and using adequate ventilation.

*(Continued on next page)*

- ◦ Cleaning visibly dirty surfaces first before disinfection. Disinfectants are less effective if used on soiled surfaces.

- ◦ Ensuring there are adequate supplies to support cleaning and disinfection practices, including cleaning products and tools and chemical resistant gloves. Make sure disinfectants are available to workers throughout the worksite.

- ◦ Cleaning and disinfecting vehicles between shifts and between workers.

## Increase Physical Distancing

When used with face covers, physical distancing, also referred to as social distancing, is an infection control measure that can stop or slow down the spread of an infectious disease by limiting contact between people. Use the following distancing measures:

- Practice physical distancing at all times, including during work, breaks and in vehicles.

- Plan for office staff to have the ability to work from home.

- Stagger break and lunch times and spread out where employees spend their breaks by providing additional seating and shade areas.

- Limit crew size by staggering or increasing the number of work shifts.

- Maintain separation of six feet or more during work:

  - ◦ Limit the number of employees gathered at the start of a shift, in break areas or during trainings and other meetings to allow employees to spread out.

  - ◦ Limit the number of personnel riding construction passenger elevators at one time.

  - ◦ Ensure employees allow for at least 6 feet of clearance between each other when lining up for the lunch truck and restrooms.

  - ◦ Hold meetings electronically rather than in person whenever possible.

  - ◦ Perform job interviews and orientations over the phone or using video conferencing.

  - ◦ Identify choke points where workers are forced to stand together (e.g. hallways, hoists, buses) and control them.

- ◦ Provide additional seating and shade structures.

- If employees are dispatched from a hiring hall, encourage the hiring hall to implement physical distancing measures, such as using additional locations for dispatch.

- Limit interaction with other contractors.

  - ◦ Where possible, limit the number of trades in the same area at the same time.

  - ◦ Maintain distance during interactions and deliveries.

- Encourage employees to avoid large gatherings and practice physical distancing during non-work hours.

- Create specific instructions for deliveries to your worksites.

  - ◦ Establish a drop-off location and all the procedures to be used at the drop-off point.

  - ◦ Create signage to easily identify drop-off points. Include contact information on the signs to assist with questions leading up to delivery and upon arrival.

  - ◦ Create procedures to disinfect deliveries, such as wiping down boxes and delivered items.

- Provide alternative methods to reduce the spread of infection when physical distancing is not possible. Engineering controls such as physical barriers between workers and face coverings can help reduce community spread of the virus.

- In addition to physical distancing, provide face coverings or ensure employees use their own face coverings. Ensure they are used in accordance with **CDPH** and **CDC** guidelines.

> **At this time, health experts do not recommend the use of respirators by the general public for protection against COVID-19.However, employers must provide them to workers in the construction industry when needed to protect against other respiratory hazards.**

*(Continued on next page)*

## Ensure Good Hygiene Practices

Ensure toilets and hand-washing facilities are readily accessible to all employees at all times.

Employers should adjust productivity expectations to allow extra time for employees to thoroughly and frequently wash their hands.

- Restrooms must be clean and sanitary.

- Hand-washing facilities must be located at or near the restrooms.

- Soap or other suitable cleansing agent and single-use towels must be provided.

- Additional hand-washing supplies should be placed as close to work areas and break areas as possible to allow for frequent hand-washing.

- Encourage more frequent hand-washing.

- Encourage more thorough hand-washing. Hands should be washed with soap and water for at least 20 seconds.

- For delivery drivers, normally accessible restrooms on routes (e.g., restaurants, coffee shops) may be closed. Employers should provide employees alternative restroom locations and allow time for employees to use them.

- If employees have limited access to hand-washing or hand sanitizing, employees as a last resort can use disposable gloves to limit hand contact with potentially contaminated surfaces. Employers should encourage employees to change gloves frequently and before touching their face, smoking, eating or using the restroom. In addition, provide an adequate supply of gloves and make them readily available. Employees should wash or sanitize hands as soon as possible after removing gloves.

- Provide hand sanitizer throughout worksites and to delivery drivers for times when access to soap and water may be limited.

- If respirators and other PPE are worn to protect against other hazards at work, hands should be washed before putting on PPE and after taking it off. Reusable PPE should be cleaned and sanitized per manufacturers' instructions.

## Implement Safe Work Practices

- Limit the sharing of tools as much as possible. If tools must be shared try to group them to be used by people who reside together or travel to work together. Shared tools must be sanitized between users.

- If fans or other means of ventilation are used on the job, place them to avoid blowing air from one worker or group of workers to another.

- Encourage workers to drive to worksites or parking areas by themselves. They should avoid having passengers or carpooling together unless they are already sheltering in place together. If carpooling cannot be avoided riders should sit as far apart as possible, wear face coverings and wash hands after the trip.

