# **EXHIBIT E**

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CASA NIDO PARTNERSHIP, a       )
California Partnership,         )
                               )
            Plaintiff,         )
                               )
    vs.                        )
                               )
CATHERINE O'HANKS and JAE      )
KWON aka JAY KWON aka JAY      ) No.
KWON SHI aka JAY SHIK          ) 3:20-CV-7923-EMC
KWON; LYNNE MARIE
GARIBOTTI aka LYNNE
GARIBOTTI BLOWER aka
LYNNE G. BLOWER,
individually as trustee
the Claudio Garibotti
Trust, dated May 1, 1952;
and SENTRY INSURANCE
COMPANY,
            Defendants.

REMOTE DEPOSITION
OF IAN UTZ
VOLUME 1

DATE:        Thursday, February 29, 2024
TIME:        10:08 a.m. - 1:54 p.m.
LOCATION:    Via Web Video Conference

Magna Legal Services
866-624-6221
www.MagnaLS.com
REPORTED BY:   JAMIE DAVIS, CSR NO. 14209



Page 21

1    going to refer to 12210 San Pablo Avenue, Richmond,

2    California, as the site.  Is that okay?

3         A. Yes.

4         Q. All right.  Mr. Utz, if we go to paragraph

5    six of the voluntary cleanup agreement, which is on

6    DTSC -- let's see, 8683, that is the Bates number.

7              But paragraph six says scope of work and

8    DTSC oversight.

9              Do you see that, Mr. Utz?

10             MR. HURTADO:  I think you were muted, Ian.

11             THE WITNESS:  Yes.

12   BY MR. DOW:

13        Q. And the document states, DTSC shall review

14   and provide proponent with written comments and all

15   proponent's deliverables as described in Exhibit C,

16   scope of work, correct?

17             MR. HURTADO:  Objection.  Document speaks

18   for itself.

19             MR. BRODY:  Join.

20             THE WITNESS:  Yes.

21   BY MR. DOW:

22        Q. Okay.  And the proponent in this case is

23   Casa Nido Partnership, correct?

24        A. I believe the proponent in this case is

25   described as only Casa Nido in this VCA.



Page 24

```
 1          THE WITNESS:  To some extent.
 2   BY MR. DOW:
 3      Q. Okay.  As far as the tasks that are listed
 4   in Exhibit C of the voluntary cleanup agreement, was
 5   it your charge to see that those tasks were
 6   fulfilled by Casa Nido?
 7      A. I don't know what you are referring to.
 8      Q. I'm referring to Exhibit C, scope of work
 9   in the voluntary cleanup agreement and there is a
10   list of tasks.
11          And let me ask you this, Mr. Utz, are you
12   somebody that can tell me the extent to which these
13   tasks were completed under the voluntary cleanup
14   agreement by Casa Nido?
15          MR. BRODY:  Objection.  Overbroad.  Lacks
16   foundation.  Calls for speculation.
17          MR. HURTADO:  I will join in those.
18          THE WITNESS:  I don't fully understand the
19   question.
20   BY MR. DOW:
21      Q. Again, Mr. Utz, I am just asking you as to
22   Exhibit C, the voluntary cleanup agreement, do you
23   have any knowledge as to whether the tasks
24   enumerated in the agreement starting with task 1
25   were fulfilled by Casa Nido?
```



Page 25

1          MR. BRODY:  Objection.  Overbroad.  Lacks

2     foundation.  Calls for speculation.

3          THE WITNESS:  To my knowledge, the tasks

4     listed in Exhibit C in their totality were not

5     completed by Casa Nido.

6          MR. DOW:  Okay.

7          MR. HURTADO:  I'll also object to legal

8     conclusion.

9          THE WITNESS:  Based on the information

10    available to me.

11    BY MR. DOW:

12       Q. Okay.  So -- and I don't mean to make you

13    repeat yourself, Mr. Utz.  But -- so are you telling

14    me -- so we have from task 1 all the way to task 19.

15    You are telling me that none of these activities

16    were completed by Casa Nido under the VCA; is that

17    correct?

18          MR. BRODY:  Objection.

19          MR. HURTADO:  Misstates the deponent.

20          MR. BRODY:  Join.

21          MR. HURTADO:  Argumentative.

22          MR. BRODY:  I apologize.  I keep

23    interrupting.  Join.

24          MR. HURTADO:  Yeah.

25          THE WITNESS:  Your representation is not an



Page 35

```
 1   DTSC's supervision, would you know that?
 2              MR. HURTADO:  Objection.  Calls for
 3   speculation.
 4              MR. BRODY:  Join.
 5              THE WITNESS:  I don't know.
 6   BY MR. DOW:
 7        Q. Was it done pursuant to the voluntary
 8   cleanup agreement?
 9              MR. HURTADO:  Objection.  Legal conclusion.
10   Calls for speculation.  Lacks foundation.
11              MR. BRODY:  Join.
12              THE WITNESS:  I don't know.
13   BY MR. DOW:
14        Q. Well, earlier, Mr. Utz, you told me that
15   Casa Nido completed no task under the voluntary
16   cleanup agreement based on the information you have,
17   correct?
18        A. No.
19              MR. BRODY:  Misstates testimony.
20   BY MR. DOW:
21        Q. Okay.  Then what did you tell me, Mr. Utz?
22              MR. HURTADO:  Objection.  Asked and
23   answered.
24              THE WITNESS:  I believe I told you that the
25   scope of work listed in Exhibit C of the voluntary
```



Page 36

1   cleanup agreement dated 2017 in its totality,

2   meaning describing all of the items together not

3   individually, to my knowledge based on the

4   information available to me had not been completed.

5   BY MR. DOW:

6       Q. Okay.  But you're telling me you can't tell

7   me if that 450 tons of soil was removed under DTSC's

8   oversight, correct?

9           MR. HURTADO:  Objection.  Calls for

10  speculation.  Asked and answered.

11          MR. BRODY:  Join.  Lacks foundation.

12          THE WITNESS:  I believe my previous answer

13  was I don't know.

14  BY MR. DOW:

15      Q. Can you tell me why you don't know?

16          MR. HURTADO:  Objection.  Argumentative.

17          MR. BRODY:  Join.

18          THE WITNESS:  No, I can't tell you why I

19  don't know.

20  BY MR. DOW:

21      Q. Okay.  Mr. Utz, have you ever seen this

22  letter before I showed it to you today?

23      A. I'm not sure.

24      Q. Okay.  Okay.  I just dropped another letter

25  into the chat.  This will be the next exhibit.



Page 46

1        Q.  Okay.  Mr. Utz, if we look at page 2 of 3

2   of this letter, it states the quote, However

3   investigation and removal activities at the site,

4   including the demolition of onsite structures,

5   proceeded without DTSC oversight for nearly two

6   years.

7             Can you -- it says for nearly two years.

8   Can you tell me what years you are referring to in

9   this letter approximately?

10       A.  The two years preceding my project

11  management role.

12       Q.  Okay.  So you were -- I think we have

13  already established that you came on board sometime

14  in 2020.  So would it be fair to say that that two

15  years is 2019 and 2018 approximately?

16       A.  It could be.

17       Q.  Okay.  Thank you.

18            Mr. Utz, can you tell me why it is

19  important that DTSC have oversight of investigation

20  and removal activities?

21            MR. HURTADO:  Objection.  Too general.

22  Ambiguous.  Vague.

23            MR. BRODY:  Join.

24            THE WITNESS:  Can you repeat the question,

25  please?



Page 47

1    BY MR. DOW:

2         Q.  Yes.  And the premise for the question is

3    that here you are pointing out to Mr. Piziali that

4    there were investigation and removal activities at

5    the site for approximately two years without DTSC

6    oversight.

