Rachel S. Doughty (CBN 255904)
Jennifer Rae Lovko (SBN 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fx: (510) 900-9502
rdoughty@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASA NIDO PARTNERSHIP, a California Partnership,<br><br>Plaintiff,<br><br>v.<br><br>CATHERINE O'HANKS; SENTRY INSURANCE COMPANY; SANDRA KATE VERNELL (f/k/a SANDRA KATE ANDERSON) and EARL RAY ANDERSON,<br><br>Defendants.<br>―――――――――――――――――<br>AND ALL RELATED COUNTER AND CROSS CLAIMS. | Case No. 20-cv-07923-EMC<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT CATHERINE O'HANKS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF 243)<br><br>Date:        August 28, 2024<br>Time:       9:30 a.m.<br>Judge:      Edward M. Chen<br>Courtroom:  5 – 17th Floor<br><br>Third Amended Complaint Filed: December 16, 2022 |

i

1

**TABLE OF CONTENTS**

2

**I.  INTRODUCTION** ...................................................................................................... 1

3

**II.  LEGAL STANDARD** ................................................................................................ 2

4

**III. STATEMENT OF FACTS** ........................................................................................ 3

5

   **A.  Initial Evaluation of the Site** ............................................................................. 3

6

   **B.  DTSC Initial Involvement and VCA Content** .................................................. 4

7

   **C.  DTSC Oversight from 2017 - 2020** ................................................................... 6

8

   **D.  DTSC Oversight from 2020 – 2022** ................................................................... 7

9

      1.  Removal Actions ........................................................................................... 7

10

      2.  Task No. 2 (PEA) of VCA ............................................................................ 8

11

      3.  Other Documents/Data Provided to DTSC ................................................... 9

12

      4.  Communications with the Public .................................................................. 9

13

      5.  Ian Utz Communications and Deposition .................................................. 11

14

      6.  Response Actions Consistent with NCP Have Resulted in CERCLA-Quality Cleanup .................................................................................... 14

15

   **E.  Protection and Redress of Community Interests** ............................................ 15

16

**IV. ARGUMENT** ............................................................................................................ 15

17

   **A.  O'HANKS' Cross-Motion for Summary Judgment Should Be Denied--Undisputed Facts Show Plaintiff's Response Actions Were in Compliance With the NCP** ......... 15

18

      1.  Plaintiff Substantially Complied with the NCP by Conducting a Removal Site Evaluation with Preliminary Assessment .................................................... 16

19

20

      2.  Plaintiff Substantially Complied with the NCP's Provisions for Removal Actions ................................................................................................... 17

21

22

      3.  Plaintiff Substantially Complied the NCP's Community Relations Provisions ......... 19

23

      4.  Plaintiff Substantially Complied with the NCP in Conducting a CERCLA-Quality Cleanup .................................................................................... 20

24

   **B.  The Cross-Motion for Summary Judgment Should Be Denied As the Undisputed Facts Show PCE Contamination Has Created a Continuing Public Nuisance** ......... 23

25

26

**V.  CONCLUSION** ........................................................................................................ 25

27

28

**TABLE OF AUTHORITIES**

Cases

*Am. Color & Chem. Corp. v. Tenneco Polymers*, 918 F. Supp. 945 (D.S.C. 1995) ........................ 19

*Capogeannis v. Superior Court,* 12 Cal. App. 4th 668 (1993) .................................................. 24, 25

*City of Emeryville v. Robinson*, 621 F.3d 1251 (9th Cir. 2010) ...................................................... 1

*Cnty. of Santa Clara v. United States Fid. & Guar. Co.*, 868 F. Supp. 274 (N.D. Cal. 1994) ........... 1

*Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415 (8th Cir. 1990 ...................... 18

*Hatco Corp. v. W.R. Grace & Co.*, 849 F. Supp. 931 (D.N.J. 1994) ................................................ 16

*Hensley v. San Diego Gas & Electric Co.*, 7 Cal.App.5th 1337 (2017) ........................................... 24

*Holdgrafer v. Unocal Corp.*, 160 Cal. App. 4th 907 (2008) .......................................................... 25

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................................... 3

*Morrison Enter. v. McShares, Inc.*, 13 F. Supp. 2d 1095 (D. Kan. 1998) ....................................... 19

*Newhall Land & Farming Co. v. Superior Court*, 19 Cal.App.4th 334 (1993) ................................. 23

*NL Indus., Inc. v. Kaplan*, 792 F.2d 896 (9th Cir. 1986) .............................................................. 16

*Orange Cnty. Water Dist. v. Alcoa Glob. Fasteners, Inc.*, 12 Cal. App. 5th 252 (2017) ................. 23

*People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090 (1997) ................................................................ 2

*Rincon Band of Luiseño Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059 (2021) ..................... 2

*Santa Clara Valley Water Dist. V. Olin Corp.*, 655 F.Supp.2d 1066 (N.D. Cal. 2009) ................... 21

*United States v. Yi-Chi Shih*, 73 F.4th 1077  (9th Cir. 2023) ......................................................... 23

*Williams v. Illinois*, 567 U.S. 50 (2012) ................................................................................... 23

*Wilson Rd. Dev. Corp. v. Fronabarger Concreters*, 209 F. Supp. 3d 1093 (E.D. Mo. 2016) ........... 18

Statutes

Cal. Health & Safety Code § 25358.7 ........................................................................................ 10

Fed. R. Evid. § 702 ................................................................................................................ 2, 21

Fed. R. Evid. § 703 ................................................................................................................ 2, 21

Regulations

40 CFR § 300.410 .............................................................................................................. 14, 16

40 CFR § 300.415 ................................................................................................ passim

Rules

Fed. R. Civ. P. 56 ............................................................................................... 2, 3

PLAINTIFF CASA NIDO PARTNERSHIP'S REPLY AND OPPOSITION

## I.    INTRODUCTION

Plaintiff Casa Nido Partnership ("CASA NIDO") hereby opposes the cross-motion[1] for partial summary judgment by Defendant Catherine O'Hanks ("O'HANKS) as the evidence in this case establishes it is undisputed that Plaintiff complied with the National Contingency Plan ("NCP"), a requirement for Plaintiff's CERCLA and Hazardous Substance Act ("HSAA") claims. Further, the undisputed facts in this case demonstrate that PCE contamination at the Site, which is the result of O'HANKS' release of PCE, has created a continuing public nuisance. Accordingly, Plaintiff is entitled to summary judgment as a matter of law.

The primary purpose behind CERCLA is the prompt cleanup of hazardous waste sites. *See Cnty. of Santa Clara v. United States Fid. & Guar. Co*., 868 F. Supp. 274, 279 (N.D. Cal. 1994). In furtherance of this purpose, CERCLA encourages private parties to engage in cleanup activities and promotes settlement as a favored outcome. *See id.*; *City of Emeryville v. Robinson*, 621 F.3d 1251, 1264 (9th Cir. 2010). Here, Plaintiff has been seeking contribution from O'HANKS for cleanup costs since August 2018, but Defendant and her insurers have steadfastly refused to resolve the matter despite having used and discharged PCE at the at-issue Site for 30 years. ECF234-1, ¶¶2-3; ECF 234-3, ¶¶5-6.

Defendant O'HANKS now seeks partial summary judgment by erroneously arguing that Plaintiff has failed to comply with the National Contingence Plan ("NCP").[2] Through this motion, O'HANKS has failed to demonstrate that to be the case; in fact the evidence before the Court is that there is no genuine issue of material fact and that CASA NIDO has complied with the NCP. The evidence relied upon by O'HANKS is irrelevant and incomplete, and the Declaration of Alborz Wozniak should not be considered as it is speculative, without foundation, and is not based on Mr. Wozniak's scientific, technical, or other specialized knowledge. Conversely, Plaintiff's evidence

---

[1] CASA NIDO filed a Second Motion for Partial Summary against Defendants O'HANKS, VERNELL, and ANDERSON (ECF 234), to which O'HANKS has responded with a joint motion of opposition and cross-motion for summary judgment (ECF 243). Defendants VERNELL and ANDERSON also opposed CASA NIDO's motion (ECF 241; ECF 242). Plaintiff filed a joint reply to O'HANKS, VERNELL, and ANDERSON's opposition motions (ECF 252). This instant motion opposes O'HANKS cross-motion for summary judgment.

