1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    CASA NIDO PARTNERSHIP,                  Case No.  20-cv-07923-EMC
8                    Plaintiff,
9             v.                             ORDER ON PLAINTIFF AND
                                             DEFENDANT O'HANKS' MOTIONS
10   JAE KWON, et al.,                       FOR SUMMARY JUDGMENT
11                   Defendants.
                                             Docket Nos. 234 and 243
12
13
14
15                    I.    **INTRODUCTION**

16          This is an environmental cleanup case brought by Plaintiff Casa Nido Partnership ("Casa

17   Nido") against several defendants, including Defendants Catherine O'Hanks, Sandra Kate Vernell,

18   and Earl Ray Anderson.  Casa Nido is the owner of the real estate in Richmond, California, in

19   which Ms. O'Hanks, Ms. Vernell, and Mr. Anderson operated a drycleaning business at different

20   points in time between 1960 to 2015.  Casa Nido has sued Defendants for damages due to the

21   release of perchloroethylene (PCE) and tetrachloroethylene (TCE) onto the floor and into the

22   groundwater below the facility, requiring Casa Nido to spend hundreds of thousands of dollars

23   towards initiating remediation and incur future costs to complete cleanup.  Casa Nido seeks

24   contribution from Defendants under the federal Comprehensive Environmental Response,

25   Compensation, and Liability Act ("CERCLA"), the California Porter-Cologne Act and Carpenter-

26   Presley-Tanner Hazardous Substance Account Act ("HSAA"), and brings common law tort claims

27   such as nuisance and negligence against Defendants.  *Id.*

28          Casa Nido now seeks partial summary judgment against the three Defendants.  Docket No.

United States District Court
Northern District of California

234. Ms. O'Hanks, Ms. Vernell and Mr. Anderson all oppose the motion. Additionally, Ms. O'Hanks has also filed a cross-motion for summary judgment. Docket No. 243.

For the following reasons, the Court **GRANTS** summary judgment for Defendants on the CERCLA, HSAA, California Porter-Cologne Act, nuisance per se, and negligence claims. The Court **DENIES** summary judgment on the nuisance claim and the negligence per se claim for a statutory violation regarding nuisance.

## II.    BACKGROUND

### A.    Factual Background

Casa Nido owns property located at 12210 San Pablo Avenue, Richmond, California, hereby referred to as the "Site." A commercial drycleaning facility operated on the Site from 1960 to 2015. Docket No. 234-2 at ¶ 12 (Clark-Riddell Decl.). Defendant Ms. O'Hanks and her late husband, Roy O'Hanks, operated the drycleaning facility between 1960 and 1990. Docket No. 150 at ¶ 17. Defendant Ms. Vernell and Defendant Mr. Anderson entered into an agreement with the O'Hanks to manage operations of the drycleaning business between 1978 and 1980. Docket No. 177 at ¶ 8.

#### 1.    Site Evaluation and Investigation

In 2014, Casa Nido retained Pangea Environmental Services (Pangea) for an investigation of volatile organic compounds at the Site. Docket No. 234-2 at ¶ 28. In 2015, Pangea conducted an investigation documenting the presence of hazardous substances related to dry-cleaning operations, specifically perchloroethylene (PCE) and its breakdown product tetrachloroethylene (TCE). *Id.* at ¶ 29-31. The PCE and TCE was found in the soil and groundwater in the Site as well as in the land immediately adjacent to the Site. *Id.*

In 2016, Pangea wrote a Site Assessment Report ("2016 Site Assessment Report") that contained its findings. *Id.* at ¶ 32. In September 2016, the Department of Toxic Substances Control (DTSC) became the overseeing agency of the Site after Casa Nido submitted an application for agency oversight. *Id.* at ¶ 33.

##### a)    Voluntary Cleanup Agreement

In May 2017, DTSC and CASA Nido entered a Voluntary Cleanup Agreement (VCA). *Id.*

at ¶ 34; Docket No. 234-11 at 377-95 (Exhibit 41). The purpose of the VCA was to "investigate and/or remediate" releases of hazardous substances at the Site under DTSC oversight. Docket No. 234-11 at 378. It noted that the Site may have been contaminated with PCE and "potential toxic degradation products of PCE." *Id.* at 378-89. Key terms of the agreement are as follows:

- All work performed pursuant to the agreement is subject to DTSC's review and approval. *Id.* at 381.
- DTSC can recommend changes or modify reports, plans, or schedules submitted for approval. *Id.*

The VCA stated that the following tasks "will be completed as part of this Agreement, if deemed necessary": conduct an initial background and scoping investigation and meeting, conduct a preliminary endangerment assessment (PEA), submit a proposed workplan describing the activities "to further characterize soil, soil gas, surface water and/or groundwater," submit a Site Characterization Report that summarizes the investigation and includes recommendations and conclusions, risk evaluation, selection of a remedy (either removal action or remedial action) and a subsequent workplan, meet California Environmental Quality Act (CEQA) requirements, prepare a remedial design and implementation plan, implement a final Removal Action Workplan (RAP) and report, and public participation, among other requirements. *Id.* at 381-92.

Casa Nido then took several actions pursuant to the VCA. In July 2017, Casa Nido demolished the Site. *Id.* at ¶ 11. In December 2017, DTSC issued a request for an investigation workplan. *Id.* at ¶ 35. Casa Nido submitted the "Offsite Vapor Intrusion Assessment Workplan." In September 2018, the DTSC responded with comments and recommendations. *Id.* at ¶ 37.

### b) <u>Response Actions</u>

Casa Nido then initiated two response actions at the Site starting in 2018. First, in October 2018, Pangea removed 454 cubic yards of impacted soil and constructed a permeable reactive barrier to treat groundwater at the Site (2018 Soil and Barrier Action). Docket No. 234-2 at ¶ 38. Second, between 2018 and 2020, Pangea installed a soil vapor extraction remediation system and sub slab depressurization mitigation system (SVE/SSD) to limit off-site migration and exposure to vapor-forming chemicals (SVE/SSD System Action). *Id.* at ¶¶ 39-41.

### 2.    DTSC Involvement

In 2020, Pangea submitted additional reports to DTSC, and in October 2021, DTSC approved the Offsite Vapor Intrusion Assessment Workplan.  *Id.* at ¶¶ 42-43.

In March 2023, Casa Nido terminated its Voluntary Cleanup Agreement with DTSC.  *Id.* at 24-25.  Elevated PCE concentrations remain at the Site and surrounding properties in connection with the Site.

In October 2023, the DTSC issued an "Imminent and Substantial Endangerment Determination and Order and Remedial Action Order" (DTSC Order) to Casa Nido, Ms. O'Hanks, Ms. Vernell, and Mr. Anderson.  Docket No. 234-10 at 22 (Exhibit 37).  It included the following in its findings of fact:

- The Site was the location of hazardous waste generation from at least 1987 to 2017. *Id.* at 24.

- Between 1960 and 2000, the dry cleaner used PCE and/or generated hazardous wastes containing PCE.  *Id.*

- PCE was identified beneath dry cleaning equipment, near damaged sewer pipes, and had migrated to adjoining properties to the north, south, east, and west.  *Id.* PCE and TCE were found at "elevated concentrations" in soil, soil gas, and groundwater on the Site, and the release is documented from samples between 2014 and 2022.  *Id.* at 25.

- The concentrations of PCE on the Site for soil, drinking water, groundwater, and soil gas "exceed certain residential screening levels." The maximum concentration of 350.00 milligrams per kilogram in the soil exceeded the 0.59 screening level. The 14,000.00 micrograms per liter in the groundwater exceeded the 5.0 screening level.  The 23,900,000.00 micrograms per cubic meter in soil gas exceeded the 15.0 screening level.  *Id.* at 25.