- Discourage shaking hands.

- Discourage the sharing of food and water. Provide single use bottles rather than using shared water stations or dispensers.

## What to do with Workers Who Might Be Sick with COVID-19

- Immediately send employees with **COVID-19 symptoms** home or to medical care as needed.

- Actively encourage sick employees to stay home.

- Ensure employees who are out ill with fever or acute respiratory symptoms do not return to work until both of the following occur:

  ◦ At least three full days pass with no fever (without the use of fever-reducing medications) and improvement in respiratory symptoms.

  ◦ At least 10 full days pass since symptoms first appeared.

- Ensure employees who return to work following an illness promptly report any recurrence of symptoms.

- Employees who are well but who have a sick family member at home with COVID-19 should notify their supervisor and follow **CDC-recommended precautions**.

*(Continued on next page)*

- Encourage sick workers to stay home by implementing work policies that do not penalize workers for missing work because they have been diagnosed with COVID-19. Consider paid sick leave benefits to help prevent the spread among workers who might otherwise work out of economic necessity. Educate eligible employees on other benefits they can access if symptoms, illness or caring for an ill family member prevents them from working.

- The **Families First Coronavirus Response Act** requires certain employers to provide employees with paid sick leave or expanded family and medical leave for specified reasons related to COVID-19. Certain counties and cities also require employers to provide sick leave benefits to workers.

- If someone goes home because they are sick, the area where the person worked and the tools and equipment they used should be disinfected prior to use by others.

- Establish procedures to notify local health officials upon learning that someone has a COVID-19 infection. These officials will help employers determine a course of action.

- Employers can implement health screening programs to ensure that employees showing up to work are healthy. Employers may choose to prohibit employees with a high temperature (100.4 degrees F or higher) from entering the worksite. Train employees on self-screening before they come to work. If conducting workplace screening, provide employees performing screening with appropriate personal protective equipment. In light of personal protective equipment shortages, use gloves, eye protection and a face covering. Have screened employees wear a face covering or cover their nose and mouth with cloth or other material during screening. Use touchless thermometers. Ensure screeners maximize their distance from the employee being screened.

*(Continued on next page)*

## Additional COVID-19 Resources for Construction

- **California Coronavirus (COVID-19) Response**
- California Coronavirus (COVID-19) Response. **COVID-19 Industry Guidance: Construction**
- California Division of Occupational Safety and Health. **Cal/OSHA Interim Guidelines for General Industry on 2019 Novel Coronavirus Disease (COVID-19)**
  - ◦ **Cal/OSHA Injury and Illness Prevention Program**
  - ◦ **Log 300 recordkeeping requirements**
  - ◦ Reporting Work-Connected Injuries - **Section 342**
- California Department of Public Health. **Asthma-Safer Cleaning and Disinfecting**
- California Department of Public Health. **Guidance for the Use of Face Coverings**
- California Labor and Workforce Development Agency. **Coronavirus 2019 (COVID-19) Resources for Employers and Workers**
- Centers for Disease Control and Prevention. **Coronavirus Disease (COVID-19)**
  - ◦ Centers for Disease Control and Prevention. **What Construction Workers Need to Know about COVID-19**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **How It Spreads**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **Interim Guidance for Businesses and Employers**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **Recommendation Regarding the Use of Cloth Face Coverings**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **Steps to help prevent the spread of COVID-19 if you are sick**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **Symptoms**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease. **Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings (Interim Guidance)**
  - ◦ Centers for Disease Control and Prevention. Coronavirus Disease (COVID-19): **Cleaning and Disinfecting Your Facility**
- Federal OSHA: **COVID-19**
- Federal OSHA: **COVID-19 - Control and Prevention/Construction Work**
- Federal OSHA: **Protecting Workers Who Use Cleaning Chemicals**
- Los Angeles County: **COVID-19: What you need to know about cloth face coverings**
- New York Times: **How to Stop Touching Your Face**
- Ohio Department of Health. COVID-19 Information for Businesses and Employers: **Screening Employees for COVID-19**
- The Center for Construction Research and Training (CPWR): COVID-19 Resources (**English**), (**Spanish**)
- U.S. Environmental Protection Agency: **Disinfectants for Use Against SARS-CoV-2** (the virus that causes COVID-19)
- U.S. Department of Labor. **Families First Coronavirus Response Act: Employee Paid Leave Rights**

**This document is available** with active links at **www.dir.ca.gov/COVID19CONST**
For assistance regarding this subject matter, employers may contact
**Cal/OSHA Consultation Services** at: 1-800-963-9424 or
**InfoCons@dir.ca.gov** www.dir.ca.gov/dosh/consultation.html



## Guidance Revision and Updates

- July 20, 2020: Added information on the use of face coverings as reflected in the June 18, **CDPH Face Covering Guidance**. Also added information on the government-sponsored leave benefits and Governor's Executive Order N-62-20.