7             And I am just asking you:  Why is DTSC

8    oversight important?

9             MR. HURTADO:  Same objections.

10            THE WITNESS:  Why is DTSC oversight

11   important?  DTSC is a regulator for the State of

12   California, and its oversight of hazardous

13   substances cleanup sites is intended, in part, to

14   ensure that cleanups occur safely and legally.

15   BY MR. DOW:

16        Q.  Thank you.

17            Mr. Utz, do you recall -- okay.  Let me

18   back up.

19            My understanding is that eventually an

20   offsite vapor intrusion and investigation work plan

21   was conditionally approved by DTSC for this site; is

22   that correct?

23        A.  An offsite investigation work plan for

24   vapor intrusion investigation was ultimately

25   approved for this site, correct.



Page 48

```
 1        Q. Okay.  And at some point, it was not
 2   conditionally approved, it was just flat out
 3   approved; is that correct?
 4        A. I don't know.
 5        Q. Okay.  Can you tell me, were there any
 6   other work plans for the site that were approved by
 7   DTSC to your knowledge?
 8             MR. BRODY:  Objection.  Calls for
 9   speculation.  No foundation.
10             THE WITNESS:  I don't know of any other
11   work plans that DTSC approved for the site
12   personally.
13             MR. DOW:  Okay.  Thank you.
14             Okay.  I am going to need a ten-minute
15   break myself.
16             Does anyone mind if we take a ten-minute
17   break?
18             MR. HURTADO:  That's fine.
19             (Break taken.)
20   BY MR. DOW:
21        Q. Mr. Utz, did DTSC oversee any soil
22   excavation by Casa Nido at the site?
23             MR. BRODY:  Objection.  Vague as to time.
24             MR. HURTADO:  Calls for speculation.
25             THE WITNESS:  I don't know.
```



Page 50

1    Mr. Piziali, right?

2        A. Yes.

3        Q. Okay.  So the letter under general comments

4    terminology it says, The unapproved remedial

5    activities performed to date, EG soil excavation,

6    soil amendments, permeable reactive barriers, soil

7    vapor extractions, and sub-slab depressurization,

8    shall hereafter be referred to "interim actions."

9    DTSC did not oversee, evaluate, or approve the

10   interim actions.

11           So based on your statement to Mr. Piziali,

12   I will ask you again.  I just want to know, was

13   there any -- to your recollection, was there any

14   soil excavation that Casa Nido did that was approved

15   by DTSC?

16           MR. HURTADO:  Objection.  Calls for

17   speculation.

18           MR. BRODY:  Join.

19           THE WITNESS:  I don't know.

20   BY MR. DOW:

21       Q. Okay.  Well, would it be accurate to say

22   that as of October 8, 2020, the soil excavation done

23   by Casa Nido at the site was not overseen by DTSC;

24   is that correct?

25           MR. HURTADO:  Same objection.



Page 51

1          MR. BRODY:  Join.

2          THE WITNESS:  The letter refers to work

3    that was referenced in a draft work plan.  The work

4    referenced in the draft work plan, which was

5    referred to as whole excavation, to my knowledge at

6    this time had not been performed under DTSC

7    oversight.

8    BY MR. DOW:

9          Q. Okay.  Thank you.

10         I'm scrolling down to page 4 of 17.  And

11   again, I understand you are commenting on a work

12   plan.  But it says here, A preliminary endangerment

13   assessment, PEA, has not been completed for the

14   site; and therefore, certain historical information

15   remained unknown.

16         My question is, to your knowledge, did Casa

17   Nido ever complete a preliminary endangerment

18   assessment for the site?

19         A. Can you repeat the question, please?

20         Q. Yes.  To your knowledge -- well, strike to

21   your knowledge.

22         Did Casa Nido ever complete a preliminary

23   endangerment assessment for the site?

24         MR. HURTADO:  Objection.  Calls for

25   speculation.



Page 52

```
 1            MR. BRODY:  No foundation.  And join.
 2            THE WITNESS:  I'm not aware of any
 3   submittals to the department with the name of the
 4   submittal being a preliminary endangerment
 5   assessment, and by department, I mean DTSC.
 6   BY MR. DOW:
 7        Q. And on page 5 of 17, it talks about the
 8   installation -- well, you're suggesting revisions to
 9   Mr. Piziali relative to the soil vapor extraction
10   system.  And are you asking him to insert into this
11   document that you are commenting on that the interim
12   system has not yet been evaluated by DTSC?
13            My question is, was the SVE system ever
14   evaluated by DTSC to your knowledge?
15            MR. BRODY:  Objection.  Vague and
16   overbroad.  Lacks foundation.
17            THE WITNESS:  No.  Not in the sense that I
18   meant in this letter here.
19   BY MR. DOW:
20        Q. Okay.  I am just not super clear.  So --
21   okay.  No, I think I get your answer.  Thanks.
22            What about the sub-slab depressurization
23   system?  To your knowledge, was that ever evaluated
24   by DTSC?
25            MR. BRODY:  Same objections.
```



Page 53

1           THE WITNESS:  Not in the sense that I

2   intended in this letter to mean by the term

3   evaluation.

4   BY MR. DOW:

5         Q. So your answer is no?

6           MR. HURTADO:  Objection.  Asked and

7   answered.

8           MR. BRODY:  Join.

9           THE WITNESS:  That is not the answer that I

10  gave you.

11  BY MR. DOW:

12        Q. Okay.  Because you -- I'm not trying to

13  make you repeat yourself, Mr. Utz, but I am just

14  trying to -- I mean -- I mean, what does evaluation

15  mean to you in the context that you are talking

16  about it here?

17        A. In the context of this letter, evaluate

18  would have included a review of written

19  documentation, including engineering plans, permits,

20  other standard engineering documents for an

21  engineered system such as the one described here,

22  the SVE and SSD system.

23        Q. Okay.  So in other words, for the SVE

24  system, DTSC did not evaluate any of the types of

25  documents you just mentioned, correct?



Page 54

1          A.  Based on the comments provided by Dr. Jesse
2     Negherbon, the professional engineer, the documents
3     required for such an evaluation had not been
4     provided.
5          Q.  Okay.  And to your knowledge, had such
6     documents been provided for the sub-slab
7     depressurization system?
8          A.  No.   That is what I meant by SVE and SSD,
9     so it would be for the depressurization system.
10    They are physically different and similar in some
11    ways.  At the site they are physically very close to
12    each other, but they are different engineered
13    systems.
14         Q.  Okay.  Okay.  Scrolling down to page 8 of
15    17.  You state the site characterization is not
16    complete and substantial levels of chlorinated VOCs
17    have been observed in soil vapor and groundwater.
18              Mr. Utz, can you tell me what site
19    characterization is, please?
20              MR. HURTADO:  Objection.  Calls for a
21    lengthy explanation.
22    BY MR. DOW:
23         Q.  It does not have to be lengthy.
24         A.  As used in this letter, the term site
25    characterization is a term of art.  It refers to



Page 55

```
 1   investigation of hazardous substances or waste

 2   release, including in some cases sampling data of

 3   environmental media.

 4           Q. And what is the point of site

 5   characterization?  Like, what is the goal of site

 6   characterization, assuming there is one?

 7               MR. HURTADO:  Objection.  Vague.

 8               MR. BRODY:  Join.

 9               THE WITNESS:  There are a number of

10   potential or possible goals for site

11   characterization.

12   BY MR. DOW:

13           Q. Let me ask it this way, at the site we are

14   talking about, the site that is the subject of this

15   voluntary cleanup agreement, why is -- assuming site

16   characterization is necessary, why is it necessary?

17               MR. HURTADO:  Objection.  Vague.  Too

18   general.  Expert opinion.

19               MR. BRODY:  Join.

20               THE WITNESS:  As discussed or as it relates

21   to this letter, site characterization is important

22   for many reasons.  One of them is to understand the

23   scope of the contamination, the types of

24   contaminants, the lateral and vertical extent of the

25   contaminants in environmental media and the
```



Page 56

1    potential risks, for example, they impose to human

2    health or the environment.