[2] O'HANKS' arguments as regards CERCLA and the HSAA are one and the same because the HSAA incorporates CERCLA's requirement that Plaintiff comply with the NCP. All evidence presented by Plaintiff in this motion equally applies to both claims.

1   establishes that Plaintiff did comply with the NCP. *See* Fed. R. of Evid. 702-703.

2       "The public nuisance doctrine in California is 'aimed at the protection and redress of

3   *community* interests.'" *Rincon Band of Luiseño Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059,

4   1103 (2021) (quoting *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1103 (1997)) (emphasis in

5   the original). Here, Plaintiff's public nuisance claim is based on PCE contamination caused by

6   O'HANKS spreading throughout the Site and beyond, thereby posing both a risk to the general

7   public as well as damage to CASA NIDO's property. Evidence from Plaintiff's consultant, Pangea

8   Environmental Services, Inc. ("Pangea"), as well as by the California Department of Toxic

9   Substances Control ("DTSC") support this claim.

10      Accordingly, Plaintiff asks this Court to deny Defendant O'HANKS' cross-motion. There is no

11  need for this lawsuit to continue to be mired in unnecessary motion practice and a trial, and delay

12  thwarts the policies of both CERCLA and California's public nuisance laws.

## II.   LEGAL STANDARD

13      "Summary judgment is properly granted when no genuine and disputed issues of material fact

14  remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

15  clearly entitled to prevail as a matter of law." *Walnut Creek Manor, LLC*, 622 F.Supp.2d at 923-24;

16  *see also* Fed. R. Civ. P. 56. The moving party bears the burden of showing that there is no material

17  factual dispute. *Id.* at 924. Where the moving party's motion is based on "negating an essential

18  element of the non-moving party's claim or defense, it must produce affirmative evidence of such

19  negation." *Id.* Where such evidence (including evidence presented in the form of affidavits or

20  declarations) is not presented in a form that does not comport with the Federal Rules of Evidence,

21  the non-moving party may object. *See* Fed. R. Civ. P. 56(c).

22      Only if the moving party presents admissible evidence showing no material factual dispute

23  does the burden shift to the non-moving party to provide specific evidence to show that a dispute of

24  material fact exists. *Id.* ("If the moving party does not meet its initial burden of production…, the

25  non-moving party is under no obligation to offer any evidence in support of its opposition.")

26  Evidence produced by the non-moving party must be regarded by the Court "as true…, if supported

27  by affidavits or other evidentiary material." *Id.*

28      The greater purpose of summary judgment is "to pierce the pleadings and to assess the proof in

order see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56, advisory committee note of 1963).

This Court may also grant summary judgment or adjudication sua sponte. Fed. R. Civ. P. 56(f)(3); *Resolution Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993) (noting that a judge may grant summary judgment on his own initiative because "[a] judge cannot be forced to hold a trial when there are no genuine issues of material fact").

## III.  STATEMENT OF FACTS[3]

The following material facts in this case are not in dispute.

### A.   Initial Evaluation of the Site

In October 2014, Casa Nido retained Pangea to perform an initial site investigation to determine if a past release of hazardous substances had occurred at the Site; Pangea's initial investigation discovered volatile organic compounds ("VOCs") in shallow soil gas (also known as subslab gas or subslab vapor) under the Site building floor slab. ECF 234-2, p.9, ¶28. In early 2015, Pangea conducted additional testing to provide further characterization of the extent of VOCs, and this testing continued into 2016. *Id.*, pp.9-10, ¶¶29, 31; ECF 252-2, p.2, ¶6. The results of this testing found PCE beneath the Site and adjacent Thai restaurant.[4] ECF 234-2, p.10, ¶31.

In conducting testing in 2015 and 2016, Pangea was aware that should Plaintiff enter into a Voluntary Cleanup Agreement ("VCA") with DTSC in the future, an "initial scoping meeting" would be held. *Id.*, p. 9-10, ¶¶29-30. DTSC guidance for VCAs acknowledges that a private party can perform assessments, cleanup, or mitigation prior to the start of entering into a VCA. *Id.*

On August 16, 2016, Pangea issued a document entitled "Site Assessment Report."[5] ECF 252-

---

[3] In Plaintiff's joint reply (ECF 252) to O'HANKS, VERNELL, and ANDERSON's opposition to Plaintiff's Second Motion for Partial Summary Judgment, Plaintiff filed a declaration by Robert Clark-Riddell (ECF 252-2) and a declaration by Rae Lovko (ECF 252-1). Plaintiff incorporates these declarations for this instant motion by reference as they address the arguments made by Defendant O'HANKS in their cross-motion for summary judgment.

[4] In 2016, Casa Nido Partnership first learned of PCE contamination at Site. ECF 234-3, p.2, ¶3.

[5] This 442 page document contains (1) a Site Description and Dry Cleaner History, (2) information from the EnviroStor database managed by CalEPA/ Department of Toxic Substances Control (DTSC), (3) information on DTSC's site screening assessment conducted in 2011, (4) nearby facilities under DTSC oversight, (5) information on the Site's geology and hydrogeology, and (6) information from (i) subslab gas sampling at seven semi-permanent probe locations within the site building; (ii) source area soil characterization via nine borings within the site building; (iii) MIP assessment at one onsite and three offsite locations for source and plume delineation; (iv) shallow

2, p.2, ¶8; ECF 184-2, pp.92-534. The Site Assessment Report contains Pangea's conclusion that "[a]ssessment data indicates that one or more *historic releases* of PCE has impacted site soil, groundwater, and subslab/soil gas at the Site." ECF 148-2, p.118. Pangea also recommended that Plaintiff meet with an oversight agency to discuss future action plans, noting that CASA NIDO was interested in removal actions to address the contamination. *Id.*, p.119.

**B.    DTSC Initial Involvement and VCA Content**

Thus, in August 2016, Plaintiff submitted an application for agency oversight from the Regional Water Board, who referred agency oversight to DTSC. ECF 252-2, p.3, ¶9. In September of 2016, DTSC indicated determination of DTSC selection as the oversight agency. *Id.* On November 1, 2016, Robert Clark-Riddell, President and Principal Engineer at Pangea, a representative of CASA NIDO, and DTSC Supervisor Daniel Murphy met to talk about the Site. *Id.*, p.3, ¶10. During that meeting, Mr. Murphy was told of concerns regarding the risk associated with contamination at the Thai restaurant located adjacent to the Site, and Plaintiff discussed the need for a vapor intrusion mitigation and vapor removal system – specifically referencing the intended interim soil vapor extraction system and sub-slab depressurization system ("SVE/SSD system"). *Id.* Mr. Murphy stated that this approach was reasonable. *Id.* Plaintiff also noted that it wanted to demolish the building at the Site and begin excavation, which Mr. Murphy agreed was appropriate. *Id.* He also found reasonable Plaintiff's intention to use a vapor intrusion barrier. *Id.* Unfortunately, after the November 1, 2016, meeting, DTSC was unable to assign staff to the Site.

It was not until May of 2017, that DTSC assign staff to oversee the Site, and after additional interaction, Plaintiff entered into a VCA with DTSC. *Id.*, p.3, ¶13; ECF 234-11, pp.377-395. Between that time and 2023, when Plaintiff withdrew from the VCA, three different DTSC project managers were assigned to the Site. On May 10, 2017, DTSC identified Megan Indermill as the Project Manager for the Site. ECF 234-11, p.377. In April of 2018, Parag Shah became Project Manager, and in May of 2020, Ian Utz became the Project Manager for the Site. ECF 252-2, pp.26, 29, When Ian Utz became Project Manager, he had just become an employee of DTSC (in April of

---

plume delineation via ten boring locations; (v) VOC plume delineation within intermediate-depth groundwater via grab groundwater sampling at three locations based on MIP data; (vi) installation and sampling of four shallow groundwater monitoring wells; (v) a sanitary sewer video inspection; (vi) a well survey, (vii) a underground utility study. ECF 252-2, pp.2-3, ¶8; ECF 184-2, pp.92-534.