- The concentrations of PCE on the Site for air were within the range of the screening levels.  The 0.55 micrograms per cubic meter in the crawl space air and 0.41 micrograms per cubic meter in the indoor air ranged around the 0.46 screening

1    level for ambient air.  *Id.*

2    In its Order, DTSC ordered Casa Nido, Ms. O'Hanks, Ms. Vernell, and Mr. Anderson to engage in

3    future response actions and also required that the SVE/SSD system operate indefinitely.  *Id.* at 27-

4    43.

5              **3.      Costs**

6          To date, Casa Nido has paid $145,732.05 to DTSC for project management (with an

7    additional $42,777.91 to be paid).  *See* Docket No. 243-3 at ¶¶7-12.  It has paid Pangea

8    $892,384.47 (with an additional $103,823.56 outstanding) for its services.  *See id.*  It has paid

9    $20,678.98 for costs and utilities.  It has paid $141,515.00 to Innovative Construction Solutions

10    for activities related to remedial excavation and SVE piping installation for the SVE/SSD system.

11    *See id.*  Defendants have not paid any other costs related to remediation of the Site.  Docket No.

12    234-1 at ¶ 3.

13              **4.      Communication with Defendants**

14          Casa Nido contacted Defendant O'Hanks demanding reimbursement for some of the costs

15    of the environmental testing and remedial work.  Docket No. 234-1 at ¶¶ 2, 5 (Doughty Decl.).

16    Defendants have not agreed to cover any of the costs.  Docket No. 234-3 at ¶ 6; Docket No. 234-3

17    at ¶ 3.  As a result, Casa Nido filed this lawsuit against Defendants seeking to recover costs.

18         **B.      Procedural Background**

19          In November 2020, Casa Nido filed a lawsuit against Defendants Catherine O'Hanks,

20    Sentry Insurance Company, Sandra Kate Vernell (formerly known as Sandra Kate Anderson), Earl

21    Ray Anderson, Lynne Garibotti, and Jae Kwon seeking reimbursement for some of all of the costs

22    of remedial work.  Docket No. 1 (Complaint).  According to Casa Nido, Defendants O'Hanks,

23    Kwon, Vernell, Anderson, and Garibotti "sequentially owned and operated a dry-cleaning facility"

24    on the property from "1960-2007."  Docket No. 147 at 1 (Third Amended Compl.).  Casa Nido

25    alleged that Defendant Sentry issued an insurance policy to Defendant O'Hanks providing

26    "coverage for claims related to hazardous substance pollution and dry-cleaning operations at the

27    Property."  *Id.*

28          Since then, three relevant procedural events have occurred.  First, Defendant Jae Kwon has

United States District Court
Northern District of California

5

passed away, and the Court denied Casa Nido's motion to substitute a successor in interest. *See* Docket No. 229 (finding there was no legal basis to do so under California law or CERCLA, exercising its discretion to do so under Rule 25(a), and noting that he died with no assets, probate was not opened, and his heirs did not inherit any assets). The estate of Mr. Kwon apparently has no assets.

Second, the Court granted in part and denied in part cross-motions for summary judgment between Casa Nido and Defendant Sentry Insurance Company. Docket No. 196. It held that Sentry had a duty to defend Casa Nido up to $100,000 pursuant to the insurance agreement. Docket No. 196 at 2.

Third, Defendant Lynne Garibotti has reached an agreement in principle to settle and is currently drafting an agreement. Docket No. 240.

Therefore, the remaining Defendants to the instant motions are Ms. O'Hanks, Ms. Vernell, and Mr. Anderson.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.[1]

Where a defendant moves for summary judgment based on a claim for which the plaintiff

---

[1] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

1    bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

2    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

3    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.    DISCUSSION

5    Casa Nido moves for summary judgment against Ms. O'Hanks, Ms. Vernell, and Mr.

6    Anderson on its first claim for relief under CERCLA, its second claim for relief under the HSAA,

7    the fourth claim for relief under Cal. Wat. Code §§ 13304 and 13350, the fifth claim of relief

8    under public nuisance, the sixth claim for relief under nuisance per se, the seventh claim for relief

9    under negligence, and the eighth claim for relief under negligence per se.  Docket No. 234 at ii.

### A.    CERCLA

11    Plaintiffs seek summary judgment on liability under the Comprehensive Environmental

12    Response, Compensation and Liability Act ("CERCLA") for response costs relating to

13    groundwater, soil, and surface contamination.  To obtain summary judgment, Casa Nido must

14    show that: (1) the area on which hazardous substances are found must constitute a defined

15    "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has

16    occurred; (3) the plaintiff has incurred "response costs" that are "necessary" and "consistent with

17    the National Contingency Plan ("NCP")"; and (4) the defendant is among one of four classes of

18    persons subject to liability. 42 U.S.C. § 9607(a)(4)(B); *Carson Harbor Village Ltd. v. Unocal*

19    *Corp.,* 227 F.3d 1196 (9th Cir. 2000).  Ms. O'Hanks cross-moves for summary judgment as to the

20    CERCLA claim, arguing that Casa Nido failed to comply with the NCP's requirements.  Docket

21    No. 243 at 14-17.  The dispositive issue is whether plaintiff's response costs were consistent with

22    the NCP.

### 1.    Legal Standard: Substantial Compliance

24    CERCLA Section 107(a)(4)(B) provides that private plaintiffs may recover their "other

25    necessary costs of response incurred … consistent with the national contingency plan."  42 U.S.C.

26    § 9607(a)(4)(B).  A private party response action will be considered "consistent with the NCP" if

27    "the action, when evaluated as a whole, is in substantial compliance with the applicable

28    requirements" and results in a CERCLA-quality cleanup.  40 C.F.R. § 300.700(c)(3)(i).

United States District Court
Northern District of California

1    Under the "substantial compliance" standard, "strict compliance [with the NCP] is not

2    required." *Louisiana-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994), as

3    amended (Aug. 30, 1994).  Specifically, "actions…will not be considered 'inconsistent with the

4    NCP'…based on immaterial or insubstantial deviations." 40 C.F.R. § 300.700(c) (citing §

5    300.700(c)(1)-(2)).  However, while "perfect" compliance is not required, "specific factual

6    findings" must support a determination that a party has substantially complied with the NCP.

7    *Louisiana-Pac. Corp*, 24 F.3d at 1576.  For instance, in *Louisiana-Pac. Corp,* the Court found that

8    the parties managing the cleanup had substantially complied with the notice and comment

9    provisions of the NCP because the parties selected the final cleanup option after preparing and

10    organizing two meetings and agendas regarding "cleanup options" that were "well advertised,

11    open to the public, and more than 21 days apart." *Id.*

12    **2.**     **Plaintiff's Actions are Removal Actions**

13    For the NCP requirements, the NCP has different standards for the two types of response

14    actions: removal and remedial actions.  The standards for removal actions are less stringent than

15    those for remedial actions.  Although CERCLA does not expressly define a "removal action," it

16    defines the terms "remove" and "removal" as follows:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such action as may be necessary to **monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.** The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for ..., action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

25    42 U.S.C. § 9601(23) (emphasis added).  "Removal actions are typically described as time-

26    sensitive responses to public health threats."  *United States v. W.R. Grace & Co.,* 429 F.3d at

27    1227-1228.

28    By contrast, "[r]emedial actions ... are often described as permanent remedies to threats for

8

United States District Court
Northern District of California

which an urgent response is not warranted.  *Id.* at 1228."  Remedial actions are defined as:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment[.]

42 U.S.C. § 9601(24).

According to the Ninth Circuit, in order "[f]or an action to be 'consistent with permanent remedy,' a permanent remedy must already have been adopted."  *California ex rel. California Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004).  This adoption takes place with final approval of a Remedial Action Plan (RAP).  *Id.*; *see also* 42 U.S.C. sec. 9617(b) (requiring public notice of the final RAP "before commencement of any remedial action").  Costs that are "incurred before the remedial action plan was finally designated" constitute "removal" costs.  *Neville*, 358 F.3d at 670 n.6.