This document is available with active links at  www.dir.ca.gov/COVID19CONST
For assistance regarding this subject matter, employers may contact
Cal/OSHA Consultation Services at: 1-800-963-9424 or InfoCons@dir.ca.gov
www.dir.ca.gov/dosh/consultation.html

**GUIDELINES FOR**
**ACCESS AGREEMENTS**

<u>Introduction</u>

The following guidelines have been prepared to assist with the development of access agreements at vapor intrusion sites.  There is no right or wrong way to construct an access agreement.  However, the following information may help streamline the process by drawing on the experience gained on previous projects.

<u>Purpose</u>

The purpose of an access agreement is to provide authority to conduct activities on private property.  An access agreement should be secured <u>prior</u> to collecting any samples on private property.

<u>Parties to the Agreement</u>

The parties to the access agreement will usually be some combination of the following:

- responsible party (or representative)
- property owner (and/or the lessee)
- regulatory agency

In most cases, the environmental consultant acting on behalf of the responsible party will be the lead party requesting access.  However, the access agreement should include language granting access for the regulatory agency (in order to allow for oversight of the activities).  In certain circumstances, the regulatory agency may act as the lead party requesting access (such as when the responsible party is either unwilling or unable to act as the lead, or when the community distrusts the responsible party).  If DTSC is the lead party requesting access then the access agreement should be drafted in consultation with the Office of Legal Counsel.

In cases where DTSC is the lead because of community distrust or the request is for access into private residences or businesses for indoor air sampling, DTSC recommends arranging a meeting with the resident or business manager (whether a renter and owner) before requesting access.  At a minimum, the project manager and the Public Participation Specialist should meet with the resident/owner/manager or renter.  Many times, the situation will call for having a toxicologist also present.  The project team should prepare prior to initiating these meetings.

When meeting with a resident or business owner, please start the meeting by listening to the person and putting yourself in their position.  Build personal trust and creditability by empathizing with the residents/owners and stressing our desire to keep disruption and inconvenience to a minimum.  Do expect a variety of reactions (humor, health concerns, distrust, reassurance, confusion, appreciation, sarcasm, desire for more

technical information, cost concerns, even anger and confrontation).  Please do not take anything as a personal attack.  Residents and or workers react in different ways based on their cultural background, personalities, previous experience with government or with other authority figures, ability to adopt to change, and so on.

Using personal pronouns makes what we say much less threatening.  "We want to sample your air so we can see if there is a problem that we can resolve" is easier to hear than "DTSC intends to use this Summa canister to sample your air to see whether there is any risk to the inhabitants."  All statements about the need for access need to be positive.  "We want to find out what may be wrong so we can clean it up as soon as possible."  Also, please use language that the resident or owner will understand clearly.

<u>Content of the Agreement</u>

The access agreement should include, at minimum, the following:

- property information (e.g. address and/or APN)
- purpose for which the access is being granted
- name(s) of the parties for which access is granted
- scope of the access provided (e.g. what activities are covered)
- duration or term of the agreement
- date, name (printed) and signature of property owner
- contact information (e.g. home and/or mobile telephone number)

The access agreement may include any other conditions as agreed by the parties.

<u>Holder of the Agreement</u>

The access agreement should be provided in duplicate so that the property owner can return one copy to the lead party requesting access and retain a copy for their records.  A copy of the access agreement should be provided to the regulatory agency.

<u>Translation</u>

The access agreement should be translated, as appropriate, based on the community demographics and past practice for the project.  However, it is important that the property owner / occupant sign an English version of the access agreement.

<u>Monetary Compensation</u>

In some cases monetary compensation is offered (or requested) in order to secure access.  Usually when this occurs the level of compensation is limited to measurable and actual costs incurred.  Some large entities (e.g., railroads) have a formal process for requesting access, including a template agreement, and may require a fee in order to process the application.

Indemnification

The property owner may request that the lead party requesting access provide indemnification against damages and liabilities resulting from access.  Most governmental agencies (including DTSC) cannot agree to indemnify a property owner as a condition of access.

Denial (Refusal) of Access

The property owner may elect to deny access to the property.  This is a relatively common occurrence and should be anticipated.  In fact, it is good practice to include an optional section on the access agreement for the property owner to complete to signify their desire to deny access.

If access is denied, then the lead party requesting access should document the decision.  The decision to deny access is adequately documented if the decline section of the access agreement was completed.  Alternatively, a letter can be sent (certified mail, return receipt requested) to the property owner documenting and confirming that a request for access was made and access was not granted.