3    BY MR. DOW:

4         Q. Thank you.

5            Let me ask you this, was site

6    characterization ever completed for this site?

7            MR. HURTADO:  Objection.  Calls for expert

8    opinion.  Lacks foundation.

9            MR. BRODY:  Join.  And overbroad.

10           THE WITNESS:  Based on the information

11   available to me, this site remains in the site

12   characterization phase of cleanup, and therefore, it

13   was not completed at the site.

14   BY MR. DOW:

15        Q. Mr. Utz, over the course of a history of a

16   cleanup, from start to finish, would you say

17   characterization occurs early in the cleanup

18   process?

19           MR. HURTADO:  Objection.  Incomplete

20   hypothetical.  Vague and ambiguous.

21           MR. BRODY:  Join.

22           THE WITNESS:  Site characterization can

23   occur at any time in the cleanup process, including

24   before or after the cleanup process.

25   BY MR. DOW:



Page 58

1  completing hazardous waste operations as it is

2  defined.

3  BY MR. DOW:

4      Q. So you are saying that the VCA requires

5  that Casa Nido submit a health and safety plan; is

6  that correct?

7          MR. HURTADO:  Objection.  Misquotes the

8  deponent.

9          MR. BRODY:  Join.

10         THE WITNESS:  What I was just referring to

11 was the order for the site, the imminent and

12 substantial endangerment determination and order and

13 remedial action order.

14 BY MR. DOW:

15     Q. Okay.  Let me show you a document.  Okay.

16 This document is dated October 19, 2020.  And this

17 will be the next exhibit.

18         (Exhibit 8 marked.)

19         THE COURT REPORTER:  Just for the record,

20 it will be 8.

21 BY MR. DOW:

22     Q. Mr. Utz, can you see -- if you look at my

23 screen, Mr. Utz, you will see an e-mail from you

24 dated October 19, 2020, to Bob Clark-Riddell, and

25 some other folks.



Page 59

1          Can you tell me who Bob Clark-Riddell is?

2          A. In the context of this e-mail, Mr. Bob

3    Clark-Riddell is a licensed professional engineer

4    and a contractor with Pangea Environmental Services,

5    Inc., working on behalf of Casa Nido, a general

6    partnership.

7          Q. Thank you.

8          It appears here that you are asking Bob

9    Clark-Riddell and Ron Piziali to stop work at that

10   site; is that correct?

11         A. In this e-mail or the following e-mail?  I

12   can't see what you are referring to on this.

13         Q. Can you see the highlight in yellow on my

14   screen?

15         A. Yes, I can see it.

16         Q. I'm sorry.  I did not mean to interrupt

17   you.  Oh, okay.  You can see the highlight.  This is

18   DTSC 14974.

19         And I will just cut to the chase, it looks

20   like -- it looks to me you are asking Bob and Ron to

21   stop work because there is no adequate health and

22   safety plans and procedures for the site; is that

23   correct?

24         A. Correct.

25         Q. So would it be correct to say that under



Page 60

1    the VCA, DTSC was requiring Casa Nido to submit

2    health and safety plans and procedures?

3           MR. BRODY:  Objection.

4           MR. HURTADO:  Objection.  Calls for legal

5    conclusion.

6           MR. BRODY:  And misstates prior testimony,

7    I believe.

8           THE WITNESS:  The scope of work, I believe

9    listed in Exhibit C of the voluntary cleanup

10   agreement dated 2017 between Casa Nido and DTSC,

11   would have included health and safety plan or health

12   and safety plans and procedures.

13   BY MR. DOW:

14       Q. Thank you.

15          To your knowledge, Mr. Utz, did Casa Nido

16   ever submit health and safety plans and procedures

17   to DTSC for review?

18          MR. BRODY:  Objection.  No foundation.

19   Calls for speculation.

20          THE WITNESS:  Yes.  Pangea submitted -- I

21   should say Casa Nido submitted multiple health and

22   safety plans for DTSC review.

23   BY MR. DOW:

24       Q. And were any of those health and safety

25   plans ultimately approved by DTSC to your knowledge?



Page 61

1        A. DTSC does not approve health and safety

2    plans.  DTSC accepts health and safety plans, which

3    are the responsibility of the employer of workers.

4        Q. Did DTSC ever accept any health and safety

5    plans from Casa Nido for the site?

6            MR. HURTADO:  Objection.  Calls for

7    speculation.

8            MR. BRODY:  Join.

9            THE WITNESS:  I recall one health and

10   safety plan being accepted in relation to vapor

11   intrusion investigation work offsite.

12   BY MR. DOW:

13       Q. And is that the only health and safety plan

14   you recall, Mr. Utz?

15       A. I recall only one being accepted under my

16   project management supervision.

17       Q. Thank you.

18           As project manager for the site, if any

19   other health and safety plans had been accepted for

20   the site before you became project manager, would

21   you have a record of that?

22       A. I don't know.

23       Q. When you became project manager for the

24   site, Mr. Utz, did you ever read or review any

25   records from prior project managers for the site?



Page 65

1    that work was occurring without a health and safety

2    plan.

3           So what I will ask you is, you know, how

4    did you know that they were working -- they were

5    conducting work at the site without a health and

6    safety plan?

7        A. I don't agree with your representation of

8    my comments here.

9        Q. Okay.  Well, may I ask you what you meant

10   by H and S is now the limiting factor to work

11   continuing at the site?

12       A. I recall that at the time of this e-mail,

13   inadequate health and safety plans and procedures

14   had been submitted to the department, and at the

15   recommendation of my consulting certified industrial

16   hygienist, I asked that work stop -- physical work

17   stop at the site with regard to hazardous waste

18   operations until such a time that DTSC had accepted

19   health and safety plans for the site.

20       Q. Okay.  Thanks.

21           Mr. Utz, over the course of your role as

22   project manager at the site, did you ever direct

23   Casa Nido and its consultant, Pangea, to sources of

24   grant funding to complete work at the site?

25       A. You asked during my time as project



Page 66

1   manager, correct?

2        Q. Yes.  Yes.

3        A. I recall sharing examples of potential

4   grants that we were aware of, my supervisor and I,

5   for -- that had been available for, you know,

6   cleanup projects statewide and that may be an

7   applicable to this site, but that would require an

8   application.

9        Q. Was one of the grant programs the State

10  Water Resource Control Board's site Cleanup

11  Subaccount Program, the acronym being SCAP, S-C-A-P?

12       A. I recall at least sharing that grant name

13  in a meeting with Casa Nido.

14       Q. And do you know, to your knowledge, did

15  Casa Nido ever follow up on that suggestion, such as

16  submitting an application for the site Cleanup

17  Subaccount Program?

18       MR. HURTADO:  Objection.  Vague and

19  ambiguous.

20       MR. BRODY:  Join.

21       THE WITNESS:  I don't know.

22  BY MR. DOW:

23       Q. Okay.  Thank you.

24       Mr. Utz, relative to the site, are you

25  aware of a subterranean creek bed which DTSC



Page 67

1  believed may be serving as a conduit for migration

2  of PCE contamination at the property -- or, rather,

3  at the site?