2020) and was placed under the supervision of Whitney Smith. ECF 252-1, p. 5 at 15:19-24.

The purpose of the VCA was to (1) investigate and/or remediate a release or threatened release of any hazardous substance at or from the Site under the oversight of DTSC, and (2) to obtain reimbursement from Plaintiff for DTSC's oversight costs incurred pursuant to the VCA. ECF 234-11, p.378. The VCA provided: "<u>When requested by DTSC</u>, [Casa Nido] shall make available for DTSC's inspection, and shall provide copies of, all data and information concerning contamination at or from the Site, including technical records and contractual documents, sampling and monitoring information and photographs and maps, whether or not such data and information was developed pursuant to this Agreement." *Id.*, pp.378-379 (emphasis added).

The scope of work and agency oversight for the VCA identified 19 different tasks that Plaintiff might be requested to perform, "if deemed necessary." *Id.*, pp.388-394. DTSC's role would be to review and provide Plaintiff with written comments on requested documents and "provide oversight of field activities, including sampling and remedial activities, as appropriate." *Id.,* p.378.

Task No. 1 was for the parties to have a scoping meeting, and Plaintiff was to provide DTSC with all background reports and data in its possession. *Id.*, p..388. Task No. 2 was to conduct a preliminary endangerment assessment ("PEA"), "if necessary." *Id.* As part of this task, the VCA provided that documents "which may be required as part of the PEA are:"

> (a) PEA Workplan. This workplan shall include a sampling plan designed to determine the type and general extent of contamination at the Site; a health and safety plan addressing health and safety issues and safe work practices; and a quality assurance/quality control plan to produce data of known quality.
>
> (b) PEA Report. This report will document whether a release has occurred or threatened release exists, the threat the Site poses to human health and the environment, and whether further action is necessary.
>
> (c) If existing data and reports are complete and consistent with information required in the PEA guidance, DTSC may at its discretion choose to consider existing data and reports as equivalent to a PEA.

*Id.* Following completion of this stage of work, the VCA addressed another task that addressed additional site characterization. *Id.*, pp.388-389. This contemplated a sampling and analysis workplan "if necessary" and a site characterization report. *Id.*

### C.   DTSC Oversight from 2017 - 2020

As noted above, DTSC assigned staff to the Site in May of 2017. Plaintiff attended multiple scoping meetings and provided DTSC with the 2016 Site Assessment Report. ECF 252-2, pp.12-13, ¶35. On December 7, 2017, DTSC issued its first agency request for a workplan in accord with Task 2 of the VCA. ECF 234-2, p.11, ¶35; ECF 252-2, p.5 n.3. On July 17, 2018, Casa Nido responded to DTSC's request by submitting the Offsite Vapor Intrusion Assessment Workplan. ECF 234-2, p.11, ¶36.

Pangea conducted additional groundwater, soil, and subslab gas testing in 2017 and 2018 to further assess risk associated with PCE release at the Site and adjacent Thai Restaurant. ECF 252-2, p.5, ¶21. On September 7, 2018, DTSC issued a letter, noting that the DTSC Human and Ecological Risk Office ("HERO") "recommends interim hazard mitigation measures (e.g., ventilation) for the restaurant until subslab vapor samples are collected and vapor intrusion risk is assessed." ECF 252-2, p.6, ¶23d. In 2018, based upon the latest testing (as well as HERO's recommendation), CASA NIDO directed Pangea to undertake interim removal actions to safeguard human health. *Id.*, ¶24. The justification for such response action was based on hazardous compound ("TCE") concentrations up to <u>43 times</u> the urgent response trigger levels established by DTSC HERO Note 5 guidance, and PCE concentrations up to <u>3,500 times</u> the remediation/ mitigation response trigger levels established by DTSC's Vapor Intrusion Mitigation Advisory. *Id.*, pp.5-7, ¶¶24, 26-28.

Due to the established imminent hazard to public health, Pangea considered and evaluated various designs and plans, as well as cost estimates, for all considered alternatives. *Id.*, p.6, 10, ¶¶25, 32. The various vadose-zone removal action technologies considered and discussed included in situ soil treatment, ex situ soil treatment, soil vapor extraction, and excavation. *Id.,* pp.10-11, ¶33. Based upon this evaluation, Plaintiff chose excavation and soil vapor extraction. *Id.* The excavation and offsite disposal that subsequently occurred at the Site is a presumptive remedy according to EPA guidance and is consistent with what Plaintiff had discussed with DTSC Supervisor Daniel Murphy on November 1, 2016. *Id.* As regards soil vapor extraction, this too is a presumptive remedy according to EPA guidance. *Id.* It was determined to be feasible and was a cost-effect measure for targeting residual VOC impact after source area excavation, using an initial SVE/SSD layout for feasibility testing and initial operation. *Id.*

Plaintiff also decided to remove groundwater within the Site perimeter. *Id.*, pp.12-13, ¶ 34. The various saturated-zone (groundwater) removal action technologies that were considered and evaluated included no action, institutional controls, groundwater extraction, extraction at the capillary fringe, Permeable Reactive Barrier ("PRB") with Enhanced Reductive Dechlorination ("ERD")/Enhanced Biodegradation ("EISB"), and in situ chemical oxidation. *Id.* Based upon this evaluation, Plaintiff chose extraction for a capillary fringe area on the Site because such extraction was effective and financially feasible due to the area's shallowness and fine-grained soil. *Id.* In addition, installation of a PRB with an ERD/EISB media was selected. *Id.* This option was selected as a feasibility test/study, in conjunction with groundwater extraction at the capillary fringe, as being the most feasible option based upon its cost and determination to be the most effective in addressing the imminent public health threat posed by contaminated groundwater. *Id.*

Excavation at the Site was done in late 2018, and the PRB was installed. *Id.*, pp.6-7, ¶25. Between 2018 and 2020, Pangea designed and installed a combined SVE/SSD system at the Site and the Thai restaurant. *Id.* The SVE/SSD system extracts vapor from onsite SVE wells and three SSD points located inside the Thai restaurant. *Id.* The air permit for the system from the Bay Area Air Quality Management District was received in September 2019. *Id.* The system was put into operation in 2020, with the delay attributed the delay in permits being issued and PG&E's delay in providing electrical service connection. *Id.*

### D.   DTSC Oversight from 2020 – 2022

#### 1.   Removal Actions

DTSC contends that it is still reviewing the interim removal actions taken by Plaintiff; however, the removal actions taken by Casa Nido and Pangea successfully addressed the risk to human health. *Id.*, pp.9-10, ¶¶29-31. During a meeting on August 4, 2022, DTSC Supervisor Whitney Smith thanked Casa Nido for their initial response actions at the Site. *Id.* Supervisor Smith confirmed that the Casa Nido would get credit for the significant source removal, removal/ remediation actions, and mitigation measures, and that DTSC would eventually review response action documentation to determine if any additional removal or remediation is merited at the Site. *Id.* DTSC confirmed the future remedy for the Site might only involve "monitored natural attenuation" or continued operation of the existing system, without the need for additional soil or

groundwater remediation. *Id.* DTSC concurred that recent assessment data performed with DTSC oversight did not find significant human health risk, which is likely the result of successful early actions conducted by CASA NIDO. *Id.*

In 2020, DTSC ordered Plaintiff to continue to operate the SVE/SSD system on a continuing and ongoing basis. *Id.*, p.9, ¶29. The order to continue the system's operation also was included in DTSC's Imminent and Substantial Endangerment Determination and Order and Remedial Action Order in 2023. ECF 234-10, p.29.

As stated above, Ian Utz became the Project Manager for the Site in May of 2020. On June 30, 2020, Pangea prepared an SVE/SSD System Startup Report, which was provided to Ian Utz. ECF 248-1; ECF 252-2, p.6, ¶25b.