Here, Casa Nido's specific strategies align with both the descriptions for a removal action and examples of permanent remedies for toxic pollution of land.  After Casa Nido and DTSC entered a Voluntary Cleanup Agreement, Casa Nido's response actions generally involved cleanup of PCE contamination in the soil, soil gas, and groundwater in the Site and surrounding areas.  Pangea removed 454 cubic yards of impacted soil and constructed a permeable reactive barrier to treat groundwater at the Site (2018 Soil and Barrier Action).  Docket No. 234-2 at ¶ 38.  Pangea installed the SVE/SSD system to limit off-site migration and exposure to vapor-forming chemicals (SVE/SSD System Action).  *Id.* at ¶¶ 39-40.  These actions are consistent with the definition of "remove" and "removal" as including "monitor, assess, and evaluate the release or threat of release of hazardous materials," and other actions "to prevent, minimize, or mitigate damage to the public health or welfare or to the environment."   42 U.S.C. § 9601(23).  On the other hand, in the context of toxic pollution of land, permanent remedies can include the destruction, immobilization, or removal of contaminants in the soil or groundwater through methods such as groundwater pump and treat systems or removal and off-site disposal of contaminated soil at an approved facility.  *See* U.S. ENV'T PROT. AGENCY, SUPERFUND REMEDY REPORT 26 (16th ed. 2020).  Pangea's soil removal, construction of a permeable reactive barrier, and installation of a SVE/SSD system could ultimately constitute permanent remedies.

United States District Court
Northern District of California

9

1      However, Casa Nido's response actions are removal actions for two reasons.  First,

2  operation of the SVE/SSD system must continue until DTSC approves its shutdown.  *See* Docket

3  No. 234-10 at 29.  Thus, the remedy is not yet permanent.

4      Second, Casa Nido implemented these response actions without receiving final approval of

5  the Remedial Action Plan.  "[A]n action can only be remedial if it is taken after the final remedial

6  action plan is approved."  *California ex rel. California Dep't of Toxic Substances Control v.*

7  *Neville Chem. Co*., 358 F.3d 661, 670 (9th Cir. 2004).  Here, Casa Nido took both response

8  actions before DTSC approved a final remedial action plan.  Specifically, in October 2018, Pangea

9  removed 454 cubic yards of impacted soil and constructed a permeable reactive barrier to treat

10  groundwater at the Site (2018 Soil and Barrier Action).  Docket No. 234-2 at ¶ 38.  Second,

11  between 2018 and 2020, Pangea installed a soil vapor extraction remediation system and sub slab

12  depressurization mitigation system (SVE/SSD) to limit off-site migration and exposure to vapor-

13  forming chemicals (SVE/SSD System Action).  *Id.* at ¶¶ 39-41.  In October 2023, DTSC entered

14  its Remedial Action Order.  Docket No. 234-10 at 22 (Exhibit 37).  In its order, DTSC stated that

15  the "purpose of this Order is to require for the Site…preparation of a Remedial Action Plan."  *Id.*

16  at 27-28.  Section 5.11 of DTSC's Order, titled "Remedial Action Plan (RAP)," states that

17  "Respondents shall prepare and submit to DTSC a draft RAP."  *Id.* at 39.  Therefore, in October

18  2023, DTSC had not approved a final remedial action plan.  Because Casa Nido took both

19  response actions before DTSC approved a final remedial action plan, both actions are considered

20  removal, not permanent, actions.  *Neville*, 358 F.3d at 670.

21                    **a)**        **Procedural Requirements for a Removal Action**

22      The NCP imposes procedural requirements for a removal action.  40 C.F.R. § 300.415.  As

23  is relevant here, first, the NCP requires that the party undertaking a removal action conduct a

24  removal site evaluation and review current site conditions.  *See* 40 C.F.R. § 300.415(a).  The

25  evaluation must consider several factors, including the actual or potential exposure of nearby

26  human populations; actual or potential contamination of drinking water supplies; threat of fire or

27  explosion; and other circumstances that may pose a threat to public health.  *See* 40 C.F.R. §

28  300.415(b).  Second,  the lead agency must review the removal site evaluation and  determine that

there is a threat to public health or welfare as a result of "[a]ctual or potential contamination of drinking water supplies" as a predicate to the taking of "any appropriate removal action."  40 C.F.R. § 300.415(b)(1) and (b)(2)(ii).  Third, if a removal action is found to be appropriate, the lead agency must conduct an engineering evaluation/cost analysis (EE/CA) of removal alternatives for the site.  40 C.F.R. § 300.415(b)(4)(i).  Fourth, owner undertaking the removal action must designate a spokesperson to inform the community of actions taken, respond to inquiries, and provide information concerning the hazardous substance release; conduct interviews with local officials, community residents, public interest groups, or other interested or affected parties to solicit their concerns; prepare a formal community relations plan based on the interviews; and establish a local information repository at or near the location of the response action. 40 C.F.R. § 300.415(n).

> **b)**  **Plaintiff Has Not Substantially Complied with the NCP Requirements**

Casa Nido argues that its response action complies with the NCP requirements for a removal action, Docket No. 234 at 8, while Ms. O'Hanks contests it was not.  Docket No. 243 at 14.

First, NCP compliance requires that the lead agency review a party's removal site evaluation prior to the initiation of any removal action.  40 C.F.R. § 300.415(b)(1) and (2).  Here, Casa Nido retained Pangea to investigate any volatile organic compounds at the Site and produce a site evaluation of its findings.  Docket No. 234-2 at ¶ 28.  There is no evidence that DTSC reviewed Pangea's 2016 Site Assessment Report or an equivalent removal site evaluation prior to Casa Nido initiating its response actions.

Second, before a removal action is initiated, the lead agency must first determine that there is "a threat to public health or welfare" due to actual or potential contamination of drinking water.  *Id.*  There is no evidence that DTSC made such a determination before Casa Nido began its removal actions in 2018.  The May 2017 VCA between DTSC and Casa Nido states that the "purpose of this Agreement is for [Casa Nido] to investigate and/or remediate a release or threatened release of any hazardous substance at or from the Site under the oversight of DTSC"

11

and that if "DTSC determines that any activity…may pose an imminent or substantial endangerment to the health and or safety of people…DTSC may order [Casa Nido] to conduct…activities…needed to abate the endangerment."  Docket No. 234-11 at 378-9 (Exhibit 41).  Nothing, including the DTSC Order from October 2023) states that DTSC determined there was in fact a threat to public health or welfare related to contamination of drinking water before Casa Nido initiated its response actions in <u>May 2017 and October 2018</u>.  Docket No. 234-10 at 22 (Exhibit 37).   In October 2018, Pangea removed 454 cubic yards of impacted soil and constructed a permeable reactive barrier to treat groundwater at the Site (2018 Soil and Barrier Action).  Docket No. 234-2 at ¶ 38.  In addition, between 2018 and 2020, Pangea installed a soil vapor extraction remediation system and sub slab depressurization mitigation system (SVE/SSD) to limit off-site migration and exposure to vapor-forming chemicals (SVE/SSD System Action).  *Id.* at ¶¶ 39-41.  All of this without a prior determination by DTSC there was a threat to public health and safety.

In sum, as to the second requirement, Casa Nido initiated its response action without DTSC (1) first reviewing its removal site evaluation, (2) subsequently determining that the removal actions were appropriate, or (3) ultimately approving the response action. *See* Docket No. 242-1 (October 8, 2020 Letter from DTSC to Casa Nido).  DTSC confirms this.  In its October 8, 2020 letter to Casa Nido, DTSC wrote "DTSC did <u>not</u> oversee, evaluate, or approve the interim actions," referring to the "unapproved remedial activities performed to date (e.g., soil excavation, soil amendments, permeable reactive barriers, soil vapor extraction, and sub-slab depressurization)."  *Id.*  In its October 6, 2023 Imminent and Substantial Endangerment Determination and Order and Remedial Action Order, DTSC also stated that "[f]rom 2018 to 2020, Casa Nido conducted interim actions without DTSC review or approval, including treatment and/or removal of soil, soil gas, and groundwater" that "require review by DTSC."  Docket No. 234-10 at 22 (Exhibit 37).  Even Clark-Riddell, Pangea's President and Principal Engineer, acknowledged that DTSC did not approve Casa Nido's "first workplan for investigation at the Site" until October 2021 – three years *after* Casa Nido initiated its removal actions.  Docket No. 234-2 at ¶ 43 (Clark-Riddell Decl.).  Therefore, Casa Nido failed to comply with the procedural

1  requirements set by 40 C.F.R. § 300.415(b)(1) and (2).