4          MR. HURTADO:  Objection.  Lacks foundation.

5          THE WITNESS:  DTSC has considered and

6  continues to consider the possibility that there may

7  be natural preferential pathways for migration of

8  contaminants from the site to offsite properties

9  including a subterranean, one may call it a

10  palaeochannel.  I am not sure if I would call it a

11  streambed, but the site is in the vicinity of an

12  historical stream channel, and so it is one of the

13  conceivable preferential pathways for contaminant

14  migration beneath the site.

15  BY MR. DOW:

16          Q.  Has that preferential pathway, the

17  subterranean creek bed, has that been confirmed by

18  DTSC through any investigations or studies or

19  otherwise?

20          MR. HURTADO:  Objection.  Lacks foundation.

21  Calls for speculation.

22          MR. BRODY:  Join.

23          THE WITNESS:  As part of my oversight of

24  the project, no.

25  BY MR. DOW:



Page 70

1  safety plan.

2          Can you recall what work plan was still

3  due?  Just the specifics of the work plan that you

4  are saying is still due here, like, what that was?

5          MR. HURTADO:  Objection.  Vague and

6  ambiguous.  Compound.

7          MR. BRODY:  Join.

8          THE WITNESS:  I believe the work plan

9  referenced in this e-mail is the offsite vapor

10  intrusion investigation work plan that we discussed

11  earlier in our deposition.

12          MR. DOW:  Okay.  Thank you.  Okay.  I am

13  going to drop another exhibit into the chat here.

14          Okay.  The next document is dated November

15  23, 2020.

16          THE COURT REPORTER:  It will be 10, for the

17  record.

18          (Exhibit 10 marked.)

19          MR. HURTADO:  I'm sorry.  Did you say that

20  this was number 10?

21          THE COURT REPORTER:  Yes.

22          MR. HURTADO:  Okay.  Thanks.

23  BY MR. DOW:

24     Q. So Mr. Utz, this is a teleconference

25  meeting minutes.



Page 71

1              Do you know who created this document,

2    Mr. Utz?

3         A. Yes, I know who created this document.

4         Q. Okay.  It is dated November 19, 2020.

5    Could you please tell me who created this document?

6         A. I created this document, but it was edited

7    by multiple people.

8         Q. Okay.  So did you create the initial --

9    well, yeah.  Did you create the initial draft of

10   this document, Mr. Utz?

11             MR. HURTADO:  Objection.  Deliberative

12   process.  Privilege.

13   BY MR. DOW:

14        Q. Okay.  Well, I don't want to ask about

15   anything that has to do with attorneys or anything

16   else.  I am not asking you -- so if this document

17   was reviewed and edited by attorneys, I don't want

18   to know anything about that.

19             But Mr. Utz, is it fair to say that you

20   initiated this document?

21        A. I created the original draft.

22        Q. All right.  Thank you.

23             Okay.  So as I said, this document

24   indicates that the teleconference was on November

25   19, 2020.  Did you create this initial document at



Page 72

1   the time or near the date of this teleconference on

2   November 19, 2020?

3           MR. HURTADO:  Objection.  Vague and

4   ambiguous.

5           THE WITNESS:  I believe that the meeting

6   minutes were sent within about a month or less of

7   the teleconference.

8   BY MR. DOW:

9       Q. They were sent.  So could you tell me where

10  they were sent?

11      A. I believe we transmitted the final

12  teleconference meeting minutes to -- we may have

13  transmitted it to Casa Nido, but I knew it was -- we

14  posted it to public envirastore, which is our online

15  database which at the time it became a publicly

16  disclosable document.

17      Q. And I don't mean to make you repeat

18  yourself, Mr. Utz, but would it be fair to say that

19  you started to draft this document soon after this

20  meeting was held?

21          MR. HURTADO:  Objection.  Vague.

22          THE WITNESS:  I would say I began drafting

23  this document soon after the teleconference.

24  BY MR. DOW:

25      Q. All right.  Thank you.



Page 73

1             In the course of your role as the senior

2    environmental scientist and project manager at DTSC,

3    would it be usual for you to make memos such as this

4    of teleconferences?

5             MR. HURTADO:  Objection.  Vague and

6    ambiguous.

7             THE WITNESS:  Can you repeat the question,

8    please?

9    BY MR. DOW:

10        Q. Yeah.  Let me ask you this:  Was this

11   memorandum drafted by you as part of your role as a

12   project manager for the site?

13        A. These are meeting minutes, not a

14   memorandum.  And I drafted them as part of my role

15   as project manager for this site.

16        Q. Okay.  Thank you.  And I will refer to them

17   as meeting minutes.

18             Is it -- have you made meeting minutes

19   after calls and other matters?  Like, is this

20   something that you would do in your role as project

21   manager?

22        A. I can't recall any other instances where I

23   have written meeting minutes, but I can recall

24   instances where I have written meeting notes to be

25   shared with external parties.



Page 74

1      Q. All right.  And would you say that these
2  particular meeting minutes -- would you say that
3  they are a reasonably accurate account of what
4  transpired at the November 29, 2020, teleconference?
5      A. Yes.
6      Q. All right.  Thank you.
7          Okay.  I want to ask you some questions
8  based on the highlights that are on this document.
9  Well, you actually have already told me that the
10 document is accurate.
11         But in this document, you make this
12 statement, you say that cleanup work has so far not
13 followed state or federal law or the voluntary
14 agreement.  This was as of November 2020.
15         I guess what I would ask you is -- and, you
16 know, you are not an attorney, but you make the
17 statement here, and so what I would ask you is that,
18 from the time while you took over as project manager
19 for the site until such time that the voluntary
20 agreement was terminated by Casa Nido, would you say
21 that the cleanup work did not follow state or
22 federal law or the voluntary agreement?
23         MR. HURTADO:  Objection.  Calls for legal
24 analysis and conclusion.
25         MR. BRODY:  Join.  And vague and ambiguous.



Page 81

```
 1            THE WITNESS:  A remedy decision -- or
 2   excuse me, a decision document can occur at a number
 3   of different points in the cleanup lifecycle.  And
 4   can also be -- can also occur at varying -- with
 5   varying availability of data.
 6   BY MR. DOW:
 7        Q. And is there a decision document for this
 8   site, Mr. Utz, pertaining to the SVE and SSD
 9   systems?
10            MR. BRODY:  Objection.  Vague.
11            THE WITNESS:  To my knowledge under DTSC
12   oversight, no.
13   BY MR. DOW:
14        Q. So without that decision document, Mr. Utz,
15   is it fair to say we don't know at this time if the
16   SVE system and the sub-slab depressurization system
17   are an appropriate remedy for the site?
18            MR. HURTADO:  Objection.  Calls for legal
19   analysis and conclusion.  Expert opinion.
20            MR. BRODY:  Join.
21            THE WITNESS:  In the absence of a decision
22   document, I can't tell you whether the SVE and/or
23   SSD systems or system would be selected as a removal
24   or remedial action at that site.  That is part of
25   the decision document.
```



Page 82

1    BY MR. DOW:

2         Q. It goes on to say that -- well, I think it

3    is -- probably just states it on its face, but is

4    it -- by the time Casa Nido terminated the VCA up to

5    that point, would you say that the remedy selection

6    process had been followed or not?

7              MR. HURTADO:  Objection.  Legal analysis

8    and conclusion.  Lacks foundation.  Calls for

9    speculation.

10             MR. BRODY:  Join.

11             THE WITNESS:  At the time of the voluntary

12    cleanup agreement dated 2017 determination in 2023,

13    the remedy selection process had not been started.