### 2.   Task No. 2 (PEA) of VCA

During Mr. Utz's initial management, he acknowledged that investigations conducted prior to the VCA addressed many elements usually contained in a PEA. *Id.*, p.13, ¶37. As regards the workplan component of the PEA task, on October 8, 2020 and November 23, 2020, Mr. Utz asked that Plaintiff revise the Offsite Vapor Intrusion Assessment Workplan to include, among other things, information regarding historical owners/operators (e.g., contact information, relationship to site, proof of relationship to site). *Id.*, p.13, ¶38; ECF 252-1, pp.34, 37; ECF 252-1, p.66. Rather than revise this workplan, DTSC and Pangea agreed that such information could be included in documentation covered by the VCA task addressing production of additional site characterization. ECF 252-2, p.13 at ¶38 and pp.39-40. On December 4, 2020, Pangea sent Mr. Utz a document entitled Additional Characterization Report, which contained the requested information regarding historical owners/ operators. *Id.*, p. 13, ¶38, 40; ECF 234-5, pp.337-1230; ECF 234-6, pp.1-412.[6] The Additional Characterization Report was over 1,300 pages in length. ECF 234-5, pp.337-1230; ECF 234-6, pp.1-412.

Plaintiff completed Task No.2 of the VCA by issuing the 2016 Assessment Report and Offsite Vapor Intrusion Workplan. ECF 252-2, pp.13, 19, ¶¶36, 57g. In late 2020, and again in 2021, Mr. Utz indicated to Robert Clark-Riddell that he considered the PEA phase as complete. ECF 252-2,

---

[6] The Offsite Vapor Intrusion Workplan and the Additional Characterization Report were subsequently approved by DTSC. ECF 234-10, p.60; ECF 244-1, p.37 at 47:19-25.

p.13, ¶39. In a telephone conversation that Mr. Clark-Riddell had with Ian Utz on February 8, 2022, Mr. Utz confirmed that the Project was no longer in the PEA stage but had moved into the supplemental investigation stage. *Id.*, p.14, ¶44.[7]

### 3. Other Documents/Data Provided to DTSC

In 2020, Ian Utz also asked Plaintiff to submit a health and safety plan ("HASP") (which is addressed as Task No. 19 of the VCA). ECF 252-2, pp.5, 13, ¶¶19, 41. Plaintiff submitted two draft HASPs. *Id.*, p.13, ¶¶41-42. The first was emailed to him on November 18, 2020, and can be considered a SVE/SSD System or O&M HASP. *Id.* The second was provided to him in 2021 and can be considered a Site Characterization HASP. *Id.* On October 29, 2021, DTSC accepted the second HASP as part of DTSC's approval of Plaintiff's Offsite Vapor Intrusion Workplan. *Id.*, p.13, ¶43.

Additional work and documentation prepared by Pangea and submitted to DTSC include a groundwater monitoring report and a technical report containing updated soil vapor and groundwater data (dated March 22, 2022). *Id.*, p.14, ¶45.

### 4. Communications with the Public

Both Plaintiff and DTSC have communicated with the public concerning the Site. *Id.*, p.14, ¶46. Ian Utz confirmed in October of 202 that DTSC would be sending letters, community updates, and vapor intrusion background information to adjacent properties that Pangea would be testing for PCE contamination. ECF 252-1, p.39. Plaintiff was to consult with DTSC's public participation specialist regarding any activities that CASA NIDO needed to perform pertaining to such testing. *Id.* Casa Nido and Robert Clark-Riddell have met and talked to this public participation specialist. ECF 252-2, pp.14, ¶46 and p.109. Based upon these meetings and discussions, Plaintiff understood that CASA NIDO was in compliance with requirements regarding public notification, and any additional requirements would be handled by DTSC. *Id.*, p.14, ¶47.

As regards communication with the public, Plaintiff is aware of the following communications and actions: (1) In 2016, the owner and manager of the Thai restaurant were contacted by Plaintiff

---

[7] DTSC's Imminent and Substantial Endangerment Determination and Order and Remedial Action Order also focuses on removal and remediation actions required after a site evaluation/preliminary assessment has been completed. Among the tasks mandated or considered by this document, DTSC does not ask for a site evaluation/preliminary assessment. ECF 234-10, pp.22-64.

and Pangea, and they were told that some contamination had been found at the Site. *Id.*, pp.14-16,
¶48. Thereafter, Pangea was granted access to the restaurant to conduct subslab gas sampling and
install the SSD component of the SVE/SSD system. *Id.* (2) In 2017, Pangea was in communication
with the City of Richmond regarding the need to demolish the building at the Site and excavate soil
due to the presence of hazardous levels of VOCs at the Site. *Id.* (3) In late 2018 and early 2019,
Pangea communicated with the Bay Area Air Quality Management District to obtain a permit for
operation of the SVE/SSD system. *Id.* (4) In June of 2020, Casa Nido sent a letter to the owners of
the Thai restaurant to update them about chemicals found on their property. *Id.*, p.15, ¶48 and p.56.
(5) In 2020, DTSC stated it would prepare Community Update fact sheets/bulletins. *Id.*, p.15, ¶48.
DTSC published these bulletins in October of 2020 and October of 2021. *Id.*, pp.58-60; ECF 252-1,
pp.51-53. (6) In October of 2021, in accordance with the Offsite Vapor Intrusion Assessment
Workplan, DTSC ordered Plaintiff to conduct testing at adjacent properties. ECF 252-2, p.15, ¶48.
Plaintiff communicated with the owners/residents at these five locations to explain that
contamination had been found at the Site, and Plaintiff wanted access to collect subslab vapor and
indoor air data. *Id.* Such communication occurred by letter, email, and phone. *Id.* (7) For the nearby
Wendy's restaurant, DTSC also was involved in the communication. *Id.*, p.15, ¶48 and pp.63-73.
(8) DTSC communicated with the City of Richmond about the Site and its contamination in March
of 2022. *Id.*, pp.68-69. (9) On March 7, 2023, DTSC issued a letter containing environmental
testing results to adjoining residential and commercial property owners of the Site. *Id.*, pp.120-122.

In addition, DTSC adopted a Public Participation Plan in February of 2024. *Id.*, pp.74-107. The
stated purpose of the document is to satisfy "DTSC's requirement under California Health and
Safety Code section 25358.7 to conduct a baseline community survey, solicit concerns and
information regarding the Site from the affected community, and develop a public participation plan
to establish communication and outreach measures." *Id.*, p.76. The Plan states that in 2021, DTSC
conducted formal tribal outreach; in January of 2022, DTSC sent a community survey to 1,321
street addresses/recipients located within and beyond a ¼ mile radius of the Site. *Id.*, pp.84, 89-90.
Additionally, it addresses community interviews conducted in January and February of 2023. *Id.*,
p.90.

### 5.   Ian Utz Communications and Deposition

During DTSC's initial oversight of the Site, DTSC did not provide much oversight for the Site. *Id.*, p.5, ¶23, p.15, ¶51. When Ian Utz became Project Manager, DTSC become more responsive to contamination at the Site and provided more oversight, which CASA NIDO welcomed. *Id.*, p.16, ¶49. By way of comparison, prior to Mr. Utz's involvement, DTSC oversight charges totaled $25,011.45. ECF 234-3, pp.3-4. After Mr. Utz's involvement, DTSC oversight charges totaled $163,498.51. *Id.*

Robert Clark-Riddell generally found that Mr. Utz tried to be responsive to any questions that arose during their communications; however, he experienced frustration that Mr. Utz both thanked Plaintiff and Pangea for their work at the Site while, at the same time, stating that actions taken by Plaintiff and Pangea were done without oversight prior to his assignment as the Site's Project Manager. *Id.*, p.16, ¶50. Further, when Mr. Clark-Riddell asked Mr. Utz if he wanted to review documents drafted by Pangea prior to 2020 (when Mr. Utz was assigned as Project Manager to the Site), Mr. Utz stated he only wanted to look at documents specifically requested by him (such as the 2020 Additional Characterization Report). *Id.*, p.18, ¶55.

Once Ian Utz became Project Manager, Mr. Clark-Riddell understood that DTSC would be reviewing the interim removal actions taken by Plaintiff and Pangea, as well as technical reports produced by Plaintiff and Pangea. *Id.*, p.17, ¶52. Yet, more than four years have passed, and DTSC still has not completed its review. *Id.*

Despite the fact that DTSC refused to engage in meaningful oversight from 2018 through early 2020, the fact that DTSC takes years to review and approve actions and associated documentation, and the fact that Mr. Utz generally did not wish to look at documents produced prior to his appointment, in November of 2020, Mr. Utz complained about the pace of Plaintiff's work at the Site being too slow. *Id.*, p.18, ¶56; ECF 252-1, pp.23-24 at 78:10-79:18. (This was just 6 months after Mr. Utz had been appointed Project Manager.)