2      As to the third requirement, 40 C.F.R. § 300.415(b)(4) states that:

3          Whenever a planning period of at least six months exists before on-
           site activities must be initiated, and the lead agency determines,
4          based on a site evaluation, that a removal action is appropriate:

5              (i)    The lead agency shall conduct an engineering
                      evaluation/cost analysis (EE/CA) or its equivalent. The
6                     EE/CA is an analysis of removal alternatives for a site.

7  Ms. O'Hanks and Ms. Vernell assert that Plaintiff did not complete an engineering evaluation/cost

8  analysis (EE/CA) of removal alternatives under the NCP requirements.  Docket No. 243 at 15-16;

9  Docket No. 242 at 8.  Casa Nido argues that an EE/CA is not required for time-critical removal

10 actions, and even if it were, it conducted the equivalent of an EE/CA.  Docket No. 252 at 7-8;

11 Docket No. 253 at 17-18.  However, there was a planning period of over six months between

12 when Casa Nido first informed DTSC that it intended to initiate removal actions in November

13 2016, and when it began removing impacted soil from the site in 2018.  Docket No. 252-2 at ¶ 10;

14 Docket No. 234-2 at ¶ 38.  Therefore, Casa Nido had sufficient time, and therefore, an EE/CA or

15 its equivalent was required.

16     Casa Nido asserts that prior to conducting soil extraction or installing the SVE/SSD

17 system, it "considered various designs and plans, as well as cost estimates for all considered

18 alternatives."  Docket No. 252-2 at ¶¶ 32-34, 70-72.  In its opposition to Ms. O'Hanks' cross-

19 motion for summary judgment, Casa Nido argues that this included evaluations "for at least 10

20 alternative removal actions." Docket No. 253 at 19. However, Casa Nido offers no documentation

21 of an EE/CA or an equivalent showing an analysis of removal alternatives.  Docket No. 245 at ¶

22 45 (Wozniak Decl.).  Therefore, Casa Nido failed to comply with 40 C.F.R. § 300.415(b)(4).

23     As to the fourth requirement, 40 C.F.R. § 300.415(n) sets community relations

24 requirements for removal actions. Under 40 C.F.R. § 300.415(n)(1), the lead agency shall

25 designate a spokesperson.  This requirement applies to "all CERCLA removal actions taken

26 pursuant to § 300.415 or CERCLA enforcement actions to compel removal response."  *Id.*

27     Casa Nido argues that as a private party, it is exempt from the administrative record

28 requirements.  Docket No. 252 at 9; Docket No. 253 at 19.  It is true that the public participation

United States District Court
Northern District of California

13

1    requirements are only "potentially applicable" to private party response actions, "with the

2    exception of the administrative record and information repository requirements."  40 C.F.R. §

3    300.415(n)(c)(6).  But the designation of a spokesperson requirement applies regardless of private

4    party status.  40 C.F.R. § 300.415(n)(1) states: "In the case of *all* CERCLA removal actions taken

5    pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a

6    spokesperson shall be designated by the lead agency."  40 C.F.R. § 300.415(n)(1) (emphasis

7    added).

8         Here, in 2017, DTSC and Casa Nido entered into a Voluntary Cleanup Agreement (VCA).

9    Docket No. 234-11 at 378.  As part of the VCA, the DTSC was to oversee, inspect, review, and

10    approve all work performed pursuant to the agreement.  *Id.* at 380-81.  However, the VCA does

11    not mention the designation of a spokesperson to inform the community of actions taken, respond

12    to public inquiries, or provide information to the public.  Further, while Casa Nido argues that

13    "DTSC had a public participation specialist for the Site," it offers no evidence that DTSC

14    designated a spokesperson as required under 40 C.F.R. § 300.415(n)(1).  Docket No. 253 at 19.

15    Therefore, Casa Nido does not offer evidence demonstrating compliance with 40 C.F.R. §

16    300.415(n)(1).

17         Next, the public participation requirement differs depending on (1) actions where the lead

18    agency determines that a removal action is appropriate and that less than six months exist before

19    the on-site removal activity must begin, (2) actions where on-site action is expected to extend

20    beyond 120 days from the initiation of on-site removal activities, and (3) actions where the lead

21    agency determines a removal action is appropriate and a planning period of at least six months

22    exists prior to the initiation of the on-site removal activities.  40 C.F.R. § 300.415(n)(2)-(4).

23         For the first category of actions (where the lead agency determines that a removal action is

24    appropriate and less than six months exist before the on-site removal activity must begin), the lead

25    agency shall 1) publish a notice of availability of the administrative record file, 2) provide a public

26    comment period, and 3) prepare a written response to significant comments.  *See* 40 C.F.R. §

27    300.415(n)(2).

28         For the second category of actions (where on-site action is expected to extend beyond 120

United States District Court
Northern District of California

days from the initiation of on-site removal activities), the lead agency shall by the end of the 120-day period 1) conduct interviews with local officials and affected parties to solicit their concerns, needs, and involvement, 2) prepare a formal community relations plan, and 3) establish at least one local information repository near the location of the response action.  *See* 40 C.F.R. § 300.415(n)(3).

For the third category of actions (where the lead agency determines that a removal action is appropriate and a planning period of at least six months exists before the initiation of on-site removal activities), the lead agency shall, at a minimum, 1) comply with the three requirements for actions expected to extend beyond 120 days before the completion of the engineering evaluation/cost analysis ("EE/CA") or its equivalent, 2) publish a notice of availability and brief description of the EE/CA through a means adequate to give notice to a community, 3) provide a reasonable opportunity for submission of written and oral comments after completion of the EE/CA, and 4) prepare a written response to significant comments.  *See* 40 C.F.R. § 300.415(n)(4).

Here, the lead agency did not determine that any removal action was appropriate. Therefore, the first and third categories of actions do not apply.  Instead, public participation is governed by (2):  the actions are on-site actions expected to extend beyond 120 days from the initiation of on-site removal activities.  40 C.F.R. § 300.415(n)(2).  This section applies because Casa Nido initiated the Soil and Barrier Action as well as the SVE/SSD System Action in 2018 (Docket No. 234-2 at ¶¶ 38-41) and the permeable reactive barrier and the SVE/SSD system are still in place.  Docket No. 234-10 at 22 (Exhibit 37).  There is no evidence that the on-site actions were expected to take less than 120 days.

For such actions, the lead agency shall by the end of the 120–day period:

> (i)    Conduct interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns, information needs, and how or when citizens would like to be involved in the Superfund process;

> (ii)   Prepare a formal community relations plan (CRP) based on the community interviews and other relevant information, specifying the community relations

United States District Court
Northern District of California

1    activities that the lead agency expects to undertake during
     the response; and

2    (iii)    Establish at least one local information repository at or
3             near the location of the response action. The information
             repository should contain items made available for public
4             information. Further, an administrative record file
             established pursuant to subpart I for all removal actions
5             shall be available for public inspection in at least one of
             the repositories. The lead agency shall inform the public
6             of the establishment of the information repository and
             provide notice of availability of the administrative record
7             file for public review. All items in the repository shall be
             available for public inspection and copying.

8    40 C.F.R. § 300.415(n)(2).