14    BY MR. DOW:

15        Q. Okay.  And then towards the end of the

16    paragraph, right before the last sentence, it says,

17    DTSC has not reviewed or approved these systems.

18             I assume "these systems" means the SVE

19    system and the sub-slab depressurization system.

20             (Court reporter lost Internet connection.)

21             (Record read.)

22    BY MR. DOW:

23        Q. Okay.  Well, the question I asked -- feel

24    free to correct me if I'm wrong anybody, but my

25    question to Mr. Utz -- and I guess I will repeat



Page 83

1    it -- is that up until today, February 29, 2024, is

2    it still the case that DTSC has not reviewed or

3    approved the soil vapor extension system and the

4    sub-slab depressurization?

5          Mr. Utz, do you mind answering that again?

6    And you can give the exact same answer you just did

7    if you want.  I mean, thank you.

8          A. I believe I said DTSC has not as of today

9    approved the SSD or SVE systems.

10         Q. Thank you.

11         Okay.  That's it for this one.  Okay.  I am

12   going to drop the next exhibit into the chat.  This

13   is dated November 23, 2020.

14         THE COURT REPORTER:  And just for the

15   record, this will be 11.

16         (Exhibit 11 marked.)

17         MR. DOW:  Thank you.  Yes.

18   BY MR. DOW:

19         Q. So this is a November 23, 2020, e-mail we

20   can just go -- Mr. Utz, feel free to review this.

21   Is this a -- well, we know -- I think we can

22   determine that you sent this e-mail because it has

23   got your signature block at the bottom.  And this is

24   to -- let's see, yeah, it is dated November 23,

25   2020, sent at 2:50 p.m., and seems to concern the



Page 84

1    preliminary endangerment assessment.

2          And if we go down to the last paragraph, it

3    says, Because the PEA requirement has not been

4    filed, DTSC does not have an adequate understanding

5    of the owners, operators, nature or extent of known

6    threaten releases or potential exposure pathways at

7    the site.

8          And my question, Mr. Utz, is as of today

9    regarding this site, is this highlighted statement

10   still true?

11         A. Which highlighted statement?

12         Q. Excuse me.  The one at the last paragraph

13   that starts, Because the PEA requirements -- or

14   excuse me -- requirement has not been fulfilled.

15         A. I'm not sure whether DTSC has accepted the

16   information submitted to date as what we would call

17   a PEA equivalent, but I know that we have not

18   approved any documents during my time as project

19   manager with the title PEA or preliminary

20   endangerment assessment.

21         Q. Okay.  Mr. Utz, is it true that over the

22   course of your work with Casa Nido under the VCA

23   that you granted several extensions for completion

24   of the health and safety plan for the site or one of

25   the health and safety plans?



Page 85

1          A. Yes, I believe I did at least once.

2          Q. Okay.  Putting a document into the chat,

3     dated 12-08-2020.

4               THE COURT REPORTER:  It will be 12, for the

5     record.

6               (Exhibit 12 marked.)

7               MR. DOW:  Okay.  So this is a long e-mail.

8     First page is DTSC 1729.  It appears to involve a

9     submission of a work plan and a health and safety

10    plan.  It appears it is a work plan and health and

11    safety plan were submitted and they were incomplete.

12    BY MR. DOW:

13         Q. Mr. Utz, looking at the very top of the

14    document, you sent an e-mail to Bob Clark-Riddell

15    and others on December 8, 2020, and you reference --

16    and correct me if I'm wrong, you believe you are

17    referencing an incomplete work plan, an incomplete

18    health and safety plan.  You asked when these things

19    are going to be completed by Casa Nido and/or

20    Pangea.  And then you state I am not granting any

21    more extensions.

22              So can you surmise from this, Mr. Utz, that

23    you had granted multiple extensions to Casa Nido to

24    complete these documents?

25         A. I don't know if I am referring to



Page 86

```
 1  extensions on these documents or on other documents.
 2       Q. Okay.  So you could be referring to
 3  extensions that you had granted in the past on
 4  documents other than these, correct?
 5       A. It is conceivable.
 6       Q. Okay.  And you say I am not granting any
 7  more extensions.  Does this reflect -- does that
 8  statement reflect any frustration either on your
 9  part or on DTSC's part with the pace of which Casa
10  Nido was attempting to complete work under the VCA?
11          MR. HURTADO:  Objection.  Calls for
12  speculation.
13          MR. BRODY:  Join.
14          MR. HURTADO:  Lacks foundation.
15          MR. BRODY:  Join.
16          THE WITNESS:  I can't recall.
17  BY MR. DOW:
18       Q. So you can't recall why you stated to them
19  I am not granting any more extensions?
20          MR. HURTADO:  Objection.  Misquotes the
21  deponent.
22          THE WITNESS:  I said I can't recall.  You
23  asked about frustration.
24  BY MR. DOW:
25       Q. Oh, okay.
```



Page 87

1        A. And with pace, and I -- my answer is I

2   cannot recall.

3        Q. Okay.  Let me ask you this, do you know why

4   you wrote, I am not granting any more extensions?

5        A. In this case, I don't know, but typically

6   we grant extensions when there is sufficient cause

7   and also when -- when appropriate.  And I know that

8   at the time of this e-mail, DTSC was concerned about

9   the pace of -- of work being completed as requested

10  by DTSC and the implications to human health and the

11  environment.

12       Q. Okay.  Thank you.

13            All right.  I just dropped another exhibit

14  into the chat.  It is dated January 20, 2020.

15            THE COURT REPORTER:  It will be 13.

16            (Exhibit 13 marked.)

17  BY MR. DOW:

18       Q. This is a memorandum, Mr. Utz, from Eric --

19  I'm not sure how to pronounce it -- Brocales to you.

20  It is a review of the health and safety plan for the

21  former Omo's cleaners.

22            Just let me ask, Mr. Utz, do you

23  remember -- do you recall receiving this -- do you

24  recognize this memorandum from Mr. Brocales?

25       A. It looks familiar.



Page 90

1    in his opinion, the submitted health and safety plan

2    does not meet minimum requirements.  So what I am

3    asking you is to the extent you can recall, was it

4    typical for Pangea to submit documents requested by

5    DTSC relative to the site that were insufficient

6    because they did not meet requirements?  That could

7    be the CCR.  It could be any requirement that DTSC

8    considered mandatory.

9            MR. HURTADO:  Same objection as before.

10           MR. BRODY:  Join.

11           THE WITNESS:  Yes.

12   BY MR. DOW:

13           Q. Thank you.

14           Okay.  Now, I am going to submit -- excuse

15   me, not submit.  Let's see.

16           Mr. Utz, do you recall instances where you

17   informed either Pangea or Casa Nido that given their

18   performance under the voluntary cleanup agreement,

19   you were considering recommending that the agreement

20   be converted to a more compulsory agreement such as

21   an INFC order?

22           (Exhibit 14 marked.)