On February 29, 2024, Mr. Utz was deposed in this action. Despite his involvement with the Site since 2020, his testimony indicates a lack of awareness of the Site and work completed there, as well as suggests that Mr. Utz was not reviewing all communications sent to him. Specifically:

Mr. Utz testified that prior to his appointment as Project Manager in May of 2020, he had no

1    personal involvement with the Site. ECF 252-1, p.29 at 123:21-14. He was asked whether he was

2    aware of any work that CASA NIDO did on the Site prior to entering into the VCA, and he testified

3    he did not know. *Id.*, p.9 at 30:2-13. Then, he was asked whether he had ever seen any documents

4    that evidence CASA NIDO conducted work at the Site before entering into the VCA, and he again

5    stated he did not know. *Id.*, p.9 at 30:15-21.

6         Mr. Utz was asked whether soil extraction at the Site (which was done in 2018) occurred under

7    DTSC supervision; he testified he did not know. *Id.*, p.13 at 34:13-23. This was followed up with a

8    question as to whether the soil extraction had been done pursuant to the VCA, to which Mr. Utz

9    testified he did not know. *Id.*, p.14 at 356:7-12.

10        As addressed above, Pangea installed a permeable reactive barrier at the Site in 2018; Pangea

11   also designed and installed an SVE/SSD system from 2018 through 2020. Yet, at his deposition,

12   Mr. Utz could not confirm whether or not a permeable reactive barrier had been installed. *Id.*,

13   pp.17-18 at 38:23-39:6. And, while he understood an SVE was installed at the Site, he said an SSD

     had not been installed. *Id.*, pp.17-18 at 37:19-38:16.

14        Counsel for O'HANKS attached the October 8, 2020, letter (addressed above in Section

15   III.D.2.) to Mr. Utz's deposition. *Id.*, pp.34-50. This letter was written by Mr. Utz and directed to

16   CASA NIDO. *Id.* Its purpose was to provide comments on and seek revision of the Revised Offsite

17   Vapor Intrusion Workplan prepared by Pangea on September 11, 2020. *Id.*, p.34. As regards Section

18   2.1 (Site Description and History) of the Workplan, Mr. Utz wrote: "A Preliminary Endangerment

19   Assessment (PEA) has not been completed for the Site, and therefore certain historical information

20   remains unknown. … Please revise [Section 2.1] to state generally that a dry cleaner operated on

21   Site from the 1960s until 2015 and generated halogenated solvent wastes, including

22   tetrachloroethylene (PCE) from at least the 1980s to 2000s." *Id.*, p.37. Referencing the letter, Mr.

23   Utz asked whether CASA NIDO ever completed a preliminary endangerment assessment for the

24   Site; he testified: "I'm not aware of any submittals to the department with the name of the submittal

25   being a preliminary endangerment assessment." *Id.*, p.21-22 at 51:16-52:5.

26        Counsel for O'HANKS also attached the November 23, 2020, e-mail (addressed above in

27   Section III.D.2.) as an exhibit to Mr. Utz's deposition. *Id.*, p.66. In that e-mail, Mr. Utz wrote that

28   Task No. 2 (which addresses PEA work) "has only partially been fulfilled through existing

reports/information (e.g., the 2017 site assessment, groundwater data, and soil vapor data)." *Id.* Mr. Utz asked that Plaintiff forward him "information regarding historical owners/operators" to enable DTSC to fill data gaps. *Id.* Referencing this e-mail, Mr. Utz was asked about the PEA requirements not being fulfilled. *Id.*, pp.26-27 at 83:11-84:20. He responded: "I'm not sure whether DTSC has accepted the information submitted to date as what we would call a PEA equivalent, but I know that we have not approved any documents during my time as project manager with the title PEA or preliminary endangerment assessment." *Id.*

Mr. Utz's testimony does not contradict the fact that instead of supplementing the 2016 Site Assessment Report or Offsite Vapor Intrusion Assessment Workplan with information regarding historical owners/operators, Mr. Utz and Plaintiff subsequently agreed that such information would instead be included in documentation covered by Task No. 3 of the VCA (pertaining to additional site characterization). ECF 252-2, p.13, ¶38; ECF 234-5, pp.337-1230; ECF 234-6, pp.1-412. Mr. Utz's testimony does not contradict that both he and DTSC consider the PEA stage of the VCA to be complete. ECF-2, pp.13-14, ¶¶38, 44; ECF 234-10, pp.22-64.

CASA NIDO terminated the VCA in 2023 after Defendant O'HANKS and other responsible parties refused to contribute financially to cleanup at the Site. ECF 234-1, p.5, ¶28; ECF 252-2, p.19, ¶57i. On December 21, 2022, counsel on behalf of CASA NIDO wrote the following to Ian Utz:

> Although Casa Nido had no involvement in any of the activities resulting in the releases, pursuant to the VCA, for more than five years Casa Nido has assumed sole financial responsibility for paying for all the [removal] work and DTSC's agency oversight costs associated with this work … To date, the previous drycleaner operators that actually caused the releases and the previous property-owners who owned the property when much of the releases occurred have contributed nothing to these financial costs. Casa Nido has made contribution requests to other responsible parties, and is presently involved in litigation against these parties, but to date no contribution or reimbursement has been made. From Casa Nido's standpoint, and consistent with the CERCLA Gore Allocation factors, allocating 100% of the [] costs and agency oversight costs to a current owner that was not involved in the releases is unfair and is unsupported by the law.
>
> The VCA provides Casa Nido with a unilateral right of termination. In light of the circumstances by this letter Casa Nido is giving notice to DTSC of its intention to terminate the VCA effective March 1, 2023.

ECF 248-5, pp.2-3. Despite this letter being directed to Mr. Utz in 2023, he testified at his

deposition that he did not recall the reasons CASA NIDO terminated the VCA. ECF 252-1, pp.32-33 at 150:9-151:2.

Finally, Mr. Utz was asked whether it had been his job to administer the VCA with CASA NIDO. *Id.*, pp.7-8 at 23:21-24:1. He could only say: To some extent."

### 6.    Response Actions Consistent with NCP Have Resulted in CERCLA-Quality Cleanup

Robert Clark-Riddell attests that while compliance with the NCP, resulting in a CERCLA-quality cleanup is required, "DTSC is not the only governmental organization that provides guidance as regards what constitutes such quality. Other state and federal organizations issue guidance for cleanup of sites where toxic contaminants are present. Thus, the work performed by Plaintiff at the Site not only took into consideration DTSC oversight, but it also took into consideration CERCLA's NCP regulations and requirements." ECF 252-2, p.20, ¶58. He further noted that (1) Plaintiff conducted a removal site evaluation, including a removal preliminary assessment, as required by 40 CFR 410(a); (2) Plaintiff's work constitutes removal actions, and Plaintiff complied with NCP regulations addressing removal actions, including provisions in 40 CFR 300.415(b); (3) in designing, planning, and actuating the removal actions, Pangea took into consideration whether soil excavation and an SVE/SSD system were proportionate to the dangers posed by the property; (4) once the SVE/SSD system became operational in 2020, DTSC required its continued operation thereafter; (5) Plaintiff has responded to DTSC requests for documents by providing numerous documents (including revisions) regarding sampling done at the Site and adjacent properties, groundwater data, workplans, HASPs, and more; (6) Plaintiff has communicated with the public both prior to and at the direction of DTSC, and DTSC also has engaged in public participation. *Id.*, pp. 21-24; *see also* ECF 234-2, p.19, ¶65. Thus, Mr. Clark-Riddell has concluded

> Based upon my education, experience, actual inspection of the Site, data collected by Pangea at the Site, levels of PCE contamination at the Site and adjacent properties, it is my opinion that when viewed as a whole, the response actions taken by Casa Nido between 2014 and 2024 were consistent with the NCP and have resulted in a CERCLA-quality cleanup.