9    Casa Nido and DTSC engaged in various communications with the City of Richmond and

10   surrounding property owners regarding response work, Docket No. 252-2 at ¶ 47-48, but failed to

11   do so within the 120-day period requirement.  Casa Nido's only public participation in 2018 was

12   Clark-Riddell (President and Principal Engineer at Pangea) communicating with the Bay Area

13   Quality Management District to obtain a permit to operate the SVE/SSD system.  Docket No. 252-

14   2 at ¶ 48(c).  The next communication with the public was in 2020, when Casa Nido sent letters to

15   the owners of a nearby Thai restaurant to update them about chemicals found on their property.

16   *Id.* at ¶ 49(d).  None of these actions are sufficient to meet the public participation requirements

17   under 40 C.F.R. § 300.415(n)(2).  Nor is there any evidence that DTSC engaged in the requisite

18   community participation during this period.

19   Only much later, in 2022, did DTSC send a community survey to 1,321 street

20   addresses/recipients located at least within a ¼ mile radius of the Site.  Docket No. 252-2 at ¶ 48.

21   Between January and February of 2023, DTSC interviewed 12 individuals to obtain information

22   about the community characteristics, concerns, issues, and effective methods of public outreach

23   for the Site.  *Id.*  Not until October 2023 did DTSC's public participation specialist approve of a

24   public participation plan for the Site.  Docket No.252-2 at ¶ 48.  Even so, sending a community

25   survey, interviewing individuals, and contacting local property owners regarding the response

26   work is at best enough to meet the requirements of 40 C.F.R. § 300.415(n)(2)(i), but not the

27   remaining two requirements under (ii) and (iii).  Furthermore, because Casa Nido began the bulk

28   of the community outreach after initiating its removal actions, there was no opportunity to receive

1   public comments or make the Site available for public inspection.

2           It is true that it was DTSC, not Casa Nido, who facilitated the public participation.  In its

3   reply brief, Casa Nido asserts that any community relations "were to be handled by the DTSC."

4   Docket Nos. 252 at 10 and 252-2 at ¶ 47.  Casa Nido argues that "where a lead agency dictates the

5   terms of community relations obligations, a private party is 'entitled to assume' that its

6   compliance with these terms meets its obligation under the NCP." Docket No. 253 at 19 (citing

7   *Morrison Enterprises v. McShares, Inc*., 13 F. Supp. 2d 1095, 1118 (D. Kan. 1998), rev'd, 302

8   F.3d 1127 (10th Cir. 2002)).  However, failure to comply with the governing law by either Casa

9   Nido or DTSC is problematic to Casa Nido's CERCLA claim.  Any failure of the DTSC to carry

10  out its obligations does not absolve the overall failure to comply substantially with NCP

11  requirements.

12          To be sure, the Ninth Circuit has held that in limited circumstances "substantial and

13  extensive" government agency involvement can satisfy the public participation requirement.

14  *Santa Clarita Valley Water Agency v. Whittaker Corp.,* 99 F.4th 458, 480 (9th Cir. 2024).  In

15  *Santa Clarita,* the court found that such involvement exists where removal actions were "subject

16  to several government agency-imposed requirements, which were themselves subject to public

17  comment.  *Id.*  There, DTSC had "significant oversight of remedial activities at the Site" and the

18  decision on the remediation strategy "was only made after multiple alternatives were analyzed."

19  Further, the remediation decision "was published to the public" and the "public was entitled to

20  comment."  *Id.*  However, in the case at bar, there was not timely "substantial and extensive"

21  government agency involvement.  Here: 1) Casa Nido initiated its response actions prior to

22  receiving DTSC approval, 2) there is no evidence of analyses comparing the technical and

23  financial feasibility of alternative response actions, and 3) the public did not have reasonable time

24  to submit comments on the removal action plans or to inspect the Site.

25          In contrast to *Santa Clarita*, the Ninth Circuit has held that when a local environmental

26  agency is involved in a "very limited fashion," its involvement does not fulfill the NCP's public

27  participation requirement.  *Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1267 (9th

28  Cir. 2006).  In *Carson Harbor*, the Ninth Circuit confirmed that "active participation by the

United States District Court
Northern District of California

[relevant agency]" can "fulfill the public comment requirement of the National Contingency Plan." *Id.* However, "minor and ministerial involvement by the [agency]" does "not suffice to be an effective substitute for public participation." *Id.* There, the court found that an agency had such "minor and ministerial" involvement because the agency 1) "was not present when [plaintiff] did a preliminary investigation of the pollutants," 2) "was not actively involved in the remedial action at the Property," 3) "merely approved" the "proposed remedial action plan, with very minor modifications," and 4) "did not oversee the cleanup…but merely inspected the Property after cleanup was complete to verify that" the entity conducting the cleanup "had complied with the remedial action plan." *Id.*

Like the agency's involvement in *Carson Harbor*, DTSC had "minor and ministerial involvement" in Casa Nido's cleanup. Specifically, DTSC was "not present" during Plaintiff's "preliminary investigation of the pollutants at the [Site]," was "not actively involved in the remedial action at the [Site]," and "did not oversee the cleanup." *Id.* In fact, DTSC wrote a letter to Casa Nido stating that "DTSC did <u>not</u> oversee, evaluate, or approve [Casa Nido's response] actions." Docket No. 242-1 (October 8, 2020 Letter from DTSC to Casa Nido). Thus, DTSC's involvement in Casa Nido's cleanup efforts was "minor and ministerial." *Carson Harbor Vill.*, 433 F.3d at 1267. Therefore, DTSC's involvement does "not suffice to be an effective substitute for public participation." *Id.*

Therefore, the Court grants summary judgment for Defendants on the CERCLA claim because Casa Nido failed to demonstrate that its actions substantially complied with the NCP requirements for a removal action. Here, Plaintiff's ability to recover costs for its response actions requires "substantial compliance with the applicable [NCP] requirements." 40 C.F.R. § 300.700(c)(3)(i). Thus, because there was no such substantial compliance, Plaintiff cannot seek from Defendants recovery for the response actions at bar.

### B.    Hazardous Substances Account Act (HSAA)

California's Hazardous Substance Account Act (HSAA), Cal. Health & Safety Code §§ 25300-25395, provides for civil actions for indemnity and contribution and expressly incorporates the liability standards and defenses of the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA), 42 U.S.C.S. §§ 9601-9675.  The elements of an

HSAA claim are essentially the same as CERCLA and include that (a) the property is a "site," (b)

each Defendant falls into one of the four classes of person subject to liability, (c) a release or

threatened release of a hazardous substance has occurred at the facility, and (d) the release or

threatened release has caused the Plaintiff to incur necessary response costs consistent with the

NCP.  *Adobe Lumber, Inc. v. Hellman,* 658 F. Supp. 2d 1188, 1190 (E.D. Cal. 2009).  Specifically,

under Section 78855(a) and (b) regarding the cleanup of hazardous substance releases, response

actions must be "consistent with the priorities, guidelines, criteria, and regulations contained in the

national contingency plan" to qualify for appropriation by the Legislature and expenditure by the

relevant director or department.  Cal. Health & Safety Code § 78855(a)-(b).

Casa Nido moves for summary judgment on the HSAA claim on the basis that it has

established all four elements of a CERCLA claim.  Docket No. 234 at 20-21.  Ms. O'Hanks cross-

moves for summary judgment on the HSAA claim.  Docket No. 243 at 17.  Ms.  Vernell also

argues that Casa Nido's HSAA claim necessarily fails as well.  Docket No. 242 at 11.

The Court grants summary judgment for Defendants on the HSAA claim because Casa

Nido failed to comply with the NCP's removal action requirements in the CERCLA claim, and

because the HSAA incorporates and is generally interpreted consistently with CERCLA.