23           A. An INFC order is not an agreement.

24           Q. Well, thank you for correcting me.  And let

25   me just give you the document I am referring to.  I



Page 97

```
 1                    REPORTER'S CERTIFICATE
 2            I, JAMIE DAVIS, CSR No. 14209, a Certified
 3    Shorthand Reporter, do hereby certify:
 4            That prior to being examined, the witness
 5    named in the foregoing deposition, IAN UTZ, was by
 6    me duly sworn to testify the truth, the whole truth,
 7    and nothing but the truth;
 8            That said deposition was taken before me at
 9    the time and place set forth and was taken down by
10    me in shorthand and thereafter reduced to
11    computerized transcription under my direction and
12    supervision; and I hereby certify the foregoing
13    deposition is a full, true and correct transcript of
14    my shorthand notes so taken.
15            Further, that if the foregoing pertains to
16    the original transcript of a deposition in a federal
17    case, before completion of the proceedings, review
18    of the transcript [X] was [ ] was not requested.
19            I further certify that I am neither counsel
20    for nor related to any party to said action nor in
21    any way interested in the outcome thereof.
22            IN WITNESS WHEREOF, I have hereunto
23    subscribed my name on March 11, 2024.
24                          ___Jamie Davis
                            Jamie Davis,
25                          CSR No. 14209
```



Page 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


CASA NIDO PARTNERSHIP, a          Case No. 3:20-cv-7923-EMC
California Partnership,

        Plaintiff,

     vs.

CATHERINE O'HANKS and JAE KWON
aka JAY KWON aka JAY KWON SHIK
aka JAY SHIK KWON; LYNNE MARIE
GARIBOTTI aka LYNNE GARIBOTTI
BLOWER aka LYNNE G. BLOWER,
individually, as trustee the
Claudio Garibotti Trust, dated
May 1, 1952; and SENTRY INSURANCE
COMPANY,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
AND RELATED CROSS-ACTIONS.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOCONFERENCE DEPOSITION OF

IAN UTZ

VOLUME II

February 29, 2024

2:45 p.m.

Berkeley, California

Reported by Arleen Jimenez, CSR No. 4240

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



Page 109

1   different people on this chain.  But this top email, you

2   sent this email to Mr. Brocales, right?

3        A    Yes.

4        Q    And down here, this next email below, it's from

5   you to Bob Clark-Riddell.  And you sent this email, too,

6   correct?

7        A    Please scroll down.

8        Q    Sure.

9        A    Yes.

10       Q    Okay.  All right.

11            MR. DOW:  I'll drop another in the chat.  This is

12   a March 26th, 2021 email.  Share this, too.

13            MR. BRODY:  And Mr. Dow, before you ask any

14   questions, can we go off the record and have a short

15   discussion?

16            MR. DOW:  Yes, sir.

17            MR. BRODY:  We are off the record?

18            MR. DOW:  Yes.

19            (Discussion held off the record.)

20            MR. DOW:  Let's go on the record, please.  All

21   right.  So, in exchange for -- we've come to an

22   agreement -- excuse me?

23            MR. BEAM:  Apologies.  Continue.

24            MR. DOW:  So we've come to an agreement amongst

25   counsel for Casa Nido and Defendants Anderson and Vernell



Page 110

1  and my client, Kathy O'Hanks.  And the agreement is,

2  generally speaking, to stipulate to the authenticity of

3  the documents produced by DTSC in response to Ms. O'Hank's

4  subpoena to the agency.

5          MR. MINK:  If I can narrow that and see if this

6  is agreeable to you.  I would enter into the stipulation

7  for Ms. Vernell as to documents that purport to either be

8  authored by DTSC, sent by DTSC or received by DTSC.

9          Like, in 21,000 pages, there could be stuff that

10 isn't any of those.  I doubt you want them, but those, I

11 wouldn't be willing to stipulate to.  You guys can feel

12 free to stipulate around me to make it broader, though.

13         MR. DOW:  I think I'm fine with that because that

14 covers -- yeah.  I'm only -- for purposes of this

15 stipulation, I think, if it's, you know, sent from DTSC or

16 sent to DTSC, or what you just said, James, then all I

17 would want from Casa Nido is not to object to the

18 authenticity of those documents.

19         MR. BRODY:  I'm willing to enter into the

20 stipulation as to authenticity and I believe we all also

21 agree that all objections as to admissibility are

22 preserved and reserved and not waived in any way by this

23 stipulation.

24         MR. DOW:  Yes.  Exactly.  All right.  So --

25         MR. MINK:  So stipulated.



Page 111

1            MR. BEAM:   So stipulated.

2            MR. DOW:   How about you, I guess, Beam?   Did you

3     stipulate?

4            MR. BEAM:   So stipulated.

5            MR. DOW:   Thank you, sir.   Okay.   Then, well, you

6     know, hopefully -- well, not even hopefully.   I guess it

7     doesn't matter, for my purposes, if Garibotti and Sentry

8     agree because, again, the main beef here is between Casa

9     Nido and plaintiff, obviously.

10           So plaintiff having made that representation, I'm

11    going to, in return, not go through a bunch of documents

12    with Mr. Utz to get them authenticated and just finish up

13    on the issues starting now.   Thank you.

14           I think, with all that said, I only have one more

15    document I need Mr. Utz to look at.   I would just add

16    that, if there's any time after Richard is done, I reserve

17    the right to ask more questions, and the other parties who

18    want to question.

19           Okay.   So let me just -- okay.   This next

20    exhibit, it's an October 16, 2023 letter from Casa Nido to

21    DTSC and I'll share it now.   Make sure it's the right one.

22           THE REPORTER:   Will this be Exhibit 17?

23           MR. DOW:   Let me share it.

24           MR. MINK:   Wasn't Exhibit 17 the May 21, 2021 or

25    did that document not get marked?



Page 112

1           MR. DOW:  I don't remember.  Do you know, Madam

2     Reporter?

3           THE REPORTER:  I can look back.  And I'm

4     discussing this off the record.

5           (Discussion held off the record.)

6           (Exhibit 17 marked.)

7     BY MR. DOW:

8     Q     Mr. Utz, thank you for your patience.  So what I

9     have on my screen now is an October 16th, 2023 letter that

10    was sent to you from Paul Kibel, one of Casa Nido's

11    attorneys.  And since this letter was sent to you, I

12    wanted to ask you about a paragraph towards the end of it.

13          At the beginning of this paragraph, Casa Nido

14    states -- or Mr. Kibel states, "To fully reserves its

15    rights and those of the other parties named in the

16    October 6, 2023 order, by this letter Casa Nido requests

17    an administrative hearing to challenge the following

18    aspects of the order."

19          And one of those aspects is, he states, "The

20    improper inclusion of several requested studies and

21    investigations in the order which should not be required

22    given that Casa Nido (operating pursuant to the Voluntary

23    Cleanup Agreement) had to proceed with the remedial work

24    without DTSC oversight due to the failure of DTSC to

25    respond to requests for agency oversight, and given that



Page 113

1    Casa Nido consultant Pangea has already provided DTSC with

2    much, if not most of the data, testing results and

3    analysis that would be included in the studies and

4    investigations requested in the order."

5            So, essentially, Mr. Kibel is saying that Casa

6    Nido had to proceed with the remedial work without DTSC

7    oversight because of DTSC's failure to respond to requests

8    for agency oversight.

9            Mr. Utz, are you -- in your time as project

10   manager for this site, are you familiar with or have you

11   seen any requests from Casa Nido for agency oversight?

12   That's my first question.

13       A    Casa Nido submitted several documents for our

14   review.  I would say that is the primary way that Casa

15   Nido would have requested oversight under the Voluntary

16   Cleanup Agreement that is referenced here.  But --

17       Q    Let me ask it this way.  Do you recall any

18   correspondence from Casa Nido in which they state

19   expressly that the agency is failing to oversee their work

20   and please oversee our work?

21           MR. BRODY:  Objection, vague, ambiguous.

22           THE WITNESS:  I don't recall correspondence from

23   Casa Nido representing that DTSC, during my time as

24   project manager, was failing to provide oversight.

25



Page 115

1    conclusion.