*Id.*, pp. 21-24; *see also* ECF 234-2, p.19, ¶65.

E.   **Protection and Redress of Community Interests**

As a result of PCE contamination, CASA NIDO has been unable to lease the Site property and has had to demolish the building on the Site that housed the drycleaning business. ECF 234-3, p.2, ¶4. In cleaning up the Site, Plaintiff has incurred over $1.3 million in costs, as of May 13, 2024. *Id.*, pp.2-12, ¶¶7-12.

Moreover, the Imminent and Substantial Endangerment Determination and Order and Remedial Action Order issued by DTSC in 2023 states that "PCE and trichloroethylene (TCE) are the primary hazardous substances found at elevated concentrations in soil, soil gas, and groundwater on Site. Their release has been documented during various sampling events from 2014 to 2022." ECF 234-10, p.25; *see also* the 2016 Site Assessment Report at ECF 148-2, pp.92-534. "PCE contamination extends laterally in groundwater to at least 250 feet southwest of the Site. PCE contamination has also been detected in groundwater more than 1,000 feet southwest of the Site." *Id.* That is, the contamination has spread beyond the Site. "The Site and neighboring properties are zoned for residential use. Certain of these properties are additionally zoned for commercial use. All adjoining properties are occupied by humans who may be exposed to Site contaminants. In addition, construction workers working at or near the Site may be exposed to Site contaminants." *Id.*, p.26.

Further, DTSC has issued an Imminent and Substantial Endangerment Determination Amendment for the MacDonald-San Pablo-Wall-45th Plume Site, finding that the Site's release of PCE into groundwater flows in a manner running from the Site down through the Miraflores Housing Development. ECF 252-2, pp.51-52. Testing at this Housing Development continues to find PCE (up to 169 ug/L) and TCE (up to 9.5 ug/L) in the groundwater. *Id.*

## IV.   ARGUMENT

### A.   O'HANKS' Cross-Motion for Summary Judgment Should Be Denied--Undisputed Facts Show Plaintiff's Response Actions Were in Compliance With the NCP

Defendant's cross-motion for summary judgment focuses on whether or not Plaintiff's response actions substantially complied with the NCP. "The NCP … is a rule that presents … [a] general plan or framework for responding to hazardous substances releases. The NCP is not intended to provide complex and detailed site-specific decision-making criteria." 50 Fed. Reg. 47912, 47920 (1985). And, in addressing whether response costs were incurred in a manner

consistent with the NCP, a private party need not show that its actions were conducted pursuant to a lead agency's direction or approval. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

Defendant asserts that Plaintiff's actions were not in compliance with the NCP because Plaintiff did not conduct a preliminary assessment, did not conduct an engineering evaluation/cost analysis ("EE/CA") of removal action alternatives for the Site, and did not follow the NCP's community relations requirements. Further, O'Hanks argues, even if Plaintiff did comply with some NCP requirements, no CERCLA-quality cleanup has begun. As addressed below, none of these arguments have merit.

### 1. Plaintiff Substantially Complied with the NCP by Conducting a Removal Site Evaluation with Preliminary Assessment

CERCLA's NCP regulations state that a "removal site evaluation includes a removal preliminary assessment." 40 CFR 300.410(a). This section lists several factors and data that "may" be included in this evaluation and assessment; however, it has few *requirements*. Rather, the NCP only requires that the assessment be documented and based on "readily available information." *Id.* at (c) & (f). Thus, for example, a preliminary assessment "may" include data on the source and nature of the release or threat of release of hazardous substances, an analysis of its threat to public health, and historical information. *Id.* It "may" consider photographs or contain literature searches. But, the failure to address a factor or consider a particular issue does not mean the assessment fails to comply with the NCP. *See e.g., Hatco Corp. v. W.R. Grace & Co.*, 849 F. Supp. 931, 965 (D.N.J. 1994) (Preliminary assessments may comply with the NCP even where site management practices, literature searches, and photographs are not considered; it is sufficient that the plaintiff considered data showing that contamination existed and had moved into the groundwater).

An actual site inspection also is not required, but it can occur "if warranted." 40 CFR 300.410(a). Here, the evidence shows that Plaintiff prepared a Site Assessment Report in 2016 that was 442 pages in length and contained information on PCE contamination, its locations and spread into groundwater, and more. ECF 252-2, pp.2-3, ¶8; ECF 184-2, pp.92-534. Additionally, Plaintiff compiled a workplan in accordance with the PEA task described in the VCA. ECF 234-11, p.388; ECF 234-2, p.11, ¶36. Thus, Plaintiff not only engaged in a site evaluation and preliminary

assessment, as required by the NCP, but went farther by actually conducting a site inspection and collecting samples. ECF 252-2, pp.21-22, ¶66. And, as addressed above in Section III.D.2., DTSC considers the PEA task to be complete.

Defendant argues otherwise, relying entirely on the October 8, 2020 letter and November 23, 2020 email written by Ian Utz, as well as deposition testimony he provided regarding these documents. As addressed in Section III.D.5, this evidence does not demonstrate that Plaintiff failed to substantially comply with 40 CFR 300.415. DTSC and Plaintiff agreed the information requested in the 2020 documents would be provided in a subsequent Additional Characterization Report (which is considered by DTSC to be a separate task from the PEA task), and Mr. Utz's testimony made clear that he was not addressing whether or not Plaintiff had submitted the equivalent of a PEA. At most, his testimony established that Plaintiff had never produced a document with the title "Preliminary Endangerment Assessment." Plaintiff agrees that it never submitted a document entitled "preliminary endangerment assessment." This is of no import. The question is whether Plaintiff substantially complied with 40 CFR 300.415, which Mr. Utz was not asked about. Defendant never asked Mr. Utz, for example, whether DTSC ever required Plaintiff to submit a document specifically entitled "preliminary endangerment assessment" or whether the 2016 Site Assessment Report and Vapor Intrusion Assessment Workplan issued by Pangea were considered to be in substantial compliance with either the VCA or CERCLA. ECF 252-1, p.2, ¶3. Also, it is clear from Mr. Utz's testimony that he has a lack of awareness of the Site and work completed there.

### 2. Plaintiff Substantially Complied with the NCP's Provisions for Removal Actions

Defendants argue that Plaintiff has not provided any evidence that an EE/CA was conducted for removal actions conducted in 2018 (soil excavation and installation of the SVE/SSD system). CERCLA NCP regulations provide that for non-urgent removal actions (those where a planning period of at least six months exists before on-site activities must be initiated), the party initiating the removal action "shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent. The EE/CA is an analysis of removal alternatives for a site." 40 CFR 300.415(b)(4) (emphasis added). An EE/CA is not required for time-critical removal actions. *Id.* For such actions, various factors must be considered such as potential exposure to nearby human populations, high levels of

hazardous substances in soils near the surface that may migrate, and more. *Id.* at (b)(2). "Of course, because the applicable yardstick is 'substantial compliance,' a private party's 'site evaluation does not have to comply strictly with the letter of the NCP, but only must be consistent with its requirements.'" *Wilson Rd. Dev. Corp. v. Fronabarger Concreters*, 209 F. Supp. 3d 1093, 1118 (E.D. Mo. 2016) (quoting *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc*., 920 F.2d 1415, 1420 (8th Cir. 1990).

Here, Plaintiff considers the soil extraction and installation of an SVE/SSD system to be time-critical removal actions; therefore, no EE/CA was required. Further, even if these removal actions were considered not to be time-critical, Plaintiff conducted the equivalent of an EE/CA.

In 2016, the historical release of PCE at the Site was determined to be responsible for contamination at the Site. ECF 252-2, p.3, ¶9 and n.4. At that time, Plaintiff considered excavating soil at the Site and installing an SVE/SSD system, relaying this consideration to DTSC Supervisor Daniel Murphy. ECF 252-2, p.3, ¶10. Mr. Murphy stated that these actions seemed appropriate and reasonable. *Id.*

Nonetheless, Pangea decided further testing was necessary to assess risk associated with PCE release at the Site and adjacent Thai restaurant. ECF 252-2, p.5, ¶1. Accordingly, in 2017 and 2018, Pangea conducted additional groundwater, soil, and subslab gas testing. *Id.* On September 7, 2018, DTSC HERO recommended interim removal measures to address the Site's hazards. *Id.*, p.6, ¶23d. Based upon that recommendation and Site data showing PCE and TCE in concentrations greatly exceeding DTSC trigger levels, Plaintiff determined time-critical removal actions were called for to address the imminent hazard to public health. *Id.*, pp.5-7, ¶¶24, 26-28. Prior to engaging in removal actions, Plaintiff considered the factors elucidated in 40 CFR 300.415(b)(2). *Id.*, pp.22-23, ¶¶70-71.