### C.     Porter-Cologne Water Quality Control Act and Water Code Sections 13304 and 13350

Casa Nido seeks civil penalties and injunctive relief against Defendant O'Hanks under the

Porter-Cologne Water Quality Control Act, California Water Code, §§ 13000 et seq., specifically

Cal. Wat. Code §§ 13304 and 13350.  The Porter-Cologne Act generally regulates activities that

may affect the quality of water in California.  It provides for regional administration of water

quality regulations within a framework of statewide coordination and policy.  Cal. Wat. Code §

13000.  Ms. O'Hanks cross-moves for summary judgment, arguing that the relevant sections of the

Porter-Cologne Act do not create a private right of action.  Rather, they only create civil liability

for a failure to comply with an order of a regional water quality control board, § 13304(b), or a

regional or state board such as the State Water Resources Board, § 13350.  Casa Nido's briefs do

not address this argument.  *See* Docket Nos. 252 and 253.

Ms. O'Hanks is correct.  The Porter-Cologne act is administered by nine regional water quality control boards, each governing a region of the state, and all supervised by the State Water Quality Control Board.  *§39:54: The Porter-Cologne Water Quality Control Act—In general,* Miller and Starr California Real Estate (2024 4th ed.).  Cal. Wat. Code § 13304(a) establishes a regional board's authority to issue a cleanup and abatement order to any person "who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance."  Upon order of a regional board, the discharger shall "clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action."  *Sweeney v. California Reg'l Water Quality Control Bd.*, 61 Cal. App. 5th 1093, 1116 (2021).  Cal. Wat. Code § 13350 states that "a person who (1) violates a cease and desist order . . . or (2) in violation of a waste discharge requirement . . . *issued by a regional board or the state board*…shall be liable civilly…" (emphasis added).  Nothing in the statute provides for a private civil action absent violation of such a board order.  Casa Nido cites no cases holding otherwise.

Therefore, Casa Nido cannot pursue a private action against Defendants under the Porter-Cologne Act because Defendants have not violated an order of or requirement issued by a regional water quality control board, § 13304(b) or a regional or state board such as the State Water Resources Board, § 13350.  Casa Nido does not present evidence that Defendants failed to comply with any such order or requirement.  The Court grants summary judgment for Ms. O'Hanks, and for all Defendants, on this claim.

**D.    Continuing Public Nuisance**

Casa Nido moves for summary judgment on the claim that the release of hazardous substances, including PCE, constitutes a continuing public nuisance.  Docket No. 234 at 23-24.  Ms. O'Hanks argues that there is no continuing nuisance, and that Casa Nido is time-barred by the statute of limitations for nuisance claims in California.  Docket No. 243 at 21, 19.  The Court addresses the nuisance classification and the statute of limitations issues.

United States District Court
Northern District of California

1    **1.    Public Nuisance**

2        Casa Nido asserts that the Site's PCE contamination, caused by Defendants' operation of a

3    drycleaning business, is a public nuisance because it poses a risk to the general public and damage

4    to its property.  Docket No. 234 at 24.  Ms. O'Hanks contests that there is no public nuisance

5    because there is no evidence of a specific injury's impact on the Site.  Docket No. 243 at 24.

6        **a)    Definition**

7        California law defines a nuisance, in part, as "[a]nything which is injurious to health ... or

8    is indecent or offensive to the senses, or an obstruction to the free use of property, so as to

9    interfere with the comfortable enjoyment of life or property...."  Cal. Civ. Code § 3479.  A public

10   nuisance is "one which affects at the same time an entire community or neighborhood, or any

11   considerable number of persons, although the extent of the annoyance or damage inflicted upon

12   individuals may be unequal."  Cal. Civ. Code § 3480.  Pollution of water constitutes a public

13   nuisance.  *Newhall Land & Farming Co. v. Superior Court,* 19 Cal.App.4th 334, 341 (1993).

14       Here, the evidence from the DTSC Order and the Site Assessment Report establishes that

15   the release of PCE at the Site resulted in damage to Casa Nido's property.  The DTSC's Imminent

16   and Substantial Endangerment Determination and Order and Remedial Action Order stated that:

17

18           PCE and trichloroethylene (TCE) are the primary hazardous
             substances found at elevated concentrations in soil, soil gas, and
19           groundwater on Site. Their release has been documented during
             various sampling events from 2014 to 2022.

20

21   Docket No. 234-10 at 25; *see also* Docket No. 148-2 at 92-534 (2016 Site Assessment Report).

22   The evidence also shows that the contamination spread beyond the Site:

23           PCE contamination extends laterally in groundwater to at least 250
             feet southwest of the Site.  PCE contamination has also been
24           detected in groundwater more than 1,000 feet southwest of the Site.

25   *Id.*  Therefore, the Site's PCE contamination is a nuisance.

26       Ms. O'Hanks's evidence of a 2022 DTSC test for PCE at a private residence next to the

27   Site is insufficient to create a genuine dispute of fact as to whether there was a public nuisance

28

21

United States District Court
Northern District of California

here.  That evidence showed the amounts of PCE in the indoor air of the private residence were below the screening level, and Mr. Utz (DTSC project manager for the Site cleanup) told the owner of the residence that the data was "not a short-term concern."  Docket No. 244-2 at 51 (Exhibit T).  However, the same evidence shows that PCE was detected beneath the residence, and the DTSC also stated there was a possibility that PCE from the Site was migrating to such offsite areas.  Utz Depo. at 66:24-67:24.  In any case, Ms. O'Hanks evidence, which only definitively shows low PCE concentration in the indoor air of a private residence next to the Site, fails to create a genuine dispute as to the presence of PCE in the soil, gas, and groundwater at the Site and in the surrounding areas based on the 2023 DTSC Order and the 2016 Site Assessment Report, a fact sufficient to support a finding of a public nuisance.

### b)      Private Plaintiff

Generally, "[a] private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise."  Cal. Civil Code § 3493.  A public nuisance is "specially injurious" to a party if that party suffers a damage "different in kind and not merely in degree from that suffered by other members of the public."  *Koll-Irvine Ctr. Prop. Owners Ass'n v. County of Orange,* 24 Cal. App. 4th 1036, 1040 (1994).

However, "[w]here a nuisance is private as well as public, i.e., a disturbance of rights in land, the plaintiff does not have to suffer damage different in kind from that suffered by the general public."  *Jordan v. City of Santa Barbara,* 46 Cal. App. 4th 1245, 1257, 54 Cal. Rptr. 2d 340, 346 (1996).  Under the California Code of Civil Procedure Section 731 governing nuisance and public nuisance:

> an action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor.

Cal. Civ. Proc. Code § 731.

Here, Defendants release of hazardous substances on Casa Nido's property has caused Casa Nido a "disturbance of rights in land." *Jordan*, 46 Cal. 4th at 1257.  Specifically, Casa Nido argues that the "PCE contamination caused by Defendants' operation of a drycleaning

business on the subject site has spread…posing both a risk to the general public as well as damage to [Casa Nido's] property." Docket No. 234 at 24. To mitigate the PCE contamination, DTSC required Casa Nido to conduct building abatement and demolition, soil excavation, barrier construction, use of the SVE/SSD system, groundwater monitoring, and more. Docket No. 234-3 at ¶¶7-12. Thus, because Casa Nido has established a "disturbance of rights in land," Casa Nido need not demonstrate that it "suffer[ed] damage different in kind from that suffered by the general public" to bring its nuisance claim. Therefore, the PCE contamination at the Site from the Defendants' operation of a drycleaning facility is a nuisance for which Casa Nido, as a private entity, can pursue a claim against Defendants.

### 2.    Continuing Nuisance

Next, there are two types of nuisances: "permanent and continuing nuisances." *Spar v. Pac. Bell,* 235 Cal. App. 3d 1480, 1483, 1 Cal. Rptr. 2d 480, 481 (Ct. App. 1991). The nuisance classification impacts the remedies available to injured parties and determines the applicable statute of limitations. Permanent nuisances are those in which one act causes a permanent injury, and damages are assessed once and for all. *Id.* at 482. In such cases, plaintiffs ordinarily are required to bring one action for all past, present, and future damage. *Id.* Damages are not dependent on any subsequent use of the property but are complete when the nuisance comes into existence. *Id.* Continuing nuisances are those that can be discontinued or abated at a "reasonable cost by reasonable means." *Mangini v. Aerojet-General Corp.,* 12 Cal. 4th 1087, 1103 (1996); *Beck Development Co. v. Southern Pacific Transportation Co.,* 44 Cal. App. 4th 1160, 1120 (3d Dist. 1996).