2            MR. BRODY:  Join.

3            THE WITNESS:  I believe you're referencing an

4    imminent and substantial endangerment determination and

5    order and remedial action order for which there are four

6    named respondents, including Catherine O'Hanks, Casa Nido,

7    a general partnership, Earl Ray Anderson and Sandra

8    Vernell; is that true?

9            MR. DOW:  That is true, yes.

10           THE WITNESS:  Okay.  Now, please repeat the

11   question.

12   BY MR. DOW:

13     Q    Okay.  Is Mr. Kibel's statement that Pangea has

14   already provided DTSC with much, if not most, of the data

15   testing results and analysis that would be included in the

16   studies and investigations requested in the ISE order

17   true?

18           MR. HURTADO:  Objection, lacks foundation and

19   legal conclusion.

20           MR. BRODY:  Join.

21           THE WITNESS:  To the extent that Mr. Kibel is

22   representing or claiming that certain requirements of the

23   order that we issued were unnecessary because they had

24   already been completed, that is incorrect.

25



Page 119

```
 1   BY MR. DOW:
 2       Q    You know what?  I'm going to drop it.  You've
 3   made it clear enough for me.
 4            Let's see.  And just to dot my Is and cross my
 5   Ts, you do recognize this document as the October 6th,
 6   2023 order, correct?
 7       A    Yes.
 8       Q    Okay.  Thank you.  Let's see.  If we look at the
 9   calendar of tasks and schedules in the order -- excuse me.
10   Calendar -- yeah, calendar of tasks and schedules, is it
11   correct to say that task -- and there may be others, but
12   these are the only ones I'm really concerned with for
13   purposes of this question.
14            Is it correct to say that tasks 10 through 35
15   are, at this time, unfulfilled and outstanding?
16            MR. HURTADO:  Objection, vague and ambiguous.
17            MR. BRODY:  Join.
18            THE WITNESS:  10 through -- please repeat the
19   final number.
20   BY MR. DOW:
21       Q    10 through 35.
22       A    To some extent.
23       Q    Let me ask you this.  Are any of the tasks 10
24   through 35 fully complete?
25            MR. HURTADO:  Objection, vague and ambiguous,
```



Page 120

1    calls for a legal conclusion.

2            MR. BRODY:  Join.

3            MR. HURTADO:  Expert opinion.

4            MR. BRODY:  Also join.

5            THE WITNESS:  To clarify, these are the same --

6    this is the same range of tasks you just asked me a

7    question on?

8            MR. DOW:  Yeah.

9            THE WITNESS:  To my knowledge, no.

10   BY MR. DOW:

11      Q   Okay.  Thank you.  I usually ask this question up

12   front, but, Mr. Utz, is there any reason today that you

13   couldn't give me your truthful testimony?

14      A   No.

15      Q   Okay.  So there's no medications or anything like

16   that, that would interfere with you giving your truthful

17   testimony today?

18      A   No medications.

19      Q   Okay.

20           MR. DOW:  All right.  That's all I have for now.

21   I'll reserve to ask questions if there is time left.

22           MR. BRODY:  Okay.  Then, if no one objects, I'll

23   go next.  Any objections?  Okay.

24

25



Page 175

1   Exhibit 19?

2            MR. DOW:  I'd have to ask the reporter.

3            MR. MINK:  Yes.

4            MR. DOW:  Thank you.

5            THE REPORTER:  I agree.

6            MR. MINK:  That's what counts.

7            MR. DOW:  Thanks for the assistance.

8            THE WITNESS:  Yes.

9   BY MR. DOW:

10       Q    Okay.  I hate to do this, but was that "yes" in

11  response to my question -- let me ask the question again,

12  Mr. Utz.  I apologize.

13            On March 18th, 2022, you wrote an email to Coby

14  Graham of DTSC in which you stated that Casa Nido has

15  demonstrated a disregard for the scope of the Voluntary

16  Cleanup Agreement.  Is that true?

17       A    I stated, "They have demonstrated a disregard for

18  its scope."  I meant by "they," Casa Nido.

19       Q    And by "its," what did you mean?

20       A    The voluntary agreement scope.

21       Q    Okay.  Thank you.  Mr. Utz, as far as earlier, we

22  talked about a vapor intrusion work plan that was either

23  approved or conditionally approved by DTSC.  Isn't it true

24  that Casa Nido never implemented the vapor intrusion work

25  plan?



Page 176

1           MR. BRODY:  Objection, vague and assumes facts

2   and assumes there's only one.

3           THE WITNESS:  Casa Nido did not fully implement

4   the work plan.

5           MR. DOW:  Okay.  Thank you.  Okay.  I'm going

6   to -- rather than make you remember -- you probably can't

7   remember this, so I'm going to -- let's see, 3-17-2022.

8   I'm going to drop another document in the chat.  This is

9   the next exhibit.  It's a March 17th, 2022 email.

10          THE REPORTER:  So Exhibit 20?

11          MR. DOW:  Yeah.

12          (Exhibit 20 marked.)

13  BY MR. DOW:

14      Q   And feel free to read as much of this document as

15  you want, Mr. Utz, for context.  What I'm interested in is

16  the highlighted portion -- it's highlighted in green on

17  the page marked DTSC 4740.  So, please read that

18  highlighted portion and as much of the document as you

19  need to, and I'm going to ask you a question based on the

20  statement highlighted in green.  So please let me know

21  when you're done reading.

22      A   Okay.  I've reviewed the email dated March 17th,

23  2022, sent at 2:10 p.m. from myself to the City of

24  Richmond and our contractors.

25      Q   So, in this email under -- let's see.  On page



Page 177

1   DTSC 4740, under a section that's bolded entitled,

2   "Background," you describe, generally speaking, work that

3   Casa Nido had done at the site, correct?

4       A    You're asking what the term, "this work," means

5   in the sentence that is highlighted?

6       Q    Well, not yet.  I mean, but when you say "this

7   work" -- when you say -- yes, let's do it this way.  When

8   you make the statement, quote, "a lot of this work,"

9   it's -- isn't it true that you're referencing the building

10  demolition at the site that occurred in 2017?

11      A    I'm referring to the work that was described in

12  the preceding sentence.  The work is dated 2017 to 2020,

13  according to my sentence.

14      Q    So when you say "a lot of this work," you're

15  referring to building demolition in 2017, soil removal and

16  treatment to 15 feet below ground done in 2018 and

17  installation of pipes for sucking air out of the ground,

18  which was done from 2018 to 2020, correct?

19      A    Correct.

20      Q    And you were telling the people you sent this

21  email to that, quote, "A lot of this work happened without

22  our approval because the owner has been reluctant to

23  communicate and plan with us and is trying to save money,"

24  end of quote, correct?

25           MR. HURTADO:  Objection, document speaks for



Page 178

1    itself.

2              MR. BRODY:  Join.

3              THE WITNESS:  Correct.

4              MR. DOW:  Thank you.

5    BY MR. DOW:

6        Q    Mr. Utz, I'm going to next show you a document

7    that has to do with -- well, actually, I think -- let's

8    see.  Well, let me ask you this question.

9              As far as the site goes, as of August 2022, the

10   current phase of the work at the site was

11   characterization; is that correct?

12       A    Can you please scroll up so I can see the date of

13   the email?

14       Q    Yeah.

15       A    Okay.  The date of the email is August 4th, 2022,

16   and at that time, the email says that "The current phase

17   of work at the site was characterization."

18       Q    Is this email correct in stating that?

19       A    Yes.

20             MR. DOW:  Okay.  And I'm going to throw that into

21   the chat because I didn't -- 2022 --

22             So, Madam Reporter, can I just mark that document

23   I just dropped in, 08-04-2022, as the next exhibit?

24             THE REPORTER:  I think that's Exhibit 21.

25             MR. DOW:  Sounds right to me.



Page 179

1          (Exhibit 21 marked.)