Soil extraction at the Site and installation of a PRB occurred within six months of determining that PCE contamination at the Site posed an imminent threat to the public health. *Id.*, pp.6-7, ¶25. Installation of the SVE/SSD system also began within the same timeframe; however, delays in obtaining necessary permits and obtaining electrical service connection from PG&E resulted in the system not becoming operational until 2020. *Id.*

Should this Court believe that an EE/CA was necessary for these removal actions, Plaintiff's evidence also establishes that its equivalent was done. Plaintiff considered and evaluated various

1    designs and plans, as well as obtained cost estimates, for at least 10 alternative removal actions. *Id.*,

2    pp.10-13, ¶¶32-33. For each alternative, Plaintiff examined its feasibility, effectiveness, and cost.

3    *Id.* Pangea also took into consideration whether the selected actions were proportionate to the

4    dangers posed by the Site. *Id.*, p.23, ¶72. The removal actions that were ultimately chosen are

5    presumptive remedies according to EPA guidance and were consistent with remedies that DTSC

6    Supervisor Daniel Murphy found to be reasonable and appropriate. *Id.*, p.3, ¶10 and ¶¶10-11, ¶¶32-

7    33.

8        Therefore, Plaintiff conducted the equivalent to an EE/CA, and whether the removal actions are

9    found to be time-critical or not, Plaintiff substantially complied with the NCP.

10       **3.    Plaintiff Substantially Complied the NCP's Community Relations Provisions**

11       Defendant states that Plaintiff did not comply with the NCP because it did not designate a

12   spokesperson, conduct interviews with various community groups, prepare a formal community

13   relations plans, or establish a local information repository (referencing 40 CFR 300.415(n)). But,

14   private parties are exempt from the administrative record requirements in 40 CFR 300.415(n). *See*

15   *Santa Clara Valley Water Dist.*, 655 F.Supp.2d at 1076-77. And, for those requirements that do

16   apply, Plaintiff need only substantially comply. *See id.* Further, where a lead agency dictates the

17   terms of community relations obligations, a private party is "entitled to assume" that its compliance

18   with these terms meets its obligation under the NCP. *Morrison Enter. v. McShares, Inc.*, 13 F. Supp.

19   2d 1095, 1118 (D. Kan. 1998). "To hold otherwise would destroy any incentive for [the private

20   party] to voluntarily cooperate with and follow the directions of state enforcement authorities, one

21   of the goals of CERCLA. It would place a PRP in the untenable position of deciding to voluntarily

22   cooperate with state enforcement authorities with no assurance that its cooperation will satisfy

23   CERCLA and NCP requirements." *Id.* (citing *Am. Color & Chem. Corp. v. Tenneco Polymers*, 918

24   F. Supp. 945, 955 (D.S.C. 1995)).

25       As addressed in Section III.D.4., most of the NCP's requirements regarding public relations

26   were handled by DTSC, with Plaintiff responsible for communicating with a handful of nearby

27   residences and communicating with DTSC's public participation specialist. Defendant O'HANKS

28   fails to address the fact that DTSC had a public participation specialist for the Site, and DTSC

     issued Community Update Bulletins, conducted community surveys and interviews, and drafted a

Public Participation Plan. As such, not only did Plaintiff comply with the NCP and DTSC's direction, but Defendant failed to shift its burden on this issue.

      **4.    Plaintiff Substantially Complied with the NCP in Conducting a CERCLA-Quality Cleanup**

Cleanup at the Site is required to be of "CERCLA-Quality." DTSC is not the only governmental organization that provides guidance as regards what constitutes such quality. Other state and federal organizations issue guidance for cleanup of sites where toxic contaminants are present. Thus, the work performed by Plaintiff at the Site not only took into consideration DTSC oversight, but it also took into consideration CERCLA's NCP regulations and requirements. ECF 252-2, p.20, ¶58.

Defendant unsuccessfully tries to argue that this is a disputed issue based upon (1) the content of teleconference meeting minutes from 2020 and related Utz testimony, and (2) the declaration of Alborz Wozniak. As addressed below, this evidence does not contradict Plaintiff's undisputed material facts.

      **a)  Teleconference Meeting Minutes**

The teleconference meeting minutes referenced by Defendant were prepared by Ian Utz following a meeting he had with Plaintiff, Robert Clark-Riddell, and DTSC staff on November 19, 2020. ECF 244-1, p.8. In these minutes, a statement is made that cleanup work had not yet complied with the VCA, and as a result, DTSC could not at that time determine if the work was in compliance with the NCP. Defendant states that Mr. Utz confirmed in his 2024 that cleanup activities occurred without oversight. This is blatantly incorrect.

The testimony referenced by Defendant only contains statements regarding the importance of DTSC oversight. As addressed in Section III.D.5., Mr. Utz was never responsible for ensuring that all components of the VCA were administered. When asked whether soil extraction (a removal action) at the Site had been done with DTSC oversight, he was not sure. Further, Mr. Utz's deposition testimony indicates that despite his involvement with the Site since 2020, he was unfamiliar with Plaintiff's removal actions, stating that he was not sure if a PRB had been installed and incorrectly stating that an SSD had not been installed.

Whether or not Mr. Utz believed oversight of the removal actions was sufficient is not the test

for determining NCP compliance. The terms of the VCA and the language of NCP regulations are not one and the same.

Plaintiff informed DTSC in November of 2016 that it was considering soil extraction, installation of a PRB, and the use of an SVE/SSD system were reasonable and appropriate actions. ECF 252-2, p.3, ¶10. In 2020, DTSC ordered Plaintiff to continue its operation of the SVE/SSD system on a continual basis until told otherwise – an order that continues under DTSC's Imminent and Substantial Endangerment Determination and Order and Remedial Action Order. ECF 252-1, p.9, ¶29; ECF 234-10, p.29. Further DTSC Supervisor Whitney Smith has confirmed that Plaintiff would be credited for its removal actions, and recent assessment data performed with DTSC oversight shows that the removal actions have so far been successful in addressing the threat caused by the PCE contamination. ECF pp.9-10, ¶¶29-31.

### b)  Alborz Wozniak Declaration

Mr. Wozniak claims that Plaintiff's actions were not in compliance with the NCP and of CERCLA-quality. This Court should disregard Mr. Wozniak's declaration because the opinions stated therein are speculative and lack foundation; Mr. Wozniak's opinions regarding remedial actions are irrelevant; and Mr. Wozniak's opinions also are not based scientific, technical, or other specialized knowledge that will assist the trier of fact in understanding the evidence in this case. *See* Fed. R. of Evid. 702-703.

Mr. Wozniak's opinions based upon requirements for remedial actions are irrelevant as Plaintiff's costs are associated with removal work.[8] Plaintiff's expert, Mr. Clark-Riddell, notes that Mr. Wozniak did not review the entire record in this matter, and he does not demonstrate a complete understanding of the contamination at the Site. ECF 252-2, pp.20-24, ¶¶58-80. For example, Mr. Wozniak signed the declaration without reviewing the declaration submitted by Mr. Clark-Riddell with Plaintiff's Second Motion for Summary Judgment (ECF 234-2), Pangea's analysis of the work

---

[8] Some of the documents in this case refer to Plaintiff's actions as alternately removal actions or remedial actions. They are properly classified as removal actions. The DTSC has classified the work associated with these costs as "interim actions" (ECF 234- 10 at p.24) – which are removal actions. *See Santa Clara Valley Water Dist. V. Olin Corp.*, 655 F.Supp.2d 1066, 1075 (N.D. Cal. 2009). Removal actions include excavation or removal of highly contaminated soils and procedures designed to reduce the spread of contaminants off-site or lessen the likelihood of human exposure. *See* 40 CFR 300.415(e). The soil excavation conducted and SVE/SSD system installed by Plaintiff were removal actions according to this regulation. ECF 252-2, pp. 21-24, ¶69.

for NCP compliance (ECF 234-11, pp.359-373), any documents related to Plaintiff's work with DTSC on HASPs subsequent to December 8, 2020, Plaintiff's 2022 technical report with updated data on soil vapor and groundwater contamination, DTSC's Community Update bulletins or Public Participation Plan, or documents available from DTSC's Envirostor website for the Site. *Id.*

Not only is Mr. Wozniak's declaration based on an incomplete review of the record, but his review is based on outdated documents. Twenty-seven of the thirty documents that form the basis for his opinions were created in 2020 or earlier. ECF 246-1.