While actions for damages based on a permanent nuisance may be subject to a bar of a single limitations period for property damage claims, *see* California Code of Civil Procedure § 338(b), actions for damages based on continuing nuisance are not subject to such statute of limitations, because the persons harmed can bring successive actions until the nuisance is abated. *See Shamsian v. Atlantic Richfield Co.,* 107 Cal. App. 4th 967, 979 (2d Dist. 2003); *see KFC W., Inc. v. Meghrig,* 23 Cal. App. 4th 1167, 1181, 28 Cal. Rptr. 2d 676 (1994); *see Capogeannis v. Superior Ct.,* 12 Cal. App. 4th 668, 675, 15 Cal. Rptr. 2d 796 (1993). In other words, "each

1  repetition of a continuing nuisance is considered a separate wrong which commences a new period

2  in which to bring an action for recovery based upon the new injury." *Beck*, 44 Cal. App. 4th at

3  1217.

4      Casa Nido seeks summary judgment that the nuisance is a continuing nuisance and thus

5  Casa Nido is not subject to the three-year limitations period.  Docket No. 234 at 3.  Defendant

6  O'Hanks does not cross-move for summary judgment on Plaintiff's public nuisance and per se

7  nuisance claims.[2]  Instead, Ms. O'Hanks argues that a material question of fact remains as to

8  whether the contamination at the site is a continuing nuisance because she alleges that Plaintiff has

9  failed to establish "that any alleged nuisance at the Site is abatable."  Docket No. 243 at 2, 21.

10     The Court denies summary judgment as to this issue because Casa Nido has not

11  established as undisputed the requisite "substantial evidence of abatability."  *Mangini*, 12 Cal. 4th

12  at 1097.  To establish a continuing nuisance, the plaintiff must demonstrate "the extent of

13  contamination and viability of remediation."  *Id.*  A mere showing "that contaminants were found"

14  or that "the technology exists to decontaminate [the] property" is insufficient.  *Id.* at 1097-1099.

15  In *Mangini*, the Supreme Court of California affirmed the California Court of Appeal's reversal of

16  a Sacramento Superior Court's judgment regarding the existence of a continuing nuisance.  Like

17  the Court of Appeal, the Supreme Court found that lack of evidence that hazardous waste

18  contamination was reasonably abatable at reasonable cost precluded a continuing nuisance claim.

19  *Id.* at 1087.  There, the court held that plaintiffs "failed to show abatability" because "plaintiffs did

20  not submit evidence of cleanup levels acceptable to or ordered by the regulatory agencies for this

21  property" and plaintiffs could not "rely on any regulatory agency as setting the standard for

22  abatement" because the "governmental investigation ha[d] not yet reached the point where a

23  health risk assessment [could] be performed to determine acceptable cleanup levels for the

24  particular site."  *Id.* at 1098.

25     Here, Casa Nido asserts that "[c]leaning up contamination to a level acceptable to or

26

27  ─────────────────
   [2] Defendant O'Hanks states in her cross-motion for summary judgment that she requests that the

28  Court deny Plaintiff's motion and grant her cross-motion for summary judgment as to plaintiff's
   first, second, fourth, seventh and eighth claims for relief.  Plaintiff's fifth and sixth claims are its
   continuing public nuisance and per se nuisance claims, respectively.  *See* Docket No. 243 at 2.

United States District Court
Northern District of California

1  ordered by a governmental agency may suffice to establish that a…nuisance is abatable and

2  therefore continuing." Docket No. 253 at 25 (quoting *Holdgrafer v. Unocal Corp.*, 160 Cal. App.

3  4th 907, 926-927 (2008)). However, Casa Nido has yet to establish conclusive evidence of

4  "cleanup levels acceptable to or ordered by the regulatory agencies for this property." *Mangini*,

5  12 Cal. 4th at 1098. Therefore, Casa Nido has not established the requisite "substantial evidence

6  of abatability" necessary for the Court to find a continuing nuisance as a matter of law. *Id.* at

7  1079.

8       Similarly, Casa Nido has not yet established beyond dispute that the nuisance can be

9  abated at a "reasonable cost by reasonable means." *See Mangini,* 12 Cal. 4th at 1103. In *Beck*, the

10  court held that a key factor in determining whether contamination may be abated at a reasonable

11  cost is whether the cost of remediation would greatly exceed the value of the land after

12  remediation. *Beck Development Co. v. Southern Pacific Transportation Co., 44* Cal. App. 4th

13  1160, 1222, 52 Cal. Rptr. 2d 518 (3d Dist. 1996). Further, a cleanup performed to standards

14  required by government regulators is generally deemed to be reasonable abatement. *Capogeannis*

15  *v. Superior Court,* 12 Cal. App. 4th 668, 683 (6th Dist. 1993).

16       Here, Casa Nido has provided evidence of its costs for DTSC project management, site

17  investigation, building abatement and demolition, soil excavation, barrier construction, the

18  SVE/SSD system, groundwater monitoring, and more. *See* Docket No. 234-3 at ¶¶7-12. These

19  costs amount to $1,346,911.97.00. *Id.* ¶¶7-12; Docket No. 234-2 at ¶¶28-65. A fact dispute

20  remains as to whether these actions will suffice to remediate the pollution and whether the

21  ultimate costs will be reasonable. Thus, Casa Nido has not established as a matter of law that the

22  nuisance can be abated at a "reasonable cost by reasonable means." *See Mangini v. Aerojet-*

23  *General Corp.,* 12 Cal. 4th 1087, 1103 (1996). This may be proven at trial.

24       Therefore, the Court denies Casa Nido summary judgment as to this issue. Because there

25  is a genuine dispute as to whether the nuisance is a continuing nuisance, the Court cannot rule on

26  whether Casa Nido's claim is time-barred.

27      **E.**   **Nuisance Per Se**

28       Casa Nido moves for summary judgment on the nuisance per se claim by arguing that a

United States District Court
Northern District of California

1    violation of Water Code §§ 13000 *et seq.* is a public nuisance per se. *See Jordan v. City of Santa*

2    *Barbara*, 46 Cal. App. 4th 1245, 1257 (1996); *Newhall Land & Farming Co. v. Superior Court*, 19

3    Cal. App. 4th 334, 341 (1993).

4    Pollution of water resulting from discharges of wastes in violation of Water Code §§

5    13000 *et seq.* is a public nuisance per se. *Newhall Land & Farming Co. v. Superior Court,* 19

6    Cal.App.4th 334, 23 Cal.Rptr.2d 377 (1993); Cal. Wat. Code § 13050(m)(3); *see also California*

7    *Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners,* 368 F. Supp. 2d 1069

8    (E.D. Cal. 2005) (Pollution of water constitutes a public nuisance and is further a public

9    nuisance *per se* when the pollution occurred as a result of discharge of wastes in violation of state

10   water law.).

11   However, here, for the reasons stated previously, the Court grants summary judgment for

12   Defendants on Casa Nido's claim for a violation of Water Code §§ 13000, because Defendant

13   O'Hanks alleges that the Porter-Cologne Act does not provide for a private right of action under

14   the circumstances of this case and Plaintiff does not challenge this assertion.  The Court thus also

15   grants summary judgment for Defendants on the nuisance per se claim.

16        **F.        Negligence**

17   Casa Nido argues that "Defendants negligently used their drycleaning equipment and

18   allowed discharges, spills, and leaks of PCE.  Specifically, "Defendants' breach of their duty of

19   care caused hazardous substances to contaminate the Site and surrounding property."  Docket No.

20   234 at 26.

21   "The elements of a cause of action for negligence are (1) a legal duty to use due care, (2)

22   the breach of such legal duty, and (3) the breach was the proximate or legal cause of injury.