2          MR. DOW:  Okay.  One more.  This time I promise.

3   And let me drop this into the chat, just so I'm doing

4   these things in order.  Okay.  This email is dated

5   March 21st, 2022, and it will be Exhibit 22.

6          (Exhibit 22 marked.)

7   BY MR. DOW:

8      Q    Mr. Utz, feel free to read this email.  I'm

9   primarily interested in the green highlights.  But read as

10  much of it as you need for context and let me know when

11  you're done reading, please.

12     A    Okay.

13     Q    Okay.  So this email references testing that was

14  done by Pangea at 403 McLaughlin Street in Richmond,

15  California.

16          Mr. Utz, are you aware that 403 McLaughlin Street

17  is a residential home?

18     A    Yes.

19     Q    Okay.  And are you aware that this residential

20  home is directly adjacent to the site to the east?

21     A    Yes.

22     Q    Okay.  And what this email says is that Pangea

23  submitted to DTSC samples that were collected in 2020,

24  September, of two sub slab soil gas samples and that this

25  work was done at 403 McLaughlin Street and that it was



Page 180

1   done without a work plan or DTSC approval.  Is that

2   correct?

3          MR. HURTADO:  Objection, document speaks for

4   itself.

5          MR. BRODY:  Join.

6          THE WITNESS:  Among other things, yes, that is

7   correct.

8   BY MR. DOW:

9      Q    Okay.  And then, if we look at the second

10  highlighted paragraph, you state, "However, these sample

11  names and locations are different from those in the work

12  plan we conditionally approved in October 2021.  Further,

13  the chain of custody on page 60 states that these samples

14  were collected on September 11th, 2020 and September 14th,

15  2020, whereas the draft table 3 on page 5 states the

16  samples were collected on September 21st, 2020, whereas

17  page 39, figure 3 states the samples were collected on

18  September 23rd, 2020, whereas the cover letter text

19  indicates they were collected in September 23rd, 2021."

20         So my question to you, Mr. Utz, is given this

21  paragraph, did this work submitted to DTSC by Pangea

22  present chain of custody issues?

23         MR. BRODY:  Objection, vague and ambiguous, calls

24  for expert opinion.

25         MR. HURTADO:  And a legal conclusion.



Page 181

1          THE WITNESS:  The paragraph speaks to the

2     difference between dates referenced in technical reports

3     that are summarizing the actual work and the dates that

4     are included in a single chain of custody document or

5     multiple chain of custody documents.

6          So I can't speak to whether or not there was an

7     issue in the chain of custody document, which relates to

8     chain of custody.

9     BY MR. DOW:

10     Q     It is true that, based on Pangea's submission to

11     DTSC of this work, you couldn't tell where these samples

12     were taken from?

13          MR. BRODY:  Objection, vague, calls for

14     speculation.

15          THE WITNESS:  To some extent, I did not know

16     where these samples were taken from, other than the

17     information that I believe was included in the tables

18     referenced in this document in this email, which it would

19     have stated the address that the samples were taken from.

20          But my email indicates that -- suggests that

21     there was no map -- or that the -- excuse me.  That,

22     because of the discrepancy between the sample locations

23     included here and the sample locations referenced in the

24     work plan that hadn't been implemented yet, that it was

25     unclear what the actual locations of the samples was --



Page 182

1    were.   The actual locations were.

2         So it was unclear, from the information submitted

3    by Pangea, where the samples were truly collected given

4    all these discrepancies between the information that they

5    submitted.

6    BY MR. DOW:

7         Q    Thank you.  And according to your question 2

8    below question 1, you also had some trouble discerning on

9    what date these samples were collected and analyzed; is

10   that true?

11        A    Based on the discrepancies between the chain of

12   custody and all the other documents I referenced, it was

13   also -- correct.  It was unclear whether the samples that

14   were summarized in the tables were, in fact, the samples

15   referenced in the chain of custody and, therefore, when

16   they were sampled.

17        Q    Okay.  So, as far as the issues we just discussed

18   pertaining to where the samples were located and when they

19   were collected and analyzed, would it be fair to state

20   that this was a failure of quality assurance and quality

21   control on the part of Pangea?

22             MR. BRODY:   Objection, calls for a legal opinion,

23   calls for an expert opinion, argumentative, vague and

24   ambiguous.

25             MR. HURTADO:   Join.



Page 183

```
 1            THE WITNESS:  These mistakes are fundamental
 2   mistakes and they represent an issue of quality control
 3   and quality assurance.
 4   BY MR. DOW:
 5       Q    Mr. Utz, how could have these mistakes been
 6   avoided by Pangea, in your estimation?
 7            MR. MINK:  Objection, calls for speculation.
 8            MR. HURTADO:  Objection, calls for speculation.
 9            MR. MINK:  I'll join.
10            THE WITNESS:  There are a number of ways.  One of
11   the ways is that the work was planned in advance and
12   documented in a work plan.
13   BY MR. DOW:
14       Q    And so these issues you raise demonstrate the
15   value of having a completed and approved work plan before
16   actual work in the field is started; is that correct?
17            MR. BRODY:  Objection, argumentative, vague and
18   ambiguous.
19            THE WITNESS:  This mistake illustrates the
20   importance of work plans.
21   BY MR. DOW:
22       Q    Mr. Utz, do you have any idea or theory as to why
23   Pangea was doing field work without a work plan?
24            MR. BRODY:  Objection, calls for speculation, no
25   foundation.
```



Page 187

```
 1                    REPORTER'S CERTIFICATION

 2

 3          I, Arleen Jimenez, a Certified Shorthand

 4   Reporter, in and for the State of California, do hereby

 5   certify:

 6

 7          That the foregoing witness was by me duly sworn;

 8   that the deposition was then taken before me at the time

 9   and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and later

11   transcribed into typewriting under my direction; that the

12   foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15          In witness whereof, I have subscribed my name

16   this 12th day of March, 2024.

17   (Signature requested)

18

19

20                      _____

21                      Arleen Jimenez, CSR No. 4240

22

23

24

25
```



**MAGNA**
**LEGAL SERVICES**

1        - - - - - -
                E R R A T A
2        - - - - - -

3

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|------|------|-------------|----------|--------|
| 10 | 18 | two years | one year | Mis-Approximation |
| 15 | 21 | Substance | Substances | Mis-Spelling |
| 17 | 9 | contaminate state | contaminant fate | Mis-Spelling |
| 51 | 5 | whole | hole | Mis-Spelling |
| 56 | 1 | impose | pose | Mis-Spelling |
| 72 | 14 | envirastore | EnviroStor | Mis-Spelling |
| 80 | 10 | Right? | -- | Was not said. |
| 82 | 12 | determination | terminated | Mis-Spelling |
| 90 | 23 | INFC | I&SE | Mis-Spelling |
| 138 | 24 | don't know | I don't know | Missing word |
| 149 | 22 | Associated | associated | Mis-Capitalization |
| 163 | 13 | has one | has been one | Missing word |
| 176 | 24 | our | their | Wrong word. |

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

1      ACKNOWLEDGMENT OF DEPONENT

2
            I, Ian Utz                    , do
3      hereby certify that I have read the
       foregoing pages,  1 - PGS, and that the      190
4      same is a correct transcription of the
       answers given by me to the questions
5      therein propounded, except for the
       corrections or changes in form or
6      substance, if any, noted in the attached
       Errata Sheet.

7

8      Ian Utz                    5/2/2024
       WITNESS NAME              DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22