Because Mr. Wozniak does not have a complete understanding of the contamination at the Site, nor has he reviewed the full record in the matter, he has an insufficient basis by which to evaluate the environmental response actions conducted by Casa Nido. *Id.*, p.21, ¶62. It also means that he states as "true" facts that are not true. For instance, he states that the community relations provisions of NCP were not fulfilled, but fails to address the fact that DTSC was in charge of most of the related requirements.

Mr. Wozniak improperly attacks the intent of CASA NIDO, stating "It is clear from the records and documentation that Casa Nido had no intention to comply with the NCP or perform work that would be considered substantially consistent with the NCP requirements, when evaluated as a whole." This is improper as "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).

Mr. Wozniak refers to a number of NCP statutes and concludes (based upon his incomplete review of the record) that Plaintiff did not comply with the statutes. Despite being a Civil Engineer and Board-Certified Environmental Engineer with alleged experience at drycleaning facilities (ECF 245, ¶¶1-2), he demonstrates no scientific, technical, or other specialized knowledge in reaching these conclusions, but rather, his declaration serves merely as a conduit for the twenty-seven documents he reviewed. Mr. Wozniak does not comment on or analyze Site data regarding PCE contamination; does not address the appropriateness or efficacy of relying on soil extraction, PRB, and SVE/SSD systems (despite them being the presumptive remedy under EPA guidance); and does not identify any reasons for concluding that the 2016 Site Assessment Report is not a preliminary assessment. Instead, Mr. Wozniak simply asserts that DTSC (more specifically, Ian Utz) sometimes

complained about Plaintiff's compliance with the VCA.[9] He does not rely upon his expertise in offering any opinion.

Experts can rely on information reasonably relied upon by experts in their field, but they must be "more than a conduit or transmitter for testimonial hearsay." *United States v. Yi-Chi Shih*, 73 F.4th 1077, 1098 (9th Cir. 2023). "[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (quoting Fed. R. of Evid. 702(a)).

The issue of NCP compliance "is a mixed question of law and fact." *Orange Cnty. Water Dist. v. Alcoa Glob. Fasteners, Inc*., 12 Cal. App. 5th 252, 331 (2017). "This means that, once the factual details regarding cleanup efforts have been established, the court decides—as a matter of law—whether those efforts substantially comply with the NCP." *Id.*

Here, the facts establish, as a matter of law, that Plaintiff substantially complied with the NCP, and Mr. Wozniak's declaration is neither helpful nor appropriate to this determination. As such, the Court should disregard it.

### B. The Cross-Motion for Summary Judgment Should Be Denied As the Undisputed Facts Show PCE Contamination Has Created a Continuing Public Nuisance

Defendant contends that the nuisance claims must fail because there has been no showing that the alleged pollution is injurious to public health and because it has not yet been determined if the nuisance is abatable.

Pollution of water constitutes a public nuisance. *See Newhall Land & Farming Co. v. Superior Court*, 19 Cal.App.4th 334, 341 (1993). The California nuisance statutes have been construed, according to their broad terms, to allow an owner of property to sue for damages caused by a nuisance created on the owner's property. Under California law, it is not necessary that a nuisance have its origin in neighboring property. *Id*. at 342. Damages recoverable in a nuisance action are "damages that would reasonably compensate (the plaintiff) for the annoyance and discomfort,

---

[9]As previously stated, the terms of the VCA do not directly mirror the terms of the NCP, nor do Ian Utz's comments constitute a legal analysis of NCP compliance.

including emotional distress or mental anguish, caused by the injury, to (plaintiff's) peaceful enjoyment of the property that (plaintiff) has occupied". CACI 2031. These damages are recoverable even when the trespass or nuisance involves solely property damage. *Hensley v. San Diego Gas & Electric Co.*, 7 Cal.App.5th 1337, 1348-1349 (2017). Plaintiff's claim is based on the PCE contamination constituting a continuing nuisance.[10]

As addressed in Section III.E., the public nuisance has caused Plaintiff to suffer damages, and relief is warranted to protect and redress the community's interests. The Imminent and Substantial Endangerment Determination and Order and Remedial Action Order issued by DTSC in 2023 states that "PCE and trichloroethylene (TCE) are the primary hazardous substances found at elevated concentrations in soil, soil gas, and groundwater on Site. Their release has been documented during various sampling events from 2014 to 2022. ... PCE contamination extends laterally in groundwater to at least 250 feet southwest of the Site. PCE contamination has also been detected in groundwater more than 1,000 feet southwest of the Site." That is, the contamination has spread beyond the Site. The Order further notes that:

> The Site and neighboring properties are zoned for residential use. Certain of these properties are additionally zoned for commercial use. All adjoining properties are occupied by humans who may be exposed to Site contaminants. In addition, construction workers working at or near the Site may be exposed to Site contaminants. … The Site and neighboring properties are zoned for residential use. Certain of these properties are additionally zoned for commercial use. All adjoining properties are occupied by humans who may be exposed to Site contaminants. In addition, construction workers working at or near the Site may be exposed to Site contaminants.

Further, DTSC has issued an Imminent and Substantial Endangerment Determination Amendment for the MacDonald-San Pablo-Wall-45th Plume Site, finding that the Site's release of PCE into groundwater flows in a manner running from the Site down through the Miraflores Housing Development. Testing at this Housing Development continues to find PCE (up to 169 ug/L) and TCE (up to 9.5 ug/L) in the groundwater.

Regarding the second contention, DTSC believes the nuisance is abatable. In the Imminent and Substantial Endangerment Determination and Order and Remedial Action Order, DTSC notes that

---

[10] "[C]ourts have consistently" held "that in a case in which the distinction between permanent and continuing nuisance is close or doubtful the plaintiff will be permitted to elect which theory to pursue." *Capogeannis v. Superior Court,* 12 Cal. App. 4th 668, 679 (1993).

1   "[r]esponse action is necessary to abate a public nuisance and/or to protect and preserve the public

2   health." ECF 252-2, p.26; *see also Capogeannis v. Super. Ct.,* 12 Cal App.4th 668, 682-683

3   (1993)(where "responsible public agencies" are engaging in a cleanup effort, this is evidence that

4   contamination is abatable for purposes of California continuing tort theory). The fact that abatement

5   efforts "may take considerable time and may never be wholly successful" is not determinative of a

6   continuing nuisance claim. *Capogeannis* at 682-683. And, "[c]leaning up contamination to a level

7   acceptable to or ordered by a governmental agency may suffice to establish that a trespass or

8   nuisance is abatable and therefore continuing." *Holdrafer v. Unocal Corp.*, 160 Cal. App. 4th 907,

9   926-927 (2008).

10  **V.    CONCLUSION**

11          For the reasons addressed above, Plaintiff asks that Defendant's motion be denied and

12  Plaintiff's motion granted. The undisputed evidence in this case demonstrates that Plaintiff has

13  spent over $1.3 million in cleanup actions that, when viewed as a whole, substantially complied

14  with the NCP. O'HANKS is liable for contamination at the Site, and Plaintiff's is entitled to recover

15  incurred costs from O'HANKS.

16

17      Dated: 8/9/24                         _____

18                                            JENNIFER RAE LOVKO
                                              *Counsel for Plaintiff and Counter-Defendant,*
19                                            *Casa Nido Partnership*

20

21

22

23

24

25

26

27

28