23   *Kesner v. Superior Court,* 1 Cal. 5th 1132, 1142 (Cal. 2016); *Brown v. USA Taekwondo,* 11 Cal.

24   5th 204, 213 (Cal. 2021); *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill*

25   *LLP,* 59 Cal. 4th 568, 573 (2014).  The elements are also often stated in a four-part formulation as

26   (1) duty, (2) breach, (3) causation, and (4) damages. *See, e.g., Johnson v. Prasad,* 224 Cal. App.

27   4th 74, 168 Cal. Rptr. 3d 196 (3d Dist. 2014).

28   As a threshold issue, a "negligence claim involving damage to real property is governed by

1    a three-year limitations period (§ 338, subd. (b)), which commences to run when the plaintiff

2    knows, or should have known, of the wrongful conduct at issue." *Angeles Chem. Co. v. Spencer*

3    *& Jones*, 44 Cal. App. 4th 112, 119, 51 Cal. Rptr. 2d 594, 597 (1996).

4         Defendant Vernell argues that the statute of limitations would have begun to run "more

5    than four decades ago" because "California's statute of limitations for actions for injury to real

6    property is three years ago" and Vernell operated the dry cleaner from 1978-1980.  Docket No.

7    242 (Vernell Opp'n) at 15.  But the operation of the dry cleaner itself does not trigger the statute of

8    limitations.  The key is when Casa Nido knew of should have known it had a claim against

9    defendants for hazardous waste contamination.

10        In a similar CERCLA case regarding cost recovery for a cleanup of hazardous waste

11   contamination, the Ninth Circuit held that it "is reasonable to infer that [the party] knew or should

12   have known of at least some of the contamination" when they were provided with an

13   "environmental site assessment" including a "description of the pollution incident." *Chubb*

14   *Custom Ins. Co. v. Space Sys./Loral, Inc*., 710 F.3d 946, 974 (9th Cir. 2013) (finding claims time-

15   barred where the party received such an environmental site assessment).

16        Here, Casa Nido did not learn of the contamination until it retained Pangea to investigate

17   the presence of volatile organic compounds at the Site.  It retained Pangea in 2014.  Docket No.

18   234-2 at ¶ 28.  In 2015, Pangea conducted the investigation and documented the presence of PCE

19   related to the dry-cleaning operations.  *Id.* at ¶ 29-31.  "The [dry cleaning] facility was

20   permanently closed in 2015 after the initial discovery of PCE."  Docket No. 252-2 at ¶ 7 (Clark-

21   Riddell Decl.).  Pangea's August 16, 2016 Site Assessment Report stated, the "PCE *soil* impact is

22   greatest within approximately 10 ft of the former dry cleaning equipment," and the "PCE impact

23   to *groundwater* was also greatest in the vicinity of the former dry cleaning equipment."  Docket

24   No. 248-2 at 118 of 592.  In August 2018, Casa Nido contacted Defendant O'Hanks seeking

25   reimbursement for its response costs.  Docket No. 234-3 at ¶ 5 (Conwill Decl.).  In October 2018,

26   Pangea removed 454 cubic yards of impacted soil and constructed a permeable reactive barrier to

27   treat groundwater at the Site (2018 Soil and Barrier Action).  Docket No. 234-2 at ¶ 38.

28        Even if the facts are viewed in Casa Nido's favor, it is undisputable that Casa Nido knew

United States District Court
Northern District of California

27

1    or should have known of hazardous substances on its property by at least August 2016, when

2    Pangea issued its Site Assessment Report.  However, Casa Nido did not bring its negligence claim

3    against Defendants until November 2020.  Docket No. 1.  Consequently, Casa Nido's negligence

4    claim for real property damage is time-barred.

5        **G.    Negligence Per Se**

6        Casa Nido asserts that Defendants have committed negligence per se because their conduct

7    has resulted in numerous statutory violations and thus caused environmental damage to the Site.

8    Docket No. 234 at 27.  *See* 42 U.S.C. § 9607(a); Cal. Health & Saf. Code §§ 25300, 25363; Cal.

9    Wat. Code §§ 13304, 13350; and Cal. Civil Code §§ 3479, 3480.

10        California Evidence Code Section 669 codifies the doctrine of negligence per se based on a

11    violation of a statute or regulation.  *Lua v. Southern Pacific Transportation Co.* 6 Cal. App. 4th

12    1897, 1901 (1992).  To establish a claim of per se negligence, plaintiff must show that the

13    defendant (1) violated the statute or regulation, (2) the violation caused Plaintiff's injury, (3) the

14    injury resulted from the kind of injury the statute or regulation was designed to prevent, and (4)

15    the Plaintiff was a member of the class of persons it was intended to protect.  Cal. Ev. Code § 669.

16    The first two generally are matters for the trier of fact and the second two are to be determined by

17    the court as a matter of law.  *Newhall Land & Farming Co. v. Superior Ct.*, 19 Cal. App. 4th 334,

18    347 (1993) (citing *Lua v. Southern Pacific Transportation Co.*, 6 Cal.App.4th at 1901-1902).  The

19    violation of the statute must "involve the tort of negligence."  Holdych, *The Presumption of*

20    *Negligence Rule in California: The Common Law and Evidence Code Section 669, supra*, 11

21    Pacific L.J. at p. 924, fn. 99.  Further, a "plaintiff cannot pursue a state cause of action for

22    damages based upon alleged violations of [a] federal [a]ct that does not offer" an "express or

23    implied private cause of action," and "this is true regardless [of] whether he attempts to frame his

24    claim as a cause of action for negligence."  *Sierra-Bay Fed. Land Bank Assn. v. Superior Court*,

25    227 Cal. App. 3d 318, 277 Cal. Rptr. 753 (1991).

26        Casa Nido asserts that Defendants have violated the following statutes:

27    • 42 U.S.C. § 9607(a): CERCLA

28    • Cal. Health & Saf. Code §§ 25300, 25363: HSAA and liability of parties responsible for

1       hazardous substance releases in California, respectively

2      • Cal. Wat. Code §§ 13304, 13350: Porter-Cologne Act

3      • Cal. Civil Code §§ 3479, 3480: Nuisance and public nuisance, respectively

4       Ms. O'Hanks contests that Casa Nido fails to establish the elements of negligence per se,

5  namely that there are no facts showing Ms. O'Hanks actions actually caused contamination at the

6  Site, that the first two elements (violation of a statute and proximate cause) are normally for a jury,

7  and that she and her late husband exercised reasonable care in cleaning up a spill of PCE and

8  training employees.  Docket No.  234-4 at ¶ 12.

9       Because the Court grants summary judgment for Defendants on the CERCLA, HSAA, and

10  Porter-Cologne Act claims, Casa Nido has failed to meet its burden to show that Defendants

11  violated these statutes or regulation.  Therefore, the Court grants summary judgment for

12  Defendants on the Negligence Per Se claim as to these statutes.

13       However, the Court denies summary judgment on the Negligence Per Se claim as to

14  nuisance and public nuisance because there exists a genuine dispute as to whether the nuisance is a

15  continuing public nuisance.

16                 **V.    CONCLUSION**

17       For the foregoing reasons, the Court decides the following:

| Claim | Summary Judgment Decision |
|---|---|
| CERCLA | Granted for Defendants |
| HSAA | Granted for Defendants |
| Porter-Cologne Water Quality Control Act, California Water Code, §§ 13304 and 13350 | Granted for Defendants |
| Continuing Public Nuisance | Denied |
| Nuisance Per Se | Granted for Defendants |
| Negligence | Casa Nido's claim is time-barred |
| Negligence Per Se: CERCLA, HSAA, Porter-Cologne Water Quality Control Act | Granted for Defendants |

| Negligence Per Se: Continuing Public Nuisance | Denied |
| --- | --- |

**IT IS SO ORDERED**.


Dated: December 18, 2024

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California